UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

        FILED UNDER SEAL

        **<u>MEMORANDUM & ORDER</u>**
        05-MD-1720 (MKB)

This document refers to: ALL ACTIONS

------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.   Background ....................................................................................................4

II.  Discussion .....................................................................................................4

  a.   Standard of review.....................................................................................4

  b.   Motion to exclude in part the Section 2 and debit market opinions of Professor Jerry Hausman ........................................................................................................7

    i.   Professor Hausman's background and expert report ................................7

    ii.  Foundations of Professor Hausman's but-for world ..............................8

      1.   Error regarding honor-all-cards rule ...............................................8

      2.   Irrational economic behavior...........................................................14

    iii.  Failure to account for increased prices to cardholders...........................17

      1.   Debit network fees ...........................................................................17

      2.   Debit interchange fees......................................................................19

      3.   Debit damages ..................................................................................22

    iv.  Opinion on debit output ..........................................................................23

    v.   Opinion on debit competition..................................................................27

      1.   Discount Attribution Test.................................................................27

        A.   Diverse offerings of rivals .........................................................28

        B.   Inclusion of discounts................................................................32

          (1)   Issuer agreements................................................................33

          (2)   Merchant agreements ..........................................................34

      2.   Opinions regarding substantial foreclosure .....................................36

      3.   Other evidence of substantial foreclosure ........................................39

    vi.  Conclusion...............................................................................................46

c.    Motion to exclude expert testimony concerning Visa's fixed acquirer fee ..................... 47

    i.    Plaintiffs' FANF liability and damages theories ..................................... 47

    ii.    Consistency of FANF liability theory and damages calculations........................... 49

      1.    Impact of FANF pricing structure on any Plaintiff .................................. 49

      2.    Portions of FANF outside of liability theory.................................... 55

    iii.    FANF damages calculations as one-sided............................................. 59

III.    Conclusion ................................................................................ 62

In December of 2020, several parties[1] in this multidistrict litigation filed a combined five

---

[1] The moving Plaintiffs consist of (1) the Equitable Relief Class, which was certified under Federal Rule of Civil Procedure 23(b)(2), *DDMB, Inc. v. Visa, Inc.*, No. 05-MD-1720, 2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021); (2) the Target Plaintiffs, the 7-Eleven Plaintiffs, and The Home Depot (collectively, the "Direct Action Plaintiffs"), which are not members of a class, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL 4325812, at *3 (E.D.N.Y. Sept. 27, 2017), *order set aside on other grounds*, No. 05-MD-1720, 2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018); and (3) Elgin Ave. Recovery, LLC, which has filed its own separate complaint, (Elgin's Am. Compl., annexed to Mot. for Leave to File Under Seal as Ex. A, Docket Entry No. 8222-1), and has agreed to rely on the 7-Eleven Plaintiffs' experts at trial except in regards to damages, (Letter dated May 26, 2020, Docket Entry No. 7949).

The Defendants consist of the Visa and Mastercard networks as well as "various issuing and acquiring banks" (the "Bank Defendants"). *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 18 (E.D.N.Y. 2019). "At the beginning of this litigation . . . Visa and Mastercard were effectively owned by their member banks." *Barry's Cut Rate Stores Inc. v. Visa Inc.*, No. 05-MD-1720, 2019 WL 7584728, at *3 (E.D.N.Y. Nov. 20, 2019). In 2006 and 2008, "Mastercard and Visa, respectively, made initial public offerings ('IPOs'), becoming publicly traded individual companies." *Id.* However, Plaintiffs claim that the alleged anticompetitive practices have "continued despite the networks' and the banks' more recent attempt to avoid antitrust liability by restructuring the Visa and [Mastercard] corporate entities." *Id.*; (Equitable Relief Class Action Compl. ("Equitable Relief Class Compl.") ¶ 1, annexed to Szanyi Decl. as SJDX4, Docket Entry No. 8520-1; *see also* Sixth Amended 7-Eleven Compl. ("7-Eleven Compl.") ¶¶ 78–79, annexed to Szanyi Decl. as SJDX1, Docket Entry No. 8520-1 (stating that "the IPOs did not change the essential character of" Visa and Mastercard's "combinations in restraint of trade"); Second Amended Target Compl. ("Target Compl.") ¶¶ 78–79, annexed to Szanyi Decl. as SJDX3, Docket Entry No. 8520-1 (same); First Amended The Home Depot. Compl. ("Home Depot Compl.") ¶¶ 120–34, annexed to Szanyi Decl. as SJDX2, Docket Entry No. 8520-1 (claiming that Visa's and Mastercard's "post-IPO structures . . . were designed to perpetuate, and not to disturb, the anticompetitive conduct detailed in this Complaint").)

motions for summary judgment and partial summary judgment,[2] and nineteen motions to exclude

expert testimony.[3]   Because of the volume of motions, the Court decides the motions to exclude

in six separate opinions based primarily on the parties who filed the motion.

---

[2]   (Defs.' Notice of Mot. for Summ. J. ("Defs.' Mot."), Docket Entry No. 8067; Notice of Target Pls.' Mot. for Partial Summ. J. ("Target Pls.' Mot."), Docket Entry No. 8097; Equitable Relief Class Pls.' Notice of Mot. for Partial Summ. J. ("Equitable Relief Class Mot."), Docket Entry No. 8150; Notice of 7-Eleven Pls.' & The Home Depot's Mot. for Partial Summ. J. ("7-Eleven & The Home Depot Mot."), Docket Entry No. 8184; Defs.' Notice of Mot. to Excl. Pls.' Expert Opinions on EMV Chargebacks & for Partial Summ. J. ("EMV Mot."), Docket Entry No. 8138.)

[3]   (Defs.' Notice of Mot. to Excl. Opinions of Dr. Reto Kohler ("Kohler Mot."), Docket Entry No. 8101; Defs.' Notice of Mot. to Excl. in Part Opinions of Prof. Robert G. Harris ("Harris Mot."), Docket Entry No. 8104; Defs.' Notice of Mot. to Excl. in Part Section 1 Opinions of Prof. Jerry Hausman ("Hausman Section 1 Mot."), Docket Entry No. 8081; Visa and Bank Defs.' Notice of Mot. to Excl. in Part Section 2 & Debit Opinions of Prof. Jerry Hausman ("Hausman Section 2 Mot."), Docket Entry No. 8084; Defs.' Notice of Mot. to Excl. in Part Opinions of Prof. Joseph E. Stiglitz ("Stiglitz Mot."), Docket Entry No. 8074; Defs.' Notice of Motion to Excl. Opinions of Mansour Karimzadeh ("Karimzadeh Mot."), Docket Entry No. 8077; Visa and Bank Defendants' Notice of Mot. to Excl. Expert Testimony Concerning Visa's Fixed Acquirer Network Fee ("FANF Mot."), Docket Entry No. 8070; Defs.' Notice of Mot. to Excl. Rep. & Testimony of the 23(b)(2) Pls.' Expert Dennis W. Carlton ("Carlton Mot."), Docket Entry No. 8086; Defs.' Notice of Mot. to Excl. Opinions of Stephen C. Mott ("Mott Mot."), Docket Entry No. 8080; Defs.' Notice of Mot. to Excl. Opinions of David P. Stowell ("Stowell Mot."), Docket Entry No. 8075; Notice of Direct Action Pls.' Mot. to Excl. Portions of Rep. & Opinions of Def. Expert R. Garrison Harvey ("Harvey Mot."), Docket Entry No. 8090; Notice of Direct Action Pls.' Mot. to Excl. Rep. & Opinions of Def. Expert Glenn Hubbard ("Hubbard Mot."), Docket Entry No. 8108; Notice of Direct Action Pls.' Mot. to Excl. Rep. & Opinions of Def. Expert Barbara E. Kahn ("Kahn Mot."), Docket Entry No. 8114; Notice of Direct Action Pls.' Mot. to Excl. Rep. & Opinions of Def. Expert David J. Teece ("Teece Mot."), Docket Entry No. 8135; Notice of Direct Action Pls.' Mot. to Excl. Portions of Rep. & Opinions of Def. Expert David P. Kaplan ("Kaplan Mot."), Docket Entry No. 8207; Notice of Mot. to Excl. the Rep. & Opinions of Def. Expert Andres V. Lerner ("Lerner Mot."), Docket Entry No. 8121; Notice of Target Pls.' Mot. to Excl. Portions of Rep. & Opinions of Def. Expert Kevin M. Murphy ("Target Murphy Mot."), Docket Entry No. 8129; Notice of The Home Depot & 7-Eleven Pls.' Mot. to Excl. Portions of Rep. & Opinions of Def. Expert Kevin M. Murphy ("Home Depot & 7-Eleven Murphy Mot."), Docket Entry No. 8181; Notice of 7-Eleven Pls.' & The Home Depot's Mot. to Excl. Portions of Rep. & Opinions of Def. Experts Marc Cleven & Stuart J. Fiske ("Cleven & Fiske Mot."), Docket Entry No. 8200.)

3

In this Memorandum and Order, the Court decides the motions to exclude expert testimony filed by Visa and the Bank Defendants, which seek to exclude (1) opinions from Professor Jerry Hausman concerning Section 2 of the Sherman Act and the debit market and (2) opinions from Professor Stephen Rowe and Mr. Robert Hutchins concerning Visa's fixed acquirer network fee ("FANF").  For the reasons set forth below, the Court denies the motions to exclude.[4]

## I.  Background

For the relevant factual background, the Court refers the reader to its Memorandum and Order addressing the motions to exclude expert testimony filed by all Defendants to wholly or partially exclude the opinions of Dr. Reto Kohler, Professor Robert G. Harris, and Professor Joseph E. Stiglitz, and the Section 1 opinions of Professor Jerry Hausman.  (Mem. & Order, Docket Entry No. 8714.)

## II.  Discussion

### a.  Standard of review

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the

---

[4]  The Court separately decides (1) the first four motions to exclude filed by all Defendants, (2) the second four motions to exclude filed by all Defendants, (3) the two motions to exclude filed by the 7-Eleven Plaintiffs and The Home Depot, (4) the two motions to exclude filed by the Target Plaintiffs, and (5) the five motions to exclude filed by the Direct Action Plaintiffs.

expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.[5]  "While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, . . . the district court is the ultimate gatekeeper." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (alteration in original) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) ("The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702." (citation omitted)), *cert. denied*, 565 U.S. 1088 (2011).

Before permitting a person to testify as an expert under Rule 702, the court must make the following findings: (1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will "assist

---

[5]  In June of 2022, the Judicial Conference Committee on Rules of Practice and Procedure voted to approve two amendments to Rule 702.  *See* Colleen Cochran, *The Process, Progression, and Potential Ramifications of the Rule 702 Amendment*, Business Law Today (Sept. 5, 2022), https://businesslawtoday.org/2022/09/rule-702-amendment-process-progression-potential-ramifications.  One of the two proposed amendments changes the text of the rule to read: "A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if *the proponent demonstrates to the court that it is more likely than not that*. . . ."  Committee on Rules of Practice and Procedure, Agenda Book, Tab 7A, at 891 (June 7, 2022), https://www.uscourts.gov/sites/ default/files/2022-06_standing_committee_agenda_book_final.pdf.  The second proposed amendment changes subsection (d) from "the expert has reliably applied the principles and methods to the facts of the case" to "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  *Id.* at 891–92.

If approved by the Judicial Conference and the United States Supreme Court, and not rejected, modified, or deferred by Congress, the amendments will take effect in December of 2023.  Cochran, *supra*.  Because the amendments are not in force at the time this decision is published, the Court does not apply the amended version of Rule 702.  However, in deciding these motions the Court is mindful of the proposed amendments' purpose of "emphasiz[ing] that the court must focus on the expert's opinion, and must find that the opinion actually proceeds from a reliable application of the methodology" and "explicitly weaving the Rule 104(a) standard into the text of Rule 702."  Committee on Rules of Practice and Procedure at 871.

the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005); *see also United States v. Napout*, 963 F.3d 187–88 (2d Cir. 2020) (explaining that the court is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993))); *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) (same). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court set forth a list of factors, in addition to the criteria set forth in Rule 702, that bear on the determination of reliability: "(1) whether a theory or technique has been or can be tested; (2) 'whether the theory or technique has been subjected to peer review and publication;' (3) the technique's 'known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation;' and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 593–94); *see also United States v. Morgan*, 675 F. App'x 53, 55 (2d Cir. 2017) (same); *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) (same). The *Daubert* inquiry for reliability is a "flexible one" and does not "constitute a definitive checklist or test," and thus the *Daubert* factors "neither necessarily nor exclusively appl[y] to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 150 (1999) (citation omitted).

The district court is afforded "the same broad latitude when it decides how to determine reliability as it enjoys [with] respect to its ultimate reliability determination." *Id.* at 142. Expert testimony should be excluded if it is "speculative or conjectural." *Jones*, 965 F.3d at 162 (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (same). When an expert's opinion is based on data or methodologies "that are simply inadequate to support the conclusions

reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."

*Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (citation omitted); *see also*

*Nimely*, 414 F.3d at 396 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires

a district court to admit opinion evidence which is connected to existing data only by the *ipse*

*dixit* of the expert. A court may conclude that there is simply too great an analytical gap between

the data and the opinion proffered." (alteration in original) (quoting *Gen. Elec. Co. v. Joiner*, 522

U.S. 136, 146 (1997))).   Nevertheless, "in accordance with the liberal admissibility standards of

the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant

exclusion." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (*citing*

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)); *see also Adams v.*

*Liberty Mar. Corp.*, 407 F. Supp. 3d 196, 202 (E.D.N.Y. 2019) (same).

> ### b.   Motion to exclude in part the Section 2 and debit market opinions of Professor Jerry Hausman

Visa and the Bank Defendants move to exclude portions of Professor Hausman's Section

2 and debit market opinions.  (Hausman Section 2 Mot.)

### i.   Professor Hausman's background and expert report

Professor Hausman is the MacDonald Professor of Economics at the Massachusetts

Institute of Technology.  (Hausman Rep. ¶ 1.)  He has a PhD in economics and has published

extensively, served on government advisory committees, and received honors including the John

Bates Clark Award of the American Economic Association.  (*Id.* ¶¶ 1–2.)  He has previously

published on antitrust issues and testified in antitrust proceedings and has been involved in the

payments industry for about twenty-five years.  (*Id.* ¶¶ 3–5.)

Professor Hausman was asked "to assess the competitive effects of certain Visa and

[Mastercard] rules, policies, and practices."  (*Id.* ¶ 10.)  These "rules, policies and practices"

include the "Honor All Cards" (HAC) rules as well as Visa and Mastercard's "practice of establishing 'default' interchange schedules, 'no-bypass' rules and practices, and various other restrictions on steering by merchants at the point of sale ('POS')." (*Id.*) Professor Hausman's report discusses the historical background of the debit market, (*id.* ¶¶ 490–506); Visa's debit strategy prior to the Durbin Amendment, (*id.* ¶¶ 507–544); the impact of the Durbin Amendment, (*id.* ¶¶ 545–553); Visa's strategy after the Durbin Amendment, (*id.* ¶¶ 554–607); and damages calculations, (*id.* ¶¶ 608–689).[6]

Professor Hausman also submitted a reply expert report responding to criticisms of his initial report. (Reply Expert Report of Prof. Jerry Hausman ("Hausman Reply Rep."), annexed to Carney Decl. as Ex. DDX6, Docket Entry No. 8544-1.)

### ii.   Foundations of Professor Hausman's but-for world

Defendants argue that Professor Hausman's debit but-for world rests on an error about Visa's debit HAC rule and assumes irrational economic behavior on the part of Visa's rivals and issuers. (Visa and Bank Defs.' Mem. in Supp. of Mot. to Excl. in Part Section 2 & Debit Opinions of Prof. Jerry Hausman 3–8 ("Hausman Section 2 Excl. Mem."), Docket Entry No. 8085.)

### 1.   Error regarding honor-all-cards rule

Visa and the Bank Defendants argue that Professor Hausman's debit monopolization opinion is undermined by a mistaken belief that Visa's debit HAC rule requires merchants who accept Visa Debit to accept its Interlink PIN debit network. (Hausman Section 2 Excl. Mem. 3.) They claim that this error forms the foundation of Professor Hausman's "Scenario D1" but-for

---

[6] This summary only includes the portions of Professor Hausman's report that are relevant to the motion analyzed in this Memorandum and Order.

world and his assumption that eliminating the debit HAC rule would eliminate exclusive deals

between Visa and debit issuers.  (*Id.* at 4–5; Visa and Bank Defs.' Reply in Supp. of Mot. to

Excl. in Part Section 2 & Debit Opinions of Prof. Jerry Hausman 1 ("Hausman Section 2 Excl.

Reply," Docket Entry No. 8131).)

      In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin Ave. Recovery, LLC

("Elgin") argue that Professor Hausman "misspoke," and that his "momentary lapse of memory

in no way constitutes an admission that he made any errors in his reports."  (7-Eleven Plaintiffs,

The Home Depot, & Elgin's Mem. Of Law in Opp'n to Visa & Bank Defs.' Mot. to Excl. in Part

the Section 2 & Debit Opinions of Prof. Jerry Hausman 11 ("Hausman Section 2 Excl. Opp'n"),

Docket Entry No. 8224.)

      Visa and the Bank Defendants cite to a portion of Professor Hausman's deposition in

which he was asked how Visa's HAC rule "interact[s] with exclusive issuer agreements."

(Videotaped Deposition of Jerry Hausman 617:11–12 ("Hausman Dep."), annexed to Carney

Decl. as Ex. DDX25, Docket Entry No. 8544-4.)  The deposition continued as follows:

> A: What it says is if you accept Visa Signature, you have to accept
> Interlink, as well.
> Q: So —
> A: I take that back.
> Q: Says that to who?
> A: I am not sure the honor-all-cards rule does cover Interlink.
> Q: So how are they linked?
> A: Then I need to rethink for a second.
> I think the honor-all-cards rule — so we're talking post-2004 after
> the tie is broken.  I take it that's what you want me to —
> Q: Yes.
> A: — assume.
> So after the tie is broken — I don't know.  I would have to rethink.
> Offhand, since I realized my mistake on Interlink, I am not sure the
> HAC rule comes into it.

(*Id.* at 618:13–619:5.)  Visa and the Bank Defendants argue that Professor Hausman "should not

be permitted to testify to the now-disavowed opinion in his reports that the Honor-All-Cards

rules are the foundation of Visa's supposed debit monopolization." (Hausman Section 2 Excl. Mem. 4.)

The Court does not agree that Professor Hausman has "disavowed" that opinion. Visa and the Bank Defendants cite to *Devito v. Smithkline Beecham Corp.*, but that case is inapposite. (*Id.*) In *Devito*, the proposed expert "was asked point blank whether he had formed any of the three opinions" for which the plaintiff was offering his testimony, "and whether he was prepared to testify to same. Each time he answered no." No. 02-CV-0745, 2004 WL 3691343, at *4 (N.D.N.Y. Nov. 29, 2004). Professor Hausman's confusion at his deposition about the relationship between the HAC rules and exclusive issuer agreements does not constitute a "disavowal" of the opinion expressed in his report. *See Bargher v. White*, 541 F. Supp. 3d 682, 687 (M.D. La. 2021) (declining to exclude expert's testimony where expert mistakenly testified that his report relied on a deposition that hadn't occurred at the time the expert submitted his report).

Visa and the Bank Defendants next argue that Professor Hausman's opinion about Visa's debit HAC rule and its exclusive agreements with issuers should be excluded because it is "grounded" in the error he made at his deposition. (Hausman Section 2 Excl. Mem. 5.)

Professor Hausman opines in his report that before the Durbin Amendment, Visa "began a strategy to monopolize the [debit] market through exclusive deals with issuers that excluded competing debit networks from the cards." (Hausman Rep. ¶ 507.) Under these exclusive deals, the issuer would sign up for "Visa 'on the front,'" (i.e., Visa would be the relevant signature debit network on the card) and "Interlink 'on the back,'" (i.e., Interlink would be "the exclusive (or near-exclusive) PIN debit network" on the card even though PIN debit cards can be linked to more than one PIN debit network). (*Id.* ¶¶ 495, 496, 507.) In return for enabling Interlink as the

exclusive PIN debit network on most or all of its Visa signature debit cards, issuers would receive "reduced fees or volume-based rebates." (*Id.* ¶ 510.)  As a result of these deals, a merchant presented with a Visa debit card with Interlink exclusivity was faced with an "ineffective choice": "Visa signature debit or Interlink." (*Id.* ¶ 513.)  Although Interlink had a "higher cost of acceptance relative to other PIN networks," dropping Interlink would mean that transactions to such cards would default to Visa signature debit instead, which was even more expensive than Interlink. (*Id.*)  Professor Hausman claims that this strategy "enabled Visa to raise Interlink pricing to merchants" — price increases that in turn forced competing PIN debit networks to raise their own prices in order to "maintain their base of issuers." (*Id.* ¶¶ 513–515.)

In January of 2004, "Visa untied credit and debit acceptance by implementing a distinct HAC rule for signature debit." (*Id.* ¶ 536.)  Professor Hausman claims that this signature debit HAC rule "enabled Visa's campaign to monopolize the debit card market":

> Given Visa's signature debit HAC rule, the large signature debit issuers that entered into exclusive debit contracts with Visa, for signature and PIN debit, knew their signature debit cards would be accepted and that they would not have to compete for such acceptance against other debit issuers.  As a result, there has been no competition between Visa debit issuers for merchant acceptance throughout the relevant period.

(*Id.* ¶ 537.)  Professor Hausman opines that "in the absence of Visa's credit and signature debit HAC rules," merchants "could have engaged in selective acceptance strategies that would have applied to debit as well as credit." (*Id.* ¶ 538.)  Given the value of debit cards and demand deposit accounts ("DDAs") to banks, Professor Hausman opines that "issuers would have been willing to reduce interchange rates to preserve acceptance of their debit cards." (*Id.* ¶ 542.)  Thus,

> competition for merchant acceptance of debit card transactions would have caused the large debit card issuing banks to enter into

> direct deals with merchants for debit card acceptance (likely in conjunction with a broader deal for credit card acceptance) in the absence of Visa's signature debit (and credit) HAC rule.   If merchants could apply this competitive discipline to signature debit acceptance costs, it would not have made economic sense for issuing banks to enter into exclusive issuing arrangements with Visa (or any other network) that would have foreclosed the issuers' ability to enter into bilateral debit acceptance agreements with merchants.

(*Id.* ¶ 543.)  In his reply report, Professor Hausman similarly states:

> Because an exclusive agreement with Visa would have foreclosed the issuer's ability to bypass Visa through bilateral arrangements, issuers (particularly large issuers) would have had strong economic incentives to preserve their flexibility to enter into bilaterals by avoiding exclusive agreements with Visa (or any other network). For this reason, the debit HAC rules supported Visa's strategy to monopolize the market through exclusive agreements.  Without the HAC rules, Visa's strategy would not have succeeded.

(Hausman Reply Rep. ¶ 508.)

Visa and the Bank Defendants argue that this "reasoning never made sense" because the HAC rules "do not require merchants that accept Visa Debit (Visa's historically signature debit network) also to accept its separate Interlink PIN debit network."  (Hausman Mem. 4.)

While this discussion is admittedly complex — and indeed the parties seem to be talking past each other in the briefing, (*see* Hausman Section 2 Excl. Opp'n 11, Hausman Section 2 Excl. Reply 2 n.8) — the Court concludes by a preponderance of the evidence that Professor Hausman does not rely on an inaccurate assumption that the HAC rules require merchants who accept Visa signature to also accept Interlink.  *See U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 225–26 (S.D.N.Y. 2004) ("The proponent of expert testimony must establish its admissibility by a preponderance of the evidence.").  In the absence of Visa's HAC rule for signature debit, merchants presented with a Visa-exclusive card would not necessarily be faced with a situation in which they must either accept Interlink or default to more expensive signature debit, because they would not have to

accept all issuers' signature debit cards.  (*See* Hausman Rep. ¶ 513.)  Thus, in the absence of the

signature debit HAC rule, issuers could not count on using Visa signature debit to compel

acceptance of Visa-exclusive cards that merchants might otherwise be inclined to avoid.  (*Id.*)  In

this way, the signature debit HAC rule supports Visa's alleged strategy based on exclusive

agreements even though it does not compel merchants that accept Visa signature debit to accept

Interlink.

The Court therefore declines to prevent Professor Hausman from testifying "that the

Honor-All-Cards rules are the foundation of Visa's supposed debit monopolization."  (Hausman

Section 2 Excl. Mem. 4.)  Given that "lapses in memory are traditionally challenged through

cross-examination," the Court does not assume that Professor Hausman's inability to recall the

link between the HAC rule and exclusive issuer agreements at his deposition represents a more

fundamental misunderstanding.  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of

America Sec., LLC*, 716 F. Supp. 2d 220, 227 n.45 (S.D.N.Y. 2010).  Nor is there "too great an

analytical gap" between Professor Hausman's analysis and his conclusion.  *Amorgianos*, 303

F.3d at 270 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 185

(E.D.N.Y. 2001)).  Given that "[d]eference to experts is particularly appropriate when expert

testimony concerns soft sciences like economics" because "challenges may ultimately be viewed

as matters in which reasonable experts may differ," Professor Hausman may testify about the

relationship between the HAC rules and Visa's alleged debit monopolization, and Defendants

may cross-examine him, including with his deposition testimony.  *Hughes v. The Ester C Co.*,

317 F.R.D. 333, 341 (E.D.N.Y. 2016) (quoting *In re Air Cargo Shipping Servs. Antitrust Litig.*,

No. 06-MD-1175, 2014 WL 7882100, at *8 (E.D.N.Y. Oct. 15, 2014), *report and

recommendation adopted*, No. 06-MD-1775, 2015 WL 5093503 (E.D.N.Y. July 15, 2015)).

13

Visa and the Bank Defendants also argue that Professor Hausman should not be permitted to testify to his "Scenario D1" debit but-for world or damages calculations because Professor Hausman assumed there would have been no HAC rules in the but-for world "and, from that, assumed (wrongly, as shown above) 'there would have been no [PIN] exclusive deals between Visa and debit issuers.'"[7]  (Hausman Section 2 Excl. Mem. 5.)  However, this does not appear to accurately represent Professor Hausman's reasoning.  Rather, Professor Hausman writes that in Scenario D1, he "assume[s] that there would have been no HAC rules (credit or debit) *and* that there would have been no exclusive deals between Visa and debit issuers." (Hausman Rep. ¶ 668 (emphasis added).)  Professor Hausman seems only to assume that there would have been no HAC rules *and* no exclusive debit deals, not that the elimination of the HAC rules would lead to the elimination of the exclusive debit deals.  For this reason and for the reasons described above, the Court does not exclude Professor Hausman's Scenario D1.

### 2.  Irrational economic behavior

Visa and the Bank Defendants argue that Professor Hausman's debit but-for world "assumes irrational economic behavior by both Visa's rivals and its issuer-customers." (Hausman Section 2 Excl. Mem. 6.)  They argue that Visa's low debit interchange rates in the but-for world "would benefit merchants only if Visa's PIN debit rivals did not offer higher interchange in exchange for issuer exclusivity *and* issuers did not switch to those rival networks

---

[7]  Professor Hausman uses "two primary approaches" to model damages in the debit card market.  (Hausman Rep. ¶ 33.)  In Scenario D1, he assumes a but-for world "without the exclusive agreements between Visa and the large debit issuing banks and without the credit or debit HAC rules."  (*Id.*)  In Scenario D2, he assumes a but-for world in which Visa "would have maintained its pre-Durbin Amendment exclusive deals with issuers and the HAC rules but would not have been able to implement its integrated strategy to subvert the competition that should have been stimulated by the Durbin Amendment."  (*Id.* ¶ 36.)

to obtain the better rates." (*Id.* at 7.)  Pointing to Professor Hausman's testimony in the *Pulse*

litigation and at his deposition,[8] Visa and the Bank Defendants argue that it would be irrational

for issuers in the but-for world to enable Visa's debit networks on their cards when doing so

would require "pass[ing] up the higher interchange rates offered for PIN exclusivity by Visa's

rivals." (*Id.* at 7–8.)  They also claim that Professor Hausman "acknowledges that, from 2004 to

2011, it was Visa's *rivals* that progressively led PIN debit interchange rates higher as they

competed for issuer exclusivity." (*Id.*)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that in the debit

but-for world, "there would have been competition among issuers on the *merchant side* of the

platform, which would have driven down debit interchange rates towards competitive levels."

(Hausman Section 2 Excl. Opp'n 13.)  They claim that the record and Professor Hausman's

report and deposition demonstrate that "systematically raising PIN debit interchange was *Visa's*

strategy, and these competitors were simply trying to keep pace to avoid being shut out of the

issuer side of the market." (*Id.*)

---

[8] *Pulse Network, LLC v. Visa, Inc.* was an antitrust suit against Visa by PIN debit
network Pulse.  No. 14-3391, 2018 WL 9850158, at *1–2.  (S.D. Tex. Aug. 31, 2018).  The
Southern District of Texas granted summary judgment in favor of Visa, *id.* at *4, but that
decision was recently reversed on appeal, 30 F.4th 480 (5th Cir. 2022).  Professor Hausman
submitted a declaration in the district court in which he "review[ed] and analyze[d] the evidence
and arguments included in Visa's summary judgment motion and assess[ed] their merit in
economic terms."  (Decl. of Jerry A. Hausman ¶ 6, annexed to Carney Decl. as Ex. DDX52,
Docket Entry No. 8544-6.)  Defendants cite to Professor Hausman's statements in his declaration
that "[i]ssuers are the ones that choose to have a PIN network be the sole option for PIN-
authenticated transactions on a debit card" and that an issuer would choose to do so "because a
PIN debit network would offer more attractive pricing conditioned on such an arrangement," (*id.*
¶ 61); that networks must set interchange fees "both to induce merchants to route to the network
(and accept the cards) and issuers to enable the network," (*id.* ¶ 55); and that "[i]f interchange
rates are set too low, a network will be attractive to merchants in terms of prioritizing for routing,
but then issuers will be unwilling to enable the network's cards," (*id.*; *see* Hausman Section 2
Excl. Mem. 6–7).

The Court does not exclude Professor Hausman's debit opinions as based on irrational economic behavior.  While it is true that an antitrust plaintiff "must presume the existence of rational economic behavior in the hypothetical free market," *Dolphin Tours, Inc. v. Pacifico Creative Servs., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985), whether competition between networks for interchange would tend to drive up debit interchange rates or competition between issuers for merchants would tend to drive down debit interchange rates[9] — and whether other networks were responsible for raising interchange fees or whether they did so in response to Visa's strategy[10] — is not properly resolved on a *Daubert* motion.  Rather, it is a proper subject for a battle between experts, and "a Daubert motion is an improper venue in which to take sides in a 'battle of the experts' offered by competing parties."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 471 (S.D.N.Y. 2018); *see also In re Namenda Indirect Purchaser Antitrust Litig.*, No. 15-CV-6549, 2021 WL 2403727, at *13 (S.D.N.Y. July 11, 2021)

---

[9]  Visa and the Bank Defendants argue that the claim that PIN debit network competition for merchants would have driven down debit interchange rates is contrary to *Amex* because, under *Amex*, competition among two-sided payment networks "encourage[s] companies to take increased profits from a price increase on side A [merchants] and spend them on side B [issuers/cardholders]."  (Hausman Section 2 Excl. Reply 4.)  It is not at all clear why this holding means that competition among issuers for merchant acceptance would not drive down interchange rates.

[10]  The Court disagrees with the contention by Visa and the Bank Defendants that Professor Hausman "acknowledges" that it was Visa's rivals that led PIN debit interchange rates higher.  (Hausman Section 2 Excl. Mem. 7–8.)  Rather, Professor Hausman testified that although other PIN debit networks "sometimes . . . did offer higher prices," this was "an outcome of Visa's convergence strategy."  (Hausman Dep. 611:17–24.)  Visa and the Bank Defendants also argue that Professor Hausman "cites no record evidence" to support his claim that Visa's rival PIN debit networks only increased their interchange rates in response to Visa's strategy.  (Hausman Section 2 Excl. Reply 4.)  Professor Hausman supports this claim in his reply report with a citation to Dr. Lerner's report; whether the cited paragraph shows that Dr. Lerner "acknowledges . . . that the interchange increases implemented by Visa's debit rivals were in response to Visa's strategy" is a matter for cross-examination at trial.  (Hausman Reply Rep. ¶ 539.)

("[D]isagreements between experts rarely if ever justify *Daubert* exclusions (although they are too often the basis for *Daubert* motions)."); *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, No. 11-CV-0564, 2019 WL 1515231, at *11 (E.D.N.Y. Feb. 21, 2019) ("The experts can battle at trial about why their assumptions were correct[, b]ut a disagreement over which assumptions are right and which are wrong is not a disagreement over the reliability of the underlying methodology itself . . . .").

### iii.   Failure to account for increased prices to cardholders

Visa and the Bank Defendants argue that Professor Hausman's analyses of debit network and interchange fees fail to "reliably account[] for the issuer/cardholder-side of debit prices as *Amex* requires." (Hausman Section 2 Excl. Reply 5.)

### 1.   Debit network fees

Visa and the Bank Defendants claim that Professor Hausman's opinions on debit network fees fail to account for issuer-side pricing. (Hausman Section 2 Excl. Mem. 10.) They contend that Professor Hausman opines that merchants in the but-for world would have paid lower network fees for Visa and Mastercard credit and debit transactions, but "never considers the effect on issuer network fees, let alone cardholder fees, if merchant-side network fees were lower." (*Id.*) Visa and the Bank Defendants cite to "unrefuted evidence" that when Visa raised merchant-side fees in the past, it "'rechanneled' a significant portion of those fees into lower fees to issuers" in order to compete with other networks for issuers. (*Id.* at 10–11.) They also cite to Professor Hausman's opinion in the *Pulse* litigation that networks that earn less revenue from merchants are less willing to offer lower prices to issuers, while networks that charge higher fees to issuers have an incentive to offer lower merchant fees. (*Id.* at 11.) Finally, Visa and the Bank

17

Defendants argue that for the period before the Durbin Amendment, Professor Hausman "does not discuss Visa's issuer-side network fees" at all.  (*Id.*)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin first point to evidence in Professor Hausman's report that both merchant-side and issuer-side debit network fees increased between 2011 and 2015, while Visa's "average cost per transaction fell by half from 2004 to 2017."  (Hausman Section 2 Excl. Opp'n 18.)  Second, they contest Visa and the Bank Defendants' argument that lower merchant-side fees in the but-for world would translate to higher issuer-side fees, arguing that "[a]s Professor Hausman explains, issuer competition for merchant acceptance in the but-for world would have resulted in direct agreements between issuers and merchants, which could have disintermediated Visa and Mastercard from transactions."  (*Id.* at 18–19.)  To avoid being disintermediated, "Visa and Mastercard would have been forced to reduce issuer-side fees to maintain issuer volume on their networks."  (*Id.* at 19.)

The Court does not exclude Professor Hausman's opinions about debit network fees. *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2287 (2018) ("*Amex*") holds that "[p]rice increases on one side of the platform . . . do not suggest anticompetitive effects without some evidence that they have increased the overall cost of the platform's services."  This does not require, however, that every expert's testimony independently establish, to the standard necessary to prevail at trial, that a decrease in the price on one side of the platform would not cause an increase in the price on the other side.  Professor Hausman's assumption that a reduction in merchant-side network fees would not cause an increase in issuer-side fees is consistent with data he cites showing that average merchant-side debit network fees and average issuer-side debit network fees both decreased between 2011 and 2015 (Hausman Rep. ¶¶ 601–

18

03) and that Visa and Mastercard's per-transaction processing costs decreased significantly between 2004 and 2017, (*id.* ¶ 216).  Visa and the Bank Defendants attack both citations, arguing that the data regarding network fees is insufficient because it does not include data from the pre-Durbin period, shows "*industry-wide*, *average* debit network fees," and ignores evidence that "*Visa's* two-sided debit network fees have consistently been *lower* than those of its rivals (and have *decreased* as rivals' fees increased)."  (Hausman Section 2 Excl. Reply 6.)  They also argue that the data showing decreasing per-transaction costs is insufficient because it fails to reflect fixed and sunk costs.  (*Id.* at 6–7.)  Visa and the Bank Defendants may cross-examine Professor Hausman with these arguments, but the Court finds that they do not constitute flaws "large enough that the expert lacks 'good grounds' for his . . . conclusions."  *Amorgianos*, 303 F.3d at 267 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994)).  Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Id.* (quoting *Daubert*, 509 U.S. at 596); *see also DPWN Holdings (USA), Inc.*, 2019 WL 1515231, at *3 (noting that the plaintiff had identified economic literature tending to support its expert's assumption and that the defendants "may elicit the fact that this literature relates to industries other than the airline industry on cross-examination").

## 2.   Debit interchange fees

Visa and the Bank Defendants argue that Professor Hausman's analysis of interchange fees "fails reliably to address the issuer/cardholder-side of the debit price."  (Hausman Section 2 Excl. Mem. at 11–12.)  Professor Hausman states that there is "'little evidence' that debit issuers pass higher interchange on to cardholders '*in the form of rewards*,'" but, Visa and the Bank Defendants argue, he fails to consider the other components of the cardholder price, and "admits

to offering 'no opinion' that increases in debit interchange in the real world were not 'passed on to cardholders in the form of something *other than rewards*.'" (*Id.* at 12.) As an example of Professor Hausman's failure to consider the impact of reduced interchange on cardholder fees, Visa and the Bank Defendants point to Professor Hausman's testimony that there is no reliable way to assess the impact of the Durbin Amendment on checking account fees. (*Id.*) They argue that there are "multiple published studies" evaluating exactly that impact, (*id.* at 13), and that contrary to Professor Hausman's claim at his deposition, at least some of these studies control for the impact of Regulation E.[11] (Hausman Section 2 Excl. Reply 10.) Visa and the Bank Defendants further argue that Professor Hausman's "only effort to show that checking account fees may *not* have increased after issuers lost interchange revenue" consists of an unreliable inference from a 2017 FDIC survey. (*Id.* at 14.) In response to the 7-Eleven Plaintiffs, The Home Depot, and Elgin's argument that debit cards and DDAs are separate products in different markets, Visa and the Bank Defendants point to the statement in Professor Hausman's opinion that banks view debit cards as a "feature of an overall DDA product" and view customer fees and debit interchange as parts of a single revenue stream. (Hausman Section 2 Excl. Reply 8.)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin claim that Professor Hausman was correct not to analyze the relationship between debit interchange fees and DDA fees because debit cards and DDAs are "*separate products in different markets*." (Hausman Section 2 Excl. Opp'n 15.) "Even if it were legally appropriate to look at DDA fees," the 7-

---

[11] "In November 2009, the Federal Reserve announced an amendment to Regulation E that restricted banks' ability to charge consumers a fee for overdrafts associated with certain ATM and debit transactions." (Hausman Rep. ¶ 499.) Professor Hausman claimed at his deposition that studies examining the effect of the Durbin Amendment on DDA fees failed to "take into account the almost simultaneous effect of" Regulation E. (Hausman Dep. 303:16–304:16.)

Eleven Plaintiffs, The Home Depot, and Elgin argue that Visa and the Bank Defendants identify "no reliable evidence showing that interchange fluctuations impacted DDA fees." (*Id.* at 17.) Rather, the studies they cite "fail[] to account for the impact of the primary reason why banks readjusted their DDA fees in 2010–12: the Federal Reserve's 2009 amendments to Regulation E and its greater impact on the larger banks." (*Id.*)

As stated above, it is not necessary for admissibility that Professor Hausman establish, to the standard necessary to prevail at trial, that debit issuers do not respond to a decrease in interchange revenue by increasing cardholders' checking account fees. Professor Hausman opines that "[w]hile debit cards are access devices to the DDA, and are important to that relationship, the situation does not mean that an economically reasonable two-sided price should include all factors that bear on DDA pricing." (Hausman Reply Rep. ¶ 493.) Rather, "DDA pricing is based on many factors beyond the transaction fees associated with debit cards," and "[b]anks receive many benefits from DDA accounts which are independent of debit cards." (*Id.*) It would therefore "be quite difficult as an economic matter to make an accurate estimate of the two-sided debit transaction price based on all the benefits banks obtain from DDAs." (*Id.*) He also cites to a 2017 FDIC study finding that "the percentage of unbanked households is at an all-time low and has decreased each year since 2011." (*Id.* ¶ 498.) At his deposition, Professor Hausman testified that this study is "consistent with [the consumer price of a DDA account] not going up and probably coming down." (Hausman Dep. 308:19–22.) He also acknowledged the existence of "published literature by various economists at the Federal Reserve that . . . look[s] at actual data and estimate[s] the effect of interchange revenue decreases from Durbin on DDA fees," but argued that these studies "didn't take into account the almost simultaneous effect of" Regulation E and are therefore "incorrect." (*Id.* at 303:16–304:16.) Whether these studies

sufficiently control for Regulation E, as Defendants argue, (Hausman Section 2 Excl. Mem. 10 n.52) — and, indeed, whether DDA fees must be included in an analysis of the two-sided debit interchange price at all — is a proper subject for cross-examination and for a "battle" between Professor Hausman and the opposing expert witnesses.  (*See* Expert Report of Dr. Andres Lerner ("Lerner Rep.") ¶¶ 167–190, annexed to Carney Decl. as Ex. DDX54, Docket Entry No. 8544-6 (claiming that issuers pass through higher interchange fees to cardholders including through checking account fees)); *see also AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411, 2019 WL 1254763, at *14 n.99 (S.D.N.Y. Mar. 19, 2019) ("[T]hese issues [of data collection and test calibration] are best left to the factfinder to weigh during the battle of the experts instead of the Court to weigh when considering the exclusion of an expert." (quoting *PacTool Int'l, Ltd. v. Kett Tool Co.*, No. C06-5367, 2012 WL 3637391, at *3 (W.D. Wash. Aug. 22, 2012))); *DPWN Holdings (USA), Inc.*, 2019 WL 1515231, at *6 (finding that, where the plaintiff's expert assumed that defendants' security costs were zero, the defendants' argument that they "outsourced all these costs — so they were not, in fact, zero" was a "'battle of the experts' issue and does not go to reliability or relevance at this gatekeeping phase").

### 3.  Debit damages

Visa and the Bank Defendants argue that, "[a]s discussed more fully in the Section 1 brief," Professor Hausman is required "as a matter of law . . . to reduce his debit damages calculations by the countervailing effect on price on the opposite side of the market."  (Hausman Section 2 Excl. Mem. 16.)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that Visa and the Bank Defendants' argument regarding damages is "doubly meritless" with respect to debit damages because "debit pass-through in the form of rewards was nearly zero throughout the

relevant period" and "[i]n debit, there are no significant 'incentive payments' to cardholders to offset Plaintiffs' damages." (Hausman Section 2 Excl. Opp'n 19.)

The Court does not exclude Professor Hausman's debit damages calculations. As discussed in the Court's order on the motions to exclude the opinions of Dr. Kohler, Professor Harris, Professor Hausman, and Professor Stiglitz, Professor Hausman is not required to reduce his damages in situations where he concludes that the cardholder price would not increase in the but-for world. As discussed in the two preceding sections, Visa and the Bank Defendants may challenge Professor Hausman's conclusions that the cardholder price would not increase in the but-for world on cross-examination and with their own experts.

### iv. Opinion on debit output

Professor Hausman "offers two potential opinions on the effects of Visa's alleged conduct on output," but Visa and the Bank Defendants argue that neither "addresses output in the debit transaction market alleged by Plaintiffs." (Hausman Section 2 Excl. Mem. 16–17.) First, Professor Hausman opines that merchant pass-through of credit transaction fees would lead to lower overall retail consumption. (*Id.* at 17.) Visa and the Bank Defendants argue that, to the extent Professor Hausman also intends to offer this theory as to debit transactions, "'overall consumption' involving all payment forms" is distinct from the debit transaction market. (*Id.*) Second, Professor Hausman opines that Visa suppressed the growth of PIN debit in favor of signature debit. (*Id.*) Visa and the Bank Defendants argue that PIN and PINless debit "are only a portion of the debit market as a whole alleged by Plaintiffs," and that "[t]o the extent [Professor] Hausman intends to argue that the growth of PIN/PINless debit alone is a proper measure of output or that the suppression of PIN/PINless debit only constitutes output restriction,

either suggestion would be wrong as a matter of law and should be precluded."[12]  (*Id.* at 17–18.)
They also claim that Professor Hausman theorizes that signature debit would be eliminated in the
but-for world, but "offers no analysis of the output effects" of this elimination.  (*Id.* at 18–19.)

Regarding Professor Hausman's first opinion as to output, the 7-Eleven Plaintiffs, The
Home Depot, and Elgin cite to Professor Hausman's statement that "merchants pass through a
significant portion of interchange expenses to consumers in the form of higher retail prices,
which reduces consumption in the economy and, necessarily, debit and credit transactions."
(Hausman Section 2 Excl. Opp'n 20.)  They state that Professor Hausman's opinions on output
"are not limited to the credit market," but rather "explicitly reference" the debit market.  (*Id.*)
Regarding Professor Hausman's second opinion concerning the suppression of PIN debit, 7-
Eleven Plaintiffs, The Home Depot, and Elgin cite to Professor Hausman's "analysis of debit's
overall performance in foreign jurisdictions where signature debit is largely absent and PIN debit
is predominant," which shows that "in a PIN-debit world, debit card usage would have been
*higher* as a percentage of card payments than it has been in the actual world."  (*Id.* at 20–21.)

The Court does not exclude Professor Hausman's opinions about debit transaction output.
First, as stated in relation to Professor Harris's opinions in the Court's order on the motions to
exclude the opinions of Dr. Kohler, Professor Harris, Professor Hausman, and Professor Stiglitz,
Professor Hausman's assumption that retail sales in the but-for world would maintain the same
proportion of payment forms — such that a decrease in overall transactions would cause a
decrease in a specific type of transaction — is an assumption that Visa and the Bank Defendants

---

[12]  "PINless debit is a single-message transaction that is not authenticated by use of a
PIN."  (Hausman Rep. ¶ 531.)  Professor Hausman claims that Visa's debit rivals began offering
PINless debit prior to the Durbin Amendment; that "Interlink was the only major PIN debit
network not to offer PINless"; and that Visa acted to suppress the spread of PINless debit.  (*Id.*)

may challenge on cross-examination.  *See Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (unless expert testimony is based on assumptions that are "so unrealistic and contradictory as to suggest bad faith" or to be "an apples and oranges comparison," "contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony" (quoting *Boucher*, 73 F.3d at 21)).  Professor Hausman is thus not prevented from opining that, because in his opinion overall transactions would decrease in the but-for world, debit transactions would also decrease.

Second, the Court does not consider whether it is "wrong as a matter of law" to argue that suppression of PIN/PINless debit constitutes output restriction because Professor Hausman does not appear to advance this opinion.  (*See* Hausman Mem. 17–18 (making an argument "[t]o the extent* Dr. Hausman intends to argue that the growth of PIN/PINless debit alone is a proper measure of output"); Hausman Rep. ¶ 526 (opining that Visa "suppress[ed] the growth of the superior PIN Debit product")); *see also* Fed. R. Civ. P. 26(a)(2)(B) (noting that an expert witness must provide a written report containing "a complete statement of all opinions the witness will express and the basis and reasons for them").  At trial, Visa and the Bank Defendants may argue that debit output in Professor Hausman's but-for world would be low because "the dramatic growth of debit began when Visa launched its signature-focused, higher-interchange strategy," (Hausman Mem. 18–19), while Professor Hausman may respond that debit card usage is higher in predominantly PIN-debit countries.  (Hausman Reply Rep. ¶ 490.)[13]  *See Pearlstein v.*

---

[13]  Visa and the Bank Defendants argue that Professor Hausman "makes no prediction about debit output in the U.S. based on the experiences of those other countries," but "argues only that the higher interchange associated with signature debit . . . did not 'substantially increase debit card issuance,' which is not the relevant measure of debit card transaction volume output." (Hausman Section 2 Reply 12.)  However, Professor Hausman's assertion that debit card usage in PIN-predominant countries is higher than debit card usage in the U.S. clearly contradicts Visa

*Blackberry Ltd.*, No. 13-CV-7060, 2021 WL 4131646, at *5 (S.D.N.Y. Sept. 10, 2021) (stating that experts' opinions presented "the quintessential 'battle of the experts' that should be the basis of cross-examination at trial — not *Daubert* motions").

Visa and the Bank Defendants also claim that Professor Hausman's report cannot be read as opining that higher interchange reduces debit transaction output by decreasing merchant acceptance of debit cards.  (Hausman Mem. 18.)  While they acknowledge that Professor Hausman has offered this opinion with regard to credit cards, they claim that the opinion cannot be extended to include debit cards because it is based on the "superior functionality" and "superior economics" of credit cards as opposed to debit cards.  (*Id.*)

Professor Hausman's opinion that "supra-competitive interchange has reduced acceptance, thereby decreasing output," applies to debit cards as well as credit, although the opinions that follow do not.  (Hausman Report ¶ 429.)  Professor Hausman explains that "[l]ower interchange stimulates increased acceptance which increases marketwide output," which logic applies to debit in the same way as to credit.  (*Id.*)  "To confirm this conclusion," he then considers "whether reduced interchange would have resulted in lower credit card issuance or usage," beginning an analysis section that considers only credit cards.  (*Id.* ¶ 430–436.)  Professor Hausman is not precluded from testifying that lower interchange would increase debit output by incentivizing merchants to accept debit cards, although he of course may not apply conclusions that are specific to credit card financing or revenue structures to debit cards.[14]

and the Bank Defendants' argument that "debit's exponential growth began *because* the higher interchange offered on signature debit — in Dr. Hausman's words — gave 'issuers . . . a bigger incentive' to promote debit usage."  (*Id.* at 11.)

[14]  Professor Hausman does opine that "[e]ven if lower interchange would have reduced rewards," this would not have had a significant impact on credit card spending because credit

### v.   Opinion on debit competition

Visa and the Bank Defendants challenge Professor Hausman's opinions that Visa foreclosed competition from a substantial share of the debit market, challenging his application of the Discount Attribution Test ("DAT") in his reply report; his opinions in his opening report that did not make use of the DAT; and his reference to foreclosure caused by "other aspects of Visa's anticompetitive strategy."  (Hausman Section 2 Excl. Mem. 19–23.)

### 1.   Discount Attribution Test

Visa and the Bank Defendants cite to the arguments in their brief for summary judgment on Plaintiffs' monopolization claims to argue that Professor Hausman "cannot properly use a Discount Attribution Test to evaluate bundled discounts offered to issuers or merchants across debit and credit products."  (Hausman Section 2 Excl. Mem. 19.)  In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin cite to the arguments in their opposition to summary judgment.  (Hausman Section 2 Excl. Opp'n 21.)

As an initial matter, the parties agree that the DAT is the appropriate test to decide whether bundled pricing is exclusionary.  (*See* Hausman Section 2 Excl. Mem. 20 (stating that "to 'ensur[e] that antitrust laws do not punish economic behavior that benefits consumers . . . , a plaintiff who challenges a package discount as anticompetitive *must* prove that' the bundled discount fails the Discount Attribution Test"); 7-Eleven Pls., The Home Depot, & Elgin's Mem. of Law in Opp'n to Visa & Bank Defs.' Mot. for Summ. J. on Pls.' Monopolization Claims 35 ("Monopolization Opp'n"), Docket Entry No. 8229 (stating that "[b]undled pricing is evaluated

---

cards would continue to offer "superior functionality" and "superior economics" compared to debit cards.  (Hausman Rep. ¶ 436.)  However, this argument is specific to a but-for world in which lower interchange causes reduced rewards and is not relevant to debit cards, which already offer very few or no rewards.  (*See id.* ¶ 234.)

under the standards outlined in" *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008), which "imposed a 'cost-based rule,' termed the '"discount attribution" standard'".) Unlike in the Ninth Circuit, however, there is no binding law in this circuit that a plaintiff *must* apply the DAT to show that a bundled discount is anticompetitive. *See Cascade*, 515 F.3d at 909.

Professor Hausman applies the DAT in his reply report, where he explains that the test is conducted by applying "the discounts and incentives for non-contestable volume for products over which Visa has substantial market (or monopoly) power . . . to the price of the contestable volume." (Hausman Reply Rep. ¶ 590.) If, after the discounts are applied, "the price of the contestable volume is below Visa's cost, then the deal is anticompetitive." (*Id.*) First, he applies the DAT to Visa's pre-Durbin deals with issuers, concluding that "[f]our of the deals ███████ ██████████████████████████████████████████ failed the test. (*Id.* ¶ 530.) Professor Hausman also applies the DAT to Visa's post-Durbin agreements with merchants, concluding that "[t]he following Visa agreements with merchants failed the Discount Attribution Test for all or a portion of the period of the agreement: ██████████████████████████████████ ██████████████████████████████████████████████████████████████████." (*Id.* ¶ 606.)

### A.   Diverse offerings of rivals

Visa and the Bank Defendants argue that because "[t]he potential for foreclosure of competition from bundled discounts is eliminated when even one rival sells as diverse a set of products as the defendant," "'no court ever has applied the discount attribution test to' a defendant that is not an exclusive (or near exclusive) supplier in the tying markets." (Visa and Bank Defs.' Mem. in Supp. of Mot. for Summ. J. on Pls.' Monopolization Claims 21

("Monopolization Mem."), Docket Entry No. 8088.)   In this case, Visa and the Bank Defendants

argue, "Mastercard, like Visa, has supported at all relevant times credit, signature debit, and PIN

debit transactions," such that "Mastercard's presence precludes Plaintiffs' bundled discount

claims."  (*Id.* at 21–22.)  Further, "there need not be a single competitor selling all products in

the bundle[] as long as there are rivals for each product" because "a package of discounts may be

obtained by customers through coordination of two or more suppliers."  (*Id.* at 22.)  Visa and

Bank Defendants argue that "Visa faced competition for both issuers and merchants for each

transaction type from a combination of Mastercard, American Express, Discover, and a dozen

debit networks at all relevant times."  (*Id.*)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that Visa and the

Bank Defendants misrepresent the cases they cite and that the caselaw actually holds that "if

even one rival cannot compete on the bundle the discount attribution test is appropriate."  (7-

Eleven Pls., The Home Depot, & Elgin's Mem. of Law in Opp'n to Visa & Bank Defs.' Mot. for

Summ. J. on Pls.' Monopolization Claims 35 ("Monopolization Opp'n"), Docket Entry No.

8229.)  They claim that for the DAT to apply, "the *only* requirement is that there be at least *some*

rivals in the market incapable of offering the bundle."  (*Id.* at 36.)  Further, the 7-Eleven

Plaintiffs, The Home Depot, and Elgin argue that "[e]ven if the law required the absence of a

significant 'as-diverse rival,'" Mastercard is not such a rival: pre-Durbin, its debit strategy was

failing "because, among other things, Visa had '*locked-up*' or '*locked in*' the banks," and post-

Durbin, "the record shows Mastercard embracing and perpetuating Visa's strategy of foreclosing

the rival PIN debit networks."  (*Id.* at 37.)  Finally, the 7-Eleven Plaintiffs, The Home Depot, and

Elgin challenge Visa and the Bank Defendants' claim that merchants could push Visa's rivals "to

'coordinate' and offer a competitive bundle," arguing that "Visa fails to offer even *one* example

of this strategy occurring . . . in the marketplace" and that such coordination is "not remotely

realistic."  (*Id.*)

Caselaw suggests that bundled discounts are only exclusionary — and therefore, the DAT

is only proper — where the defendant enjoys significant market power with regard to one of the

bundled products (the "tying product").  *See Aerotec Int'l v. Honeywell Int'l, Inc.*, 836 F.3d

1171, 1186–87 (9th Cir. 2016) (stating that the DAT "only applies where one of the competitors

produces fewer goods or services than the other competitor" because it is "the fact that the

bundling competitor has exclusive capacity to 'bundle' multiple products and absorb the cost of

the total discount" that gives rise to the possibility that it could force an equally efficient

competitor out of the market); *Suture Express, Inc. v. Owens & Minor Dist., Inc.* (*Suture I*), No.

12-2760, 2016 WL 1377342, at *23, 19 (Apr. 7, 2016) (stating that "no court has applied the

discount attribution test to a non-monopolist" and that "[i]n order to have antitrust significance a

bundle must not merely keep one rival out of the market; it must exclude all of them"), *aff'd*, 851

F.3d 1029 (10th Cir. 2017); *Suture Express, Inc. v. Owens & Minor Dist., Inc.* (*Suture II*), 851

F.3d 1029, 1043 (10th Cir. 2017) (finding "no support in the caselaw" for the proposition that the

DAT "can properly be used to show coercion by a non-monopolist"); *Valassis Commc'ns, Inc. v.

News America Inc.*, No. 2:06-CV-10240, 2011 WL 2420048, at *5 (E.D. Mich. Jan. 24, 2011),

*report and recommendation adopted*, No. 06-01240, 2011 WL 2413471 (E.D. Mich. June 15,

2011) (noting that "[i]f the complaining firm can compete by constructing its own equally-

effective bundle, then the concern that customers may be coerced by the defending firm is

reduced," but that "if the defending firm retains a product that customers 'must have' from the

defendant, then the bundles cannot be equally effective or competitive, and . . . the [DAT] will

still apply").

The Court is not persuaded that it should exclude Professor Hausman's application of the DAT based on Defendants' argument that other companies also offer credit and debit services. First, it is not clear from the caselaw that, as Defendants argue, the DAT is inapplicable so long as "there are rivals for each product."[15] (Monopolization Brief 22.) Rather, *Aerotec* indicates that the prerequisite for application of the DAT is that the bundling competitor "has exclusive capacity to 'bundle,'" suggesting that for the DAT to be inapposite at least one other competitor must also have the "capacity to 'bundle.'" *Aerotec*, 836 F.3d at 1187. Second, while it is true that "Mastercard, like Visa, has supported at all relevant times credit, signature debit, and PIN debit transactions," (Monopolization Brief 21), the Court will allow Professor Hausman to opine that Mastercard was never positioned to compete with Visa's bundles. Professor Hausman claims in his reply report that before Durbin, "Mastercard was the only viable rival to Visa's strategy since only *it* offered a front-of-the-card product (and a credit network) that could compete with Visa's bundling strategy," but that its "back-of-the-card product . . . had almost no presence in the U.S. at that time," it had "a 25% share of signature debit and virtually no share in PIN debit," and its "efforts to dislodge Visa were usually unsuccessful." (Hausman Reply Rep. ¶ 548.) With regard to the post-Durbin period, Professor Hausman argues that "[t]he key planks of Mastercard's post-Durbin strategy were implemented under the Visa umbrella." (*Id.* ¶ 711.)

---

[15] Defendants support this claim with a citation to *Suture II*, but the citation is not on point. (Monopolization Brief 22.) The quoted text is a description of the district court's conclusion that the plaintiff had failed to show that the defendants could exclude competition. *Suture II*, 851 F.3d at 1041. The district court had found that neither of the defendants "could exclude competition in the tying market since there was evidence the opposite was occurring, with regional and national competitors growing and expanding during the pertinent time period." *Id.* The fact that the plaintiff had not met its burden to show market power because competition was expanding in the "tying market" — that is, the market for the tying product — does not necessarily mean that the DAT is improper unless the defendant is a monopolist in the tying market.

An expert's testimony should be excluded as contrary to controlling law "only where an argument has already been rejected by the Court"; "[w]here the legal or factual sustainability of a party's theory has not yet been decided, the possibility that such theory 'may be legally or factually deficient' is 'not justification[] for concluding that, in the context of [that party's] theory, [the expert's] testimony is unreliable or unhelpful.'" *Olin Corp. v. Lamorak Ins. Co.*, No. 84-CV-1968, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018) (quoting *In re Pfizer Sec. Litig.*, 819 F.3d 642, 661 (2d Cir. 2016)). Although the caselaw indicates that the DAT "only applies where one of the competitors produces fewer goods or services than the other competitor," *Aerotec*, 836 F.3d at 1186–87, no court appears to have rejected the precise argument made by Professor Hausman. Acknowledging that "the rejection of expert testimony is the exception rather than the rule," *Martinez v. Agway Energy Servs., LLC*, No. 5:18-CV-00235, 2022 WL 306437, at *14 (N.D.N.Y. Feb. 2, 2022) (quoting Fed. R. Evid. 702, Advisory Committee's Note), and in particular that "[d]eference to experts is particularly appropriate when expert testimony concerns soft sciences like economics," *Hughes*, 317 F.R.D. at 341, the Court does not exclude Professor Hausman's application of the DAT as contrary to law.

### B.   Inclusion of discounts

Visa and the Bank Defendants argue that the DAT should only be performed on discounts that issuers or merchants would lose if they used a non-Visa network for PIN debit, but that Professor Hausman "treated *all* Visa discounts — whether or not they would be lost by using another network for PIN debit — as bundled in his DAT." (Monopolization Mem. 23.)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that the "exclusionary effect from bundled pricing comes from the below-cost nature of the defendant's offer once the incentives are attributed to the competitive product" and therefore "exclusivity is

not required." (Monopolization Opp'n 35.) They claim that Visa and the Bank Defendants do

not identify an issuer deal that failed the DAT "where, as a factual matter, the issuer would not

have lost its credit or signature debit incentives if the issuer failed to fulfill its PIN debit

obligation across the entire term of the contract." (Monopolization Opp'n 34–35.)

### (1)   Issuer agreements

In conducting the DAT with issuer agreements, Professor Hausman "compare[d] the

revenue a competing PIN debit network would have earned from the issuer's Interlink volume to

the [Visa Partnership Program, or VPP] discounts the issuer received from Visa." (Hausman

Reply Rep. ¶ 530.) The Direct Action Plaintiffs' Response to the Defendants' Statement of

Material Facts claims that the issuer agreements that Professor Hausman analyzed with the DAT

"tied VPP discounts to the issuer's use of Interlink because 1) the agreements that provided the

VPP discounts also included PIN commitments; and 2) if the issuer failed to meet the PIN

commitments, Visa could terminate the entire agreement, including the VPP discounts." (Direct

Action Pls.' Resp. to Defs.' Rule 56.1 Statement 1795 ("Direct Action 56.1 Resp."), Docket No.

8195.) However, Visa and the Bank Defendants argue that this is insufficient because "[a]n

issuer whose contract was terminated for not meeting a PIN debit obligation would still have the

very same VPP credit and signature debit offer available under Visa's standing offer to all

issuers." (Visa and Bank Defendants' Reply Mem. in Supp. of Mot. for Summ. J. on Pls.'

Monopolization Claims 27 ("Monopolization Reply"), Docket Entry No. 8091.)

For a bundled discount to be anticompetitive, the discount must be contingent on the

purchase of the bundled items as a bundle. *See Inline Packaging, LLC v. Graphic Packaging

Int'l, LLC*, 351 F. Supp. 3d 1187, 1208 (D. Minn. 2018) (stating that the plaintiff must show that

the defendant "conditioned discounts and incentives on the purchase of [the bundled products] as

a bundle").  If issuers could receive the same VPP discounts regardless of whether they meet

their PIN commitments, Professor Hausman cannot treat the VPP discounts as "bundled" with

the PIN commitments.

However, whether issuers could receive the same VPP discounts regardless of whether

they met their PIN commitments appears to be a disputed issue of fact.  (*Compare* Defendants'

Stmt. of Material Facts ¶ 881 ("Defs.' 56.1"), Docket Entry No. 8068 (stating that the only

discounts Professor Hausman included in his DAT for issuers "were the [VPP] discounts that

were *not* conditioned on using Visa for PIN debit as well") *with* Direct Action 56.1 Resp. 2037

("There is no record evidence that the credit or signature debit discounts that were part of these

deals would still otherwise be available in whole or in part if the issuer did not provide its PIN

volume to Visa.")).  "[D]isputes of fact do not as a matter of law render an expert's opinion

unreliable.  Were it otherwise, no expert would ever be able to testify in any case not decided as

a matter of law." *Johnson v. Air & Liquid Sys. Corp.*, No. 18-CV-132, 2020 WL 11563846, at

*4 (E.D. Va. Nov. 6, 2020); *see also In re Flint Water Cases*, No. 17-10164, 2022 WL 189503,

at *2 (E.D. Mich. Jan. 20, 2022) ("This highly factual dispute is unsuited for resolution at the

*Daubert* stage."); *Royal Ins. Co. of Am. v. Joseph Daniel Constr., Inc.*, 208 F. Supp. 2d 423,

425–26 (S.D.N.Y. 2002) (stating that courts must "take care not 'to exclude an expert's

testimony on the ground that the court believes one version of the facts and not the other'"

(quoting Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702)). The Court

therefore does not exclude Professor Hausman's DAT as applied to issuer agreements.

### (2)   Merchant agreements

In conducting the DAT with merchant agreements, Professor Hausman estimated "the

value of incentives that a merchant would lose if it routed all of its PIN debit transactions and

potential PINless transactions away from Visa to a competing network," assuming that "all Interlink and PAVD transactions were contestable" and "var[ying] the extent to which signature debit transactions were contestable based on the merchant in question and Visa's estimates of PINless debit risk over time."[16]  (Hausman Reply Rep. ¶ 604.)  Visa and the Bank Defendants claim that Professor Hausman "opined that agreements with ██████████████████████ ███████████████████████████████ failed his DAT during some quarterly periods when Visa provided discounts only on Visa Debit" and that "Visa's agreement with ██████ contained discounts on credit card transactions that were *not* conditioned on debit routing." (Monopolization Mem. 23.)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that "these merchants were candidates for PINless acceptance, which meant *some of their signature debit volume was contestable based on issuer enablement*, so that PINless volume was treated as if it were PIN debit volume."  (Monopolization Opp'n 41.)  With regard to the ████████ they claim that "█████████████████████████████████████████████████████████ ██████████" and that █████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████ (*Id.*)

Professor Hausman's merchant agreement DAT is admissible.  Professor Hausman's decision to treat signature debit volume as contestable based on PINless debit risk is not a basis

---

[16] "Following the Durbin Amendment regulations in 2011, Visa began requiring their issuing banks to support PIN-authenticated Visa debit (PAVD) and promoting its usage by merchants."  (Harris Rep. ¶ 192.)  "The PAVD mandate states that any issuer seeking to utilize Visa's signature debit network must also enable PIN functionality over VisaNet, Visa's network (which is a different network from Interlink, the PIN debit network owned by Visa)."  (Hausman Rep. ¶ 574.)

for finding that he "lacks 'good grounds' for his . . . conclusions." *Amorgianos*, 303 F.3d at 267

(quoting *In re Paoli*, 35 F.3d at 746); *see also United States v. Acquest Transit LLC*, No. 09-CV-

55S, 2018 WL 3861612, at *16 (W.D.N.Y. Aug. 14, 2018) (stating that "provided expert's

testimony is adequately based in scientific knowledge, questions as to methods and procedures

used in arriving at opinion [are] matters of weight, not admissibility" (citing *McCullock v. H.B.*

*Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995))).   Rather, Visa and the Bank Defendants may

question this decision on cross-examination. *See Amorgianos*, 303 F.3d at 267.  With regard to

the ▮▮▮▮▮, the 7-Eleven Plaintiffs, The Home Depot, and Elgin appear to be correct that

Professor Hausman only conducted the DAT ▮▮▮▮▮▮▮▮▮▮▮▮.  (Hausman

Reply Rep. ¶ 632.)  To the extent Visa and the Bank Defendants wish to challenge Professor

Hausman's handling of the DAT with regard to the ▮▮▮▮▮, they may do so on cross-

examination.

## 2.    Opinions regarding substantial foreclosure

Visa and the Bank Defendants argue that Professor Hausman should be precluded from

opining that "Visa's discounts in agreements with issuers, merchants, or acquirers foreclosed a

substantial share of the debit market to competition."  (Hausman Section 2 Excl. Mem. 19–20.)

They claim that Professor Hausman's opening report opined that Visa's discounts foreclosed a

substantial share of the debit market, but failed to support that opinion with the necessary test,

namely the DAT.  (*Id.* at 20.)  When Professor Hausman *did* apply the DAT in his reply report,

Visa and the Bank Defendants claim that he found "that only a few of the discounts in the

agreements he initially challenged were actually, in his view, exclusionary," and he

"conspicuously drop[ped] the words 'substantial' and 'significant' from any assertions about

foreclosure."  (*Id.* at 20–21.)

36

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue, first, that "[g]iven that Professor Hausman finds *direct* evidence of harm to competition, he did not need to offer a specific foreclosure percentage in his opening report." (Hausman Section 2 Excl. Opp'n 22.)  Second, they argue that it is proper under *Daubert* to consider Professor Hausman's reply report in assessing the admissibility of his opinions.  (*Id.*)  Third, they claim that Professor Hausman's use of the DAT in his reply report was not an "admission that the DAT is the 'correct methodology,'" but rather a "response to opinions offered by Dr. Lerner" that actually "*corroborates* the economic analysis in" Professor Hausman's opening report.[17]  (*Id.* at 23.)  Finally, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that the fact that Professor Hausman did not use the word "substantial" every time he discussed foreclosure in his reply report "cannot be interpreted as a disavowal of any of his opinions."  (*Id.* at 23–24.)

Professor Hausman's reply report does not retract his claims about substantial foreclosure in his original report.  Professor Hausman's original report opines that Visa's pre-Durbin strategy "helped Visa maintain its monopoly position in debit by foreclosing its PIN debit rivals (STAR, PULSE, and NYCE, etc.) from a substantial portion of the market," (Hausman Rep. ¶ 530), and that its post-Durbin deals "have foreclosed competition in a significant portion of the debit card market," (*id.* ¶ 568.)  In his reply report, Professor Hausman defends his opinions about Visa's routing deals from criticisms by Defendants' expert Dr. Lerner:

> My opening report provided numerous citations and economic analysis explaining why Visa's scheme results in monopolization of the debit market.  I provided citations to Visa documents showing the extent to which Visa's strategy blocked competition in the market, and discussions of how an equally (or more) efficient PIN

---

[17]  Dr. Andres V. Lerner is an expert for Visa and the Bank Defendants.  (Videotaped Dep. of Andres Lerner 343:7–11, annexed to Wilson Decl. as Ex. 2, Docket Entry No. 8499-2; Defs.' Mem. in Opp'n to Target Pls.' Mot. to Excl. Rep. & Opinions of Def. Expert Andres Lerner 1, Docket Entry No. 8205.)

> debit competitor could not compete with Visa's deals without losing money.  Moreover, I offered specific examples of Visa's agreements foreclosing competition, such as the ███████████ among others.

(Hausman Reply Rep. ¶ 601 (footnote omitted).)  Professor Hausman goes on to write that "[t]he documents Dr. Lerner relied upon actually confirm that many of Visa's routing deals with merchants likely would fail the" DAT.  (*Id.* ¶ 602.)  Dr. Lerner himself does not apply the DAT, which Professor Hausman argues is "because it is evident that many of Visa's post-Durbin agreements fail that test."  (*Id.* ¶ 604.)  After applying the DAT to Visa's merchant agreements, (*id.* ¶ 606), Professor Hausman acknowledges that some of Visa's deals pass the DAT, "consistent with [his] view that not all of Visa's deals were anticompetitive," but states that this does "not change [his] conclusion that the overall Visa post-Durbin strategy, including many of its routing deals with merchants and acquirers, was anticompetitive."  (*Id.* n.1099.)

The Court agrees with the 7-Eleven Plaintiffs, The Home Depot, and Elgin that Professor Hausman's failure to "write the magic word 'substantial' every time he discusses foreclosure in his reply report cannot be interpreted as a disavowal of any of his opinions."  (Hausman Section 2 Excl. Opp'n 24.)  Professor Hausman's reply report clearly indicates that he believes the DAT supports his opinion that Visa's deals substantially foreclosed the debit market.  To the extent that Visa and the Bank Defendants disagree that a substantial portion of the debit market was foreclosed or that the results of Professor Hausman's DAT support this conclusion, they may challenge him on cross-examination.

Nor does the Court exclude Professor Hausman's opinions that certain deals represent exclusionary bundling even where those opinions are unsupported by evidence from the DAT. In his opening report, for example, Professor Hausman claims that "Visa's agreement with ████ also leveraged its substantial market power in the credit card market to harm

38

competition in the debit card market," (Hausman Rep. ¶ 72), but Professor Hausman does not include ████ in his list of retailers that failed the DAT. (Hausman Reply Rep. ¶ 606.) This Circuit has not held that the DAT is the only way that a party may show that bundled discounts are exclusionary. In the absence of such a holding, the Court does not find that an opinion that a given bundled discount is anticompetitive is inherently unreliable unless the expert applies the DAT.

### 3. Other evidence of substantial foreclosure

Visa and the Bank Defendants argue that Professor Hausman's "speculative assertions" that "Visa's anticompetitive strategy (PAVD, the suppression of competition in e-commerce, and certain EMV practices) . . . further foreclosed rival networks" should be excluded because "he does not actually try to show any incremental foreclosure from any of these other aspects of Visa's debit strategy." (Hausman Section 2 Excl. Mem. 22.) As an example, they point to Professor Hausman's opinion about EMV terminals, and contend that Professor Hausman's testimony shows that he "has no basis or expertise to claim any level of foreclosure from EMV choice screens — or to discuss EMV at all." (*Id.* at 22–23.) They also ask the Court to exclude Professor Hausman's speculation about Visa's pre-2004 HAC rule, which "gives rise to no claims here" and which Professor Hausman "admitted he has not 'studied.'" (*Id.* at 23.)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that "Professor Hausman offered detailed economic analysis on all aspects of Visa's monopolization scheme." (Hausman Section 2 Excl. Opp'n 25.) They claim that Visa and the Bank Defendants' argument is "contrary to law" and fails to cite any cases showing that "incremental foreclosure must be shown on each aspect of an interrelated anticompetitive strategy." (*Id.* & n.32.)

The Court does not exclude Professor Hausman's opinion that "to assess the complete impact of Visa's anticompetitive conduct on the debit market post-Durbin, the impact of these anticompetitive deals must be considered along with the other aspects of Visa's anticompetitive strategy (PAVD, the suppression of competition in e-commerce, and certain EMV practices), which further foreclosed rival networks and extended the harmful impact of Visa's strategy." (Hausman Reply Rep. ¶ 615.)  Professor Hausman's opinion that these alleged anticompetitive strategies should be considered together does not constitute a "speculative assertion."  (Hausman Section 2 Excl. Mem. 22.)  Nor is it problematic that Professor Hausman "fails to offer *any* opinion about how much (if any) additional foreclosure was caused by these strategies." (Hausman Section 2 Excl. Reply 15.)  Assuming without deciding that such percentages are necessary for the 7-Eleven Plaintiffs, The Home Depot, and Elgin to prevail at trial, that does not mean they are necessary for admissibility.  *See Ambrosini v. Labarraque*, 101 F.3d 129, 135 (D.C. Cir. 1996) (stating that the fact that the expert's "testimony alone may be insufficient for the [plaintiffs] to survive summary judgment does not necessarily defeat its admissibility under the 'fitness' prong of *Daubert*"); *In re Pfizer*, 819 F.3d at 661 ("The dispositive question [under Rule 702] is whether the testimony will assist the trier of fact . . . not whether the testimony satisfies the plaintiff's burden on the ultimate issue at trial." (quoting *Ambrosini*, 101 F.3d at 135)).  Because Professor Hausman's challenged paragraph explains his theory that the different elements of Visa's strategy should be considered in combination, it "will help the trier of fact to understand the evidence or to determine a fact in issue" and is admissible.  Fed. R. Evid. 702(a).

Visa and the Bank Defendants also challenge Professor Hausman's opinions about EMV choice screens, arguing that Professor Hausman "did nothing to educate himself about how those screens came about or the ease of switching them off" and that he "ultimately disclaimed either

expertise or any 'scientific' knowledge about these screens including their prevalence."
(Hausman Section 2 Excl. Mem. 22.)

Professor Hausman's opening report states that "through the guidelines it published for terminal manufacturers and the software suppliers who support payment acceptance terminals, Visa required that EMV readers provide for 'cardholder choice' of payment network," thus presenting consumers with "a deceptive set of options."[18]   (Hausman Rep. ¶ 594.)  In this way, Visa "exploited its power over EMV to maintain its monopoly power in the debit market."  (*Id.*)  Professor Hausman opines that this strategy is anticompetitive.  (*Id.*)  He acknowledges that "merchants can take steps to unwind" the choice screen, but claims that doing so is "costly and technically difficult for smaller merchants."  (*Id.* ¶ 596.)  In his reply report Professor Hausman defends his opinions about EMV choice screens against criticisms from Defendants' expert Dr. Lerner.  (Hausman Reply Rep. ¶¶ 748–751.)

Defendants cite to Professor Hausman's deposition testimony that he did not know that in September 2015, Visa "informed terminal manufacturers, merchants, and acquirers that they . . . weren't required to implement choice screens." (Hausman Dep. 514:14–23.)  Professor Hausman said that the "only thing [he did] know" was that he had encountered choice screens at ████████ and at a ████████ in Massachusetts.  (*Id.* at 514:22–515:10.)  He also testified that he did not know that "when Visa issued its official transaction acceptance guide for how to create the EMV terminals, [it] expressly provided the information on how not to offer choice screens and expressly said that was an alternative acceptable way to configure terminals."  (*Id.* at

---

[18]  Specifically, the EMV terminals "offered consumers a . . . choice between 'Visa Debit' (which routed the transaction to Visa) and 'US Debit' (which enabled routing choice to all debit networks including Visa's)."  (Hausman Rep. ¶ 594.)  Professor Hausman claims that "[t]hat choice was deceptive because 'US Debit' is not a term that has any meaning to consumers."  (*Id.*)

515:12–20.)  Professor Hausman testified that he had not reviewed the deposition testimony from

██████ and ██████ that "Visa did not require them to supply terminals . . . with choice

screens."  (*Id.* at 517:7–19.)  He said that he wanted "to look at the outcome and how it affects

competition" which is his "expertise as an economist."  (*Id.* at 517:12–17.)  He testified that he

was not aware "that in Visa's transaction acceptance guide, . . . Visa expressly said that if you

don't like Visa debit, U.S. Debit, you can also just continue using credit and debit choice

screens."  (*Id.* at 524:21–525:3.)  Nor did he know how much it cost to "counteract those

screens."  (*Id.* at 532:16–533:1.)  Professor Hausman was asked whether it would reduce his

antitrust concerns "if the cost of getting rid of logging in, switching off the choice screens and

just only prompting for PIN is minimal."  (*Id.* at 534:9–12.)  Professor Hausman replied that it

would depend on the cost but that he knew from observation that the choice screen at ██████

██████ "lasted for quite a while."  (*Id.* at 534:16–535:13.)  He said that a low cost of switching off

the choice screen did not seem "consistent with what [he] observed in the real world."  (*Id.* at

535:14–16.)  Professor Hausman testified that he was not an expert in "how to switch from

choice screens to the default of the common AID,"[19] but that "the economic evidence is that you

---

[19]  "Under EMV specifications, something called an Application Identifier ('AID') is used to identify what applications exist on the card and to differentiate among them."  (*See* Expert Report of Mansour Karimzadeh ¶ 31, annexed to Carney Decl. as Ex. DDX8, Docket Entry No. 8544-2.)  The AID "identifies the owner of the application, the technical application logic required for operation, and can also specify particular product offerings.  AIDs play a key role in EMV processing by allowing the card and terminal to communicate with each other."  *Id.* Under Visa and Mastercard's routing restrictions, "each debit card in the U.S. contain[s] . . . a Visa/Mastercard international 'global' AID and a Visa U.S. 'common' AID."  (*Id.* ¶¶ 134–135.)  The common AID "provides the potential for access to any of the networks enabled on a given debit card, including routing to Visa and Mastercard," while the global AID "limit[s] routing from the [g]lobal AID to only Visa or only Mastercard."  (*Id.* ¶¶ 136–137.)  On the EMV terminals criticized by Plaintiffs, consumers who selected "Visa Debit" were selecting Visa's global AID.  (*Id.* ¶ 144.)  However, if the consumer selected "US Debit," they selected the common AID, and "the merchant would maintain its ability to route the transaction over any network available on the card."  (*Id.*)

had these sophisticated merchants that didn't switch, . . . although it was costing them money leading to higher prices . . . and lower profits." (*Id.* at 536:2–14.)

The Court does not exclude Professor Hausman's EMV opinions. Visa and the Bank Defendants are correct that expert opinions should not be based on anecdote. *See Berk*, 380 F. Supp. 2d at 354 ("An anecdotal account of one expert's experience, however extensive or impressive the numbers it encompasses, does not by itself equate to a methodology."); *Playtex Prods., Inc.*, 2003 WL 21242769, at *10 (stating that expert's conclusions "founded solely on 'anecdotal evidence' are unreliable and are not based on scientific knowledge"). However, Professor Hausman's EMV opinions in his report are not based on anecdote but on materials in the record. (*See* Hausman Rep. ¶¶ 594–596; Hausman Reply Rep. ¶¶ 748–751.) The fact that an expert invokes anecdotes in support of his theory does not nullify the appropriate sources that the expert also relies on. *See Upstate Jobs Party v. Kosinski*, 559 F. Supp. 3d 93, 126 (N.D.N.Y. 2021) (admitting defendant's expert and stating that the plaintiffs "are free to cross-examine [the expert] about his 'extensive anecdotal evidence'").

Nor does the Court exclude Professor Hausman's EMV opinions on the basis that he is unqualified to opine on EMV. Professor Hausman's EMV opinions in his reports properly concern the economic implications of Visa's choice screens. (*See* Hausman Rep. ¶¶ 594–596; Hausman Reply Rep. ¶¶ 748–751.) Professor Hausman is not an expert on choice screens and did not specifically familiarize himself with Visa's "official acceptance guide for how to create the EMV terminals," testimony from terminal manufacturers, or the cost of switching off choice screens. (*See* Hausman Dep. 514:14–23, 517:7–19, 524:21–525:3, 532:16–533:1, 534:16–535:13, 536:2–14.) However, his opinions are not based on his personal expertise as to these topics, but rather cite to materials in the record indicating that changing the choice screen is

43

"costly and technically difficult for smaller merchants."  (*See* Hausman Rep. ¶ 596 n.825.)

Professor Hausman does not need to be an expert on EMV choice screens to opine about their

economic implications.  *See Johnson & Johnson Vision Care, Inc.*, No. 04-CV-7369, 2006 WL

2128785, at *6 (S.D.N.Y. July 28, 2006) ("It is not important that [the expert] does not have

specific training in the field of optometry or experience related to the eye care profession

because his opinions involve financial rather than industry specific analysis."); *TC Sys. Inc. v.

Town of Colonie*, 213 F. Supp. 2d 171, 174–75 (N.D.N.Y. 2002) (allowing testimony by an

economics expert despite lack of specific experience in telecommunications industry).  To the

extent Visa and the Bank Defendants claim that these opinions are inaccurate or irrelevant

because it is easy and inexpensive for merchants to change choice screens, they may make this

argument on cross-examination or in the presentation of their own evidence.  *See Cedar

Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 285 (S.D.N.Y.

2011) ("Questions over whether there is a sufficient factual basis for an expert's testimony may

'go to weight, not admissibility.'" (quoting *Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329, 343

(S.D.N.Y. 2006))).

Finally, Visa and the Bank Defendants argue that Professor Hausman's "speculation" that

"the success of both Visa and signature debit in general was attributable to" the pre-2004 HAC

rules should be excluded.  (Hausman Section 2 Excl. Mem. 23.)  Professor Hausman's opening

report includes a section on the background of the debit market, which opines that Visa and

Mastercard "were able to boost the acceptance footprints of their signature debit products by

leveraging their substantial market power in the credit market to force acceptance of signature

debit through their HAC rules."  (Hausman Rep. ¶ 498.)  This practice led to the *Visa Check*

litigation, which resulted in a settlement under which Visa and Mastercard agreed "to untie their

HAC rules into two rules, one for credit cards and the other for debit cards." (*Id.*)  In his reply

report, Professor Hausman argues that Defendants' expert Dr. Lerner's "discussion of the

evolution of the debit market glosses over several important details."  (Hausman Reply Rep. ¶

457.)  Professor Hausman again opines that until they were rescinded in 2004, "the HAC tying

rules supported supra-competitive credit-card-level interchange rates for signature debit" and that

Visa used its market power in the credit industry to monopolize the debit market.  (Hausman

Reply Rep. ¶ 458, 460.)  He critiques Dr. Lerner for failing to mention "that to preserve

acceptance of its signature debit product" after the 2004 HAC rules were revoked, "Visa had to

reduce interchange rates for many of the large debit-acceptance merchants."  (*Id.* ¶ 461.)  After

the *Visa Check* settlement, the "signature debit rate decreased," which Dr. Lerner suggests is the

product of "competitive forces," but which Professor Hausman argues was caused by "the

elimination of the HAC tying arrangement."  (*Id.* ¶ 463.)  Dr. Lerner also claims that Visa gained

an advantage by "recognizing that merchants would prefer using the existing credit card

networks instead of requiring merchants to install new terminals to support PIN-authentication,"

but Professor Hausman argues that Visa actually gained this advantage "through the HAC tying

rules."  (*Id.* ¶ 464.)

     The Court does not exclude Professor Hausman's opinions about the pre-2004 HAC tying

rules.  Visa and the Bank Defendants point to Professor Hausman's testimony at his deposition

that if the HAC tying rules had not existed, he did not "know what would have happened"

because he had not "studied that."  (Hausman Dep. 120:19–22; Hausman Section 2 Excl. Mem.

23.)  Professor Hausman did not make this comment in the course of rescinding his opinions

about the pre-2004 HAC tying rules; rather, he testified specifically that the pre-2004 tying rules

were one reason that signature debit was able to dominate the debit market even though PIN

technology is superior.  (Hausman Dep. 119:20–120:7.)  His failure to consider a specific

hypothetical does not render his opinions about the debit market prior to 2004 inadmissible.

Visa and the Bank Defendants also point out that the pre-2004 rule "gives rise to no claims

here." (Hausman Section 2 Excl. Mem. 23.)   However, many experts in this case, including

some of the Defendants' experts, have included descriptions of the history of the payment card

industries in their reports, including making claims about how this history supports their

opinions.  (*See* Expert Report of Kevin M. Murphy ¶¶ 54–117, annexed as Ex. 1 to Notice of

Filing Exhibits to Wilson Decl. in Supp. of Target Pls.' Mot. to Excl. Portions of Rep. &

Opinions of Kevin M. Murphy, Docket Entry No. 8501-1; Report of Dr. Andres V. Lerner ¶¶

23–84, annexed as Ex. 1 to Notice of Filing Exhibits to Wilson Decl. in Supp. of Target Pls.'

Mot. to Excl. Rep. & Opinions of Andres V. Lerner, Docket Entry No. 8499-1.)  Further, as

Professor Hausman's dispute with Dr. Lerner in his reply report makes clear, the pre-2004 HAC

rules are relevant to why signature debit is predominant, why signature debit rates decreased

after 2004, and why other PIN debit networks have so little brand recognition.  (*See* Hausman

Reply Rep. ¶¶ 460–65.)  Professor Hausman's references to the pre-2004 HAC rules tend "to

make the existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence" and are therefore admissible.

*Amorgianos*, 303 F.3d at 265.

>        **vi.   Conclusion**

The Court denies Visa and the Bank Defendants' motion to exclude portions of Professor

Hausman's report containing his Section 2 and debit opinions.

c.    **Motion to exclude expert testimony concerning Visa's fixed acquirer fee**

Visa and the Bank Defendants move to exclude Plaintiffs' experts Professor Stephen

Rowe and Mr. Robert Hutchins' damages calculations related to the FANF.  (FANF Mot.; *see*

Expert Report of Stephen Rowe ("Rowe Rep."), annexed to Carney Decl. as Ex. DDX16, Docket

Entry No. 8544-2; Expert Report of Robert Hutchins ("Hutchins Rep."), annexed to Carney

Decl. as DDX7, Docket Entry No. 8544-2.)

i.    **Plaintiffs' FANF liability and damages theories**

The FANF "is a fixed fee that merchants who accept Visa debit and/or credit products

must pay in order to access Visa's credit and/or debit markets."  (Rowe Rep. ¶ 28.)  In the case

of card-present charges, the FANF is "based on the number of physical locations [the merchants]

operate per tax ID."  (*Id.* ¶ 29; *see also* Hausman Rep. ¶ 244.)  This is known as "Table 1

FANF."  (*See* Visa Business News, Feb. 9, 2012, annexed to Carney Decl. as Ex. DDX107,

Docket Entry No. 8544-16.)  Merchants with card-not-present volume "are also assessed a

separate, additional fee for card-not-present transactions, based on monthly gross sales volume."

(Hausman Rep. ¶ 244.)  This second fee is the "Table 2 FANF."  (*Id.* ¶ 244 n.268.)  At the same

time that Visa implemented the FANF, it reduced its per-transaction fees.  (*Id.* ¶ 562.)

Professor Hausman opines that the FANF "is an exercise of Visa's substantial market

power in the credit market that has had anticompetitive effects in the debit market."  (*Id.* ¶ 560.)

Further, it allowed Visa to "reduce certain variable fees secure in the knowledge that its overall

revenue position would increase due to the FANF."  (Hausman Reply Rep. ¶ 587.)  Visa

"deployed FANF concessions and other discounts and incentives to foreclose competition from

equally (or more) efficient debit network competitors," thus "protect[ing] its monopoly in the

debit market."  (*Id.*)  In Professor Hausman's Scenario D1, in which there are no HAC rules and

47

no exclusive deals between Visa and debit issuers, Visa would not have been able to implement the FANF.  (Hausman Rep. ¶¶ 668, 669.)  Professor Hausman therefore "consider[s] the FANF to be damages" and "calculate[s] the FANF merchants paid, net of any incentives to offset the FANF, as damages."  (Hausman Rep. ¶ 35; *see also id.* ¶ 672 ("To quantify these damages, I calculate the FANF paid by each merchant minus any offsetting rebates the merchant received regarding the FANF.").)  In Scenario D2, the debit HAC rules and Visa's pre-Durbin Amendment exclusive arrangements with issuers would remain in place, but Visa would not "implement its integrated strategy to undermine the competition that . . . should have occurred as a result of the Durbin Amendment."  (*Id.* ¶ 678.)  Visa would not implement the FANF in Scenario D2, so Professor Hausman again "calculate[s] the FANF merchants paid, net of any incentives to offset the FANF, as damages."  (*Id.* ¶ 36; *see also id.* ¶ 681 ("I quantify FANF damages in the same way as I did in Section B(i).").)

Dr. Stephen Rowe, an expert for the 7-Eleven Plaintiffs, (Rowe Rep. ¶ 1), was asked "to calculate the total FANF payments net of any rebates or concessions the [7-Eleven Plaintiffs] received from Visa," (*id.* ¶ 2).  He concluded that from April 2012 through September 2018, the 7-Eleven Plaintiffs "will have collectively incurred FANF expenses of approximately ███

████."  (*Id.* ¶ 35.)  Similarly, Mr. Hutchins, an expert for The Home Depot, was asked "to quantify the estimated damages The Home Depot incurred," (Hutchins Rep. ¶ 1), including "damages to The Home Depot based upon The Home Depot's payment of Visa's" FANF, (*id.* ¶ 91).  He concluded that "the total amount of FANF fees paid by The Home Depot through December 31, 2016 is ██████."  (*Id.* ¶ 93.)[20]

───────────────

[20]  Defendants state that although their motion to exclude expert testimony concerning the FANF is addressed to Elgin, this is "because the motion challenges the damages methodology of

ii.   **Consistency of FANF liability theory and damages calculations**

Visa and the Bank Defendants argue that Professor Rowe's and Mr. Hutchins' FANF

damages calculations are "wholly inconsistent with" Professor Hausman's theory "of how the

FANF pricing structure . . . constitutes anticompetitive conduct by Visa in the alleged debit

market."  (Visa and Bank Defs.' Mem. in Supp. of Mot. to Excl. Expert Testimony Concerning

Visa's Fixed Acquirer Network Fee 5 ("FANF Excl. Mem."), Docket Entry No. 8072.)

Specifically, they argue that Professor Rowe and Mr. Hutchins fail to calculate the true impact of

the FANF pricing structure on the Plaintiffs and that their calculations include portions of the

FANF that are outside the scope of the Plaintiffs' liability theory.  (*Id.* at 6–9.)

1.   **Impact of FANF pricing structure on any Plaintiff**

Visa and the Bank Defendants claim that, according to Professor Hausman, to quantify

the net impact of the FANF on any particular Plaintiff, "you would have to look at what [the

Plaintiff was] paying as a result of the FANF, subtract out what they are [p]aying from lower

per-transaction fees, [and] subtract out other []specially negotiated agreements."  (Visa and Bank

Defs.' Reply Mem. in Supp. of Mot. to Excl. Expert Testimony Concerning Visa's Fixed

Acquirer Network Fee 3 ("FANF Excl. Reply"), Docket Entry No. 8118 (quoting Hausman Dep.

at 649:14–651:11).)  Visa and the Bank Defendants argue that Professor Rowe and Mr. Hutchins

"fail[] to follow" these instructions for calculating damages.  (*Id.* at 1.)  Instead, Professor Rowe

_____

the 7-Eleven Plaintiffs' experts . . . on which Elgin intends to rely."  (Visa and Bank Defs.'
Reply Mem. in Supp. of Mot. to Excl. Expert Testimony Concerning Visa's Fixed Acquirer
Network Fee 1 n.1 ("FANF Excl. Reply"), Docket Entry No. 8188 (quoting Hausman Dep. at
649:14–651:11).)  The parties have stipulated that Elgin may serve a damages-only expert report
by Dr. Jeffrey Leitzinger, and that Defendants may move to exclude Dr. Leitzinger's opinions.
(Letter regarding Status Update, Docket Entry No. 7949; Order dated May 27, 2020.)
Defendants do not address Dr. Leitzinger's opinions in this motion, instead "retain[ing] the right
to bring a subsequent, second *Daubert* challenge against Dr. Leitzinger."  (*Id.*)

"purports to calculate damages by first estimating each Plaintiff's FANF costs, and then deducting only the discounts a Plaintiff may have received that were specifically labeled as FANF discounts," which Visa and the Bank Defendants argue "ignores other 'incentives per transaction' earned 'if you route to Visa,' which Professor Hausman considers part of Visa's 'integrated strategy.'" (*Id.* at 6–7.)  Mr. Hutchins "includes as damages 'the total amount of FANF fees' for The Home Depot, without accounting for *any* associated savings," and "could not even say whether The Home Depot overall was better or worse off under the FANF pricing structure." (*Id.*)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue, first, that Professor Hausman opined that the variable fee reductions and routing incentives "would have been *greater* in the but-for world." (Mem. in Opp'n to Visa & Bank Defs.' Mot. to Excl. Expert Testimony Concerning Visa's Fixed Acquirer Network Fee 16, 18 ("FANF Excl. Opp'n"), Docket Entry No. 8227.)  Second, they claim that Professor Hausman "*already incorporated* per-transaction network fee reductions into his network fee damages calculations," and Mr. Hutchins "followed the same approach in calculating network fee damages for The Home Depot." (*Id.* at 17.)  Third, concerning routing incentives, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that most plaintiffs did not receive any non-FANF-related debit routing incentives, such that "even if Visa's argument had merit (and it does not), there is nothing to offset for those Plaintiffs." (*Id.* at 18.)  Finally, the 7-Eleven Plaintiffs, The Home Depot, and Elgin point to testimony from a Visa witness "that Visa is often unable to disentangle which portions of a routing incentive agreement is somehow attributable to an attempt by Visa to reduce the cost of the FANF, as opposed to other factors." (*Id.*)  Visa therefore "seeks to hold Plaintiffs' damages experts to a higher standard of computation than it can execute itself." (*Id.* at 18–19.)

50

Plaintiffs' experts' damages opinions must correspond to Plaintiffs' theory of liability. While "courts have allowed antitrust plaintiffs considerable latitude in proving the amount of damages," this latitude "is limited by the requirement that the damages awarded must be traced to some degree to unlawful acts." *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988); *see also In re LIBOR*, 299 F. Supp. 3d at 560 (excluding expert's damages opinions because "[b]y . . . failing to take into account not only the applicable legal standard . . . but also other relevant aspects of the but-for world . . . [the expert's] methodology cannot be fairly said to calculate 'damages'"). Because Professor Rowe and Mr. Hutchins do not put forth their own theories of liability, their damages calculations must correspond to Professor Hausman's theory. (*See* Hutchins Rep. ¶¶ 6, 7; Rowe Rep. 10 n.12.)

Both Professor Rowe and Mr. Hutchins subtracted only FANF rebates that were specifically designated as such from their FANF damage calculations. Regarding subtracting FANF incentives, Professor Rowe writes:

> Some merchants received FANF rebates over the course of the damages period. Some of those rebate payments I understand are summarized in a chart produced by Visa in the case. In such cases, I accounted for the value of the FANF rebate in my estimate of the total FANF charges incurred by the merchant that had received the rebate. I also accounted for the value of any rebates received by merchants as indicated in the merchant documents, or as spelled out in agreements between a merchant and Visa.

(Rowe Rep. ¶ 34 (footnote omitted); *see also* Reply Report of Dr. Stephen Rowe ¶ 56 ("Rowe Reply"), annexed to Carney Decl. as Ex. DDX17, Docket Entry No. 8544-3 ("My inclusion of rebates was based on Visa's characterization of the rebates as FANF related.").) Mr. Hutchins does not subtract any rebates in his FANF calculations, (Hausman Rep. ¶ 93); the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that this was because "[t]he Home Depot did not receive any FANF-specific concessions." (FANF Excl. Opp'n 15.)

51

Professor Hausman opines that FANF damages should be calculated as the amount merchants paid under the FANF net of incentives to offset the FANF, but does not otherwise specify which incentives should be subtracted.  In his report, Professor Hausman states that in Scenario D1, "Visa would not have been able to implement the [FANF] and, thus, I consider the FANF to be damages.  Therefore, I calculate the FANF merchants paid, net of any incentives to offset the FANF, as damages."  (Hausman Rep. ¶ 35; *see also id.* ¶ 672 ("To quantify these damages, I calculate the FANF paid by each merchant minus any offsetting rebates the merchant received regarding the FANF.").)  Similarly, in Scenario D2, Professor Hausman states that "I calculate the FANF merchants paid, net of any incentives to offset the FANF, as damages."  (*Id.* ¶ 36; *see also id.* ¶ 681 ("I quantify FANF damages in the same way as I did in Section B(i).")) At his deposition, Professor Hausman was asked:

> And to determine whether any individual merchant is better off or worse off under that new pricing structure, you would have to look at what they are paying as a result of the FANF, subtract out what they are [paying] from lower per-transaction fees, subtract out other especially negotiated agreements and discounts with Visa, right?

(Hausman Dep. 651:1–7.)  He replied: "In principle, I don't see how Interlink comes into it, but yeah, you could — you always try to net things out."  (*Id.* at 651:9–11.)  Opposing counsel asked, "Well, for Interlink, one of the things that Visa is paying merchants for [is] preferential routing to either Interlink or to PAVD, right?"  (*Id.* at 651:13–15.)  Professor Hausman said yes, but that "you could disagree about whether you should do it.  I would have to think about it, but I don't think it should be subtracted because, as I remember, you only paid FANF if you have signature."  (*Id.* at 651:16–20.)  Later in the deposition, opposing counsel stated: "With rare exception, Visa is not reducing FANF from its routing agreements.  It's just simply paying incentives per transaction if you route to Visa and reach your performance requirements."  (Hausman Dep. 653:12–15.)  Professor Hausman replied: "I see this as an integrated strategy and

when it was discussed and has been discussed numerous times, it always seems to be an integrated strategy."  (*Id.* at 653:17–20.)

As an initial matter, the Court does not find the 7-Eleven Plaintiffs, The Home Depot, and Elgin's arguments persuasive.  They argue that it is not necessary to deduct variable fee reductions and routing incentives because such reductions "would have been *greater* in the but-for world."  (FANF Excl. Opp'n 16, 18.)  However, this contradicts Professor Hausman's statement that he calculates "the FANF merchants paid, *net of any incentives to offset the FANF*, as damages."  (Hausman Rep. ¶ 35 (emphasis added).)  More generally, if Professor Hausman's theory is that the FANF was introduced alongside other fee reductions and was used to fund those fee reductions, a damages assessment that did not include those fee reductions would fail to capture the impact of the FANF.  (*See generally id.* ¶¶ 555–564.)  Second, the 7-Eleven Plaintiffs, The Home Depot, and Elgin claim that Professor Hausman and Mr. Hutchins already incorporated per-transaction network fee reductions into their network fee damages.  (FANF Excl. Opp'n 17.)  As Visa and the Bank Defendants argue, however, Professor Hausman's network fee damages analysis states that network fees would be lower in the but-for world due to "large issuing banks that would have pursued hybrid closed-loop opportunities," "the absence of no-bypass rules," and "competition from issuing banks"; it does not mention the FANF.[21] (Hausman Rep. ¶ 682, FANF Excl. Reply 3–4; *see also* Hutchins Rep. ¶ 95.)  Third, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that most plaintiffs did not receive any non-FANF-

---

[21]  Visa and the Bank Defendants also argue that "the 'Network Fee' damages cannot show that any Plaintiff suffered injury-in-fact from the integrated FANF pricing structure, as is required for any antitrust claim," (FANF Excl. Reply 4), but this is not a reason to exclude Professor Rowe's and Mr. Hutchins' opinions.  *See Ambrosini*, 101 F.3d at 136 (stating that the fact that expert's "testimony alone may be insufficient for the [plaintiffs] to survive summary judgment does not necessarily defeat its admissibility under the 'fitness' prong of *Daubert*").

related debit routing incentives.  (FANF Excl. Opp'n 18.)  As Visa and the Bank Defendants

point out, however, ███████████████████████████████████████████████████

████████████████████ (FANF Mem 7 n.4), ██████████████████████████████

████████████████████████████████████████████████████ (FANF Excl.

Reply 5 n.5.).  Finally, the 7-Eleven Plaintiffs, The Home Depot, and Elgin point to evidence that

Visa itself has difficulty distinguishing FANF and non-FANF rebates.  (FANF Excl. Opp'n 18–

19.)  It is true that "courts have allowed antitrust plaintiffs considerable latitude in proving the

amount of damages," and that this holding affects the Court's evaluation of Professor Rowe's

and Mr. Hutchins' damages calculations.  *U.S. Football League*, 842 F.2d at 1378.  However,

those calculations still must correspond to Professor Hausman's liability theory to be

meaningful.  *See In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 217

(S.D.N.Y. 2018) ("Plaintiffs must demonstrate that [their expert's] methodology identifies only

damages that result from Defendants' wrong — *i.e.*, it must isolate damages that inhere from a

valid theory of antitrust impact from those that do not.").

     Despite rejecting the 7-Eleven Plaintiffs', The Home Depot's, and Elgin's arguments, the

Court concludes that Professor Rowe's and Mr. Hutchins' damages calculations are not

necessarily contrary to Professor Hausman's limited testimony about calculating FANF

damages.  Professor Hausman's report describes the deductions that should be subtracted from

FANF damages as "incentives to offset the FANF" or "rebates the merchant received regarding

the FANF," (Hausman Rep. ¶¶ 35, 672), which is consistent with the challenged experts'

decision to subtract only rebates characterized as FANF-related.  Visa and the Bank Defendants

point to Professor Hausman's deposition testimony that discounts contained in individually

negotiated routing agreements were part of Visa's "integrated strategy" and would not have been

offered absent the FANF.  (*See* FANF Excl. Reply 5–6, Hausman Dep. 651–654.)  This nonspecific testimony, however, does not require that *all* discounts contained in individually negotiated routing agreements be considered part of the "integrated strategy."  While Professor Rowe and Mr. Hutchins may have failed to accurately represent the damages stemming from the alleged "integrated strategy," the Court does not conclude that their opinions are "speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison.'"  *Zerega Ave.*, 571 F.3d at 214 (quoting *Boucher*, 73 F.3d at 21).  Rather, it is still more likely than not that their opinions are the product of reliable principles and methods and will be helpful to the jury.  *See* Fed. R. Evid. 702(c).  Visa and the Bank Defendants may question Professor Hausman, Professor Rowe, and Mr. Hutchins at trial about which discounts should be deducted from FANF damages under Professor Hausman's theory.  *United States. v. Barone*, No. 09-CR-91, 2010 WL 2976502, at *1 (S.D.N.Y. July 14, 2010) (stating that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking . . . admissible evidence" (quoting *Daubert*, 509 U.S. at 596)).

## 2.    Portions of FANF outside of liability theory

Visa and the Bank Defendants argue that Professor Rowe's and Mr. Hutchins' damages calculations "include portions of the FANF that are beyond the scope of the liability theory Plaintiffs have put forth."  (FANF Excl. Mem. 8.)  They argue first, that "the Rowe and Hutchins calculations include Table 2 FANF amounts as damages," but Plaintiffs' complaints and Professor Hausman's report "challenge only the 'fixed,' 'locations'-based structure of Table 1 FANF, without alleging that the variable, volume-based structure of Table 2 FANF is exclusionary."  (*Id.*)  Second, Professor Rowe's and Mr. Hutchins' calculations "do not

distinguish between different merchant agreements," even though Professor Hausman "found anticompetitive agreements with only fifteen merchants during only certain limited three-month time periods." (*Id.* at 9.)

In response to Visa and the Bank Defendants' first argument, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that Table 2 FANF is "still *a fixed monthly fee*, but the Tier which a merchant falls into is determined by gross monthly sales volume (as opposed to number of locations)." (FANF Excl. Opp'n 20.) Further, because "the rationale for FANF damages is predicated on it being an exercise in market power that would not have existed in the but-for world," "it does not matter how many merchant deals incorporated the FANF to foreclose competition." (*Id.* at 22.) In response to Visa and the Bank Defendants' second argument, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that although Professor Hausman limited his DAT to only fifteen agreements, he "never suggested that *only those fifteen* agreements were anticompetitive." (*Id.*)

Professor Hausman includes the FANF as damages in both his Scenario D1 and his Scenario D2. In Scenario D1, in which there are no HAC rules, Professor Hausman states that Visa "would not have been able to implement" the FANF, and that therefore he "consider[s] the FANF to be damages." (Hausman Rep. ¶ 669.) In Scenario D2, in which the HAC rules exist but Visa does not implement its post-Durbin "integrated strategy," Professor Hausman considers the FANF to be damages because "the sole reason Visa implemented the FANF was to inhibit competition post-Durbin Amendment" and Visa therefore would not have implemented the FANF in Scenario D2. (*Id.* ¶¶ 687, 680.)

The Court concludes that Professor Rowe's and Mr. Hutchins' decision to include Table 2 FANF damages is supported by Professor Hausman's liability theory. Regarding Scenario D1,

Professor Hausman's reasoning that Visa could not have imposed the FANF in the absence of the allegedly anticompetitive HAC rules applies equally to Table 1 and Table 2 FANF.  Indeed, Professor Hausman states in his reply report that "[Table 2 merchants] (and their customers) pay the FANF and are injured by it.  This aspect of the FANF reflects Visa's substantial market power in the credit market, and the extent to which it has been wielded to harm card-not-present merchants."  (Hausman Reply Rep. ¶ 569.)  Defendants argue that it is improper to treat the FANF as damages merely because it is an exercise of market power, claiming that "the mere possession and exercise of market power, absent exclusionary conduct, is not a violation of Section 2."  (FANF Excl. Reply 10.)  However, it is not clear at this stage of the litigation that the FANF constitutes a permissible exercise of market power rather than "'flow[ing] from' the distortion of the market caused by the monopolist's anticompetitive conduct."  *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979).  Professor Hausman theorizes that in the Scenario D1 but-for world without the allegedly anticompetitive HAC rules, "Visa would not have been able to implement" the FANF.  (*Id.* ¶ 35).  It is not appropriate in deciding a *Daubert* motion to determine whether the FANF is a consequence of Visa's allegedly anticompetitive conduct in the credit market; rather, this is a matter for trial.  *Royal Ins. Co. of Am.*, 208 F. Supp. 2d at 425–26 (stating that courts must "take care not 'to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other'" (quoting Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702)).

Regarding Scenario D2, because Visa would have maintained the HAC rules in this scenario, (*see* Hausman Rep. ¶ 36), the Court assumes that in this scenario Visa's conduct in the credit market is not anticompetitive and that the FANF — as "an exercise of Visa's substantial market power in the credit market," (*id.* ¶ 565) — therefore does not "'flow[] from' the distortion

of the market caused by [Visa's] anticompetitive conduct." *Berkey Photo*, 603 F.2d at 297.

However, Professor Rowe's and Mr. Hutchins' inclusion of Table 2 FANF in their damages

calculations is sufficiently supported by Professor Hausman's opinion that, because "the sole

reason Visa implemented the FANF was to inhibit competition post-Durbin Amendment," Visa

would not have implemented the FANF in Scenario D2.  (Hausman Rep. ¶ 680.)  Visa and the

Bank Defendants argue that Table 2 FANF *could not have* inhibited competition under Professor

Hausman's theory because Professor Hausman "criticizes only the *fixed*, per-location nature of

Table 1 FANF," and that Table 2 FANF actually "*invites* competition" because it is "based on

the volume of transactions a merchant routes to Visa." (FANF Excl. Mem. 8–9.)  However,

Professor Hausman opines only that "[t]he per-location structure of the fee *supports* the

conclusion that the FANF was designed to create a lever to secure signature debit acceptance and

win routing deals."  (Hausman Rep. ¶ 556 (emphasis added).)  He also claims that Visa failed to

"assess its fixed costs when it set the FANF," showing its anticompetitive intentions, (*id.* ¶ 557),

and that Visa used the FANF to discourage merchants from dropping Visa debit by failing to

clearly announce that a merchant that dropped Visa credit or debit would only have to pay 50%

of the FANF, (Hausman Reply Rep. ¶ 567).  While it is true that "Table 2 FANF provides an

incentive for merchants to minimize Visa Debit volume by diverting debit transactions to Visa's

rivals," (FANF Excl. Reply 12), Professor Hausman has identified alternative evidence that

Table 2 FANF represents part of an anticompetitive strategy.  Noting that Plaintiffs still bear the

burden of proving their theory at trial, and bearing in mind that "[d]eference to experts is

particularly appropriate when expert testimony concerns soft sciences like economics," the Court

does not exclude Professor Rowe's or Mr. Hutchins' inclusion of Table 2 FANF damages.

*Hughes*, 317 F.R.D. at 341 (quoting *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *8).

Finally, the Court also does not exclude Professor Rowe's and Mr. Hutchins' opinions on the basis that they include merchant agreements that Professor Hausman did not specifically find to be anticompetitive.  (*See* FANF Excl. Mem. 9.)  In Scenario D1, the FANF damages represent an exercise of anticompetitively acquired market power, and therefore it is not necessary to show their connection to specific anticompetitive merchant agreements.  In Scenario D2, Visa would not have implemented the FANF at all because it would not have pursued an anticompetitive strategy post-Durbin Amendment.  As described above, Professor Hausman points to Visa's failure to assess its costs before imposing the FANF and its allegedly misleading messaging regarding the FANF as evidence that the FANF is anticompetitive even without reference to specifically anticompetitive merchant agreements.  While this theory that the FANF is anticompetitive may not prevail at trial or survive summary judgment, the Court does not exclude it at this time.  *See Ambrosini*, 101 F.3d at 135 (stating that the fact that expert's "testimony alone may be insufficient for the [plaintiffs] to survive summary judgment does not necessarily defeat its admissibility under the 'fitness' prong of *Daubert*").

### iii.   FANF damages calculations as one-sided

Visa and the Bank Defendants claim that "Professor Rowe and Mr. Hutchins fail to consider whether the damages they calculated should be reduced by any price-lowering effects on the issuer/cardholder side of the market."  (FANF Excl. Mem. 10.)  They argue that Professor Rowe and Mr. Hutchins have therefore "failed to apply the correct legal framework to calculate damages in a two-sided market."  (*Id.*)  Visa and the Bank Defendants argue that it is not their burden to show that the FANF generated price-lowering effects on the issuer/cardholder side of

the platform, but that they have presented evidence of such price-lowering effects regardless. (FANF Excl. Reply 13.)  Specifically, they point to evidence "that acquirer network fees were used, in part, to fund issuer fee reductions, and that revenue from the FANF in particular was part of Visa's response to downward pressure on issuer network fees following the Durbin Amendment."  (*Id.*)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue, first, that Visa "has provided no evidence" that it "passed the FANF . . . through to cardholders in any way." (FANF Excl. Opp'n 23.)  Second, they claim that "there is no legal basis to require an offset to Plaintiffs' FANF damages," citing to *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 92 U.S. 481, (1968).  (*Id.* at 24.)

In *Hanover*, plaintiff Hanover alleged that the defendant United had acted in violation of Section 2 by "leasing and refusing to sell its more complicated and important shoe machinery," and that Hanover "should recover from United the difference between what it paid United in shoe machine rentals and what it would have paid had United been willing during the relevant period to sell those machines."  *Hanover Shoe, Inc.*, 392 U.S. at 484–85.  United argued that "the illegal overcharge during the damage period was reflected in the price charged for shoes sold by Hanover to its customers" and that if Hanover had bought the machines at lower prices, it "would have charged less and made no more profit than it made by leasing."  *Id.* at 488.  The Supreme Court affirmed the Court of Appeals' rejection of this "'passing-on' defense," holding that if a buyer can show that he paid illegally high prices and the amount of the overcharge, he does not need to show that he did not pass on the overcharge to his own customers.  *Id.* at 488– 89.

*Hanover* is not applicable because Visa and the Bank Defendants' argument is based on the law concerning two-sided platforms: "In cases involving two-sided *transaction* platforms, the relevant market must, as a matter of law, include both sides of the platform." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019). As the Second Circuit explained in *US Airways*, "[i]n a market encompassing both sides of the platform, . . . if prices charged to [one side of the platform] are less — or incentive payments made are greater — than those that would be observed in a competitive market, then that difference must be accounted for in determining [the other side of the platform's] damages, if any." *Id.* at 59. Thus, prices on the issuer/cardholder side of the platform are relevant notwithstanding the "pass-through" analysis in *Hanover*.

Nevertheless, Professor Rowe's and Mr. Hutchins' FANF opinions are not excluded as one-sided. As is the case with Professor Hausman's damages calculations and Professor Harris's damages benchmarks, discussed in the Court's order on the motions to exclude the opinions of Dr. Kohler, Professor Harris, Professor Hausman, and Professor Stiglitz, the Court accepts Professor Rowe's and Mr. Hutchins' assumptions that the FANF did not cause lower issuer/cardholder prices. *Zerega Ave.*, 571 F.3d at 214 (stating that unless expert's assumptions are "so unrealistic and contradictory as to suggest bad faith" or be "in essence 'an apples and oranges comparison,'" other "contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony" (quoting *Boucher*, 73 F.3d at 21)). Visa and the Bank Defendants may challenge these assumptions on cross-examination. Although Visa and the Bank Defendants cite to "evidence that the FANF enabled price-lowering effects on the issuer/cardholder side of the platform," all the evidence in question is either disputed by Plaintiffs or is expert evidence that the jury may ultimately reject as unpersuasive. (FANF Excl.

Reply 13; *see* Defs.' 56.1 ¶¶ 889, 891–892, 921; Direct Action 56.1 Resp. 2051–53, 2057–61, 2140; Lerner Rep. ¶¶ 371–372, 378, 380.)  The Court declines to resolve this disagreement at the current stage of the litigation.  "[D]isputes of fact do not as a matter of law render an expert's opinion unreliable.  Were it otherwise, no expert would ever be able to testify in any case not decided as a matter of law."  *Johnson*, 2020 WL 11563846, at *4.

### III.  Conclusion

For the foregoing reasons, the Court denies Visa and the Bank Defendants' motions to exclude portions of Professor Hausman's Section 2 and debit expert testimony and expert testimony concerning Visa's FANF.

Dated: October 8, 2022
      Brooklyn, New York

SO ORDERED:

/s/ MKB
_____
MARGO K. BRODIE
United States District Judge