UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE          FILED UNDER SEAL
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION                                  **MEMORANDUM & ORDER**
                                            05-MD-1720 (MKB)


This document refers to: ALL ACTIONS

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.   Background ........................................................................................................... 5

II.  Discussion ............................................................................................................ 5

  a.  Standard of review ............................................................................................ 5

  b.  Motion to exclude opinions of Mansour Karimzadeh ...................................... 8

    i.   Karimzadeh's background and expert report ............................................... 8

    ii.  Opinions on EMV timing, financial incentives, and lack of PIN mandate .................. 10

      1.  Relevance of Mr. Karimzadeh's opinions on EMV migration ............................... 10

      2.  Opinions on commercial and economic issues ................................................. 13

      3.  Opinion that the US EMV rollout should have begun earlier ................................ 16

      4.  Opinion that liability shift dates were "unachievable" ..................................... 16

      5.  Opinion that the EMV timeline was too short ................................................ 19

      6.  Opinion that a lack of financial incentives delayed EMV adoption ......................... 24

      7.  Opinion that Visa and Mastercard should have mandated PIN for credit and debit
          transactions ................................................................................. 26

    ii.  Opinions on choice screens ................................................................... 27

      1.  Opinion on confusion ....................................................................... 28

      2.  Opinion on burden .......................................................................... 31

      3.  Opinion that Visa "could" have made different recommendations ........................... 33

      4.  Opinions about compliance with Durbin Amendment ......................................... 34

    iii. Opinions on motivations and state of mind ................................................... 38

    iv.  Conclusion ................................................................................. 41

  c.  Motion to exclude the report and testimony of Dennis W. Carlton ....................... 42

    i.   Professor Carlton's qualifications and expert report ..................................... 42

    ii.  Professor Carlton's opinion about the real-world net price of credit transactions ....... 46

iii.    Causal link between 2012 rule changes and price decrease ...................................... 52

    1.    Grand Bargain ........................................................................................... 52

    2.    PayPal proposal ........................................................................................ 59

    3.    Overall causality ...................................................................................... 62

iv.    Professor Carlton's analysis of Australia ................................................... 65

v.    Link between challenged rules and Durbin Amendment ............................ 67

vi.    Conclusion .................................................................................................. 70

d.    Motion to exclude opinions of Stephen C. Mott .................................................... 70

i.    Mr. Mott's qualifications and expert report ............................................... 70

ii.    Intent, motives, and state of mind .............................................................. 73

iii.    Witness credibility ................................................................................... 101

iv.    Narrative of the record ............................................................................. 105

v.    Conclusion ................................................................................................ 114

e.    Motion to exclude the opinions of David P. Stowell .......................................... 115

i.    Professor Stowell's qualifications and expert report ............................... 115

ii.    "Fit" of Professor Stowell's opinions ..................................................... 117

iii.    Intent, motive, and state of mind ............................................................. 124

iv.    Professor Stowell's methodology ............................................................ 128

v.    Conclusion ................................................................................................ 132

III.    Conclusion ............................................................................................................... 133

In December 2020, several parties[1] in this multidistrict litigation filed a combined five

motions for summary judgment and partial summary judgment,[2] and nineteen motions to exclude

---

[1] The moving Plaintiffs consist of (1) the Equitable Relief Class, which was certified under Federal Rule of Civil Procedure 23(b)(2), *DDMB, Inc. v. Visa, Inc.*, No. 05-MD-1720, 2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021); (2) the Target Plaintiffs, the 7-Eleven Plaintiffs, and The Home Depot (collectively, the "Direct Action Plaintiffs"), which are not members of a class, *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL 4325812, at *3 (E.D.N.Y. Sept. 27, 2017), *order set aside on other grounds*, No. 05-MD-1720, 2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018); and (3) Elgin Ave. Recovery, LLC, which has filed its own separate complaint, No. 13-CV-5746 (E.D.N.Y.), Elgin's Am. Compl. & Jury Demand, Docket Entry No. 213), and has agreed to rely on the 7-Eleven Plaintiffs' experts at trial except regard to damages, (Letter dated May 26, 2020, Docket Entry No. 7949).

The Defendants consist of the Visa and Mastercard networks as well as "various issuing and acquiring banks" (the "Bank Defendants"). *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 18 (E.D.N.Y. 2019). "At the beginning of this litigation . . . Visa and Mastercard were effectively owned by their member banks." *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, No. 05-MD-1720, 2019 WL 7584728, at *3 (E.D.N.Y. Nov. 20, 2019). In 2006 and 2008, "Mastercard and Visa, respectively, made initial public offerings ('IPOs'), becoming publicly traded individual companies." *Id.* However, Plaintiffs claim that the alleged anticompetitive practices have "continued despite the networks' and the banks' more recent attempts to avoid antitrust liability by restructuring the Visa and [Mastercard] corporate entities." *Id.*; (Equitable Relief Class Action Compl. ("Equitable Relief Class Compl.") ¶ 1, annexed to Szanyi Decl. as SJDX4, Docket Entry No. 8520-1; *see also* Sixth Amended 7-Eleven Compl. ("7-Eleven Compl.") ¶¶ 78–79, annexed to Szanyi Decl. as SJDX1, Docket Entry No. 8520-1 (stating that "the IPOs did not change the essential character of" Visa and Mastercard's "combinations in restraint of trade"); Second Amended Target Compl. ("Target Compl.") ¶¶ 78–79, annexed to Szanyi Decl. as SJDX3, Docket Entry No. 8520-1 (same); First Amended The Home Depot. Compl. ("Home Depot Compl.") ¶¶ 120–34, annexed to Szanyi Decl. as SJDX2 (claiming that Visa and Mastercards' "post-IPO structures . . . were designed to perpetuate, and not to disturb, the anticompetitive conduct detailed in this Complaint").)

[2] (Defs.' Notice of Mot. for Summ. J. ("Def.'s Mot."), Docket Entry No. 8067; Notice of Target Pls.' Mot. for Partial Summ. J. ("Target Pls.' Mot."), Docket Entry No. 8097; Equitable Relief Class Pls.' Notice of Mot. for Partial Summ. J. ("Equitable Relief Class Mot."), Docket Entry No. 8150; Notice of 7-Eleven Pls.' & The Home Depot's Motion for Partial Summ. J. ("7-Eleven & The Home Depot Mot."), Docket Entry No. 8184; Defs.' Notice of Mot. to Excl. Pls.' Expert Opinions on EMV Chargebacks & for Partial Summ. J. ("EMV Mot."), Docket Entry No. 8138.)

expert testimony.[3] Because of the volume of motions, the Court decides the motions to exclude

in six separate opinions based primarily on the parties who filed the motion.

Defendants filed eight motions to exclude expert testimony, seeking to exclude opinions

from Dr. Reto Kohler, Professor Robert G. Harris, Professor Jerry Hausman, Professor Joseph E.

Stiglitz, Mr. Mansour Karimzadeh, Professor Dennis W. Carlton, Mr. Stephen C. Mott, and

Professor David P. Stowell. (*See* Kohler Mot., Harris Mot., Hausman Section 1 Mot., Stiglitz

Mot., Karimzadeh Mot., Carlton Mot., Stowell Mot., Mott Mot.) In this Memorandum and

Order, the Court decides four of Defendants' eight motions to exclude expert testimony,

---

[3] (Defs.' Notice of Mot. to Excl. Opinions of Dr. Reto Kohler ("Kohler Mot."), Docket Entry No. 8101; Defs.' Notice of Mot. to Excl. in Part Opinions of Prof. Robert G. Harris ("Harris Mot."), Docket Entry No. 8104; Defs.' Notice of Mot. to Excl. in Part Section 1 Opinions of Prof. Jerry Hausman ("Hausman Section 1 Mot."), Docket Entry No. 8081; Visa and Bank Defs.' Notice of Mot. to Excl. in Part Section 2 & Debit Opinions of Prof. Jerry Hausman ("Hausman Section 2 Mot."), Docket Entry No. 8084; Defs.' Notice of Mot. to Excl. in Part Opinions of Prof. Joseph E. Stiglitz ("Stiglitz Mot."), Docket Entry No. 8074; Defs.' Notice of Motion to Excl. Opinions of Mansour Karimzadeh ("Karimzadeh Mot."), Docket Entry No. 8077; Visa and Bank Defendants' Notice of Mot. to Excl. Expert Testimony Concerning Visa's Fixed Acquirer Network Fee ("FANF Mot."), Docket Entry No. 8070; Defs.' Notice of Mot. to Excl. Report & Testimony of the 23(b)(2) Pls.' Expert Dennis W. Carlton ("Carlton Mot."), Docket Entry No. 8086; Defs.' Notice of Mot. to Excl. Opinions of Stephen C. Mott ("Mott Mot."), Docket Entry No. 8080; Defs.' Notice of Mot. to Excl. Opinions of David P. Stowell ("Stowell Mot."), Docket Entry No. 8075; Notice of Direct Action Pls.' Mot. to Excl. Portions of Report & Opinions of Def. Expert R. Garrison Harvey ("Harvey Mot."), Docket Entry No. 8090; Notice of Direct Action Pls.' Mot. to Excl. Report & Opinions of Def. Expert Glenn Hubbard ("Hubbard Mot."), Docket Entry No. 8108; Notice of Direct Action Pls.' Mot. to Excl. Report & Opinions of Def. Expert Barbara E. Kahn ("Kahn Mot."), Docket Entry No. 8114; Notice of Direct Action Pls.' Mot. to Excl. Report & Opinions of Def. Expert David J. Teece ("Teece Mot."), Docket Entry No. 8135; Notice of Direct Action Pls.' Mot. to Excl. Portions of Report & Opinions of Def. Expert David P. Kaplan ("Kaplan Mot."), Docket Entry No. 8207; Notice of Mot. to Excl. the Report & Opinions of Def. Expert Andres V. Lerner ("Lerner Mot."), Docket Entry No. 8121; Notice of Target Pls.' Mot. to Excl. Portions of Report & Opinions of Def. Expert Kevin M. Murphy ("Target Murphy Mot."), Docket Entry No. 8129; Notice of The Home Depot & 7-Eleven Pls.' Mot. to Excl. Portions of the Report & Opinions of Def. Expert Kevin M. Murphy ("Home Depot & 7-Eleven Murphy Mot."), Docket Entry No. 8181; Notice of 7-Eleven Pls.' & The Home Depot's Mot. to Excl. Portions of Reports & Opinions of Def. Experts Marc Cleven & Stuart J. Fiske ("Cleven & Fiske Mot."), Docket Entry No. 8200.)

addressing the motions to exclude the opinions of Mr. Karimzadeh on behalf of the 7-Eleven

Plaintiffs and The Home Depot, Professor Carlton on behalf of the Equitable Relief Class,

Professor Stowell on behalf of the Target Plaintiffs, and Mr. Mott on behalf of the 7-Eleven

Plaintiffs and The Home Depot.  For the reasons set forth below, the Court grants in part and

denies in part the motions to exclude.[4]

## I.   Background

For the relevant factual background, the Court refers the reader to its Memorandum and

Order addressing the motions to exclude expert testimony filed by all Defendants to wholly or

partially exclude the opinions of Dr. Reto Kohler, Professor Robert G. Harris, and Professor

Joseph E. Stiglitz, and the Section 1 opinions of Professor Jerry Hausman.  (Mem. & Order,

Docket Entry No. 8714.)

## II.   Discussion

### a.   Standard of review

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill,

experience, training, or education may testify in the form of an opinion or otherwise if: (a) the

expert's scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient

facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the

expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid.

---

[4] The Court separately decides (1) the first four motions to exclude filed by all
Defendants, (2) the two motions to exclude filed by Visa and the Bank Defendants, (3) the two
motions to exclude filed by the Target Plaintiffs, (4) the two motions to exclude filed by the 7-
Eleven Plaintiffs and The Home Depot, and (5) the five motions to exclude filed by the Direct
Action Plaintiffs.

702.[5]  "While the proponent of expert testimony has the burden of establishing by a

preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, . . .

the district court is the ultimate gatekeeper." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir.

2020) (alteration in original) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir.

2007)); see also *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) ("The law assigns

district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of

Rule 702." (citation omitted)), *cert. denied*, 565 U.S. 1088 (2011).

Before permitting a person to testify as an expert under Rule 702, the court must make

the following findings: (1) the witness is qualified to be an expert; (2) the opinion is based upon

reliable data and methodology; and (3) the expert's testimony on a particular issue will "assist

the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005); *see also*

---

[5]  In June of 2022, the Judicial Conference Committee on Rules of Practice and
Procedure voted to approve two amendments to Rule 702. *See* Colleen Cochran, *The Process,
Progression, and Potential Ramifications of the Rule 702 Amendment*, BUSINESS LAW TODAY
(Sept. 5, 2022), https://businesslawtoday.org/2022/09/rule-702-amendment-process-progression-
potential-ramifications/.  One of the two proposed amendments changes the text of the rule to
read: "A witness who is qualified as an expert by knowledge, skill, experience, training or
education may testify in the form of an opinion or otherwise if *the proponent demonstrates to the
court that it is more likely than not that* . . . ."  Committee on Rules of Practice and Procedure,
Agenda Book (June 7, 2022), Tab 7A, https://www.uscourts.gov/sites/default/files/2022-
06_standing_committee_agenda_book_final.pdf, at 891.  The second proposed amendment
changes subsection (d) from "the expert has reliably applied the principles and methods to the
facts of the case" to "the expert's opinion reflects a reliable application of the principles and
methods to the facts of the case."  *Id.* at 891–92.
    If approved by the Judicial Conference and the United States Supreme Court, and not
rejected, modified, or deferred by Congress, the amendments will take effect in December of
2023.  Cochran, *supra*.  Because the amendments are not in force at the time this decision is
published, the Court does not apply the amended version of Rule 702.  However, in deciding
these motions the Court is mindful of the proposed amendments' purpose of "emphasiz[ing] that
the court must focus on the expert's opinion, and must find that the opinion actually proceeds
from a reliable application of the methodology" and "explicitly weaving the Rule 104(a)
standard into the text of Rule 702."  Committee on Rules of Practice and Procedure at 871.

*United States v. Napout*, 963 F.3d 163, 187–88 (2d Cir. 2020) (explaining that the court is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993))); *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) (same).  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court set forth a list of factors, in addition to the criteria set forth in Rule 702, that bear on the determination of reliability: "(1) whether a theory or technique has been or can be tested; (2) 'whether the theory or technique has been subjected to peer review and publication;' (3) the technique's 'known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation;' and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 593–94); *see also United States v. Morgan*, 675 F. App'x 53, 55 (2d Cir. 2017) (same); *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) (same).  The *Daubert* inquiry for reliability is a "flexible one" and does not "constitute a definitive checklist or test," and thus, the *Daubert* factors "neither necessarily nor exclusively appl[y] to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 150 (1999) (citation omitted).

The district court is afforded "the same broad latitude when it decides how to determine reliability as it enjoys [with] respect to its ultimate reliability determination." *Id.* at 142.  Expert testimony should be excluded if it is "speculative or conjectural." *Jones*, 965 F.3d at 162 (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (same). When an expert's opinion is based on data or methodologies "that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."

*Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (citation omitted); see also *Nimely*, 414 F.3d at 396 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." (alteration in original) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997))).  Nevertheless, "in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion."  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)); *see also Adams v. Liberty Mar. Corp.*, 407 F. Supp. 3d 196, 202 (E.D.N.Y. 2019) (same).

### b.   Motion to exclude opinions of Mansour Karimzadeh

Defendants move to exclude the opinions of Mansour Karimzadeh, ("Karimzadeh Mot."), an expert witness for the 7-Eleven Plaintiffs and The Home Depot.  (*See* Expert Report of Mansour Karimzadeh ("Karimzadeh Rep.") ¶ 6, annexed to Carney Decl. as Ex. DDX8, Docket Entry No. 8544-2.)

### i.   Karimzadeh's background and expert report

Mansour Karimzadeh is the CEO of a "consultancy, training, and software solutions provider with expertise in EMV implementations."  (Karimzadeh Rep. ¶ 1.)  He previously served as co-founder and Managing Director of a company that "provided specialist smart card services and software applications."  (*Id.* ¶ 2.)  He is also co-chair of the U.S. Payment Forum's Communications & Education working committee, a former member of the EMV Migration Forum's Steering Committee, a member of the ATM Industry Association, and the EMV

8

technical advisor to its U.S. EMV Migration committee.  (*Id.* ¶ 4.)  Mr. Karimzadeh has not provided expert testimony within the last four years.  (*Id.* ¶ 5.)

Mr. Karimzadeh's assignment was "to analyze whether there were aspects of how Visa and Mastercard introduced EMV technology in the United States that differed from how that technology was introduced elsewhere around the world, and to examine some of the potential security and technical justifications for those differences."  (*Id.* ¶ 6.)  His expert report includes a technical background of EMV standards, (*id.* ¶¶ 11–54); a discussion of EMV implementation around the world, (*id.* ¶¶ 55–84); a discussion of EMV in the United States, (*id.* ¶¶ 85–114); a discussion of debit transaction routing and the EMV migration, (*id.* ¶¶ 115–167); and a discussion of the EMV migration timeline, (*id.* ¶¶ 168–220).  He describes his report as setting fourth four main opinions:

> • Contrary to how they acted throughout the world, Visa and Mastercard delayed bringing EMV to the U.S., exposing U.S. merchants and cardholders to a lower quality payment system marked by higher fraud and lower global interoperability.
> • Contrary to how they acted throughout the world, when Visa and Mastercard finally introduced EMV to the U.S., the world's largest and most complex market, they did so on an extremely short timeline, most of which elapsed without agreed-upon, legally-compliant debit card specifications; provided incentives to issuers, but not merchants; and caused EMV-card issuance to far outpace terminalization, triggering an avalanche of chargebacks on U.S. merchants, including the 7-Eleven Plaintiffs.
> • Contrary to how they acted throughout the world, Visa and Mastercard declined to mandate "Chip & PIN," yet required the use of "signature" despite its inferiority as a form of authentication.
> • Visa and Mastercard implemented EMV in a way that limited merchant control over debit routing, leading to additional cost and complexity for merchants and confusion for cardholders.

(Reply Expert Report of Mansour Karimzadeh ¶ 2 ("Karimzadeh Reply Rep."), annexed to Carney Decl. as Ex. DDX9, Docket Entry No. 8544-2.)

Mr. Karimzadeh also submitted a reply expert report responding to criticisms of his initial report. (Karimzadeh Reply Rep.)

### ii.  Opinions on EMV timing, financial incentives, and lack of PIN mandate

Defendants challenge (1) the relevance of Mr. Karimzadeh's opinions on EMV migration, (2) Mr. Karimzadeh's qualifications to opine on commercial and economic matters, (3) Mr. Karimzadeh's opinion that the US EMV rollout should have begun earlier, (4) Mr. Karimzadeh's opinion that the liability shift dates were "unrealistic," (5) Mr. Karimzadeh's opinion that the EMV migration timeline was too short, (6) Mr. Karimzadeh' opinion that a lack of financial incentives delayed EMV adoption, and (7) Mr. Karimzadeh's opinion that Visa and Mastercard should have mandated PIN for debit and credit transactions.  The Court concludes that Mr. Karimzadeh's opinions on these topics are relevant and admissible.

### 1.  Relevance of Mr. Karimzadeh's opinions on EMV migration

Defendants argue that because Mr. Karimzadeh's opinions about EMV migration are offered "in support of Plaintiff's allegations that Visa and Mastercard possess market power," the relevant question "is whether the timing of the EMV rollout in the United States and the lack of other financial incentives or a PIN mandate as part of that rollout are inconsistent with a competitive outcome in the United States." (Mem. of Law in Supp. of Mot. to Excl. Opinions of Mansour Karimzadeh ("Karimzadeh Excl. Mem.") 7–8, Docket Entry No. 8079.)  They claim that "Mr. Karimzadeh's methodology expressly does *not* address this relevant question." (*Id.* at 8.)  Defendants also argue that Mr. Karimzadeh's opinions are not independently relevant as evidence of poor product quality because "[p]roduct quality and innovation . . . are meaningful topics in an antitrust case only if they are contrasted with some but-for world where allegedly competitive market forces would have resulted in differences in quality or innovation." (Reply

in Further Supp. of Mot. to Excl. Opinions of Mansour Karimzadeh ("Karimzadeh Excl. Reply")

4, Docket Entry No. 8159.)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that Mr.

Karimzadeh's opinions are relevant to the market power inquiry, as shown by Professor

Hausman's "reliance on them for his market power opinions concerning EMV." (Mem. of Law

in Opp'n to Defs.' Mot. to Excl. Opinions of Mansour Karimzadeh ("Karimzadeh Excl. Opp'n")

13, Docket Entry No. 8226.)  They claim that "[i]ndustry experts like Mr. Karimzadeh routinely

testify in complex antitrust cases like this one, and it is common in such cases for the economic

experts to rely on industry expertise for portions of their analysis." (*Id.* at 14.)  The 7-Eleven

Plaintiffs, The Home Depot, and Elgin also argue that "Mr. Karimzadeh's opinions are

independently relevant" because they show "decreased quality in the relevant market," which is a

form of direct evidence of anticompetitive effects. (*Id.* at 17.)  Further, Mr. Karizadeh's opinions

are relevant to rebut Defendants' assertions that "the level of quality and innovation in the U.S.,

including with respect to payment card security and functionality, is proof that U.S. markets

were operating competitively." (*Id.* at 18.)

The Court finds that Mr. Karimzadeh's opinions are relevant.  First, his opinion that Visa

and Mastercard's EMV migration strategy is not justifiable from a technical perspective is

relevant to whether the EMV migration strategy is evidence of Visa and Mastercard's market

power. (*See* Hausman Rep. ¶¶ 264, 266 (opining that "Visa and Mastercard's conduct with

respect to payment card security further reflects their substantial market power" and that

Professor Hausman "understand[s] from the expert report of Mansour Karimzadeh that several

aspects of the implementation cannot be justified from a security or technical perspective")); *see*

*also Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 40 (S.D.N.Y. 2016) (allowing expert

11

testimony that was "but 'one piece'" of the plaintiffs' ultimate market definition).  Second, decreased quality in the relevant market is a form of direct evidence of anticompetitive effects. *Ohio v. Am. Express Co.* ("*Amex*"), 138 S. Ct. 2274, 2284 (2018) ("Direct evidence of anticompetitive effects would be '"proof of actual detrimental effects [on competition],"' such as . . . decreased quality in the relevant market." (alteration in original) (citation omitted) (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 477, 460 (1986))).

Defendants argue that both Mr. Karimzadeh and Professor Hausman fail to "engage with the issue of whether other factors, aside from 'technical' or 'security' considerations, could explain the timing of EMV migration in the U.S." (Karimzadeh Excl. Reply 3.)  Defendants may introduce evidence of other factors responsible for the timing of EMV migration in the U.S., but Mr. Karimzadeh's and Professor Hausman's failure to discuss these other factors does not render their opinions inadmissible.  *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, No. 11-CV-0564, 2019 WL 1515231, at *6 (E.D.N.Y. Feb. 21, 2019) (finding that expert's failure "to account for" a certain fact was "a 'battle of the experts' issue" that "does not go to reliability or relevance at this gatekeeping phase."); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 466 (S.D.N.Y. 2016) (finding that while a certain fact "is fair game for cross-examination of [the expert], and seems to undermine his conclusion . . . , in these circumstances his failure to discuss it in his report is not so glaring as to render his opinion unreliable or admissible").

Finally, Defendants argue that Mr. Karimzadeh's opinions are not relevant evidence of poor product quality because "[p]roduct quality and innovation . . . are meaningful topics in an antitrust case only if they are contrasted with some but-for world where allegedly competitive market forces would have resulted in differences in quality or innovation." (Karimzadeh Excl. Reply 4.)  The Court finds that Mr. Karimzadeh's opinions about the inferior quality of signature

12

debit and the delayed EMV rollout are relevant to a showing that anticompetitive behaviors caused poor product quality. *See Kogut v. County of Nassau*, 894 F. Supp. 2d 230, 239 (E.D.N.Y. 2012) ("Expert evidence is relevant if it tends to make any fact of consequence to the litigation more or less probable.").

### 2. Opinions on commercial and economic issues

Defendants also argue that the opposition's "concession that 'commercial and economic factors'" are beyond Mr. Karimzadeh's expertise "warrants the exclusion of the few opinions on commercial and economic issues that Mr. Karimzadeh selectively offers." (Karimzadeh Excl. Reply 4–5.)

Defendants point, first, to Mr. Karimzadeh's opinion "that the economic incentives Mastercard and Visa offered to merchants in connection with implementing EMV technology were insufficient to spur EMV adoption." (*Id.* at 5.) Mr. Karimzadeh's opinion that "[t]he lack of financial support for merchant implementation of EMV in the U.S. was atypical and contributed to the low rate of chip adoption in the U.S. at the time of the liability shift" is admissible. (Karimzadeh Rep. ¶ 206.) Mr. Karimzadeh's extensive experience with EMV technology in the payment card industry, (*see id.* ¶¶ 1–4), qualifies him to compare EMV migration in the United States with EMV migration in other countries, including the presence or absence of financial incentives. Such an opinion does not require a sophisticated knowledge of "commercial and economic factors." *See Reach Music Publ'g, Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 405 (S.D.N.Y. 2013) (finding expert's experience in the music industry a sufficient basis for his opinions about the "custom and practice" in that industry); *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 132–33 (2d Cir. 2006)

13

(affirming district court's decision to permit expert with thirty-one years of experience in the insurance industry to testify about practices in that industry).

Second, Defendants argue that Mr. Karimzadeh "devotes an entire section in his Reply to what he contends was the 'positive business case for EMV' in the years prior to its implementation." (Karimzadeh Excl. Reply 5.)  Defendants cite to a section of Mr. Karimzadeh's reply report in which he responds to Defendants' experts' claim that "there was not a strong business case for EMV in the U.S. before 2011." (*Id.*; Karimzadeh Reply Rep. ¶ 75.)  In the challenged paragraphs, Mr. Karimzadeh first "discuss[es] the materials" that Defendants' experts Mr. Cleven and Dr. Fiske "rely upon," critiquing those experts' interpretation of a Merchant Advisory Group presentation from June 2011; an article by authors at the European Payments Council; EMV business case analyses performed for Visa and Mastercard; and a 2011 Mastercard memorandum. (Karimzadeh Reply Rep. ¶¶ 76–87.)  Next, Mr. Karimzadeh challenges Defendants' experts' claim "that merchants, issuers, and other stakeholders discouraged the implementation of EMV" by critiquing Mr. Cleven's and Dr. Fiske's interpretation of testimony from a Visa executive; pointing to evidence of "the views [and] interests of merchants"; highlighting evidence that there was "interest on the issuer side"; and claiming that Mr. Cleven and Dr. Fiske "focus narrowly on 2011–2015, and misstate what [Mr. Karimzadeh] say[s] about the period." (*Id.* ¶¶ 88–94.)

The Court does not exclude these paragraphs.  Like Mr. Karimzadeh's opinions about EMV adoption incentives, these are not wide-ranging economic opinions, but rather are narrowly tailored to the payment card industry and the EMV transition.  While Mr. Karimzadeh, Mr. Cleven, and Dr. Fiske are not economists, all have substantial experience with the payment card industry and EMV transition. (*See* Karimzadeh Rep. ¶ 4; Expert Rep. of Marc Cleven ¶¶ 1–12,

annexed to Glist Decl. as Ex. 1, Docket Entry No. 8486-1; Expert Rep. of Dr. Stuart J. Fiske ¶¶
5–6, annexed to Glist Decl. as Ex. 2, Docket Entry No. 8486-2.)  Further, Mr. Karimzadeh's
opinions about the "business case" for the EMV transition are closely related to his "technical
and security" expertise; in particular, the "business case" discussion hinges on the relationship of
EMV to credit card fraud in the United States.  (Karimzadeh Excl. Mem. 16; *see* Karimzadeh
Rep. ¶¶ 75–94.)  *See Mahaska Bottling Co. v. PepsiCo, Inc.*, 441 F. Supp. 3d 745, 761–62 (S.D.
Iowa 2019) (concluding that beverage industry expert "d[id] not attempt to create an economic
model beyond his expertise but rather focuse[d] his testimony on historical information and
trends regarding the beverage industry, a topic on which he is qualified").

   Third, Defendants argue that "Mr. Karimzadeh opines that the networks' decisions on
EMV technology were driven by commercial motivations."  (Karimzadeh Excl. Reply 5.)
Defendants point to the section of Mr. Karimzadeh report contending that the EMV migration
delay protected Visa and Mastercard's revenues, (Karimzadeh Rep. ¶¶ 98–104), and the section
of his reply report defending that opinion, (Karimzadeh Reply Rep. ¶¶ 95–100).  In these
sections, Mr. Karimzadeh opines that Visa and Mastercard's delayed EMV implementation in
the United States "cannot be explained by security or technical considerations unique to the U.S.
market," but that "the record contains indications that Visa's decision about whether to bring
EMV to the U.S. was affected by its desire to protect revenues it was enjoying from its signature
debit product."  (Karimzadeh Rep. ¶¶ 98–99.)

   The Court concludes that Mr. Karimzadeh's opinions in this section are narrowly tailored
to the payment card industry and EMV migration, as well as intertwined with his security and
technical opinions.  (*See, e.g.*, Karimzadeh Rep. ¶¶ 100–101 (noting that due to technical factors,
"it would be reasonable to expect EMV to be implemented in the United States as Chip & PIN,"

but that doing so "would shift more debit volume to PIN networks at the expense of Visa's and Mastercard's signature debit businesses").) The Court also notes that Mr. Karimzadeh's opinions on this topic are limited, as described below, by the fact that an expert may not opine as to intent, motive, or state of mind.

### 3.   Opinion that the US EMV rollout should have begun earlier

Mr. Karimzadeh's opinion about the timing of the EMV rollout from a technical perspective is relevant and admissible.

Defendants argue that Mr. Karimzadeh's methodology is unhelpful in determining whether the timing of the EMV rollout in the United States is evidence of market power because he "assumed away all commercial dynamics relevant to EMV adoption." (Karimzadeh Excl. Mem. 9.) They point to Mr. Karimzadeh's admissions "that his approach was not designed to examine the competitive forces in the marketplace that govern when EMV should be adopted," (*id.*), and that he believes these commercial realities are relevant "to the question of when a rollout could occur," (*id.* at 10).

The Court does not exclude Mr. Karimzadeh's opinion about the EMV rollout timing. Mr. Karimzadeh's opinion need not address all possible reasons behind the rollout timing for it to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Defendants may introduce evidence of other reasons that the EMV rollout occurred when it did, but neither Mr. Karimzadeh's nor Professor Hausman's opinions is excluded for failure to address these other reasons.

### 4.   Opinion that liability shift dates were "unachievable"

Mr. Karimzadeh's opinions about the liability shift dates are admissible.

Defendants challenge Mr. Karimzadeh's opinion that "the October 2015 liability shift dates were 'unachievable' for merchants 'through no fault of their own.'" (Karimzadeh Excl. Mem. 12.) First, they argue that it exceeds "Mr. Karimzadeh's purported expertise as to the 'technical or security' aspects of EMV technology." (*Id.*) Second, they argue that Mr. Karimzadeh failed to support his conclusion with an "analysis of merchants' commercial realities," noting that he "could not recall, or was unaware of, evidence showing that numerous merchants either did not make diligent efforts to implement EMV or purposefully chose to prioritize other technology projects over EMV." (*Id.* at 13.)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin note that ████ ██d ████████████████████████████████████████████████████████r ████████████████r █████████████████████████████' and that Defendants are "free to cross-examine Mr. Karimzadeh about the fact that a small percentage of merchants made the deadline in the U.S., many of them for credit cards only." (Karimzadeh Excl. Opp'n 19.)

The relevant section of Mr. Karimzadeh's report explains that Visa and Mastercard's delay in finalizing their EMV strategy contributed to certification bottlenecks. (Karimzadeh Rep. ¶¶ 168–184.) Contrary to Defendants' arguments, Mr. Karimzadeh's opinion is based in "technical or security-based issues," namely merchants' difficulty in acquiring the required certification. (*See* Karimzadeh Rep. ¶¶ 42–48 (explaining the certification process).)

Nor does Mr. Karimzadeh's failure to analyze "merchants' commercial realities" render his opinions about the liability shift dates inadmissible. (Karimzadeh Excl. Mem. 13.) Defendants may introduce evidence of these "commercial realities," (*see id.*), but Mr. Karimzadeh's failure to discuss these specific facts does not render unreliable his opinion about the technical feasibility of EMV migration. The same is true for evidence that "numerous

17

merchants either did not make diligent efforts to implement EMV or purposefully chose to prioritize other technology projects over EMV." (*Id.*)

Defendants cite to *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, (8th Cir. 2000), but that case is distinguishable. (*Id.*)  In *Concord Boat Corp.*, an expert economist's opinion that the defendant's discount programs prevented boat builders from buying from other manufacturers was undermined by evidence that some boat builders purchased more than the minimum required to qualify for the discount and "other evidence that the boat builders were not unable to forgo [the defendant's] discounts." 207 F.3d at 1046, 1056.  The expert also "construct[ed] a hypothetical market which was not grounded in the economic reality" of the market: it "assessed an overcharge on each engine sold at any point where [the defendant] possessed over [a] 50% market share," but failed to reflect that the defendant "had achieved a 75% share in the mid 1980s," before the challenged conduct began.  *Id.* at 1056.  The expert's model "also failed to account for market events that both sides agreed were not related to any anticompetitive conduct."  *Id.*  The court concluded that the expert's "opinion should not have been admitted because it did not incorporate all aspects of the economic reality of the stern drive engine market and because it did not separate lawful from unlawful conduct."  *Id.* at 1057.  The *Concord Boat Corp.* expert inaccurately represented the data he purported to model.  Defendants attack Mr. Karimzadeh's opinion about the technical achievability of the EMV transition by claiming that he should have also analyzed merchants' commercial realities.  The existence of additional facts about merchants' commercial situations does not undermine Mr. Karimzadeh's opinion about the technical feasibility of the transition.

Also distinguishable is *Berk v. St. Vincent's Hospital and Medical Center*, (*see* Karimzadeh Excl. Mem. 13), in which the expert "present[ed] no generally accepted scientific

18

methodology, no germane medical literature, and no other evidence that withstand adversarial

scrutiny," produced a report "contain[ing] several factual errors"; had not "received or reviewed

[the plaintiff's] own deposition, or the testimony of several other witnesses"; and was not

supported by "any expert advice, medical literature, or any other evidence." 380 F. Supp. 2d

334, 355 (S.D.N.Y. 2005). The fact that Mr. Karimzadeh does not analyze merchants'

commercial realities in his analysis of the technical feasibility of the EMV migration is not

comparable to an expert report that misstates facts in the record or is unsupported by evidence.

Finally, Defendants' citation to *Bailey v. Allgas, Inc.*, is similarly inapposite. (*See* Karimzadeh

Excl. Mem. 13.) In that case, the expert "did not contact or read the depositions of plaintiffs or

any of the competitors," "did not review sales figures, cost data, or prices of competitors," "did

not review any documents produced by competitors," and "made no independent determination

of whether these competitors were, in fact, competing with plaintiffs or [the defendant]." 148 F.

Supp. 2d 1222, 1238 (N.D. Ala. 2000), *aff'd*, 284 F.3d 1237 (11th Cir. 2002). Defendants' belief

that the U.S. EMV migration is explained better by merchants' commercial realities than by an

analysis of the technical feasibility of the transition is not the same as an expert report that is not

supported by any relevant evidence.

### 5.   Opinion that the EMV timeline was too short

Mr. Karimzadeh's analysis of EMV timing in the United States is not rendered

inadmissible by a failure to control for the difference between the United States and other

countries.

Defendants challenge Mr. Karimzadeh's opinion that "the U.S. EMV rollout should have

taken place over a longer timeline." (Karimzadeh Excl. Mem. 13.) First, they argue that Mr.

Karimzadeh "claims work began earlier and lasted longer in a handful of other countries," but

"looks at only a limited number of countries and ignores critical differences between them and the United States." (*Id.* at 14 (footnote omitted).)  Second, they claim that Mr. Karizadeh measured the length of other countries' timelines "differently than how he measured the U.S. timeline," yielding an "apples-to-oranges comparison." (*Id.* at 15.)  Finally, Defendants argue that Mr. Karimzadeh's opinion about the EMV rollout timeline "does not tie to any question that may be before the jury." (*Id.*)  They argue that Mr. Karimzadeh "does not identify any antitrust violation he is assuming away, nor purport to analyze what rational market participants (*i.e.*, issuers, acquirers, merchants, and networks) would have done absent such a violation." (*Id.* at 15–16.)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that Defendants are "free to question Mr. Karimzadeh as to whether he only looked at a small number of countries or mis-measured the length of EMV rollouts." (Karimzadeh Excl. Opp'n 19 n.49.)  They claim that Mr. Karimzadeh "looked at EMV migrations on an individual market level — examining four countries in depth — and measured the migration period as the time between (a) the announcement of the liability shift and (b) the date of the shift; and he did not use pilots in other countries as the starting point." (*Id.*)

Mr. Karimzadeh's report compares EMV implementation in the U.S. to EMV implementation in Europe, the United Kingdom, Australia, and Canada.  (Karimzadeh Rep. ¶¶ 55–84; *see also* ¶¶ 185–211.)  Defendants cite to Mr. Karimzadeh's acknowledgment at his deposition that the United States, as an online country, is "different from all of the countries who are offline" and that the United Kingdom and France both "started as an offline system." (Videotaped Dep. of Mansour Karimzadeh 59:20–61:8 ("Karimzadeh Dep."), annexed to Carney Decl. as Ex. DDX27, Docket Entry No. 8544-4.)  Defendants also point to his

20

acknowledgements that every country "implemented [EMV] slightly differently," (*id.* at 169:11–172:1); that the United States was the only country in which "Visa or Mastercard shared their technology with their rival debit networks," (*id.* at 175:22–176:11); that Visa and Mastercard should have looked at and did in fact look at EMV implementation in China and Japan, which implemented chip and signature technology, (*id.* at 178:13–180:14); that in some countries like the Netherlands and the UK the government took a more active role in EMV implementation, (*id.* at 256:23–260:21); that Mr. Karimzadeh's timeline of the EMV rollout in the UK and the Netherlands was several years longer than the Defendants' experts' timeline because "pilots and work on EMV had begun years before the national rollout began," (*id.* at 264:7–17); and that the first EMV pilot in the U.S. occurred in 1996, with a second pilot in 2000, (*id.* at 265:18–266:1). (Karimzadeh Excl. Mem. 14 n.56.) Mr. Karimzadeh also acknowledged during his deposition that in transitioning the United States to EMV, he "would have assumed" that "Visa and Mastercard had the benefit of their experiences in other countries regarding the need for effectiveness of various financial incentives." (Karimzadeh Dep. 138:13–20.) Finally, Defendants cite to an article by the 7-Eleven Plaintiffs and The Home Depot's expert Stephen Mott, which states that "the circumstances are different" in Europe and Canada in part because of "the lack of the effective communications systems that offer cheap and ubiquitous real-time authorization in the U.S." (Karimzadeh Excl. Mem 2 n.8, 14 n.56.)

While Europe, the United Kingdom, Australia, and Canada are a "limited set of other countries," this does not mean that comparing United States to these countries is "an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009). Rather, "the European experience and the experiences in what used to be the British Empire" would seem to be an obvious point of comparison for the United States

given the similarities between these countries. (Karimzadeh Dep. 170:10–17.) The comparison is also relevant because, given that EMV was introduced to the United States after it was introduced to the comparator countries, (*see* Karimazadeh Rep. ¶ 85), Visa and Mastercard arguably had the opportunity to learn from the prior rollouts. While no comparison is perfect, it is more likely than not that comparing the EMV rollout in the United States to that in the UK, Australia, and Canada is ultimately a relevant and reliable form of evidence that will assist the jury. *See Jones*, 965 F.3d at 161 (noting that admissibility is determined under the "preponderance of the evidence" standard). Defendants may question Mr. Karimzadeh about the differences between the countries on cross-examination.

Defendants cite to *State v. Deutsche Telekom AG*, but that case is distinguishable. In *Deutsche Telekom AG*, the plaintiffs claimed that the defendants' proposed merger would reduce competition in the wireless telecommunications market. 419 F. Supp. 3d 783, 786 (S.D.N.Y. 2019). The defendants "request[ed] that the [c]ourt exclude from trial any materials or expert testimony regarding the market structure, competitiveness, or competitive effect of mergers in wireless communications markets located outside of the United States." *Id.* at 787. The court found that the relevance of such evidence would be "dubious at best": "[d]espite the apparent similarity between mergers in foreign and domestic markets involving a similar number of competitors, numerous salient factors, including market structure, consumer demographics, regulatory frameworks, and infrastructure may differ significantly and likely yield only an apples-to-oranges comparison." *Id.* at 788. The court also found that, "[e]ven assuming that evidence of foreign wireless services mergers was relevant, . . . the limited probative value of such evidence would be outweighed by the undue delay that would result from its consideration at trial." *Id.* The proposed comparison between EMV rollouts in other countries and in the

22

United States is facially more similar than the proposed comparison in *Deutsche Telekom AG*:
the rollouts involve the same actors (Visa and Mastercard) introducing the same technical
standards to different countries within the same twenty-year period.  Unlike in *Deutsche Telekom*
*AG*, the "undue delay that would result from its consideration at trial" is not a concern here.  *Id.*

Defendants also argue that in the other countries Mr. Karimzadeh considered, "he began
his timeline when 'pilots' of EMV occurred and other behind-the-scenes work started, before
national rollouts were announced," but that "for the United States, he began when Visa
announced its EMV migration roadmap in August 2011, despite readily acknowledging that pre-
announcement work had been going on for years, including multiple chip-technology pilots as
far back as 1996."  (Karimzadeh Excl. Mem. 15.)  They cite to the following portion of Mr.
Karimzadeh's testimony:

> Q.  For example, in the U.K., Visa's and Mastercard's experts have
> said that from the time of the national rollout to when full
> implementation had occurred it was about three years.  But you say
> no, it was far longer because pilots and work on EMV had begun
> years before the national rollout began, correct?
> A.  That's what I've said.
> Q.  And you've said that in the U.K. and also about the Netherlands,
> for example, right?
> A.  Yes, I said.

(Karimzadeh Dep. 264:7–17.)  Mr. Karimzadeh's reply report responds to this criticism, arguing
that Defendants' expert Marc Cleven was wrong to claim that the Netherlands rollout began in
2011.  (Karimzadeh Reply Rep. ¶¶ 106–118.)  Mr. Karimzadeh argues that "[t]he Dutch payment
system began migrating to EMV with pilots beginning in 2003," (*id.* ¶ 112), and that "[i]n 2003,
the Dutch planned a deliberate migration to take place over many years," (*id.* ¶ 113).  By 2011,
"over 90% of [Dutch] terminals had been converted to EMV."  (*Id.* ¶ 115.)  Mr. Karimzadeh also
defends his timelines in the U.K. and Canada, arguing that although the U.K.'s EMV rollout
began in October of 2003, "Visa had already announced a European liability shift, which applied

to the U.K., in 1998." (*Id.* ¶¶ 142–147.) Similarly, in Canada, "Visa announced its EMV liability shift roadmap in June 2003, followed by Mastercard in December 2005," such that "by the time of the 'national rollout' in 2008, the Canadian migration was well on its way in advance of a liability shift." (*Id.* ¶ 144.) With regard to the United States, Mr. Karimzadeh's opening report acknowledges that Visa began examining the possibility of EMV implementation in the U.S. in the 1990s, citing to documents that refer to the 1996 Olympics pilot project and other pilot projects in the early 2000s. (Karimzadeh Rep. ¶ 87 & n.111.) However, he concludes that Visa "did not choose to proceed with EMV in the United States until after the Durbin Amendment in 2010." (*Id.* ¶ 87.) Visa ultimately "announced its EMV roadmap in 2011 and Mastercard followed in 2012." (*Id.* ¶ 126.)

The Court does not exclude Mr. Karimzadeh's opinions due to inconsistent comparative rollout dates. Mr. Karimzadeh and Defendants' experts have a difference of opinion regarding when various countries' EMV rollouts properly began, but the dates Mr. Karimzadeh selected are supported by reasoning and are not so arbitrary or inconsistent as to render his opinion unreliable. *See In re Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15-CV-6549, 2021 WL 2403727, at *18 (S.D.N.Y. June 11, 2021) ("[T]he 'errors' to which [Defendants] point[] in [their] motion to exclude are really nothing more than differences of opinion that undergird any battle of the experts.").

### 6. Opinion that a lack of financial incentives delayed EMV adoption

The Court does not exclude Mr. Karimzadeh's opinion regarding financial incentives.

Defendants challenge Mr. Karimzadeh's "opinion that Mastercard's and Visa's decisions not to offer merchants additional financial incentives beyond the liability shifts contributed to merchants' delayed adoption of EMV." (Karimzadeh Excl. Mem. 16.) First, they argue that

24

"[a]ny opinion regarding the effect of financial incentives on EMV adoption falls outside of Mr.

Karimzadeh's expertise: the technical and security aspects of EMV." (*Id.*)  Second, they argue

that Mr. Karimzadeh "did no analysis and has no expertise to explain how the *observation* that

one or more networks offered financial incentives in some other countries supports the

*conclusion* that the absence of such financial incentives in the United States 'contributed to the

low rate of chip adoption in the U.S. at the time of the liability shift.'" (*Id.* at 16–17.)  Third,

Defendants argue that Mr. Karimzadeh's opinion "ignores key differences between the U.S.

payment environment and that of other countries." (*Id.* at 18.)  Finally, Defendants argue that

Mr. Karimzadeh did not specifically compare the experiences of U.S. merchants that received

subsidies to transition to EMV with those of merchants that did not. (*Id.* at 17.)

      The Court does not exclude Mr. Karimzadeh's opinion regarding financial incentives for

several reasons.  First, for the reasons described above, Mr. Karimzadeh's experience with EMV

technology and migration qualifies him to opine about financial incentives for EMV migration.

Second, the definition of an incentive provides the "analysis" that Defendants seek: merchants,

who Mr. Karimzadeh explains "bear most of the costs" of EMV migration, are more likely to

migrate to EMV earlier if they will be financially rewarded for doing so. (*See* Karimzadeh Rep.

¶ 206.) Defendants may argue that other factors created the disparity between chip adoption in

the U.S. and other countries at the time of the liability shift, but Mr. Karimzadeh's discussion of

financial incentives does not require more analysis than he provides.  Third, for the reasons

discussed above, Mr. Karimzadeh's alleged failure to account for "key differences" between the

United States and other countries does not render his opinion inadmissible.

      Nor is Mr. Karimzadeh's opinion unreliable because he did not compare the experiences

of merchants in the United States who received financial subsidies for transitioning to EMV with

the experiences of those that did not.  While such evidence would be relevant, and Defendants may present it to the jury, Mr. Karimzadeh is not required to include it for his opinion to be admissible.  Defendants cite to *Suture Express, Inc. v. Owens & Minor Distribution, Inc.* ("*Suture II*"), 851 F.3d 1029 (10th Cir. 2017), but that case is distinguishable.  *Suture II* was an antitrust case that came before the Tenth Circuit on an appeal from summary judgment.  851 F.3d at 1033–34.  The plaintiff argued that the defendant's behavior had injured competition because fifty-five to sixty-four percent of the relevant market was restrained by contract from purchasing from the plaintiff at its lower price.  *Id.* at 1044.  The court found that this conclusion "fail[ed] to note that the 'but-for world' existed for almost half the market (since 36–44% of the market was not constrained), yet less than half of that market 'purchased from [the plaintiff] at its lower price.'"  *Id.*  It concluded that the plaintiff had not "demonstrated substantially adverse effects on competition caused by" the defendants.  *Id.* at 1045.

The question posed by Defendants' motion is not whether the 7-Eleven Plaintiffs, the Home Depot, and Elgin have demonstrated substantially adverse effects on competition sufficient to survive summary judgment, but rather whether Mr. Karimzadeh's opinions are sufficiently reliable for admission.  Mr. Karimzadeh's opinion connecting merchant incentives in other countries, the higher rate of chip adoption in those countries, the lack of merchant incentives in the United States, and the lower rate of chip adoption in the United States is sufficiently reliable for admission.

### 7. Opinion that Visa and Mastercard should have mandated PIN for credit and debit transactions

Mr. Karimzadeh's opinion that Visa and Mastercard should have mandated PIN for credit and debit transactions is admissible.

26

Defendants claim that "Mr. Karimzadeh's opinions on Visa's and Mastercard's decisions not to mandate PIN for EMV transactions also must be excluded." (Karimzadeh Excl. Mem. 19.) First, they argue that Mr. Karimzadeh "again fails to account for any commercial considerations and thus his opinions cannot help a factfinder determine whether the decisions not to mandate PIN were more consistent with competition or with the exercise of market power." (*Id.*) Second, they argue that Mr. Karimzadeh compares EMV adoption in the United States to EMV adoption in other countries without analyzing "critical differences between the United States and those markets," such as the fact that those countries adopted Chip-and-PIN and the United States did not. (*Id.* at 20.)

The 7-Eleven Plaintiffs, The Home Depot, and Elgin do not specifically oppose this argument. (*See* Karimzadeh Excl. Opp'n; Karimzadeh Excl. Reply 6–7 ("Plaintiffs did not respond to this argument in their Opposition.").)

The Court does not exclude Mr. Karimzadeh's opinions about Visa's and Mastercard's decisions not to mandate PIN for EMV transactions. For the reasons described above, Mr. Karimzadeh is not required to account for commercial considerations for his opinion to be admissible, nor are his comparisons to other countries an "apples to oranges" comparison. Any countervailing commercial considerations or differences in the comparator countries selected by Mr. Karimzadeh go to the weight, not the admissibility, of his opinion.

### ii.   Opinions on choice screens

Defendants challenge Mr. Karimzadeh's opinions regarding "Visa's recommendation . . . that EMV terminals provide cardholders at the point of sale a choice between 'VISA DEBIT' and 'US DEBIT.'" (Karimzadeh Excl. Mem. 20.) They claim that (1) Mr. Karimzadeh is not qualified to opine that consumers found the choice screens confusing, (2) Mr. Karimzadeh is not

qualified to opine that the choice screens were burdensome for merchants to change, (3) Mr.

Karimzadeh's opinion that Visa "could" have made different choice screen recommendations is

irrelevant, and (4) Mr. Karimzadeh's opinion about the choice screens' compliance with the

Durbin Amendment is irrelevant.

### 1. Opinion on confusion

Mr. Karimzadeh's opinions about confusion caused by choice screens are admissible.

Defendants argue that Mr. Karimzadeh is not qualified to opine on whether consumers

were confused by choice screens, as he "is not an expert in consumer behavior or branding."

(Karimzadeh Excl. Mem. 21.)  In addition, they argue that Mr. Karimzadeh "acknowledged that

he did not review any research or other information to learn whether consumers were in fact

confused by choice screens."  (*Id.*)  Further, they claim that Mr. Karimzadeh "acknowledged" at

his deposition "that the choice screens . . . *eliminated* pre-EMV cardholder confusion over how

to select Visa and provided clarity to cardholders."  (*Id.*)  Finally, Defendants argue that the

opposition "effectively concede[s] that Mr. Karimzadeh cannot opine that choice screens . . .

were confusing to customers."  (Karimzadeh Excl. Reply 7.)

The 7-Eleven Plaintiffs, The Home Depot, and Elgin Ave. Recovery, LLC respond, first,

that Mr. Karimzadeh's "opinion about the technical origin and effect of selection prompts in

EMV implementations fits squarely within his experience working with EMV and other payment

technology." (Karimzadeh Excl. Opp'n 23.)  Second, they argue that Mr. Karimzadeh "does not

need to opine" on whether the choice screens are confusing because "Defendants' documents

and testimony confirm it." (*Id.* at 25.)

Mr. Karimzadeh may not claim to be an expert on choice screen confusion, and is not

qualified to use independent methodology to opine that Visa's choice screens are confusing.

However, as choice screen confusion is not the primary subject of his expert testimony, he may assume that choice screens are confusing for purposes of his opinion about the effects and technical justifications of Visa's rules. The Court concludes that that Mr. Karimzadeh has adequately supported this assumption. His statement that the screens "negatively impacted cardholders by presenting patently confusing AID [Application Identifier] selection screens" cites to sources from Trader Joe's, Visa, and Mastercard.[6] (Karimzadeh Rep. ¶ 156). Further, contrary to Defendants' arguments, Mr. Karimzadeh did "review . . . other information to learn whether consumers were in fact confused by choice screens," namely the sources that he cites in his report. (*See* Karimzadeh Excl. Mem. 21.)

Nor is the Court persuaded by Defendants' arguments from Mr. Karimzadeh's deposition testimony. Defendants argue that Mr. Karimzadeh "speculated based solely on his own personal experience how customers might react when presented with a 'VISA DEBIT'/'US DEBIT' choice screen"; "testified that he had not considered, for example, whether [cardholders] might be more likely to select a brand they recognize and trust (Visa)"; and "acknowledged that the choice screens . . . *eliminated* pre-EMV cardholder confusion over how to select Visa and

---

[6] "Under EMV specifications, something called an Application Identifier ('AID') is used to identify what applications exist on the card and to differentiate among them." (Karimazadeh Rep. ¶ 31.) The AID "identifies the owner of the application, the technical application logic required for operation, and can also specify particular product offerings. AIDs play a key role in EMV processing by allowing the card and terminal to communicate with each other." (*Id.*) Under Visa and Mastercard's routing restrictions, "each debit card in the U.S. contain[s]" . . . "a Visa/Mastercard international 'global' AID and a Visa U.S. 'common' AID." (*Id.* at ¶¶ 134, 1– 35.) The common AID "provides the potential for access to any of the networks enabled on a given debit card, including routing to Visa and Mastercard," while the global AID "limit[s] routing from the [g]lobal AID to only Visa or only Mastercard." (*Id.* at ¶¶ 136–137.) On the EMV terminals criticized by Plaintiffs, consumers who selected "Visa Debit" were selecting Visa's global AID. (*Id.* at ¶ 144.) However, if the consumer selected "US Debit," they selected the common AID, and "the merchant would maintain its ability to route the transaction over any network available on the card." (*Id.*)

29

provided clarity to cardholders." (*Id.*)  These arguments misstate Mr. Karimzadeh's testimony.
Mr. Karimzadeh stated at his deposition that he had "seen in the record that multiple people have
stated that these screens are confusing." (Karimzadeh Dep. 188:2–7.)  Opposing counsel asked
whether "other people have said it's confusing and thus that's how you know it's confusing?"
(*Id.* at 188:8–10.)  Mr. Karimzadeh replied: "It is confusing to me because I don't know what
happens when I press one or the other, it should be confusing to other people also." (*Id.* at
188:12–15.)  He then clarified that he used "me" as a general cardholder and that he understood
how the screens worked because he is "in this business," but that his wife would not know how it
works.[7] (*Id.* at 188:25–189:5.)  This does not constitute an admission that he "speculated based
solely on his own personal experience how customers might react when presented with a 'VISA
DEBIT'/'US DEBIT' choice screen." (Karimzadeh Excl. Mem. 21.)  Rather, both Mr.
Karimzadeh's testimony and his report reflect that he relied on documents reflecting customer
confusion. (Karimzadeh Dep. 1882:2-7; Karimzadeh Rep. ¶ 156.)

Nor did Mr. Karimzadeh testify that he did not consider the role of branding or that
choice screens eliminated cardholder confusion. (Karimzadeh Excl. Mem. 21.)  He
acknowledged that "the Visa AID labeling it Visa debit was actually telling cardholders that if
you push that button, you're assured it's going to be Visa," (Karimzadeh Dep. 189:22–190:2),
but did not testify that this distinction would be meaningful to consumers or that they would be
making an informed choice of "Visa debit" rather than selecting Visa because they were using a

---

[7] The Court notes that, because Mr. Karimzadeh is not an expert on choice screens,
whether he personally finds choice screens confusing is irrelevant.  Even if he were a choice
screen expert, "[a]n anecdotal account of one expert's experience, however extensive or
impressive the numbers it encompasses, does not by itself equate to a methodology, let alone one
generally accepted by the relevant professional community." *Berk v. St. Vincent's Hosp. & Med.
Ctr.*, 380 F. Supp. 2d 334, 354 (S.D.N.Y. 2005).  Mr. Karimzadeh therefore may not testify at
trial that choice screens are confusing because he personally finds them confusing.

Visa card, (*see* Karimzadeh Rep. ¶ 143 n.174 (████████████ a ████████████

████████████████████████████████████████████████████ Mr.

Karimzadeh also acknowledged Visa and Mastercard's brand-building, (Karimzadeh Dep.

190:3–192:24), and investment in fraud prevention, (*id.* at 192:25–193:16), and opined that the

choice screens used in the U.S. before EMV were also confusing, (*id.* at 193:17–197:17),

although he offered no opinion as to whether they were anticompetitive, (*id.* at 197:4–8). These

comments, however, do not constitute an opinion that the current choice screens are not

confusing or that Mr. Karimzadeh's original opinion was incorrect because it was not based on

Visa and Mastercard's branding. Defendants may present evidence about choice screens based

on branding, but the existence of this argument does not compel the exclusion of Mr.

Karimzadeh's opinions.

### 2.  Opinion on burden

Mr. Karimzadeh's opinions about the burden of choice screens on merchants are

admissible.

Defendants argue that Mr. Karimzadeh's opinion about the burden of choice screens on

merchants is "unsupported by any knowledge, training, or experience." (Karimzadeh Excl.

Mem. 22.)  They point to Mr. Karimzadeh's lack of "experience working with merchants in

configuring EMV terminals"; his lack of effort "to understand the logistics required to change

terminal configurations"; his lack of knowledge about "how many merchants were affected by

this issue"; and his inability to "quantify or describe any expense, complexity, or amount of time

involved in changing choice screens." (*Id.*) Defendants also argue that Mr. Karimzadeh's

opinion about choice screens was "contrary to evidence that turning off choice screens was not

difficult," pointing to "unrefuted testimony of the leading terminal manufacturers that the

process required minimal effort by either the manufacturer or the merchant." (*Id.*) They also note that "Mr. Karimzadeh does not actually opine that the way EMV choice screens work in other countries should have governed the choices offered consumers here," and argue that choice screens in other countries are irrelevant due to the United States' "unique regulatory environment." (Karimzadeh Excl. Reply 8.)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin Ave. Recovery, LLC argue that Mr. Karimzadeh uses his "knowledge of EMV specifications" to explain that "these screens are invoked by a standard EMV process called 'application selection' designed to allow a cardholder to select which *account* to pay from, not which *network* to process the transaction." (Karimzadeh Excl. Opp'n 23.) Further, they argue that "[w]hile Mr. Karimzadeh did not estimate the cost for merchants to reprogram their terminals when these screens were installed, he explains that this was because custom programming depends on a number of factors, including the terminals used and the 'set up' of the merchant's system." (*Id.* at 24.)

Although Mr. Karimzadeh may not opine as an expert on merchant burden, he may assume that changing choice screens is burdensome in the context of his opinions about the effects and technical justifications of Visa's rules. The Court concludes that he has adequately supported this assumption. His report states that there "is no technical justification for Visa's guidance on this issue" because Visa and Mastercard

> could have instructed terminal manufacturers and other stakeholders to implement programming to make the Common AID the "default" in their terminals for certain transactions. In the real world, certain merchants managed this by developing and implementing custom programming — ▉▉▉▉ ▉▉▉▉ o ▉▉▉▉▉▉ s ▉ ▉▉▉▉▉. This custom programming added to the expense, complexity, and duration of merchant implementations.

(Karimzadeh Rep. ¶ 160 (footnote omitted).)  Mr. Karimzadeh supports this last statement by

citing to testimony from a 

In his reply report, Mr. Karimzadeh also cites to testimony from a Sears employee about the

"difficulty" of reprogramming Sears Auto Center terminals to auto-select the Common AID.

(Karimzadeh Reply Rep. ¶ 255 n.385.)  He has therefore adequately supported his assumption

that changing choice screens is burdensome to merchants, although Defendants may of course

challenge this assumption.  The Court also does not exclude Mr. Karimzadeh's testimony on the

basis that he was ███████████ h █████████████████████████████████████

█████████████████████████████████████ er ██ n █████ (Karimzadeh

Excl. Mem. 22.)  Mr. Karimzadeh's citations to testimony from ██████████████████ s

███████████████████████████████████████████████████████████,

██████████████████.

### 3. Opinion that Visa "could" have made different recommendations

Mr. Karimzadeh's opinion that Visa could have recommended a different choice screen

configuration is admissible.

Defendants claim that Mr. Karimzadeh's opinion "that Visa 'could' have recommended"

different choice screen configurations "is irrelevant to any antitrust claim, would confuse and

mislead the jury, and is contrary to law."  (Karimzadeh Excl. Mem. 23.)  They argue that

33

"[w]ithout any basis that merchants faced high barriers to switching off choice screens, there can be no antitrust concern arising from an opinion that Visa 'could' have, from a technical perspective, made a different recommendation." (*Id.*)

The 7-Eleven Plaintiffs, The Home Depot, and Elgin do not specifically respond to this argument. (*See* Karimzadeh Excl. Opp'n; Karimzadeh Excl. Reply 7 ("Plaintiffs] do not address at all Mr. Karimzadeh's assertions that Visa 'could have' taken different approaches to choice screens.").)

The Court admits Mr. Karimzadeh's opinion that Visa could have recommended a different choice screen configuration. Defendants are correct that the mere fact that Visa could have done something differently does not constitute an antitrust claim. (Karinzadeh Mem. 23–24.) However, taken in combination with Plaintiffs' arguments that Visa forced merchants to employ the choice screens and that the choice screens misled customers into choosing Visa routing, Mr. Karimzadeh's opinion that Visa and Mastercard "could have" recommended programming that would have made the common AID "the 'default'" is relevant to whether the choice screens were anticompetitive. (Karimzadeh Rep. ¶ 160.)

Defendants further argue that it "is simply competition on the merits" that Visa's recommended choice screen "might bring it more business based on its well-known and trusted brand." (Karimzadeh Excl. Mem. 23.) Whether Visa's choice screen brought it business based on its brand or based on confusing customers and misleading merchants, however, is still a disputed issue. The Court does not assume the answer to this disputed fact for purposes of this *Daubert* motion.

### 4. Opinions about compliance with Durbin Amendment

Mr. Karimzadeh's challenged testimony about the Durbin Amendment is admissible.

Defendants argue that because "[t]he Durbin Amendment is not an antitrust statute and provides no private right of action," Mr. Karimzadah should "be precluded from opining that Visa's preference for cardholder choice or any other approaches to EMV violated or were inconsistent with the purpose behind the Durbin Amendment." (Karimzadeh Excl. Mem. 24.) Defendants argue that the opposition "effectively concede[s] that Mr. Karimzadeh cannot opine that choice screens violated the Durbin Amendment." (Karimzadeh Excl. Reply 7.)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that "[t]his is a red herring" because Mr. Karimzadeh "does not opine on [choice screens'] legality." (Karimzadeh Excl. Opp'n 24–25.)

The Court admits Mr. Karimzadeh's opinions about Visa's compliance with the Durbin Amendment. Defendants cite to three paragraphs of Mr. Karimzadeh's report in which he explains that "███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████" ███████████, █████████████████████████████████████ ████████████e ████████████████████████er ████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████ ████████████████████████████) The Federal Reserve "ultimately issued [a list of Frequently Asked Questions] making clear that under the Durbin Amendment, merchants could not be required to present options to the consumer that would not allow the merchant to have routing choices." (*Id.* ¶ 163.) Mr. Karimzadeh at no point opines that, because Visa violated the Durbin Amendment, it also must be in violation of antitrust laws. Rather, these paragraphs are relevant because they support Mr. Karimzadeh's claim that

35

merchants and acquirers "reasonably interpreted" Visa's guidance "to mean that their terminals must prompt cardholders with the choice screen, or they would be in violation of Visa rules." (*Id.* ¶ 151.)



Defendants cite to *Hogan v. Novartis Pharmaceuticals Corp.*, but that case is distinguishable. *Hogan* concerned two claims against the defendant pharmaceutical company: "breach of implied warranty and failure to warn of the risk of developing osteonecrosis of the jaw . . . from defendant's intravenous drug, Zometa." No. 6-CV-0260, 2011 WL 1533467, at *1 (E.D.N.Y. Apr. 24, 2011). The plaintiff's proposed expert stated that her role in the litigation was not as an expert on Zometa and its predecessor drug Aredia, but rather as "the expert on FDA issues involving Aredia and Zometa." *Id.* The court stated that most of the expert's testimony was irrelevant: the plaintiff had "not asserted a federal claim for violating FDA regulations and fail[ed] to mention them anywhere in her pleading," the joint pretrial order

described the claim in common law terms only, and the plaintiff's counsel had "declined the [c]ourt's invitation to identify an FDA regulation that . . . would bear on [the] plaintiff's common law claims." *Id.* at *2. The FDA was therefore "mostly irrelevant to this action," and "any evidence or testimony discussing the FDA, its regulations, and upcoming meetings, will not be admitted without independent probative value. *Id.* at *2, 3. Rather than submitting a "120-page report" primarily about an irrelevant regulation, *id.* at *1, Mr. Karimzadeh devotes three paragraphs to the FTC and Federal Reserve's response to Visa's choice screen configuration. These paragraphs have "independent probative value" because they relate to Visa's guidance to merchants and the effect of the Durbin Amendment on Visa's U.S. EMV strategy. *Id.* at *3.

Defendants also support their argument to exclude Mr. Karimzadeh's discussion of the Durbin Amendment by citing to a portion of Mr. Karimzadeh's deposition. (Karimzadeh Excl. Mem. 24 n.95.) Opposing counsel had asked Mr. Karimzadeh what he believed Visa and Mastercard had done to prevent a merchant from accepting any debit network. (Karimzadeh Dep. 74:21–23.) Mr. Karimzadeh replied that "[r]outing implementation is difficult for merchants to use on a network." (*Id.* at 74:25–75:1.) Opposing counsel asked him to explain what he meant. (*Id.* at 75:2–3.) Mr. Karimzadeh responded: "Durbin's idea is to allow competition between different networks and simplify the selection of a route by the merchant." (*Id.* at 75:5–8.) Opposing counsel went on to ask how Visa and Mastercard's EMV implementation made routing implementation difficult for merchants, and Mr. Karimzadeh replied that the networks "implemented a single app to AID solution with complexities that make it difficult to use." (*Id.* at 75:9–15.) Mr. Karimzadeh's comment about the Durbin Amendment does suggest that Visa and Mastercard's U.S. EMV implementation violated the Durbin

Amendment.  However, the Court does not find that this brief comment would confuse or mislead the jury such that Mr. Karimzadeh's opinions must be excluded.

### iii.  Opinions on motivations and state of mind

The Court excludes Mr. Karimzadeh's opinions in part as improperly opining as to motivation and state of mind.

Defendants claim that "Mr. Karimzadeh offers numerous opinions that purport to characterize Visa's or Mastercard's motivations, beliefs, intent, or state of mind — all of which should be excluded."  (Karimzadeh Excl. Mem. 25.)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin acknowledge that Defendants "point to three 'example[s]' where Mr. Karmzadeh supposedly opines as to Defendants' motive or state of mind," but argue that the examples "omit critical context and language showing that Mr. Karimzadeh does not offer such opinions."  (Karimzadeh Excl. Opp'n 20.)

"Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004); *see also Kewazinga Corp. v. Microsoft Corp.*, No. 18-CV-4500, 2021 WL 4066597, at *15 (S.D.N.Y. Sept. 1, 2021) ("Expert opinions about beliefs, intents, or motives are inadmissible."); *Scott*, 315 F.R.D. at 45 (noting that "experts may not offer opinions regarding the intent or motive of parties as part of their analysis"); *In Re Diet Drugs Prods. Liab. Litig.*, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000) ("The question of intent is a classic jury question and not one for experts . . . .").  "Experts may, however, offer testimony discussing 'ordinary practices and usages' in a particular industry."  *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 46 (S.D.N.Y. 2016) (citing to *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 471

38

(S.D.N.Y. 2005)); *see also In re Blech Secs. Litig.*, No. 94-CV-7696, 2003 WL 1610775, at *19 (S.D.N.Y. Mar. 26, 2003) (stating that "it is proper for an expert to testify as to the customs and standards of an industry, and to opine as to how a party's conduct measured up against such standards" (quoting *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), *abrogated on other grounds by Casey v. Merck & Co., Inc.*, 563 F.3d 95 (2d Cir. 2011))). Courts have also permitted experts to testify as to commercial reasonableness. *See Dover v. British Airways, PLC (UK)*, 254 F. Supp. 3d 455, 462 (E.D.N.Y. 2017) (describing expert's testimony about "commercially reasonable alternatives" the defendant could have pursued); *Sting Soccer Operations Grp. LP v. JP Morgan Chase Bank, N.A.*, No. 15-CV-127, 2016 WL 4141118, at *3 (E.D. Tex. Aug. 4, 2016) (finding that expert had "sufficient experience in the banking industry to draw conclusions as to commercial reasonableness"); *MBIA Ins. Co. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568, 617 (S.D.N.Y. 2013) (favorably citing a case that "rel[ied] on expert testimony . . . for purposes of commercial reasonableness analysis"). Finally, experts in antitrust cases "frequently testify concerning economic incentives, the market behaviors they are likely to induce, and the market events or conditions that may contribute to monopsony power." *Sitts v. Dairy Farmers of Am., Inc.*, No. 2:16-CV-287, 2020 WL 3467993, at *7 (D. Vt. June 24, 2020). Thus, while an expert "may not ascribe a particular motivation to Defendants or their representatives or call their credibility into question, he may explain why a particular action would be inconsistent with normal market incentives." *Id.*

       The Court excludes Mr. Karimzadeh's opinions about intent and mental state in part. Defendants point to a paragraph in which Mr. Karimzadeh states that the liability shift "is meant to incentivize 'late adopters' or holdouts to become EMV compliant," (Karimzadeh Rep. ¶ 53); a paragraph claiming that "the record contains indications that Visa's decision about whether to

bring EMV to the U.S. was affected by its desire to protect revenues it was enjoying from its signature debit product," (*id.* ¶ 99); a paragraph stating that Visa repeatedly considered whether to transition the U.S. to EMV, but "was concerned about the revenue impacts PIN proliferation would have on Visa and its issuers," (*id.* ¶ 102); a paragraph stating that Visa "only took significant steps to introduce EMV in the United States after becoming concerned that, if it did not do so, regulators would intervene to mandate Chip & PIN," (*id.* ¶ 103); a paragraph stating that Visa's decision to implement EMV with Chip and Choice "appears to have been driven by a desire to prevent PIN-authentication from affecting its signature-debit revenues and spreading to credit cards," (*id.* ¶ 114); a paragraph stating that Visa and Mastercard "understood" that their AID-based routing approach "would complicate an already complex migration in the U.S. market," (*id.* ¶ 129); a paragraph stating that from what Mr. Karimzadeh "can tell, the primary purpose" of Visa and Mastercard's AID configuration is to create "a reliable way . . . to ensure that routing can be limited only to Visa or to Mastercard," (*id.* ¶ 136); and a paragraph in Mr. Karimzadeh's reply report reiterating that Visa's decision to migrate the U.S. to EMV "was affected by its desire to protect revenues it was enjoying from its signature debit product," (Karimzadeh Reply Rep. ¶ 95; *see* Karimzadeh Excl. Mem. 25 n.97.)

The Court excludes these opinions in part. In paragraph 53, Mr. Karimzadeh may state that the liability shift incentives "late adopters" to become compliant, but may not state that this is the intended purpose of the liability shift. (*See* Karimzadeh Rep. ¶ 53.) In paragraphs 99 to 102, and in this section of his report generally, he may opine that PIN proliferation would impact Visa and its issuers' revenue, but may not opine that Visa delayed bringing EMV to the United States for this reason. (*Id.* ¶¶ 99–102; Karimzadeh Reply Rep. ¶ 95.) Similarly, he may opine that regulation mandating Chip & PIN would have had negative effects on Visa's revenues, but

may not opine that Visa was "concerned" about regulation unless citing to a source in which

Visa directly stated that it was concerned. (Karimzadeh Rep. ¶ 103.) In paragraph 114, Mr.

Karimzadeh may state that Visa's decision to use Chip and Choice is consistent with preventing

PIN-authentication from threatening its signature-debit revenues, but may not claim that this was

Visa's specific motivation. (*See id.* ¶ 114.) In paragraph 129, the 2012 Mastercard Advisors

report appears to state that the AID-based routing approach would introduce technology

impediments, whereas BIN routing would reduce the time and costs of the EMV implementation.

(*See id.* ¶ 129 n.170.) Mr. Karimzadeh therefore may testify that Mastercard, or at least the

authors of the Mastercard advisors report, held this belief. However, he does not appear to have

any basis to opine that Visa also believed these things. In paragraph 136, Mr. Karimzadeh may

not testify about the "primary purpose" of the U.S. AID configuration, but may testify that the

configuration had the *effect* of "ensur[ing] that routing can be limited only to Visa or to

Mastercard." (*See id.* ¶ 136.) *See United States v. DiDomenico*, 985 F.2d 1159, 1165 (2d Cir.

1993) (stating that the "plain language" of Federal Rule of Evidence 704(b) "means that the

expert cannot expressly 'state the inference,' but must leave the inference, however obvious, for

the jury to draw").

### iv.   Conclusion

The Court excludes in part paragraphs 53, 99, 102, 103, 114, and 129 of Mr.

Karimzadeh's report, and paragraph 95 of his reply report. It otherwise denies Defendants'

motion to exclude Mr. Karimzadeh's opinions.

### c.   Motion to exclude the report and testimony of Dennis W. Carlton

Defendants move to exclude the report and testimony of Equitable Relief Class Plaintiffs'

expert Professor Dennis W. Carlton.  (Carlton Mot.; *see* Expert Report of Dennis W. Carlton

("Carlton Rep.") ¶ 6, annexed to Carney Decl. as Ex. DDX1, Docket Entry No. 8544-1.)

### i.   Professor Carlton's qualifications and expert report

Professor Carlton is the David McDaniel Keller Professor of Economics at the Booth

School of Business of the University of Chicago.  (Carlton Rep. ¶ 1.)  Professor Carlton

specializes in the economics of industrial organization.  (*Id.* ¶ 2.)  He has published extensively,

serves on the editorial and advisory boards of a variety of professional journals, and has provided

expert testimony in various litigation, including litigation involving the payment card industry.

(*Id.* ¶¶ 2, 4–5.)  Professor Carlton has also served on and advised a number of governmental

bodies dealing with antitrust matters.  (*Id.* ¶ 3.)  He is a Senior Managing Director of a consulting

firm, through which he has "extensive experience in the payment card industry."  (*Id.* ¶¶ 4–5.)

Professor Carlton was asked by the Equitable Relief Class Plaintiffs "to evaluate certain

Visa and Mastercard business practices that impose restrictions on the terms upon which credit

and debit card network services can be supplied to merchants," which he refers to as "Network

Restrictions."  (*Id.* ¶ 6.)  Because "the rules can change over time," Professor Carlton emphasizes

that his analysis "applies generally to restrictions on merchants' ability to provide accurate price

signals to their own customers, e.g. through surcharging of more costly payment methods."  (*Id.*)

Professor Carlton opines that the Network Restrictions "are a direct interference with the

competitive process, and result in supra-competitive prices for network services provided to

merchants . . . and an increase in the 'net price,'" and all else being equal, are "associated with

restricted output."  (*Id.* at ¶ 7.)

After an introductory and background section, (*id.* ¶¶ 10–25), Professor Carlton analyzes "the competitive effects of the challenged Network Restrictions," (*id.* ¶¶ 38–73). Next, he explains that the Network Restrictions have elevated Visa and Mastercard's prices for network services. (*Id.* ¶¶ 74–110.) He argues, first, that even merchants' limited ability to steer after the 2012 *Visa Check* settlement led to lower merchant service fees for many merchants. (*Id.* ¶¶ 75–83.) Professor Carlton claims that "[t]he evidence shows that merchant service fees fell" after the 2012 settlement and that "overall rewards to cardholders have not fallen — thus both the price to merchants and the net price fell." (*Id.* ¶ 75.) Professor Carlton also claims that █ a █████████████████, ████████████████████████████████████ ███████████████████████████████████████████████. (*Id.* ¶¶ 77, 81.) He concludes that "economic evidence shows that the Network Restrictions have elevated prices to merchants, relaxing them has led to lower merchant prices, and eliminating them altogether will lead to lower prices." (*Id.* ¶ 83.)

Next, Professor Carlton performs an economic analysis purporting to show that net prices for credit card network transactions were lower after the 2012 settlement. (*Id.* ¶¶ 84–91.) He begins by "report[ing] data from issuing banks on rewards expenses paid out relative to effective interchange received." (*Id.* ¶ 86.) Professor Carlton interprets this data as showing that "[r]eward payments have been going up but are always smaller than interchange revenues obtained by the issuer." (*Id.*) He claims that "[a]vailable evidence points to the conclusion that issuers do not pass back all of their interchange fees to cardholders, and many pass back no more than half, resulting in a net price of about █████████ or more." (*Id.*) Professor Carlton states that this is corroborated by an interim report by the European Commission and a study "by

43

Sumit Agarwal and others." (*Id.* ¶¶ 89–90.) Professor Carlton concludes that "net prices have fallen" because "prices to some merchants went down after the 2012 settlement," "rewards did not go down," and "less than 100 percent of interchange is passed through to cardholders." (*Id.* ¶ 91.) Thus, "rewards to cardholders do not offset price increases to merchants and thus . . . the Network Restrictions elevate the net price of payment network services." (*Id.*) Professor Carlton also claims that net prices for debit network transactions fell after the Durbin Amendment and the 2012 settlement, arguing that "evidence indicates that the reductions in merchant service fees" caused by the Durbin Amendment "have not been offset by increases in marginal fees on the cardholder side," and, moreover, that "[u]sage of debit has . . . increased by roughly a third since the Durbin Amendment and the 2012 settlement." (*Id.* ¶¶ 92–94.)

Next, Professor Carlton claims that international evidence indicates that "marginal net prices fell when interchange fees were lowered, and that surcharging and steering can be effective in improving competition and thereby benefiting consumers." (*Id.* ¶ 95.) He begins with Australia. (*Id.* ¶¶ 96–106.) Professor Carlton explains that in 2003, the Reserve Bank of Australia reduced interchange fees "and eliminated no surcharging rules and limitations on entry by non-banks." (*Id.* ¶ 97.) Beginning with the effect of the interchange fee reduction, Professor Carlton claims that the evidence shows that "the merchant service fee fell by more than the change in net fees paid by cardholders." (*Id.*) Professor Carlton cites to sources indicating that "interchange fee reductions were fully passed through to merchants" and that "reductions in issuer revenues were only partially offset by increases in cardholder payments, resulting in a lower 'net price' in Australia after the intervention." (*Id.* ¶¶ 98–102.) Next, he analyzes the effect of the regulations' elimination of surcharge rules, claiming that since 2003, "the share of merchants of all sizes that have instituted surcharges has steadily increased." (*Id.* ¶ 103.)

44

Professor Carlton claims that the Reserve Bank of Australia's 2013 Consumer Payments Use Study found that "although the number of merchants surcharging increased substantially between 2010 and 2013 . . . the number of transactions on which a surcharge was paid did not grow but remained around four percent, indicating that consumers respond to credit-card surcharges by using other forms of payment." (*Id.* ¶ 104.) Finally, Professor Carlton responds to Mastercard's 2001 statement that "reductions in interchange fees in Australia could result iu a 'death spiral' unravelling of its network," arguing that not only did the regulations not cause a "death spiral," but "the number and value of payment card transactions continued to increase in Australia" after the 2003 intervention. (*Id.* ¶¶ 105–106.) Professor Carlton then looks at evidence from other countries, (*id.* ¶¶ 107–110), pointing to a zero-interchange network in Canada, (*id.* ¶ 108); the effect of the elimination of the surcharging prohibition in the Netherlands, (*id.* ¶ 109); and a settlement agreement in New Zealand that eliminated a surcharging prohibition and reduced interchange fees, (*id.* ¶ 110).

In the final sections of his report, Professor Carlton considers remedies, (*id.* ¶¶ 111–124), and market definition and market power, (*id.* ¶¶ 125–145). The report also contains appendices; in Appendix E, table 5 presents interchange fees in basis points from ████████████████████████ ████ █████████████████████████████████████ ls ████. ████████████ ███████████████. Table 6 presents the effective net price, calculated as interchange revenue less rewards expense, ██████ k ████████████████████████████████████████████ The net effective price is given as ████████████████████████████ e and ████████████████████ k █ ██████, for an average net effective price of █████████████. (*Id.*) Table 6 also states: ████ ████████████████████████l ████████████████████████████

Professor Carlton also wrote a reply report critiquing Defendants' experts' opinions and responding to critiques of his own opinions. (Expert Reply Report of Dennis W. Carlton, annexed to Carney Decl. as DDX2, Docket Entry No. 8544-1.)

### ii. Professor Carlton's opinion about the real-world net price of credit transactions

Defendants argue that "[n]either Prof. Carlton's net price calculation nor his pass-through analysis has any relevance for supracompetitive prices." (Mem. of Law in Supp. of Defs.' Mot. to Excl. Rep. & Testimony of 23(b)(2) Pls.' Expert Dennis W. Carlton ("Carlton Excl. Mem.") 8, Docket Entry No. 8087.) They claim, first, that Professor Carlton's calculated net price of █ █ is "meaningless" since he did not calculate a competitive price to compare it to. (*Id.*) Second, they argue that the *Amex* Court found Professor Carlton's claim that issuers pass through "no more than half" of merchant fees to be "irrelevant to establishing supracompetitive prices." (*Id.*) Third, they argue that Professor Carlton's calculated price of █ █ is unreliable because Professor Carlton "does not identify a process or methodology for choosing which data he included and excluded in his calculation," "relied on data from two banks only (from a single year)," and "could not explain why a data point from a third bank . . . was excluded." (*Id.* at 9.) Defendants also cite to Professor Carlton's testimony at his deposition that he "was not prepared to 'justify th█ .'" (*Id.*)

In response, the Equitable Relief Class Plaintiffs argue, first, that "to show that a restraint results in supracompetitive prices does not require plaintiffs to show what the specific price would be in the but-for world"; rather, "[a]ll that is required is showing that the competitive net price would be lower, which is exactly what Professor Carlton opines." (Equitable Relief Pls.' Opp'n to Defs.' Mot. to Excl. Rep. & Testimony of Dennis W. Carlton ("Carlton Excl. Opp'n" 9–10, Docket Entry No. 8164 (footnote omitted).) They also argue that Professor Carlton did not

46

admit that his calculation was unreliable, but rather "explained that he was calculating a 'general net price,' given that he is 'interested in the general levels and trends.'" (*Id.* at 10.) The Equitable Relief Class Plaintiffs argue that Professor Carlton did not only rely on data from two banks, but rather "relied on numerous data sources, including *Visa-wide* data, which show a net price of ███████████." (*Id.*) They claim that Professor Carlton excluded data from the "third bank" referenced by Defendants "because it reflected only one quarter of data, while the other figures were full-year figures." (*Id.* at 11.)

At his deposition, Professor Carlton agreed with opposing counsel that table 6 of his report "is what supports the calculation of a net price of about ██████████ or more." (Videotaped Dep. of Dennis W. Carlton ("Carlton Dep." 74:15–19, annexed to Carney Decl. as DDX22, Docket Entry No. 8544-3.) ████████████████████████████████████e ███k ████████████████████ Professor Carlton acknowledged that there are "well over a thousand issuers in the United States," but claimed that "we had some difficulty getting the data from the banks and they all didn't come in the same format, or they used different terminologies." (*Id.* at 75:7–12.) He added that his intention was to look at "general levels and trends." (*Id.* at 75:12–14.) Opposing counsel asked whether Professor Carlton had "done any work to analyze whether the effective net price for these two banks is representative of other issuers in the United States." (*Id.* at 78:25–79:3.) Professor Carlton replied that table 5 of his report shows that █████████████████████████████ ███████████ He ████████████████████████████ ██████████████████████████████████████. ████ █████████████n ████████████████████████████ ████████████████████He added:



████████████ Professor Carlton also testified that he was "interested in general levels and trends and that, you know, the█ seemed like a reasonable summary." (*Id.* at 96:6–13.) He said that ████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████ So, you know, I'm just making a general statement based on everything." (*Id.* at 96:14–20.) Professor Carlton added that "[t]he particular calculation of █ ████████████ is consistent with what [he was] doing in table 5," but that he "wasn't attempting to give a particular number here other than to indicate a general net price" and that he was "interested in the general levels and trends and those are clear across different issuers." (*Id.* at 96:21–97:14.) Professor Carlton also testified that although ████████████████████ ████████████████████████████ and that "if you look at table 5, and as a rough approximation you assume that half are rewards for many banks, you can see that the statement that the net effective price is ████████ is accurate." (*Id.* at 99:12–22.)

The Court does not exclude Professor Carlton's net price opinion or pass-through analysis. (Carlton Rep. ¶ 86.) First, although Defendants are correct that Professor Carlton does not calculate a competitive price, (Carlton Excl. Mem. 8; *see* Carlton Dep. 72:11–20; 92:22–93:6), this does not render Professor Carlton's opinion that the net price was "about ████ or more," (Carlton Rep. ¶ 86), so irrelevant as to warrant exclusion. "Expert evidence is relevant if it tends to make any fact of consequence to the litigation more or less probable." *Kogut*, 894 F. Supp. 2d at 239. The Court does not read this rule so narrowly as to exclude

evidence that bears intimately on the issues involved in the litigation solely because the expert

does not directly use the evidence to prove his point on a contested issue. *See Daubert*, 509 U.S.

at 587 ("[T]he Rules' basic standard of relevance . . . is a liberal one."). Although Professor

Carlton does not calculate a competitive price to compare with his net price, the effective net

price of credit card transactions is inherently relevant to the topics under discussion and may be

used by the jury in combination or comparison with other experts' estimates. Further, admitting

Professor Carlton's net price is consistent with, for example, admitting the opinions of Professor

Harris, who calculates a "single price" for Visa and Mastercard but does not directly calculate a

competitive price. (*See* Harris Rep. ¶¶ 923–44.) Finally, even assuming the "about ▮▮▮▮

▮▮▮ or more" figure is not strictly relevant, given the obvious relevance of Professor Carlton's

discussion of interchange in relation to rewards, the Court declines to "overly fragment an

expert's opinions in order to pick out only the relevant and helpful portions." *In re LIBOR-

Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 469 (S.D.N.Y. 2018).

    Second, as discussed in the Court's other order on Defendants' motions to exclude, *Amex*

held that pass-through data was insufficient to establish anticompetitive prices, but that does not

mean that such expert evidence is *irrelevant*. *Amex*, 138 S. Ct. at 2288. "The dispositive

question [under Rule 702] is whether the testimony will assist the trier of fact . . . not whether the

testimony satisfies the plaintiff's burden on the ultimate issue at trial." *In re Pfizer Inc. Sec.

Litig.*, 819 F.3d 642, 661 (2d Cir. 2016) (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 135

(D.C. Cir. 1996)). Even if Professor Carlton's evidence regarding pass-through is legally

insufficient to establish anticompetitive pricing, the Court concludes that it is nevertheless

relevant to the dispute at hand. *See Amex*, 138 S.Ct. at 2288 (stating that the Supreme Court will

"not infer competitive injury from price and output data *absent* [certain forms of additional] evidence" (emphasis added)).

Third, the Court does not find Professor Carlton's effective net price figure to be unreliable. Professor Carlton does not opine that the net price is exactly ▮▮▮▮▮▮▮▮▮▮, but that it is "about ▮▮▮▮▮▮▮▮ or more," (Carlton Rep. ¶ 86) — a general estimate that is consistent with Professor Carlton's testimony that he intended the figure as "a general net price" reflecting "general levels and trends," (Carlton Dep. 96:6-97:14). The Court finds that this "general net price" is sufficiently supported by the evidence in Professor Carlton's report. After stating that the net price is "about ▮▮▮▮▮▮▮▮ or more," Professor Carlton's report states: "See below for evidence from the United States and abroad and see also Exhibit E." (Carlton Rep. ¶ 86.) Appendix E contains not only table 6, which calculates net effective price for two banks, (*see* Carlton Rep., Appendix E at 125), but also table 5, which presents interchange fees from five banks and also supports the "about ▮▮▮▮▮▮▮ or more" figure assuming that, as Professor Carlton testifies, many issuers pass "no more than half" of their interchange fees to cardholders, (Carlton Rep. ¶ 86 & Appendix E at 126; *see also* Carlton Dep. 96:14-20). The report also goes on to cite to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which Professor Carlton claims can be used to "calculate interchange revenue less rewards and partnership divided by gross sales volume, which is ▮▮▮▮▮▮▮." (Carlton Rep. ¶ 88 n.120.) Defendants claim that this is an "after-the-fact justification" and that Professor Carlton "does not include such an explanation anywhere in his report." (Reply in Further Supp. of Defs.' Mot. to Excl. Rep. & Testimony of 23(b)(2) Pls.' Expert Dennis W. Carlton ("Carlton Excl. Reply") 2–3, Docket Entry No. 8144.) It is clear from Professor Carlton's report, however, that he sources his "about ▮▮▮▮▮▮▮ or more" figure to "below" in the report — which includes the ▮▮▮▮▮▮▮▮▮▮▮▮ figure — and to

Appendix E, which includes both tables 5 and 6. While Professor Carlton certainly could have performed a more rigorous calculation, the Court considers this to be sufficient evidence to support his "about ████████ or more" estimate; Defendants may seek to undermine the estimate through "[v]igorous cross-examination [and] presentation of contrary evidence." *Daubert*, 509 U.S. at 596.

The Court agrees with the Equitable Relief Class Plaintiffs that Professor Carlton did not "admit[] that his calculation is unreliable" at his deposition, but rather emphasized that he was "interested in general levels and trends" and considered ████████ to be a "reasonable summary." (Carlton Dep. 96:6-13.) Nor does the Court exclude Professor Carlton's net price estimate on the grounds that he "could not explain why a data point from a third bank . . . was excluded." (Carlton Excl. Mem. 9.) As the Equitable Relief Class Plaintiffs argue, "it is obvious" that the ████████ "expressly was not included in [Professor Carlton's] average because it reflected only one quarter of data, while the other figures were full-year figures." (Carlton Excl. Opp'n 11.) This is not an "after-the-fact justification," as Defendants argue, (Carlton Excl. Reply 3); Table 6 plainly states ████████████████████ ██ ████████████████████████████████ Defendants may argue that this exclusion is improper, but this is an objection best raised on cross-examination. *See Bocoum v. Daimler Trucks N. Am. LLC*, No. 17-CV-7636, 2022 WL 902465, at *16 (S.D.N.Y. Mar. 28, 2022) (stating that criticism of the expert's "methodology and assumptions . . . may be explored at trial," and collecting cases).

Accordingly, the Court does not exclude Professor Carlton's net price calculation or pass-through analysis.

### iii.   Causal link between 2012 rule changes and price decrease

Defendants assert that Professor Carlton's claim that "decreases in merchant and net

prices were caused by the 2012 rule changes that relaxed restrictions on surcharging" is

improperly based on "observ[ing] separate market phenomena and declar[ing] them causally

related." (Carlton Excl. Mem. 10.) They argue that the only evidence Professor Carlton cites in

support of his claim "is anecdotal: (1) '█████████████████████████████████████████

███████; and (2) ████████████████████████████d ███████' (*Id.*) Defendants

critique each of these forms of evidence. (*Id.* at 11–15.)

#### 1.   ████ d █████

Defendants claim, first, that Professor Carlton "cites no evidence that the main driver

behind the ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████" ████████ Professor Carlton also "reviewed only proposals instead of executed

agreements" and therefore failed to analyze whether any final agreements, if reached, ████████

████████████████████████████████████ Defendants claim that "provisions regarding

surcharging appear as a routine term included in agreements between Visa and merchants" even

before the surcharging rules were modified in 2012. (*Id.* at 11–12.) Further, because Professor

Carlton relied on proposals rather than final agreements, Defendants argue that he "cannot even

reliably conclude that prices in fact fell for the merchants he identifies." (*Id.* at 12.) They also

claim that Professor Carlton's "belief that no final agreements were produced" is "mistaken."

(*Id.*) Defendants claim that Professor Carlton improperly concludes that "average" merchant

prices fell because prices to a few merchants fell. (*Id.* at 12–13.) They also argue that Professor

Carlton's data "show that net price decreased because cardholder rewards were increasing faster

52



than prices to merchants," and that Professor Carlton "makes no attempt to demonstrate" that the ability to surcharge "was causally linked to the higher rewards offered . . . to cardholders during this period." (*Id.* at 13.)

The Equitable Relief Class Plaintiffs respond that the ███████████████ is not just an "anecdote" affecting "a small number of merchants," as "the program's targets included some of the nation's largest retailers." (Carlton Excl. Opp'n 6.) ███████████████████
██████a █████████████████████████████████s █████
████████████████████████ The Equitable Relief Class Plaintiffs argue that
████████████████████████████████████████████
████████████████████████████████████████████s
████████████████████████████████████
████████████████████████████████████
███) The Equitable Relief Class Plaintiffs also argue that it is "███████████r █
████████████████████████████████████████s
████████████████████r ████████████████████
████████████████████████████ They claim that "the probative value of the ████████████s does not depend on showing that merchant fees fell across the board" because "████████████████████s
████████████████████h v████████████
████████████████████████ Further, the Equitable Relief Class Plaintiffs argue that "[i]f merchants who did not enter into no-surcharge agreements paid even *higher* fees," ███ v█████████████████████n ████████████l
████████████████████████ The Equitable Relief

Class Plaintiffs also respond to Defendants' argument that "net prices began to decline before 2012 and that the decline was caused by increasing cardholder rewards," arguing that "Professor Carlton addressed this trend" and that the trend shows only that "lower interchange fees obtained by ███████████ merchants were not offset by *decreased* rewards, and hence net prices for transactions with those merchants declined." (*Id.* at 8.)

At his deposition, Professor Carlton testified that "one motivation" of the ████████████ agreements, "from [his] point of view . . . was to prevent merchants from surcharging." (Carlton Dep. 100:14-101:9.) He stated that he did not review any executed ████████████████████ because he "d[idn't] believe those were provided." (*Id.* at 101:10–12.) He also did not know "how many were actually executed." (*Id.* at 101:19–102:23.) Professor Carlton was unable to say whether any ████████████████, if executed, █████████████████████████, but testified that "it is probative that they were offering to do so." (*Id.* at 102:24–103:7.) Opposing counsel asked: "Without seeing evidence of how many, if any, ████████████████ were executed, how can you conclude what impact the ████████████████ had on overall net price?" (*Id.* at 104:16–19.) Professor Carlton replied that "if none were executed, then none had an effect," but that "if any were executed, then it had an effect." (*Id.* at 104:20–22.) He added that ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ (*Id.* at 104:22–105:1.)

Professor Carlton agreed that "[he] point[ed] to the ████████████████ "evidence for [his] opinion that the net price of credit card transactions went down after the 2012 settlement." (*Id.* at 105:12–17.) Opposing counsel asked whether he used the ████████████ ████ "to discuss the net price of credit card transactions going down after the 2012 settlement generally," rather than "just to particular merchants." (*Id.* at 106:1–5.) Professor Carlton replied

that his report "explains that to the extent those ▆▆▆▆▆▆▆▆▆▆▆ were implemented, ▆▆▆▆▆▆▆▆▆▆▆▆ o ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ d ▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (*Id.* at 106:6–12.) He said that he used the ▆▆ d ▆▆▆▆▆▆▆▆ "to show that at particular merchants [the price of credit card transactions] went down" and added that "mathematically . . . if everyone else's interchange fee stays constant, then the average interchange goes down." (*Id* at 106:17–21.) He also added that he used the strategy "to show that there was an incentive to pay merchants not to surcharge and the way you paid them was you lowered their interchange fee." (*Id.* at 107:21–24.) Professor Carlton testified that he was "not aware of" ▆▆▆▆▆▆▆▆▆ s being offset by "increases in interchange to other merchants," and that he did not "see any evidence" of ▆▆▆▆▆▆▆▆▆ s being offset by decreases in cardholder rewards. (*Id.* at 107:2–16.)

The Court excludes Professor Carlton's ▆▆▆▆▆▆▆ opinions in part. As a threshold point, Professor Carlton appears to render two principal opinions based on the ▆▆▆▆▆▆▆▆▆ materials. First, he claims that the ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆ t ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (Carlton Rep. ¶ 91). Although it is not totally clear, he also appears to claim that these lower prices to some merchants reduced merchant service fees overall. (*See id.* at ¶ 75 (claiming that "▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *with* 106:1–4 (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ o ▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆ v ▆▆▆▆▆▆▆▆) Second, Professor Carlton claims that the ▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆



Professor Carlton's claim that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(Carlton Rep. ¶ 76), and did not know how many agreements were actually executed, (Carlton

Dep. 101:19–102:23). As he acknowledged at his deposition, "if none" of the agreements "were

executed, then none had an effect." (*Id.* at 104:20–22.) Professor Carlton claims that

"Defendants have not provided discovery on the full extent and terms of such arrangements,"

(Carlton Rep. ¶ 76); Defendants refer to this claim as "mistaken," but do not cite to any sources,

(Carlton Excl. Mem. 6, 12), while the Equitable Relief Class Plaintiffs cite to a deposition

indicating that Visa was "not at liberty" to "describe any of the substance of . . . any agreement

where we would customize interchange," (Carlton Excl. Opp'n 6–7 n.7; *see* Videotaped Dep. of

William M. Sheedy ("Sheedy Dep.") 329–330, annexed to Eisler Decl. as ERPX 2, Docket Entry

No. 8578.)

Nevertheless, the Court does not prevent Professor Carlton from inferring from Visa's

proposals that some merchants accepted those proposals and that their interchange subsequently

declined. As the Equitable Relief Class Plaintiffs argue, Defendants "*do not* represent that Visa

did not in fact enter into such agreements"; they simply argue that Professor Carlton cannot

prove that they did. (Carlton Excl. Opp'n 6; *see* Carlton Excl. Mem. 11–14.) While it is a close

question, the Court allows Professor Carlton to infer from the proposals that some merchants

entered into these agreements and that those merchants paid lower interchange fees as a result,

particularly as it appears that the final agreements were not in evidence. (*See* Sheedy Dep. 329–

330); *see Arista Records LLC v. Lime Group LLC*, No. 06-CV-5936, 2011 WL 1674796, at *13

(S.D.N.Y. May 2, 2011) ("Although some of the assumptions upon which [the expert's] conclusion rest are potentially weak, those weaknesses can be easily exposed through cross-examination, and do not render his testimony inadmissible.").

However, the Court agrees with Defendants that, to the extent Professor Carlton claims that the ███████████████████████████████, that opinion should be excluded. Defendants argue that ████████████████████████ v ██████ n ██████ ████████████████████████████████████████████████ f ████████████████████████████ n. ████████ n F████████ ████ If there were no evidence to the contrary, Professor Carlton could permissibly assume that other merchants' interchange remained constant so that "all else equal," average merchant fees decreased. (Carlton Dep. 107:2-9.) However, while "contentions that the assumptions are unfounded" ordinarily "go to the weight, not the admissibility, of the testimony," this is not the case where the assumptions are "so unrealistic and contradictory as to suggest bad faith." *Zerega Ave.*, 571 F.3d at 214. The assumption that ████████████████████████████████ ████████ is clearly in tension with evidence that interchange fees steadily increased from 2000 to 2017.[8] (Carlton Rep., Appendix E at 124.) In general, "inconsistencies in an expert witness's testimony do not implicate *Daubert*, but rather are properly addressed during cross examination." *In re Fosamax Prods. Liab. Litig.*, 924 F. Supp. 2d 477, 496 (S.D.N.Y. 2013). However, because Professor Carlton would need to rely on an assumption that contradicts data presented elsewhere in his report, he "lacks 'good grounds'" to conclude that the ████████ n

---

[8] Merchant fees could presumably decrease while interchange fees were increasing if some non-interchange portion of the merchant fee decreased. (*See* Carlton Rep. ¶ 7 n.1 (defining "merchant service fees" as consisting of "the interchange fee, the acquirer network fee and the acquirer fee").) However, there is nothing in Professor Carlton's report to indicate that this is the case.

████████████████████████. *Amorgianos*, 303 F.3d at 267. This determination is further buttressed by the fact that the Equitable Relief Class Plaintiffs do not defend a conclusion that the ████████████████████████ rather, they argue that "the probative value of the ████████████████ does not depend on showing that merchant fees fell across the board." (Carlton Excl. Opp'n 7.)

The Court also does not exclude Professor Carlton's second ████████ opinion: that the ██████████████████████████████████████████. (*See* Carlton Rep. ¶ 82; Carlton Dep. 102:24-103:7, 104:22-105:1.) Defendants argue that Professor Carlton "cites no evidence that the main driver behind the ████████ ████████████████████████ noting that "[n]one of the documents cited by Prof. Carlton . . . directly ties no-surcharging, as opposed to other conditions, to the ████ ████ , ████ (Carlton Excl. Mem. 11 & n.8.) The Court is not persuaded that this warrants exclusion. ████████████████████████████████████████

██████████████████. ██████████████████████████████████████a

████████████y ████████████████████████████████████

██████h ████████████████████████████████. ██

██ Although the "documents [Professor Carlton] relies upon" may well state that the "████

████████████████████████████████s, Carlton Excl. Reply 6–7 & n.6), there is no reason that Visa could not have pursued multiple goals with the same agreements. Defendants also argue that ████████████████████████ ████████████████████████████even before the surcharging rules were eliminated in 2012. (Carlton Excl. Mem. 11–12.) The Court agrees with the

Equitable Relief Class Plaintiffs that Professor Carlton may plausibly consider the elimination of the no-surcharging provision in the Visa Rules to affect the intention and impact of these no-surcharging provisions. (*See* Carlton Excl. Opp'n 7.) Ultimately, the Court does not find Professor Carlton's Grand Bargain opinions to be "so fundamentally unsupported that [they] can offer no assistance to the jury." *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 670 (E.D.N.Y. 2013) (quoting *First Union Nat'l Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005)).

### 2 ▮▮▮▮▮▮▮▮▮ ▮

Professor Carlton claims that "Mastercard has . . . reduc[ed] merchant fees in order to induce [merchants] not to engage in steering activities." (Carlton Excl. Mem. 14.) Defendants claim that he supports this claim with only ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮ ▮▮▮▮▮▮▮▮▮ d ▮▮▮▮▮▮ . ▮▮ They argue that Professor Carlton does not explain "methodologically" how "a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [is] sufficiently representative for him to draw a conclusion regarding how Mastercard would respond to all merchants in the but-for world." (*Id.*) Further, they claim that this proposal is "idiosyncratic" because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, not just a merchant." (*Id.*)

The Equitable Relief Class Plaintiffs argue that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ shows that the defendants sought to avoid steering by offering fee reductions," thus supporting Professor Carlton's theory "that network restrictions on surcharging elevate net prices for credit card network services." (Carlton Excl. Opp'n 9.) The Equitable Relief Class Plaintiffs also point out that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ s ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ – ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – ▮▮ ▮▮▮▮▮▮▮▮ n ▮▮▮▮▮▮▮▮▮▮▮

The Court does not exclude Professor Carlton's use of the ██████████████

Professor Carlton claims that ██████████████████████████████] ████████

██████████████████████████████

██████ l ██████████████████████. ██████ While "For example" certainly implies a

pattern of behavior, and Defendants may cross-examine Professor Carlton about the existence of

other examples, the Court finds that Professor Carlton has sufficiently substantiated his claim

that ██████████████████████████████████████

██████████████████████████, Similarly, ██████████████

██████████████████████ is a matter for cross-examination, but is not sufficiently

"idiosyncratic" to warrant exclusion.  (Carlton Excl. Mem. 14.)



The cases Defendants cite to are distinguishable.  (*See* Carlton Excl. Mem. 14–15 (citing

to *In re Lyman Good Dietary Supplements Litig.*, No. 17-CV-8047, 2019 WL 5682880

(S.D.N.Y. Oct. 31, 2019), *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3,

AFL-CIO*, 313 F. Supp. 2d 213 (S.D.N.Y. 2004)), Carlton Excl. Reply 7 (citing to *SEC v. Lek

Sec. Corp.*, 370 F. Supp. 3d 384, 418 (2019).)  In *In re Lyman Good Dietary Supplements Litig.*,

the court found that the purported expert's report was "not based on any 'scientific, technical, or

specialized' knowledge."  2019 WL 5682880, at *4; (*see* Carlton Excl. Reply 6).  The "only

portion" of the report that engaged the expert's "specialized knowledge" was his "analysis of

[the p]laintiff's 2011 tax return," which assumed that a single year was "typical" of the plaintiff's

expenses and estimated the profitability of the plaintiff's self-employment activities based on

that year.  *Id.*  The court held that this "opinion, which is based on a single data point, cannot

reasonably be extrapolated to reach a reliable opinion of [the p]laintiff's profitability from 2012

to 2017."  *Id.*  The expert also "acknowledged . . . that the tax transcripts lack[ed] the necessary

details to support a complete opinion" and that he could not "ascertain the exact amount" the plaintiff made from a certain deal that would "affect the profitability calculation." *Id.* Professor Carlton does not offer a specific figure based on a "single data point" like the expert in *Lyman*, nor does he acknowledge the insufficiency of his data or the absence of a key data point. Rather, he claims that Mastercard "has engaged in" a specific behavior and cites to an example of Mastercard engaging in that behavior. (Carlton Rep. ¶ 81.)

In *Lek Securities Corp.*, the expert "analyzed eight of the 675,504 Layering Loops" to conclude that the defendant did not engage in market manipulation. 370 F. Supp. 3d at 417; (*see* Carlton Excl. Reply 7).[9]  The court held that to draw conclusions based on these eight examples, the expert "would have to show that they are representative of the whole," which he "ha[d] not done." *Id.* at 417–18. Professor Carlton does not claim that ▮▮▮▮▮▮▮▮▮▮ ▮ ▮▮▮▮ was "representative of the whole," nor does his overall conclusion require an inference that many or most of Mastercard's proposals to merchants offered anti-steering incentives. Similarly, in *U.S. Information Systems, Inc.*, discovery was limited to "103 projects that were related specifically to [the plaintiffs'] damages claims," such that the data available to the expert "was systematically biased to select projects with the very price differential that [the expert's] analysis was designed to test for." 313 F. Supp. 2d at 233–34. A statistical analysis that relies on a biased sample of data and purports to represent the whole is not comparable to a single example used to show that a party "has engaged" in a given behavior.

---

[9] Layering is "a trading strategy whereby traders place 'visible limit orders . . . that they do not intend to execute.'" *Id.* at 390. A "Loop" is an order placed by a trader that meets certain criteria. *Id.* at 391. The expert in *Lek Securities Corp.* identified Loops that were consistent with layering, or "Layering Loops." *Id.*

Finally, Defendants also argue that Professor Carlton "has failed to justify how and why" the ████████████████ "is a worthwhile gauge for conduct vis-à-vis merchants in response to the 2012 rule change regarding surcharging." (Carlton Excl. Mem. 15.) This critique is valid in part. The Court does not exclude paragraph 81, which states that "Mastercard has engaged in similar behavior of reducing merchant fees in order to induce them not to engage in steering activities." (Carlton Rep. ¶ 81.) As described above, a single example is sufficient to conclude that Mastercard "has engaged" in a given behavior. However, the Court does partially exclude Professor Carlton's claim that "[s]ince the 2012 settlement, █████████████████████████████ █████████████████ s ████████████████), ████ Professor Carlton supports this claim with a citation to Visa sources and then a review of ████████ █ ████ followed by the paragraph about the ████ █ ████. (*Id.* ¶¶ 75– 83 & n.88.) Although the ████ █ ████ itself is admissible, Professor Carlton does not seem to cite an example of a post-2012 Mastercard discount incentivizing merchants not to surcharge. The Court therefore excludes Professor Carlton's claim that Mastercard has granted such discounts.

### 3.  Overall causality

Defendants argue that Professor Carlton's claim that "decreases in merchant and net prices were caused by" the 2012 elimination of the surcharging prohibition is insufficiently supported by "anecdotal" evidence of the ███████████ ██████ 's ████ █ ████. ████████████ h. ██ They claim that Professor Carlton's "own data show that net price was decreasing *prior* to 2012, and no significant change in the rate of decline took place in or after 2012." (Carlton Excl. Reply 4–5.)

In response, the Equitable Relief Class Plaintiffs argue that Professor Carlton "addressed" that net prices began to decline before 2012 due to increased cardholder rewards. (Carlton Excl.

Opp'n 8.) They note that the trend means "that lower interchange fees obtained by ▮▮▮d

▮▮▮ merchants were not offset by *decreased* rewards, and hence net prices for transactions

with those merchants declined." (*Id.*)

First, Professor Carlton may not opine that merchant fees fell as a result of the 2012

elimination of the surcharging prohibition. In paragraph 75 of his report, Professor Carlton

states:

> The 2012 settlement removed or relaxed several of the Network
> Restrictions, albeit subject to various new constraints. That allows
> one to see what the effect is of doing so. The evidence shows that
> merchant service fees fell . . . . For example, Visa and Mastercard
> still made it difficult to surcharge, but it became possible to do so in
> circumstances where it previously was not. As a result, in spite of
>  [T]he evidence indicates that overall
> rewards to cardholders have not fallen — thus both the price to
> merchants and the net price fell. This is direct evidence that the
> Network Restrictions elevated Visa and Mastercard's prices.

(Carlton Rep. ¶ 75.) Professor Carlton goes on to discuss ▮▮▮d ▮▮▮, (*id.* ¶¶ 76–80),

and to claim that Mastercard "has engaged in similar behavior," (*id.* ¶ 81). He states that

although Visa and Mastercard "may claim that there has been relatively little surcharging since

the 2012 settlement" and that therefore "relief from the Network Restrictions would be

ineffective,"  *Id.*

¶ 82.) He concludes that the network restrictions "have elevated prices to merchants, relaxing

them has led to lower merchant prices, and eliminating them altogether will lead to lower

prices." (*Id.* ¶ 83.)

The Court agrees that Professor Carlton seems to opine that "merchant service fees fell" due to Visa's and Mastercard's no-surcharging deals with merchants, and that this opinion is unsupported. As described above, Professor Carlton lacks a sufficient basis to opine that the ████████ caused overall merchant prices to decrease. He also does not cite any evidence to show that Mastercard entered into interchange deals with merchants after 2012 to prevent surcharging. Further, even leaving aside claims about no-surcharging deals, Professor Carlton's report does not appear to support an opinion that merchant service fees after 2012 fell generally. As stated above, Table 5 in Professor Carlton's report indicates that interchange has increased since 2012. (Carlton Rep., Appendix E at 124.) Because it is not supported by facts, the Court excludes any opinion that the 2012 elimination of the surcharging restriction caused overall merchant service fees to decline. (As described above, he may opine that deals between Visa and merchants after 2012 caused merchant service fees to decline *as to some merchants*.)

Professor Carlton also may not use this alleged decrease in merchant fees and the fact that rewards to cardholders have not fallen to opine that net prices fell. (*See* Carlton Rep. ¶ 75.) Obviously, if Professor Carlton's opinion about merchant fees is not based on sufficient facts or data, any inferences from that opinion are also not supported by sufficient facts or data. *See Amorgianos*, 303 F.3d at 267 ("To warrant admissibility . . . it is critical that an expert's analysis be reliable at every step."). Nor may he opine that "net prices have fallen" because "prices to some merchants went down after the 2012 settlement," "rewards did not go down," and "less than 100 percent of interchange is passed through to cardholders." (Carlton Rep. ¶ 91.) This, however, does not preclude Professor Carlton's opinion that "issuers do not pass back all of their interchange fees to cardholders, and many pass back no more than half." (*See id.* ¶¶ 84–91.)

Accordingly, the Court excludes Professor Carlton's opinions that the 2012 elimination of the surcharging prohibition caused merchant fees and net fees to decline, as expressed in paragraphs 75 and 91 of his report.

### iv.   Professor Carlton's analysis of Australia

Defendants argue that Professor Carlton "cannot use the experience of surcharging in Australia to assert that surcharging has any effect on interchange fees" because "he conceded at his deposition that it was the interchange regulation, not the ability to surcharge, that lowered Visa's and Mastercard's fees in that country." (Carlton Excl. Mem. 15.) They claim that Professor Carlton made a "last-minute attempt" at his deposition to "salvage his opinion" by stating that "American Express . . . also lowered merchant discount fees." (*Id.*) Defendants argue that this American Express argument also fails because it is "conspicuously absent from [Professor Carlton's] report" and because Professor Carlton "engages in no analysis to determine whether any alleged decrease in American Express's merchant discount rates was an indirect effect of the interchange regulation rather than the ability to surcharge." (*Id.*)

In response, the Equitable Relief Class Plaintiffs argue that Professor Carlton never claimed that "Visa and Mastercard's lower interchange rates in Australia were caused by surcharging, rather than by the direct regulation of interchange." (Carlton Excl. Opp'n 11–12.) Rather, they claim that Professor Carlton "opined that the Australia experience provides useful evidence that a reduction in interchange fees reduces net prices of card transactions; that surcharging is effective in steering consumers to lower-cost payment methods; and that Visa and MasterCard do not need to charge supracompetitive prices in order to function." (*Id.* at 12.) The Equitable Relief Class Plaintiffs acknowledge that Professor Carlton opined at his deposition that "surcharging had the effect of causing American Express . . . to lower its interchange fees." (*Id.*)

However, they argue that this was not an attempt on Professor Carlton's part to "salvage his opinion" about Visa and Mastercard. (*Id.* at 12 n.16.)  They argue that Defendants "do not offer any reason to think that the ability of merchants to surcharge played no role in causing American Express to reduce its fees to align more closely with Visa's and MasterCard's lower fees," and that Defendants' "speculation about causation is not a basis for excluding Professor Carlton's testimony on this point." (*Id.* at 12.)

In his report, Professor Carlton opines that the Australian experience "is informative on three issues": first, "what happens when interchange fees are reduced because of some intervention"; second, "what happens when surcharging is permitted"; and third, "whether claims that vertical restrictions and free-riding concerns justify the Network Restrictions are plausible." (Carlton Rep. ¶ 96.)  Regarding surcharging specifically, Professor Carlton claims that since surcharging was regulated in Australia, "the share of merchants of all sizes that have instituted surcharges has increased steadily." (*Id.* ¶ 103.)  Further, he points to evidence that "when consumers encounter a surcharge, many opt to use payment methods without surcharges, i.e., that surcharging is effective at steering consumers to lower-cost payment methods." (*Id.* ¶ 104.)

At his deposition, Professor Carlton was asked whether it is his opinion "that the ability to surcharge in Australia lowered interchange fees in Australia." (Carlton Dep. 166:1–3.)  He replied that he believes "that in Australia the ability to surcharge did have an effect on American Express in lowering and having to lower its interchange fee." (*Id.* at 166:4–7.)  Opposing counsel then asked if he believes "that the ability to surcharge in Australia lowered interchange fees on Visa and MasterCard transactions." (*Id.* at 166:8–10.)  Professor Carlton replied that Visa and Mastercard interchange was directly regulated at that time. (*Id.* at 166:11–25.)  However, he added that "the ability to surcharge did cause American Express to lower . . . their

66

effective interchange through the merchant discount" because American Express's interchange was not directly regulated. (*Id.* at 167:1–13.)

The Court agrees with the Equitable Relief Class Plaintiffs that Professor Carlton does not opine that Visa and Mastercard's lower interchange rates in Australia were caused by surcharging. (Carlton Excl. Opp'n 11.) The Court also agrees with Defendants that, because Professor Carlton did not opine in his reports that surcharging caused American Express interchange to decrease in Australia, he will not be permitted to testify to this opinion. *See* Fed. R. Civ. P. 26(a)(2)(B) (stating that the expert report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them").

### v.   Link between challenged rules and Durbin Amendment

Defendants challenge Professor Carlton's opinion that "'the Durbin Amendment led to lower merchant prices and to lower net prices' in the debit card market." (Carlton Excl. Mem. 16.) They argue, first, that "the effect of the Durbin Amendment has nothing to do with whether the rules Prof. Carlton challenges led to supracompetitive prices" because the amendment "capped certain debit interchange fees and was unrelated to surcharging rules." (*Id.*) Second, Defendants argue that this opinion is "inconsistent with the methodology used . . . in independent, pre-existing researchers" because "[a]s other experts have acknowledged and as established in academic literature," "the proper measure of cardholder price must include DDA account fees and cannot properly be limited to rewards." (*Id.* at 16–17.) They claim that "unrefuted evidence, literature, and testimony of other experts establish that" DDA account fees and per-transaction fees decreased as debit interchange increased and "increased to replace entirely (or almost entirely) the reductions in interchange revenue to banks associated with DDAs following the Durbin Amendment." (*Id.* at 17 n.12.) Defendants cite to the 7-Eleven

Plaintiffs and The Home Depot's expert Professor Hausman for the statement that "an expert's 'conclusions on the two-sided [debit] price are unreliable' when the expert does not consider 'evidence that debit interchange has had an effect on DDA pricing.'" (*Id.* at 17–18.)

The Equitable Relief Class Plaintiffs respond that the "main purpose" of Professor Carlton's opinion was not about "whether restrictions on surcharging lead to supracompetitive prices." (Carlton Excl. Opp'n 13.) Rather, they claim that Professor Carlton "opined that the introduction of an interchange cap creates a natural experiment that shows that a reduction in interchange rates reduced net prices for debit transactions, and thus that the earlier debit interchange rate was supracompetitive," which "is plainly relevant to [P]laintiffs' claim that network services for debit cards is a relevant market in which [D]efendants have market power." (*Id.*) The Equitable Relief Class Plaintiffs further argue that Professor Carlton's exclusion of "non-marginal fees [that] do not affect the price of a debit transaction," like DDA fees, "is entirely appropriate." (*Id.*) They note that when such fees increase, "they increase regardless of how many debit transactions are conducted on the account or whether the account is even linked to a debit card," and argue that "[i]n any event, the question about the appropriate treatment of such fees is one for cross examination." (*Id.* at 13–14.) They also contest Defendants' claim that "unrefuted" evidence indicates that DDA account fees offset reductions in debit interchange after the Durbin Amendment, claiming that Defendants "ignore a study by Federal Reserve Board economists . . . which finds to the contrary" and "mischaracterize the two studies that they do cite." (*Id.* at 14.)

Professor Carlton's Durbin Amendment opinions are admissible. "Expert evidence is relevant if it tends to make any fact of consequence to the litigation more or less probable." *Kogut*, 894 F. Supp. 2d at 239. Evidence that interchange prices in the debit market were

supracompetitive prior to the Durbin Amendment makes it more likely that the Network

Restrictions elevate prices to supracompetitive levels, which is Professor Carlton's argument in

this section. (*See* Carlton Rep. ¶¶ 74–110 ("Visa and Mastercard's prices for network

services . . . are supra-competitive in the precise sense that they are elevated as a result of the

Network Restrictions compared to what they would be in the absence of those restrictions.").)

The Court disagrees that Professor Carlton's Durbin Amendment opinions are irrelevant to

Plaintiffs' "burden of proof . . . to show that net price is supracompetitive as a result of the

network rules." (Carlton Excl. Reply 10.)

   Nor does the Court exclude Professor Carlton's Durbin Amendment opinions on the basis

that he fails to include DDA account fees in his measure of cardholder price. (Carlton Excl.

Mem. 16–17.) Rather, the Court agrees with the Equitable Relief Class Plaintiffs that whether

the two-sided debit price must include DDA fees is best addressed on cross-examination. (*See*

Carlton Excl. Opp'n 13–14.) Although Professor Hausman claims that opinions on the two-

sided debit price are unreliable when the expert "does not consider 'evidence that debit

interchange has had an effect on DDA pricing,'" Professor Hausman is not the authority on

reliability of evidence, nor is there a rule that the 7-Eleven Plaintiffs and The Home Depot's

witness must agree with the Equitable Relief Class Plaintiffs' witness. (Carlton Excl. Mem. 17–

18.) Defendants may argue about the relevance of DDA fees at trial, including presenting

evidence that DDA fees have decreased when debit interchange increased and vice versa. (*See*

*id.* at 17 n.12.) *See Royal Ins. Co. of Am. v. Joseph Daniel Constr., Inc.*, 208 F. Supp. 2d 423,

426 (S.D.N.Y. 2002) (noting that in assessing reliability, "[t]he district court is not charged with

weighing the correctness of an expert's testimony, nor must the court choose between the

testimony of competing expert witnesses").

###### vi.   Conclusion

The Court grants Defendants' motion to exclude portions of the report and opinions of

Professor Carlton as to his opinions that Mastercard has given discounts to induce merchants not

to surcharge since the 2012 settlement and that the 2012 elimination of the surcharging

prohibition caused overall merchant fees and net fees to decline.  The Court otherwise denies

Defendants' motion.

##### d.   Motion to exclude opinions of Stephen C. Mott

Defendants move to exclude the report and opinions of 7-Eleven Plaintiffs and The Home

Depot's expert Stephen C. Mott.  (Mott Mot.; *see* Expert Rep. of Stephen Craig Mott ("Mott

Rep.") ¶ 1, annexed to Carney Decl. as Ex. DDX14, Docket Entry No. 8544-2.)

###### i.   Mr. Mott's qualifications and expert report

Mr. Mott is the head of BetterBuyDesign, LLC, a payments consultancy he incorporated

in 2011.  (Mott Rep. ¶ 4, 9.)  He has "worked in the payments industry as a practitioner,

consultant, and advisor for more than 20 years," and has worked on projects "involving cash,

checks, Automated Clearing House (ACH) transactions and check images, credit cards, debit

cards, prepaid cards and accounts, loyalty and reward programs, online and mobile transacting

and security, and alternative payments, including mobile and digital wallets."  (*Id.* at ¶ 3.)  Mr.

Mott has worked for Mastercard and worked on multiple engagements involving Visa and

Mastercard products.  (*Id.* at ¶¶ 11, 13, 17.)  He has also spoken and written extensively on topics

relevant to the payments industry.  (*Id.* at ¶¶ 19–20.)  He has "been involved in more than a

dozen expert witness engagements since 2005."  (*Id.* at ¶ 23.)

Mr. Mott's assignment in this case was to analyze:

> (1) digital wallets and explain how they differ from traditional
> payments methodologies, (2) how, if at all, Visa's and Mastercard's

rules and practices challenged in this litigation impact the strategies digital wallet operators utilize for digital payment transactions, (3) whether any of . . . Visa's and Mastercard's rules and practices that impacted digital wallet operators are commercially necessary.

(*Id.* at ¶ 1.) He applied a methodology "based on both [his] experience in the payment industry and [his] experience in evaluating new, alternative payment forms," which included:

assessing the viability of a new payment form's business model and comparing that model to prevailing industry models to assess its viability; determining the value proposition of a payment form for issuers, merchants, consumers, and the networks; assessing the risks associated with a payment form, including potential security and fraud risks; determining how a payment form fits into the existing payment infrastructure; and ascertaining the applicability of payment network rules and regulations, including existing and new rules.

(*Id.* at ¶ 30.) Mr. Mott opines that "digital wallets and digital payments can enable lower costs, greater performance, convenient consumer access, and better risk controls for retail payments," (*id.* at ¶ 33); that "Visa's and Mastercard's rules and pricing structures and conduct have undermined alternative wallet models," (*id.* at ¶ 37); that Visa and Mastercard "likely" created the Honor-All-Wallets (HAW) rules to avoid being "disintermediated" at the point of sale, and that their commercial justifications for the rules are "flawed," (*id.* at ¶ 38); and that Visa and Mastercard "used their central role in the payments ecosystem to undermine PayPal's staged wallet business model," (*id.* at ¶ 39.)

Mr. Mott has also submitted a reply report, which responds to criticisms of his initial report. (Reply Expert Rep. of Stephen Craig Mott ("Mott Reply Rep."), annexed to Carney Decl. as DDX15, Docket Entry No. 8544-2.)

The parties cite to *LendingTools.com, Inc. v. Bankers' Bank of Kansas*, No. 11-CV-1879, 2015 WL 13839134 (D. Kan. March 4, 2015), a 2015 case in which the court excluded some of Mr. Mott's opinions. (Defs.' Mem. of Law in Supp. of Mot. to Excl. Opinions of Stephen C.

71

Mott ("Mott Excl. Mem.") 8, Docket Entry No. 8082; 7-Eleven Pls.', The Home Depot, &

Elgin's Mem. of Law in Opp'n to Defs.' Mot. to Excl. Opinions of Stephen C. Mott ("Mott Excl.

Opp'n") 12, Docket Entry No. 8225.)   In that case, the defendants moved to exclude Mr. Mott's

opinions that the plaintiffs' "software functions and functionality were 'unique' among

correspondent banking software" and claimed that he also opined "as to the credibility of other

witnesses" and "as to [the] defendants' and other witnesses' states of mind."  Defs.' Joint Mot. to

Excl. Improper Opinion Testimony, *LendingTools.com, Inc. v. Bankers' Bank of Kansas*, 2014

WL 12910926 (D. Kan. Oct. 14, 2014).  The defendants cited multiple opinions that they

claimed improperly addressed state of mind, including Mott's opinion that the defendants

"appeared oblivious and disdainful of the conventional . . . best practices"; that the defendants'

"motivation would appear to be reducing costs"; and that the defendants "embarked on a

deliberate campaign to discredit" the plaintiffs.  *Id.*  The District Court of Kansas declined to

exclude Mr. Mott's expert testimony "on the subject of whether any of the aspects of [the

plaintiff's] software identified by [the plaintiff] as misappropriated trade secrets were 'unique' or

'proprietary.'"  2015 WL 13839134, at *1..  However, it precluded the plaintiffs' experts,

including Mr. Mott, from "giving opinion testimony that weighs disputed evidence or comments

on the credibility of other witnesses" or "giving testimony that opines and comments on the state

of mind or defendants or witnesses."  *Id.* at *2.  The court also found that Mr. Mott did "not have

the necessary qualifications and factual foundation to give expert testimony in this case on issues

related to [the] plaintiff's alleged damages," and that Mr. Mott's opinions were "based on

speculation and his testimony would not assist the jury."  *Id.*  It therefore excluded Mr. Mott's

damages opinions.  *Id.*  As in *LendingTools.com*, the Court does not exclude or admit Mr. Mott's

opinions based on a blanket rule, but rather considers the admissibility of each challenged opinion separately.

### ii.   Intent, motives, and state of mind

Defendants claim that Mr. Mott's report "contains numerous opinions on the motives, intent, and state of mind of Visa, Mastercard, PayPal, Apple, issuing banks, and personnel of those businesses." (Mott Excl. Mem. 5.) They argue that their challenges cannot "be addressed by repackaging [Mr. Mott's opinions] as opinions about 'effects' rather than intent, motive, or state of mind," noting that experts "may not explicitly *or implicitly* opine on [a party's] intent, motivations, or state of mind." (Defs.' Reply Mem. of Law in Supp. of Mot. to Excl. Opinions of Stephen C. Mott ("Mott Excl. Reply") 3, Docket Entry No. 8160.) Defendants cite to *LendingTools.com*, in which "[t]he court precluded Mr. Mott from testifying on the state of mind of defendants or witnesses." (Mott Excl. Mem. at 8.)

In response, 7-Eleven Plaintiffs, The Home Depot, and Elgin claim that Defendants "selectively pluck phrases" from Mr. Mott's reports "to make [trivial], out-of-context critiques of his word choices." (Mott Excl. Opp'n 6–7.) They claim that Mr. Mott's proposed opinions are proper "[i]ndustry expert testimony," which "is admissible to assist a lay jury in understanding and drawing inferences involving complex documents and an industry with complex business relationships, competitive dynamics, and technologies." (*Id.* at 8.) The 7-Eleven Plaintiffs, The Home Depot, and Elgin claim that Defendants' objections "can be resolved by simply deleting the challenged phrases, or by instructing Mr. Mott to refrain from using such language at trial," and that "Plaintiffs will not elicit testimony from Mr. Mott that Visa's and Mastercard's justification for their respective strategies to eliminate PayPal's staged wallet model were 'pretextual,'" but that those facts will instead "be proven through direct evidence at trial." (*Id.* at

7 n.6, 10 n.12.)[10]  The 7-Eleven Plaintiffs, The Home Depot, and Elgin also argue that

Defendants make "conflicting arguments to exclude Mr. Mott's opinions," such as "object[ing]

to a statement on the grounds that it is both an improper opinion and improper narrative

testimony." (Mott Excl. Opp'n 9 n.11.)

     Rather than considering whether Defendants' challenges to Mr. Mott's opinions are

contradictory, the Court considers the portions of Mr. Mott's report that Defendants identify as

impermissibly offering opinions on intent, motive, and state of mind.  (Mott Excl. Reply 6 n.4;

*see also* Mott Mem 2 n.4 (noting that the "sections that Defendants contend should be excluded

are highlighted" in exhibits DDX93 and DDX94); Highlighted Mott Rep., annexed to Carney

---

[10] The parties also disagree over portions of Mr. Mott's deposition testimony.  (*See* Mott
Excl. Mem. 5–6; Mott Excl. Opp'n 11–12; Mott Excl. Reply 5–6.)  Defendants claim that Mr.
Mott "confirmed" at his deposition that he offers opinions on "motives, intent, and state of
mind," (Mott Excl. Mem. 5), and that his statements that he does not know various actors'
intentions or states of mind represent an attempt to "recant earlier testimony," (Mott Excl. Reply
6.)  The 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that Mr. Mott "repeatedly
testified that he was not opining on Defendants' intent."  (Mott Excl. Opp'n 11.)
     Mr. Mott testified that "I think you can infer intentions without having somebody directly
tell you this is what their intention was," (Videotaped Dep. of Stephen C. Mott ("Mott Dep.")
244:23–25, annexed to Carney Decl. as DDX28, Docket Entry No. 8544-4); that he opined as to
what he thought "was in [the networks'] minds," (*id.* at 245:10–18); that he could "contribute to
the discussion to ascertain [Mastercard's] full intentions or motivations," (*id.* at 247:18–248:2);
and that he was "interpreting and inferring what [the networks'] intentions are based on the
evidence that [he has] assembled," (*id.* at 265:25–266:2).  After a break in the deposition, (*id.* at
267:19–21; *see* Mott Excl. Reply 6), Mr. Mott testified that what he had "been trying to say" was
that he did not "know what the intentions and motivations and state of mind is per se," (Mott
Dep. 268:16–19); that he "make[s] inferences from what [he] read[s] in the record that [he has]
reviewed as well as [his] industry experience," (*id.* at 268:16–21); and that he "certainly didn't
intend to say" that he "can be the arbiter and know all of the intentions and motivations and state
of mind," (*id.* at 269:7–11).  He also testified that "I don't know intent.  I don't know state of
mind.  I don't know motivations. . . . I interpret things that you are construing or people could
construe as an assessment of an intention, but that's not what my testimony is." (*Id.* at 292:10–
15).
     The Court does not base its decision about Mr. Mott's opinions on his testimony, but
rather individually considers each opinion in the report challenged by Defendants.

Decl. as DDX93, Docket Entry Nos. 8544-10, 8544-11, 8544-12; Highlighted Mott Reply Rep., annexed to Carney Decl. as DDX94, Docket Entry Nos. 8544-13, 8544-14.)

Defendants move to exclude portions of paragraphs 36, 38, 39, 63, 76, 77, 79, 80, 81, 82, 84, 85, 86, 90, 91, 93, 94, 95, 96, 105, 106, 109, 110, 111, 112, 113, 114, 116, 118, footnote 188 to paragraph 118, 119, 120, 122, 123, 125, 126, 127, 128, 129, 130, 131, 132, 133, 141, and 142 of Mr. Mott's original report, and portions of paragraphs 4, 5, 7, 9, 10, 17, 19, 20, 26, 27, 28, 30, 34, 39, 40, 41, 43, 48, 54, 55, 56, 60, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 77, 82, 86, 88, 89, 90, 91, 92, 94, 96, and 100 in his reply report.  (*See* Mott Excl. Reply 6 n.4.)[11]  In many of the challenged portions of Mr. Mott's opinion, the Court finds that Mr. Mott cites to a source stating as a fact that the party or nonparty had that state of mind and therefore does not offer a claim about state of mind "as his expert opinion," but rather "referenc[es] this fact . . . as the *basis* for his ultimate opinion."[12]  *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09-CV-686, 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011).  Specifically, the Court does not exclude the challenged text in paragraphs 76, 77, 79, 80, 84, 85, 86, 90, 91, 95, 96, 106, footnote 188 to paragraph 118, 129, or 130 of Mr. Mott's original report or the challenged text in paragraphs 20, 26, 27, 28, 40, the second challenged portion of paragraph 41, 43, 55, 56, 66, 69, 77, 88, 90, 92, or 100 of his reply report because, although these excerpts do refer to intentions,

---

[11]  Defendants do not include paragraph 93 in the list of challenged paragraphs in footnote 4 on page 6, (Mott Excl. Reply 6 n.4), but it is highlighted green in the highlighted copy of Mr. Mott's report, (Highlighted Mott Rep.).  The Court accordingly treats it as challenged.

[12]  Regarding the excluded paragraphs, if Mr. Mott is in fact relying on a source that states a party's motive, intention, or state of mind as a fact, he may testify to that fact at trial.  If Defendants disagree that his statement represents a fact rather than an opinion, they may challenge his testimony at that time.  It is not always obvious from an expert's report alone whether the expert is relying on a source that states a party's state of mind or improperly inferring state of mind.

motivation, or states of mind, they are supported by citations to sources purporting to state those intentions, motivations, or states of mind as facts.

In other paragraphs, Mr. Mott permissibly offers an expert opinion as to a topic other than intent, motivation, or state of mind, such as the parties' behavior or the effect of the agreements between them. The Court does not exclude the challenged text in paragraphs 36, 112, the first three challenged portions of paragraph 119, 128, 131, 132, or 141 of Mr. Mott's original report or the challenged text in paragraphs 4, 5, 7, 9, 10, 17, 19, 28, 54, 56, 65, 67, 70, 71, the first two challenged portions of paragraph 72, 86, 89, 91, or 96 because these excerpts do not opine as to intentions, motivation, or state of mind.

Below, the Court specifies where it excludes certain opinions and its reasons for doing so.

1. In paragraph 38, Mr. Mott writes:

> Visa and Mastercard have offered various commercial justifications for the HAW rules, including brand integrity, consumer confusion, and security. However, based on my understanding of how digital payments operate, my experience in evaluating alternative payment strategies, and evaluation of the payments industry, these justifications are flawed. I do not think it would be confusing for consumers to associate the acceptance proposition in digital wallets with the wallet itself. This strategy, however, would potentially disintermediate Visa and Mastercard at the POS, and this is the likely reason why the networks created the HAW rules. HAW rules are not necessary for the development of digital payments.

(Mott Rep. at ¶ 38.)

Mr. Mott may not testify as to the "likely reason why the networks created the HAW rules" as this represents an "[i]nference[] about the intent or motive of parties or others." *In re Rezulin*, 309 F. Supp. 2d at 547. However, he may testify that he believes that Visa and Mastercard's "commercial justifications" are substantively "flawed" and that a system in which consumers "associate the acceptance proposition in digital wallets with the wallet itself" would

"potentially disintermediate Visa and Mastercard at the POS."[13]  (Mott Rep. ¶ 38.)  The Court therefore excludes the challenged text in part.

2.  In paragraph 39, Mr. Mott writes: "It is also my opinion that Visa and Mastercard's justification for their respective strategies to eliminate PayPal's staged wallet model were (and are) pretextual."  (Mott Rep. at ¶ 39.)

The 7-Eleven Plaintiffs, The Home Depot and Elgin claim that in this text, Mr. Mott "opines that Visa and Mastercard took actions that had the effect of undermining PayPal's staged wallet business model (which challenged the Visa and Mastercard status quo) when PayPal announced plans to deploy its staged wallet model at the physical point of sale."  (Mott Excl. Opp'n 9–10.)  They claim that Plaintiffs "will not elicit testimony from Mr. Mott that Visa's and Mastercard's justification for their respective strategies to eliminate PayPal's staged wallet model were 'pretextual.'"  (*Id.* at 10 n.12.)  They also argue that in this paragraph Mr. Mott "analyzes and draws conclusions from . . . the steps Visa and Mastercard took in response to PayPal's initial success using a staged wallet model that allowed ACH steering . . . and the impact those steps had on PayPal's business."  (*Id.* at 11 n.13.)

The Court excludes the challenged text as offering an improper opinion on state of mind. Mr. Mott may not testify that Visa's and Mastercard's justifications for their respective strategies were pretextual or otherwise disingenuous, as this involves an inference about the networks' state of mind.  The Court excludes this testimony, consistent with the 7-Eleven Plaintiffs, The

---

[13]  In response to the 7-Eleven Plaintiffs, The Home Depot, and Elgin's claim that Defendants merely criticize Mr. Mott's "word choices," Defendants argue that counsel may not "rewrite an expert's opinions after the fact."  (Mott Excl. Reply 3.)  While this is true, in many cases Mr. Mott's report implies *both* that a party had a certain mental state *and* that the mental state relates to a certain technical or market reality.  In those situations, Mr. Mott may testify about what he believes to be the market or technical reality; he is prevented only from testifying about the parties' mental states.

Home Depot, and Elgin's statement that they "will not elicit testimony . . . that Visa's and

Mastercard's justification for their respective strategies to eliminate PayPal's staged wallet

model were 'pretextual.'" (*Id.* at 10 n.12.)  Notably, as stated above, Mr. Mott *may* opine that he

believes the networks' justifications are substantively flawed.

    3.  Also in paragraph 39, Mr. Mott states: "Visa and Mastercard used their central role in the

payments ecosystem to undermine PayPal's staged wallet business model when PayPal

announced plans to deploy its wallet model in physical stores." (*Id.* ¶ 39.)

        The Court excludes the challenged text in part as offering an improper opinion on intent.

Mr. Mott may testify, based on his expertise, that Visa and Mastercard's actions had the effect of

undermining PayPal's staged wallet business model, but he may not opine that Visa and

Mastercard intended to have such an effect unless he is citing to a source that states this intention

as a fact.

    4.  In paragraph 63, Mr. Mott writes that "Visa and Mastercard have used their rules and

other practices to constrain the development of alternative payment products and services from

issuers or technology companies in the United States." (*Id.* at ¶ 63.)

        The Court excludes the challenged text in part.  As above, Mr. Mott may testify that Visa

and Mastercard's rules and other practices that have had the effect of constraining the

development of alternative payment products and services, but may not testify that Visa and

Mastercard intentionally "used" their rules and other practices to this effect unless citing to a

source stating that this was their intent.

    5.  In paragraph 81, Mr. Mott writes:

> As further discussed below, despite PayPal's initial success using a
> staged wallet model that allowed ACH steering, once Visa,
> Mastercard, and issuers identified the dangers of ACH to their
> network model — and corresponding interchange revenue — they

took steps to destroy PayPal's staged wallet approach and eliminate ACH steering.

(*Id.* ¶ 81.)

The 7-Eleven Plaintiffs, The Home Depot and Elgin claim that this paragraph is not improper, but rather represents Mr. Mott "analyz[ing] and draw[ing] conclusions from . . . the steps Visa and Mastercard took in response to PayPal's initial success using a staged wallet model that allowed ACH steering." (Mott Excl. Opp'n 11 n.13.)

The Court excludes the challenged text in part as offering an improper opinion on intent. Mr. Mott may testify, based on his expertise, that ACH posed a danger to Visa, Mastercard, and issuers' network model, and that Visa, Mastercard, and issuers took actions that had the effect of destroying PayPal's staged wallet approach and eliminating ACH steering. However, he may not testify that Visa, Mastercard, and issuers identified ACH as a danger to their network model unless he is citing to sources directly stating the same. Similarly, he may only testify that Visa, Mastercard, and issuers took certain steps with the goal of destroying PayPal's staged wallet and approach and eliminating ACH steering if he is citing to sources directly saying so.

6. In paragraph 82, Mr. Mott writes: "After PayPal announced its deal with Discover, as discussed more fully below, Visa and Mastercard started to pressure PayPal to drop its staged wallet model." (Mott Rep. ¶ 82.)

The Court excludes the challenged text to the extent that it implies that Visa and Mastercard had the intention of pressuring PayPal to drop its staged wallet model. He may not testify that they had this intention unless citing to sources directly saying so. However, to the extent the challenged text states only that Visa and Mastercard's actions had the effect of pressuring PayPal, this opinion is admissible.

7. In paragraph 93, Mr. Mott writes:

> [Programs that could lead to more rewards for cardholders] will not happen, however, without the willing participation of merchants, who possess the SKU data and will only part with it in bilateral arrangements with issuers or wallets where the data is deployed to drive more sales to the merchants. Issuers with experience with merchants understand this. In my experience, Visa and Mastercard rules and conduct have materially impeded the emergence of these partnerships. In the current environment, merchants mistrust the issuers in large part because of their continued adherence to the Visa and Mastercard rules framework and the interchange that merchants are forced to pay to issuers. Moreover, the HAW rules force merchants to accept digital wallets, reducing, if not eliminating their leverage to negotiate effective agreements on data sharing with wallet providers.

(*Id.* ¶ 93.)

The 7-Eleven Plaintiffs, The Home Depot and Elgin claim that in this paragraph Mr. Mott "analyzes and draws conclusions from . . . actors' incentives in the payments ecosystem," and that this opinion is "not based on Mr. Mott's evaluations of the parties' state of mind and [is] appropriate." (Mott Excl. Opp'n 11 n.13.) They also argue that this paragraph "analyzes and draws conclusions from . . . the factors that are necessary to lead to greater and more-targeted rewards for cardholders." (*Id.*)

The Court excludes the challenged text in part. Mr. Mott supports his claim about what issuers "understand" with a citation to a single Chase document, which is not enough to show that it is a fact that issuers with experience with merchants all have a certain understanding. He also may not opine that merchants "mistrust" issuers unless citing to a document showing that this is a fact. However, Mr. Mott may testify about what would be required for certain rewards programs to be viable and may opine about the effects of Visa and Mastercard rules, including whether they have impeded the emergence of certain partnerships.

8. In paragraph 94, Mr. Mott writes that in his experience, "merchants have long wanted to steer consumers to different forms of payments and have done so successfully at the physical

POS when permitted and when it is cost-effective to do so, such as steering debit card transactions to lower cost PIN debit options and steering consumers to private-label payment cards." (Mott Rep. ¶ 94.)

The 7-Eleven Plaintiffs, The Home Depot and Elgin claim that in this paragraph Mr. Mott "analyzes and draws conclusions from . . . actors' incentives in the payments ecosystem," and that this opinion is "not based on Mr. Mott's evaluations of the parties' state of mind and [is] appropriate." (Mott Excl. Opp'n 11 n.13.)

The Court excludes the challenged text in part, as Mr. Mott may not opine about what merchants "want" or "have wanted." However, he may testify about why steering is beneficial for merchants and describe instances in which they have successfully steered consumers to alternative forms of payment.

9. In paragraph 105, Mr. Mott writes:



(Mott Rep. ¶ 105.)

The Court excludes the challenged text in part. Mr. Mott may not opine as to what Visa ████████████ s ██████████████████████████ h ██████ . However, he may opine about the value of screen placement.

10. In paragraph 106, Mr. Mott writes:

Visa also recognizes [the importance of top-of-wallet status]: ██





(*Id.* ¶ 106.)

The Court excludes the challenged text in part as offering improper opinions about state

of mind.  Mr. Mott may not opine about what "almost every issuer wants" unless citing to

sources showing that these issuer desires are a fact.  However, he may opine about why top-of-

wallet status would be advantageous for issuers and why it would be difficult for them to

compete with the status in the current environment.

Mr. Mott also ordinarily may not opine about what Visa "recognized."  Here, however,

he is citing to a document in which Visa expresses exactly this recognition.

11. In paragraph 109, Mr. Mott writes:

> My view [prior to 2014] was that Visa and Mastercard used the
> EMV rollout to seed merchant POS terminals with contactless-
> enabled devices.  In this regard, one of the principal reasons Visa
> and Mastercard pushed EMV was to ensure merchants that accepted
> plastic card transactions also implemented the infrastructure
> necessary to accept NFC payments.  And Mastercard believed
> ubiquitous EMV contactless acceptance that leveraged the existing
> payment rails would protect against disintermediation by PayPal and
> other alternative payment providers.

(*Id.* ¶ 109.)

Defendants argue that it is "beside the point that Mr. Mott may have some basis in his

professional experience, or purportedly in the record, for his opinions about what Visa and

Mastercard feared and believed."  (Mott Excl. Reply 5.)  In response, the 7-Eleven Plaintiffs, The

Home Depot, and Elgin argue that in this paragraph, Mr. Mott "is simply providing his opinion

as an industry expert who has been deeply involved with the development and implementation of

EMV in the United States and properly augments that opinion with his interpretation of documents produced by Defendants." (Mott Excl. Opp'n 8.)

The Court excludes the challenged text in part as offering an improper opinion on intent. Mr. Mott may not testify about the "*principal* reasons" Visa and Mastercard pushed EMV, or about the primary purpose behind the EMV rollout, unless citing to a source stating these primary reasons or purposes as facts. He also ordinarily may not opine about Visa and Mastercard's motivations for the "EMV rollout," nor may he ordinarily opine about what Mastercard "believed." However, here he is citing to documents in which Visa and Mastercard ostensibly expressed exactly these motivations and beliefs.

12. In paragraph 110, Mr. Mott states:

> Many of the merchants with which I worked did not want to accept Android Pay because of concerns related to Google's data collection practices. One of merchants['] concerns was that Google, or other wallets, would capture valuable SKU data (as discussed above) and deploy it in ways antagonistic to the merchant, such as using the data to present targeted offers from other retailers based on consumer purchases. As a result, I am aware of merchants who respond to Visa's rule by declining to enable NFC, and as discussed below, it is my view that merchants will soon be forced to switch to NFC. In my opinion, the extension of the HAC rules was connected to the various arrangements and agreements between Visa and Apple that preceded the launch of Apple Pay. Apple Pay, as noted, is an NFC-based wallet that will benefit from the HAW rule that Visa first announced in October 2014.

(Mott Rep. ¶ 110.)

The Court excludes the challenged text in part. Mr. Mott may not testify about merchants' "concerns" and desires unless he is citing to a source stating those concerns or desires. However, he may testify that it is possible that digital wallets could capture SKU data and use it in ways antagonistic to the merchant.

Mr. Mott also may not testify that the extension of the HAC rules was "connected" to the

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ to the extent that this "connection" is based on Visa or

▮▮▮▮▮ intentions or motivations. However, he may testify that the two were linked temporally,

in terms of their effects, or in another way that does not implicate state of mind.

13. In paragraph 111, Mr. Mott writes:

> In my view, [in 2014], neither Visa nor Mastercard anticipated that QR code technology, which had been used by Starbucks to support its closed-loop payment system, would emerge as a potential alternative to NFC in terms of driving industry adoption of general-purpose contactless transactions. That explains why they did not include QR codes in their extension of the HAC rules in October 2014.

(*Id.* ¶ 111.)

The 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that Mr. Mott "is describing

developments in the payment industry, the potential effects of those developments on industry

participants, and those effects on the business dynamics in the payment industry." (Mott Excl.

Opp'n 8.) They also claim that in this paragraph Mr. Mott "analyzes and draws conclusions

from . . . the technologies payment networks were using prior to October 2014 to draw a

conclusion regarding why certain technologies were not included in the HAC Rules." (Mott

Excl. Opp'n 11 n.13.)

The Court excludes the challenged text in part. Mr. Mott may not testify as to what Visa

and Mastercard did or did not "anticipate" or why they "did not include QR codes in their

extension of the HAC rules" unless citing to sources stating these facts. (Mott Rep. ¶ 111.) He

may testify that QR code technology has "emerge[d] as a potential alternative to NFC" and may

opine that it would have been expected or advantageous for Visa and Mastercard to have

included QR codes in the HAC rules extension. (*Id.*)

14. In paragraph 113, Mr. Mott states in relevant part:

> Visa was deeply concerned that Chase — the largest credit card
> issuer on the Visa network in the United States — was implementing
> QR-code technology in the United States in a way that gave it the
> ability to differentiate itself at the POS and unlevel the playing
> field. . . . [I]n my opinion, Chase's attempt to jumpstart that strategy
> through a deal that enabled it to reach many of the largest merchants
> in the United States magnified that threat.  I believe the April 2016
> notes of Oliver Jenkyn — Visa's Global Head of Strategy and
> Corporate Development — reveal portions of Visa's strategy to
> blunt competition from Chase Pay.

(*Id.* ¶ 113.)

The Court excludes the challenged text in part.  Although the source that Mr. Mott cites

to does appear to state Visa's concerns about Chase's QR-code technology, Mr. Mott may not

state that Visa was "deeply" concerned unless citing to a source directly stating that Visa's

concerns were "deep."  Mr. Mott also may opine that Chase Pay posed a threat to Visa, but may

not state that Visa perceived Chase Pay as a threat unless he cites to a source stating it did.

Similarly, Mr. Mott may claim that Visa's strategy was intended to "blunt competition from

Chase Pay" only if citing to a source that says the same.

15. In paragraph 114, Mr. Mott states:

> To block Chase from competing for merchant acceptance via digital
> wallet exclusivity, Visa engaged in a multi-pronged strategy.  First,
> they extended the HAW rules to QR codes.  Second, when the
> application of the HAW rules to QR-based wallets was unclear, Visa
> made sure that digitally savvy merchants, such as Starbucks,
> implemented the Visa QR-code specification (which incorporated
> the HAI rules).  Third, Visa and Mastercard leveraged their
> dominance of EMVCo to develop and promulgate an industry-wide
> QR-code specification based on Visa's proprietary QR-code
> technology.  As I discuss below, Chase is now using NFC for Chase
> Pay, which suggests that it is now abiding by the HAW rules and
> not offering merchants digital wallet exclusives.

(*Id.* ¶ 114.)

The Court excludes the challenged text in part as offering an improper opinion as to

motive.  Mr. Mott may not testify as to the motives behind Visa's "multi-pronged strategy"

unless citing to a source directly stating that that was the purpose of the strategy.  However, he may opine as to how this strategy affected Chase's ability to compete for merchant acceptance via digital wallet exclusivity.

16. In paragraph 116, Mr. Mott states that one reason "the impact of the HAW rules will be felt across the market once NFC functionality becomes widespread at the POS" is that "Visa and Mastercard have successfully pushed the payments industry (via the EMV Liability Shift deadline) to widely deploy contactless-capable POS terminals."  (*Id.* ¶ 116.)

The Court excludes the challenged text in part.  Mr. Mott may not testify as to Visa and Mastercard's motivation for "push[ing] the payments industry . . . to widely deploy contactless-capable POS terminals."  (*Id.*)  However, he may opine that Visa and Mastercard *have* "pushed" the payments industry in this way and that one effect is that "the impact of the HAW rules will be felt across the market once NFC functionality becomes widespread at the POS."  (*Id.*)

17. In paragraph 118, Mr. Mott writes:

> Based on my experience and review of the record, it is my understanding that both Apple and Google considered building their own payment networks to compete with Visa and Mastercard. Accordingly, and from my experience in the industry, I doubt Visa and Mastercard would have extended the HAC rules in this manner had they not feared potential competition — especially from Apple and Google.

(*Id.* ¶ 118.)

The 7-Eleven Plaintiffs, The Home Depot and Elgin argue that "Defendants omit the portion of [Mr. Mott's] opinion that makes clear that the conclusion is based on his 'experience in the industry.'"  (Mott Excl. Opp'n 7.)  In response, Defendants argue that "[w]hatever the basis, Mr. Mott cannot opine on what Visa and Mastercard may have 'feared,'" and that this is "classic 'state of mind' testimony."  (Mott Excl. Reply 5.)

86

The Court excludes the challenged text in part.  Mr. Mott may not testify about what Visa and Mastercard "feared" unless citing to sources that show these fears as a fact.  Mr. Mott cites to a source showing that Visa viewed Apple as a "threat," but does not show that Mastercard feared Apple or that Visa and Mastercard feared Google.  This source is therefore insufficient. Mr. Mott *may* opine that Apple and Google represented a competitive threat to Visa and Mastercard and that extending the HAC rules allowed Visa and Mastercard to preempt or avoid this threat.

18. Defendants make multiple challenges to paragraph 119.  The Court does not exclude paragraph 119 on the basis of most of these challenges.  However, Mr. Mott also states, in relevant part:

> Instead, Visa and Mastercard have used their tokenization services to maintain their networks' central role in digital payment transactions.  Moreover, Visa and Mastercard have given digital wallet operators that use the networks' (or an approved third-party's) token services lower card-present interchange rates. Tokenization provides Visa and Mastercard with an additional layer of control over the digital wallets, control they have exercised to force these wallets to acquiesce to the network-centric model.  In my view, this approval process is not based on any security rationale, but rather is an effort by Visa and Mastercard to extend and maintain control of payment transactions.

(Mott Rep. ¶ 119.)

The Court excludes this portion of the challenged text in part as offering an improper opinion as to intent.  Mr. Mott may not testify about Visa's and Mastercard's intentions in "us[ing] their tokenization services" or why Visa and Mastercard have used their "approval process" in the specific way they have,  (*id.*), but he may testify about the effects of the ways Visa and Mastercard have used their tokenization services.

19. In paragraph 120, Mr. Mott writes:

> However, Visa and Mastercard's imperative to maintain the so-
> called level playing field for their largest issuers was ensured



(*Id.* ¶ 120.)

The Court excludes the challenged text to the extent that "Visa and Mastercard's imperative" means or implies that Visa and Mastercard consciously sought to "maintain the so-called level playing field for their largest issuers." (*Id.*) Mr. Mott may not testify to such a goal unless citing to a source stating that that was Visa and Mastercard's intention. However, Mr. Mott may opine that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ had the effect of maintaining that level playing field.

20. In paragraph 122, Mr. Mott states that in his view ▮▮▮▮▮▮▮▮ d ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ n ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – ▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮ e ▮▮▮▮▮▮▮▮▮▮)

The 7-Eleven Plaintiffs, The Home Depot, and Elgin claim that in this paragraph Mr. Mott "is describing developments in the payment industry, the potential effects of those developments on industry participants, and those effects on the business dynamics in the payment industry." (Mott Excl. Opp'n 8.) They also argue this paragraph "analyzes and draws conclusions from . . . the factors that would create a 'level playing field' that limits competition between issuers and the reason why issuers would continue to abide by the HAC Rules." (Mott Excl. Opp'n 11 n.13.)

The Court excludes the challenged text in part as offering an improper opinion as to intent. Mr. Mott may not testify about Visa's and Mastercard's reasons for brokering the issuer ███████████████ unless citing to a source directly stating what their reasons were. However, he may testify that the issuer deals had the effect of maintaining the level playing field.

Mr. Mott also generally may not testify as to why Visa and Mastercard "granted the issuers a concession." (Mott Rep. ¶ 122.) However, the previous sentence explains that "[w]hen Visa decided to designate [in-app] transactions as card-not-present, it noted that 'significant issuer payments to other value chain participants,' *i.e.*, ███████████████████████, were a factor in its decision." (*Id.*) Thus, he is not testifying that Visa granted issuers higher card-not-present interchange for in-app transactions "as his expert opinion," but rather is referencing this fact as a basis for his opinion. *See Bd. of Trs. of AFTRA Ret. Fund*, 2011 WL 6288415, at *8.

21. In paragraph 123, Mr. Mott writes that ███████████████████████████████████ ██████████████████████████████████████████████████████n █████████ ████████████████████d ████████████ n███████████, ███████

The Court excludes the challenged text in part. Mr. Mott may not testify about Visa's intentions or motivations in implementing ████ unless he is citing to a source that directly states those intentions. However, he may testify that ████ has the effect of preserving the "level playing field."

22. In paragraph 125, Mr. Mott writes:

> Because of issuer opposition, Visa considered cutting off Apple's
> ████████████████████████████████████████████████████
> ████████████████████████████████████████████████████
> ████████████████████████████████████████████████████
> ████████████████████████████████████████████████████
> ████████████████████████████████████████████████████
> ████████████████████████████████████████████████████



(*Id.* ¶ 125.)

Defendants argue that "[w]hatever the basis, Mr. Mott cannot opine on . . . [Visa and Mastercard's] intention for pursuing business strategies." (Mott Excl. Reply 5.) The 7-Eleven Plaintiffs, The Home Depot and Elgin respond that Defendants "gloss over the fact that Mr. Mott's opinion is based on factual information, such as how issuers reacted or the incentives faced by each party, which Defendants do not challenge." (Mott Excl. Opp'n 7–8.) They claim that "[r]ather than opine on state of mind, Mr. Mott describes the competitive dynamics of digital wallets at issue based on his experience, including his participation with the Federal Reserve's studies of tokenization and mobile wallets." (*Id.* 8.)

The Court excludes the challenged text in part as offering an improper opinion as to state of mind. Mr. Mott may not testify about what Visa "preferred" unless citing to a document in which Visa directly states its preferences. Mr. Mott also may not opine that [REDACTED]

[REDACTED] A[REDACTED]," although he may opine that *he* considers the

[REDACTED] A[REDACTED]

[REDACTED]

The Court does not exclude Mr. Mott's statement that "[REDACTED]

[REDACTED]" (*see* Mott Excl. Mem. 6), as

it is supported by a citation to a Visa document stating that "[[REDACTED]

[REDACTED]P[REDACTED]a v[REDACTED]

[REDACTED].[REDACTED])

23. In paragraph 126, Mr. Mott states:



(*Id.* ¶ 126.)

The Court excludes the challenged text in part. Mr. Mott may not testify about what Visa ███████ in the sense of Visa having a mental or emotional response to █████████ with issuers. However, he may opine that ████████████ h A████████████ ████████████ y ████████████████████.

24. In paragraph 127, Mr. Mott states: "Visa opposed the staged version of Google Wallet — especially in-store acceptance — and orchestrated issuer opposition to it. Faced with issuer opposition, Google was forced to abandon the staged version of Google Wallet and implement a pass-through wallet model instead." (*Id.* ¶ 127.)

The Court excludes the challenged text in part. Mr. Mott may not testify that Visa was internally "opposed" to the staged version of Google Wallet unless citing to a source directly stating that Visa felt "opposed." However, he may testify that Visa took actions that opposed the staged version of Google Wallet.

25. In paragraph 133, Mr. Mott states that "[r]ecent statements by PayPal executives support [his] conclusions" and lists a number of statements. (*Id.* ¶ 133.) In the course of this paragraph, he relevantly states that he "believe[s] the real concern of Visa, Mastercard, and the issuers with PayPal was in-store POS acceptance and that ACH steering would result in disintermediation and lost interchange revenue for the issuers" and that issuers "liked" the deal with PayPal because "it preserved their interchange revenue." (*Id.*)

91

The Court excludes the challenged text in part.  Mr. Mott may not testify about Visa's, Mastercard's, and issuers' "real concern" unless citing to sources directly stating that this was their real concern.  However, he may opine that in-store POS acceptance and ACH steering threatened Visa's, Mastercard's, and issuers' revenue because they could have led to disintermediation and lost interchange revenue.

26. In paragraph 142, Mr. Mott states: "In my opinion, Visa and Mastercard discriminated against the staged-wallet model not because of supposed transaction data visibility, consumer confusion, or bank operation issues, but because PayPal, the primary staged wallet model, emerged as a serious competitive threat to Visa and Mastercard." (Mott Rep. ¶ 142.)

The Court excludes the challenged text to the extent that Mr. Mott's statement about Visa and Mastercard's motivations in "discriminat[ing] against the staged-wallet model" is not supported by a source stating that this was their motivation.  (*Id.*)  However, he may opine that PayPal "emerged as a serious competitive threat to Visa and Mastercard."  (*Id.*)

27. Defendants make multiple challenges to paragraph 19 of Mr. Mott's reply report.  The Court does not find that all of these challenges warrant exclusion.  However, Mr. Mott states in relevant part that in his opinion, "if Visa, Mastercard, and their issuers had to absorb the costs associated with online fraud, they would have likely been more motivated to address this issue long ago, rather than offloading the risk to merchants."  (Mott Reply Rep. ¶ 19.)

The Court excludes the challenged text in part.  Mr. Mott may not testify that Visa, Mastercard, and their issuers are not "motivated" to address online fraud unless citing to a source directly stating that they are not motivated.  However, he may opine that Visa, Mastercard, and their issuers' incentives to address online fraud would have been different if they had to absorb the costs.

92

28. In paragraph 30 of his reply report, Mr. Mott states:

> Merchants are reluctant to enable NFC functionality because, once they do that, they are required to accept all NFC-based wallets that include Visa and Mastercard cards. That raises the specter of merchants being forced to accept a wallet without any ability to negotiate the parameters of the exchange between the merchant and wallet.

(*Id.* ¶ 30.)

The Court excludes the challenged text in part. Mr. Mott may not testify about what merchants are "reluctant" to do unless citing to a source directly stating their reluctance, but he may testify that merchants have historically resisted enabling NFC functionality or why it may be against merchants' best interest to enable NFC functionality.

29. In paragraph 34 of his reply report, Mr. Mott writes: "The HAW rules amplify these fears because absent these rules, pass-through wallet operators would need to convince merchants to accept their wallets, and that process would stimulate negotiated solutions to those serious data issues." (*Id.* ¶ 34.)

The 7-Eleven Plaintiffs, The Home Depot and Elgin claim that in this paragraph Mr. Mott "analyzes and draws conclusions from . . . actors' incentives in the payments ecosystem," and that this opinion is "not based on Mr. Mott's evaluations of the parties' state of mind and [is] appropriate." (Mott Excl. Opp'n 11 n.13.)

The Court excludes the challenged text in part. Mr. Mott may not testify about what amplifies merchants' "fears" unless citing to a source directly stating this as a fact. However, he may testify that in the absence of the HAW rules, "pass-through wallet operators would need to convince merchants to accept their wallets, and that process would stimulate negotiated solutions to these serious data issues." (Mott Reply Rep. ¶ 34.)

30. In paragraph 39 of his reply report, Mr. Mott states: "Based on my experience in working with merchants, some would be willing to restrict acceptance of digital wallets to protect their data, which is enormously valuable to them, and to control their costs." (*Id.* ¶ 39.)

The Court excludes the challenged text in part. Mr. Mott may not testify about what merchants "would be willing" to do unless citing to a source stating the merchants' willingness. However, he may testify that merchants' data is valuable to them and that it would be advantageous for merchants to restrict acceptance of digital wallets.

31. Defendants make multiple challenges to paragraph 40 of Mr. Mott's reply report. The Court does not find that all of these challenges warrant exclusion. However, Mr. Mott states in relevant part:

> And [Mr. Peterson][14] discounts Visa's concerns over the Chase-MCX partnership announcement that I described in my opening report, whereby MCX merchants would have accepted Chase Pay in exchange for reduced fees and other benefits. Visa attempted to block Chase's plans by extending the HAW rules to QR codes and other strategies.

(*Id.* ¶ 40.)

The Court excludes the challenged text in part because it contains improper opinions about intent. Mr. Mott may not testify about Visa's "attempt to block Chase's plans by extending the HAW rules to QR codes and other strategies" to the extent that this implies an opinion about Visa's intentions, unless citing to a source stating that those were Visa's intentions. (*Id.*) However, he may opine that Visa's strategies had or could have had the effect of "block[ing] Chase's plans." (*Id.*)

---

[14] Thad Peterson is Defendants' digital wallets expert. (Mott Opp'n 4 n.2; Mott Reply Rep. ¶ 1.)

32.    Defendants make multiple challenges to paragraph 41 of Mr. Mott's reply report. The Court does not find that all of these challenges warrant exclusion. However, Mr. Mott states in relevant part:

> As an initial matter, when Visa discovered Chase was operating outside of the HAC rubric by offering Chase Pay exclusivity, Visa took steps to stop that practice and Chase Pay, apparently, has relented. Moreover, s.



(*Id.* ¶ 41.)

The Court excludes the challenged text in part. Mr. Mott may not testify about what motivated the "steps" Visa took to stop Chase from offering Chase Pay exclusivity unless he cites to a source directly stating that that was Visa's motivation. However, he may opine that Visa's "steps" had the effect of stopping Chase from offering Chase Pay exclusivity, and that it acted shortly after learning that Chase was offering Chase Pay exclusivity.

33.    Defendants make multiple challenges to paragraph 43 of Mr. Mott's reply report. The Court does not find that all of these challenges warrant exclusion. However, Mr. Mott states in relevant part that in his opinion, "Visa and Mastercard's restrictions on innovative business models, especially any business model that rivals or threatens their issuers' interchange fee revenue, are consistent with the networks' efforts to protect their legacy business model — and are certainly not indicative of companies that seek to 'accelerate' payment innovation." (*Id.* ¶ 43.)

The Court excludes the challenged text in part. Mr. Mott may not testify that Visa and Mastercard restricted "innovative business models" with the intention of "protect[ing] their legacy business model" unless he cites to a source directly stating that that was their motivation.

However, he may opine that Visa and Mastercard restricted "innovative business models" and
that this had the effect of protecting the networks' "legacy business model." (*Id.*) Similarly, he
may not opine that Visa and Mastercard did not have the intention of accelerating payment
innovation, but may opine that their actions have not had that effect.

34. In paragraph 48 of his reply report, Mr. Mott states:

> In my first report, I described how Visa and Mastercard came to
> view PayPal's staged-wallet model as a competitive threat to their
> legacy payment networks because it had created its own acceptance
> mark at the merchant point of sale and because it steered consumers
> to ACH payments, which threatened the networks' issuers
> interchange fee revenue. ███████████████████████
> ███████████████████████ I further described how
> Visa and Mastercard eliminated the competitive threat posed by
> PayPal, including by levying punitive new fees, imposing new rules,
> and raising interchange rates that apply to staged-wallet
> transactions, particularly at the in-store point of sale. Visa and
> Mastercard also leveraged their tokenization services to restrict its
> staged wallet model and end ACH steering, as I describe below.

(*Id.* ¶ 48.)

The Court excludes the challenged text in part. First, Mr. Mott may not testify that Visa
and Mastercard "lev[ied] punitive new fees, impos[ed] new rules, and rais[ed] interchange rates"
in order to eliminate the competitive threat posed by PayPal unless he is citing to a source
directly stating the same. However, he may opine that Visa and Mastercard took these actions
with the effect of eliminating the threat posed by PayPal. Second, he may not testify that Visa
and Mastercard "leveraged their tokenization services" to restrict PayPal's staged wallet model
and end ACH steering, but he may testify that Visa and Mastercard's actions concerning their
tokenization services had that effect.

The Court notes that Mr. Mott ordinarily may not opine about what Visa viewed as a
threat; here, however, his initial report cited to sources ostensibly indicating that Visa did view
digital wallets as a threat for the reasons stated here.

35. In paragraph 60 of his reply report, Mr. Mott states in relevant part:

> Mr. Peterson argues that the consumer sign-up process for ACH is "cumbersome," and requires consumer to disclose their bank account information. Mr. Peterson ignores the fact that most major digital wallets, including Visa and Mastercard's preferred pass-through wallets like Apple Pay and Google Pay, provide ACH functionality for their users to transfer funds from those wallets to their bank accounts.

(*Id.* ¶ 60.)

The Court excludes the challenged text in part. Mr. Mott may not testify that Visa and Mastercard "prefer" pass-through wallets like Apple Pay and Google Pay unless he cites to sources directly stating that this is their preference. However, he may opine that Visa and Mastercard have demonstrated favorable behavior toward these digital wallets or that these wallets are more favorable to the networks.

36. In paragraph 62 of his reply report, Mr. Mott states:



(*Id.* ¶ 62.)

The Court excludes the challenged text in part. Mr. Mott may not testify that █████████ ███████████████████████ in order to placate issuers unless he cites a source to show this is why

the fee was implemented. However, he may testify, for example, that same-day ACH was not

approved without the fee, but was approved with the fee. The Court does not interpret Mr.

Mott's statements that ████████████████████████ to modernize the ACH

network or that issuers have "resisted" these efforts as referring to mental states. Further, while

Mr. Mott ordinarily may not testify as to why ████████████ a certain way, here he cites

to a source purporting to show ████████████████████.

37. In paragraph 63 of his reply report, Mr. Mott writes in relevant part:

> Visa and Mastercard initially supported the growth of PayPal's
> staged wallet model because it brought new merchants and
> consumers to the card payment networks, especially in eCommerce
> where PayPal and other staged wallets were popular with consumers
> because of ease-of-use and enhanced security.

(*Id.* ¶ 63.)

The Court excludes the challenged text in part. Mr. Mott may not testify that Visa and

Mastercard "initially supported" PayPal's growth or why they did so unless he cites to a direct

source. However, he may testify that PayPal's growth was advantageous to Visa and Mastercard

in its early stages.

38. In paragraph 64 of his reply report, Mr. Mott states:

> I further explained that Visa, Mastercard, and their issuers over time
> came to fear that PayPal's staged wallet model and ACH steering
> because it threatened to disintermediate the payment networks and
> to reduce interchange fee revenue. PayPal's rapid growth in
> eCommerce and the competitive threat of in-store ACH acceptance,
> coupled with PayPal's bilateral merchant acceptance agreements,
> heightened their fears and spurred them to act. Starting in 2013,
> Visa and Mastercard engaged in campaigns to pressure PayPal to
> end ACH steering and to curtail its staged wallet business model.
> Those actions included imposing staged-wallet operator fees and
> threatening to levy higher interchange rates on staged-wallet
> transactions. Visa and Mastercard also leveraged their tokenization
> schemes by denying lower card-present interchange rates for PayPal
> unless it agreed to adopt their pass-through wallet model for its in-
> store transactions. Visa and Mastercard's pressure tactics continued

until PayPal entered into the partnership agreements with the
payment networks in 2016.

(*Id.* ¶ 64.)

The 7-Eleven Plaintiffs, The Home Depot, and Elgin claim that in this paragraph Mr.
Mott "is simply expressing that PayPal represented a competitive threat to Visa and Mastercard"
based on "his analysis of the factors and incentives in the payments industry and the potential
effects of PayPal's staged wallet model and ACH steering on Visa's and Mastercard's
interchange-based business models." (Mott Excl. Opp'n 7.)

The Court excludes the challenged text in part. Mr. Mott may testify about what Visa,
Mastercard, and their issuers "came to fear," what "heightened their fears," and what "spurred
them to act" only to the extent that these claims are supported by sources stating them as fact.
Similarly, Mr. Mott may state that Visa and Mastercard took certain actions in order to pressure
PayPal only if he is citing to a fact in the record and not offering an expert opinion. He similarly
may not opine that PayPal entered into the agreements with Visa and Mastercard for certain
reasons unless citing to a source stating that those were PayPal's motivations. However, he may
opine about why Visa and Mastercard's actions made it advantageous for PayPal to enter into
those agreements.

39. Defendants make multiple challenges to paragraph 67 of Mr. Mott's reply report. The
Court does not find that all of these challenges warrant exclusion. However, Mr. Mott states in
relevant part that by requiring access to Visa and Mastercard's tokenization services and NFC
acceptance footprint to qualify for non-discriminatory interchange rates, "Visa and Mastercard
exploited their tokenization systems, and its connection to the interchange fees they set, to force
PayPal to accede to their demands." (Mott Reply Rep. ¶ 67.)

The Court excludes the challenged text in part.  Mr. Mott may not testify that Visa and Mastercard managed tokenization and interchange with the intention of forcing PayPal to take certain actions unless citing to sources stating this directly.  However, he may testify that Visa and Mastercard's management of tokenization and interchange had the effect of causing PayPal to take those actions.

40. In paragraph 68 of his reply report, Mr. Mott states that "Visa and Mastercard required PayPal to abandon its in-store staged-wallet model and ACH steering for Visa and Mastercard payment transactions as a quid pro quo for access to their tokenization services.  In doing so, Visa and Mastercard exploited their control over the payment system to disadvantage PayPal." (*Id.* ¶ 68.)

The Court excludes the challenged text in part.  Mr. Mott may not testify that Visa and Mastercard managed their tokenization services in order to "disadvantage PayPal" or with any other specific intention unless supported by a source stating this as a fact, but he may testify that Visa and Mastercard's management of their tokenization services had the effect of disadvantaging PayPal.

41. Defendants make multiple challenges to paragraph 72 of Mr. Mott's reply report.  The Court does not find that all of these challenges warrant exclusion.  However, Mr. Mott states in relevant part that it is his opinion that:

> as a result of its agreements with Visa and Mastercard, PayPal has largely abandoned its efforts to become an alternative payment network that could challenge the legacy payment networks and is now relegated to serving as a distribution arm for Visa and Mastercard payment transactions.  In that sense, Visa and Mastercard achieved their goal of neutering PayPal as a competitive threat.

(*Id.* ¶ 72.)

The Court excludes the challenged text in part. Mr. Mott may not testify about whether Visa and Mastercard had a "goal of neutering PayPal as a competitive threat" unless citing to a source directly stating that that was their goal, but he may opine that Visa and Mastercard's actions have had this effect. (*Id.*)

42. In paragraph 82 of his reply report, Mr. Mott states that "Visa and Mastercard designed these limitations [to the digital wallet] to curb any meaningful innovation through their rules and agreements with pass-through wallet operators like Apple, thus ensuring that card-based payments would remain dominant." (*Id.* ¶ 82.)

The Court excludes the challenged text in part. Mr. Mott may not give an expert opinion about Visa's and Mastercard's reasons for designing the digital wallet the way they did; he may only cite to a source that states these reasons as a fact. However, he may testify that their design had the effect of curbing meaningful innovation for the reasons stated above.

43. In paragraph 94 of his reply report, Mr. Mott quotes his conclusion in his initial report that " ████████ d ████████████████████ n ████████████████████████████ ████████████████████ ▬ ████████████████████████████████████ ▬ ████████████████████████ e ████████████████████████████

For the reasons described above in relation to paragraph 122 of Mr. Mott's original report, the Court excludes the challenged text in part as offering an improper opinion as to intent.

### iii. Witness credibility

Defendants argue that Mr. Mott improperly "offers opinions about the credibility of evidence." (Mott Excl. Mem. 1.) They claim that Mr. Mott "improperly opines that business justifications Visa and Mastercard have offered for their decisions are 'pretextual' and not credible" and "made his own determinations, not based on scientific, technical, or other

101

specialized knowledge, that witnesses and documents that contradicted his opinions were incorrect, irrelevant, or otherwise not credible." (*Id.* at 9–10.)

The 7-Eleven Plaintiffs, The Home Depot, and Elgin respond that "the challenged portions of Mr. Mott's reports merely reflect opinions that Defendants contend are contradicted by other evidence or by their expert, Mr. Peterson." (Mott Excl. Opp'n 13.) With regard to Defendants' claim that "Mr. Mott opines as to the credibility of Visa's and Mastercard's justifications for their conduct against PayPal's staged wallet business model," the 7-ElevenPlaintiffs, The Home Depot, and Elgin argue that "Mr. Mott's opinions concern the plausibility of the networks' justifications based on his direct and extensive industry expertise with digital wallets; he is not speculating about witness credibility." (*Id.*) They claim that "[a]s with state of mind," they will not "elicit testimony from Mr. Mott relating to witness credibility, or whether Mr. Mott agrees with a particular witness's characterization of facts."[15] (*Id.* at 14 n.18.)

---

[15] The parties also disagree over portions of Mr. Mott's deposition testimony. Defendants argue that "in reviewing deposition testimony and documents, Mr. Mott purports to have made determinations as to 'whether witnesses were being ingenuous or not.'" (Mott Excl. Mem. 9–11.) They claim that Mr. Mott's testimony shows that he "disregarded the testimony" of a certain witness "because he did not 'believe that's what [the witness] believed' and determined the testimony was 'wrong and irrelevant.'" (*Id.* (alterations in original).) The 7-Eleven Plaintiffs, The Home Depot, and Elgin claim that "*Defendants* elicited testimony from Mr. Mott regarding whether he performed a credibility analysis because his industry analysis differed from the witness in question." (Mott Opp'n 14.)

At his deposition, Mr. Mott testified that he was aware that Merchant Customer Exchange (MCX) CEO ████ 's ██████ was deposed in this case. (Mott Dep. 151:8–10.) He remembered reading the testimony and disagreeing with ██████████████████████ ████████████████████████████████████H ██████████████████████████████ However, he did not "specifically comment on ██r. ██████s testimony on that point in [his] expert report." (*Id.* at 152:17–20.) Mr. Mott explained that he did not comment on this testimony because he "thought it was wrong and irrelevant." ██████████████ He added that he does not "believe that's what █N ██ believed" based on his experience with Mr. ████████████████. Regardless of whether Mr. Mott's statements *at his deposition*

The Second Circuit "has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." *Nimely*, 414 F.3d at 398. "[T]hat is, expert testimony is inadmissible if it 'comment[s] directly, under the guise of expert opinion, on the credibility of

---

implicate ██ r. I████████ credibility, these statements do not imply that *Mr. Mott's opinions in this case* improperly evaluate witness credibility or are based on an evaluation of witness credibility. Mr. Mott is not required to comment on ██ r. ████████ testimony in his report, to agree with it, or to believe that ██ r. I████████ is telling the truth. The fact that Mr. Mott did not discuss this contradictory evidence in his report is a possible ground for cross-examination. *See In re Mirena.*, 169 F. Supp. 3d at 466 (finding that while a certain fact "is fair game for cross-examination of [the expert], and seems to undermine his conclusion . . . , in these circumstances his failure to discuss it in his report is not so glaring as to render his opinion unreliable or admissible") . However, it does not transform Mr. Mott's report into an evaluation of witness credibility.

Mr. Mott later testified that a witness from Visa or Mastercard would have firsthand knowledge of their motivations "[i]f they were being [ingenuous]." (*Id.* at 242:5–20.) Opposing counsel asked what he meant by "if they were being [ingenuous]." (*Id.* at 242:21–22.) Mr. Mott replied: "People testify on a sense of what they are trying to accomplish in a case." (*Id.* at 242:23–24.) Opposing counsel asked: "When you were reviewing testimony from witnesses in this case, were you trying to make determinations as to whether they were being [ingenuous] or not?" (*Id.* at 242:25–243:3.) Mr. Mott replied: "Of course." (*Id.* at 243:4.) Opposing counsel asked: "Did your conclusions as to whether witnesses were being ingenuous in their testimony affect the opinions that you are offering in this case?" (*Id.* at 243:5–8.) Mr. Mott replied: "Yes, that's not mine to ascertain. It contributes to the credibility of what I think and the sum of what the evidence portrays." (*Id.* at 243:10–13.) Opposing counsel asked: "Did you conclude that some witnesses were less credible than other witnesses when you were reviewing their testimony?" (*Id.* at 243:14–16.) Mr. Mott replied: "Where I saw conflicts in other testimony that would raise that question in my mind." (*Id.* at 243:18–20.) Opposing counsel asked: "So, where you saw conflicts in testimony, you made a decision about which witnesses you found more credible on particular issues; is that what you are saying?" (*Id.* at 243:21–24.) Mr. Mott replied: "It impacts my view as to whether the person was informed and how they interacted with the other testimony to allow me to reach an opinion or conclusion." (*Id.* at 243:25–244:3.)

The meaning of this testimony is not totally clear. For example, it is not clear what Mr. Mott means when he says that conclusions as to witnesses' ingenuity are "not [his] to ascertain" and that they "contribute[] to the credibility of what [he] thinks." (*Id.* at 243:10–13.) Overall, Mr. Mott seems to be testifying that not all witnesses tell the truth, and that his opinion of whether a given witness is telling the truth is informed by whether the witness's testimony contradicted other evidence. The Court does not conclude from this testimony that Mr. Mott's opinion "constitute[s] [an] evaluation[] of witness credibility." *Nimely*, 414 F.3d at 398.

trial testimony from' specific fact witnesses." *United States v. Maxwell*, No. 20-CR-330, 2021 WL 5283951, at *4 (S.D.N.Y. Nov. 11, 2021) (quoting *Nimely*, 414 F.3d at 398). "Such testimony does not 'assist the trier of fact,' but rather 'undertakes to tell the jury what result to reach,' and 'attempts to substitute the expert's judgment for the jury's.'" *Nimely*, 414 F.3d at 398 (citations omitted).

The Court does not exclude any portions of Mr. Mott's opinions on the basis that they constitute improper opinions as to witness credibility. Defendants challenge paragraphs 39, 84, 113, 114, 119, and 137 of Mr. Mott's report, and paragraphs 26, 27, 40, 41, 60 n.171, 66, 70 to 72, 89, 90, 95 n.280, 96, and 100 of his reply report. (Mott Excl. Reply 9 n.6; *see also* Mott Mem 2 n.4 (noting that the "sections that Defendants contend should be excluded are highlighted" in exhibits DDX93 and DDX94), Highlighted Mott Rep.; Highlighted Mott Reply Rep.) The Court begins by noting that it already excludes Mr. Mott's claim in paragraph 39 that Visa and Mastercard's business justifications are "pretextual," and therefore does not evaluate Defendants' witness credibility argument with regard to that paragraph. With regard to the other paragraphs that Defendants challenge, the Court agrees with the 7-Eleven Plaintiffs, The Home Depot, and Elgin that Defendants have simply identified paragraphs that they contend are contradicted by other evidence. (Mott Excl. Opp'n 13.) In paragraph 113, for example, in which Mr. Mott opines about MCX, Defendants claim that Mr. Mott's position "is directly contradicted by the former ▆▆▆▆ K, ▆▆▆▆▆▆▆▆'s ▆▆▆▆▆ H ▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (Mott Excl. Mem. 10.) They point to Mr. Mott's deposition testimony to argue that Mr. Mott disregarded with the ▆X▆ s testimony "because he did not 'believe that's what [the witness] believed' and determined the testimony was 'wrong and irrelevant.'" (*Id.* at 10–11.) However, the challenged paragraph does not

contain an evaluation of witness credibility. The fact that Mr. Mott disagrees with testimony from the former ██ ( ███ X does not mean that he "comment[s] directly, under the guise of expert opinion, on the credibility of . . . testimony." *Nimely*, 414 F.3d at 398. Rather, the former CEO's testimony is a proper matter for cross-examination. *See In re Mirena*, 169 F. Supp. 3d at 425 ("Although Plaintiffs are free to make this point during cross-examination, it does not warrant preclusion under *Daubert*.") Notably, Mr. Mott may not testify on cross-examination that he disagrees with the former CEO's testimony because the former CEO did not testify credibly; rather, he will have to describe whatever substantive reasons he may have for disagreeing with the testimony. However, the challenged paragraph does not actually contain an evaluation of a witness's credibility. Nor does Mr. Mott improperly opine as to witness credibility in footnote 171 of his reply report, in which he opines that Defendants' expert Mr. Peterson "misrepresents the record regarding merchant interest in ACH payments." (Mott Reply Rep. ¶ 60 n.171.) Disagreeing with another expert witness — something done by essentially every expert witness in this litigation — does not "constitute [an] evaluation[] of witness credibility." *Nimely*, 414 F.3d at 398. The other paragraphs challenged by Defendants likewise fail to comment improperly on witness credibility.

### iv.  Narrative of the record

Defendants claim that "Mr. Mott devotes swaths of his report to characterizing documents and testimony in the record, without applying any discernible industry expertise." (Mott Excl. Mem. 12.) They argue that the 7-Eleven Plaintiffs, The Home Depot, and Elgin "may not present Mr. Mott's narrative of record evidence as expert opinion where Mr. Mott is drawing inferences not based on a reliable expert methodology, but rather based on the same tools of common logic available to a lay juror." (*Id.* at 13.) In particular, they argue that "direct

evidence relating to Visa's and Mastercard's application of rules to digital wallets and to negotiations around Apple Pay should be elicited from fact witnesses, not 'cloaked as expertise' through Mr. Mott's opinions." (*Id.*)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that the testimony challenged by Defendants represent paragraphs in which Mr. Mott "analyzes documents and explains why they support his conclusions," as experts "are required" to do. (Mott Excl. Opp'n 16.) They claim that the challenged paragraphs "are interspersed and intertwined with Mr. Mott's opinions regarding how Visa and Mastercard extended the HAC Rules to digital wallets" and that "an expert may properly intertwine factual discussions with opinion testimony, particularly to justify his description of a defendant's conduct." (*Id.* at 16 & n.21.) Further, they argue that "Mr. Mott is well qualified to analyze and interpret technical documents relating to digital technologies and present the information in a way that would assist a finder of fact about the complex and specialized issues involved in this case." (*Id.* at 17.)

"Mere narration . . . fails to fulfill *Daubert*'s most basic requirements." *Tchatat v. City of New York*, 315 F.R.D. 441, 444 (S.D.N.Y. 2016) (quoting *Luitpold Pharms, Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-CV-681, 2015 WL 5459662, at *3 (S.D.N.Y. Sept. 16, 2015)). "Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 676 (S.D.N.Y. 2013). "In addition, narration of facts of the case may easily invade the province of the jury, providing a separate basis for exclusion." *Id.*; *see also Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 183 (S.D.N.Y. 2008) (excluding expert's "factual narrative of events" because the expert had "no personal knowledge of these facts and they are lay matters that the jury is capable of understanding and deciding

without [the expert's] testimony"); *In re Rezulin*, 309 F. Supp. 2d at 551 (holding that expert's "narrative of the case which a juror is equally capable of constructing" was "properly presented through percipient witnesses and documentary evidence"). However, courts have allowed experts to present some narrative testimony where that narrative "underl[ies]" or is "intertwine[d]" with the expert's opinion testimony. *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 413 (S.D.N.Y. 2015) (noting that "expert opinions must provide the underlying facts and basis of the expert's opinions"); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 691 F. Supp. 2d 448, 466–67 (S.D.N.Y. 2010) (allowing narrative testimony where the expert intended "to intertwine his factual narrative with his opinion testimony — which he must do to justify his description of [the p]laintiffs' conduct"). Expert testimony is also admissible "where it 'synthesizes' or 'summarizes' data in a manner that 'streamline[s] the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion,'" or where the expert's commentary on documents "relates to the 'context in which [documents] were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge.'" *Scott*, 315 F.R.D. at 45 (alteration in original).

Defendants challenge paragraphs 58, 75 to 86, 90, 91, 95, 96, 105, 106, 109, 110, 112 to 114, 118 to 123, 118 n.188, 125, 127 to 133, 137, 138, and 141 of Mr. Mott's report, and paragraphs 7, 9, 10, 17, 20, 22, 25 to 28, 39 to 41, 48, 54 to 56, 62 to 66, 69 to 72, 77, 81, 86, 88 to 92, 94, 100, and 101 of his reply report as improper narrative testimony. (Mott Excl. Reply 10 n.7; *see also* Mott Mem 2 n.4 (noting that the "sections that Defendants contend should be excluded are highlighted" in exhibits DDX93 and DDX94), Highlighted Mott Rep.; Highlighted Mott Reply Rep.)

The Court does not exclude any portions of Mr. Mott's opening report on the basis that they constitute improper narrative testimony.  Paragraph 58 of Mr. Mott's report is part of the background section that Mr. Mott, like many experts in this case, includes to describe the topics that are the subject of his expert opinions.  (Mott. Rep. ¶ 58; *see, e.g.*, Carlton Rep. ¶¶ 10–37; Expert Rep. of Andres V. Lerner ¶¶ 23–84, annexed to Wilson Decl. as Ex. 1, Docket No. 8499.)  In paragraphs 75 to 80 and 82, Mr. Mott "provid[es] the underlying facts and basis" of his opinion that "PayPal ACH steering posed a competitive threat" to Defendants' model, (Mott Rep. ¶ 76), and ultimately that "Visa, Mastercard, and issuers" took steps that destroyed PayPal's staged wallet and ACH steering.  In paragraph 81, he does not narrate but rather directly opines that Defendants took actions that had the effect of "destroy[ing] PayPal's staged wallet approach and eliminat[ing] ACH steering."  (Mott Rep. ¶ 81.)  In paragraph 83, he opines that digital wallets present an opportunity for merchants to partner with issuers, which in turn could benefit cardholders, (*id.* ¶ 83), but that these partnerships have been "materially impeded" by "Visa and Mastercard rules and conduct," (*id.* ¶ 93).  In paragraphs 84, 85, 86, 90, and 91, Mr. Mott provides the basis of his opinion that "Visa and Mastercard rules and conduct" have "materially impeded" beneficial partnerships made possible by digital wallets.  (*Id.* ¶ 93).  In paragraphs 95, 96, 105, and 106, Mr. Mott provides the basis of his opinion that the digital context presents a new opportunity for merchant steering but that this opportunity is limited by "Visa and Mastercard's efforts to preserve the network-centric, one-size-fits-all model."  (*Id.* ¶ 106.)  In paragraphs 108 through 116, Mr. Mott properly describes the application of Visa's and Mastercard's rules to digital wallets in order to opine that "the HAW rules force merchant acceptance of digital wallets that adhere to the traditional Visa and Mastercard four-party model," thus preventing such wallets "from emerging as distinct forms of payment . . . and

becom[ing] competitive with the prevailing network model." (*Id.* ¶ 115.) In paragraphs 118 and 119, Mr. Mott describes the application of the HAW rules to digital wallets in order to opine that the rules have an anticompetitive effect. (*Id.* ¶ 118–119.) In paragraph 122, Mr. Mott provides four observations related to his opinion that "the lack of differentiation between the issuers in their A███████████████ highlight[s] the problems of the network-centric model in digital wallets and payments." (*Id.* ¶ 122.) In paragraphs 123, 125, 127, and 128, Mr. Mott provides the basis of his opinion that ████ s ██████████████████████████████████████████ ████████ et r████████████████████████████████████████████ et ████████████████████████████████████. In paragraphs 137 and 138, Mr. Mott provides the basis of his opinion that "the HAW rules are not commercially justified." (*Id.* ¶¶ 137–138.) In paragraph 141, Mr. Mott responds to Visa and Mastercard's claim that "the staged wallet model introduces risks to the payment system" and opines that these risks, "if they exist at all[,] are inconsequential." (*Id.* ¶ 141.) Elsewhere in paragraph 141, Mr. Mott supports his opinion that "consumers are not confused by PayPal." (*Id.*) None of these opinions constitute inadmissible "[m]ere narration," *Tchatat*, 315 F.R.D. at 444, or represent Mr. Mott "[a]cting simply as a narrator of the facts," *Tourre*, 950 F. Supp. 2d at 676.

Defendants argue that in paragraphs 119 to 121, Mr. Mott "merely gives his lay interpretation of certain agreements and related documents in the record regarding Apple Pay and PayPal, without purporting to apply any specialized industry knowledge." (Mott Excl. Mem. 13.) They argue that the 7-Eleven Plaintiffs, The Home Depot, and Elgin's arguments to the contrary fail to identify the "supposed 'technical issues' or 'complex technologies'" that Mr. Mott's testimony will help the jury understand and that even if PayPal's staged wallet is considered a "complex technology," "Plaintiffs do not show how that aspect of the technology

relates to any opinion Mr. Mott intends to offer." (Mott Excl. Reply 9.) They also argue that the

7-Eleven Plaintiffs, The Home Depot, and Elgin "make no effort to show why" Apple's contracts

and business relationships "require expert clarification" and claim that instead, "[t]he fact

witnesses familiar with those documents can testify about them." (*Id.* at 10.) Defendants argue

that Mr. Mott "lacks" "specialized expertise" in "'[t]he business relationships between Apple,

Visa, Mastercard, and issuing banks' 'and between PayPal, Visa, and Mastercard.'" (*Id.*)

     The 7-Eleven Plaintiffs, The Home Depot, and Elgin argue in response that "Mr. Mott

can help a jury understand the significance of Visa's and Mastercard's treatment of PayPal's

staged wallet as a potential competitor" and that Mr. Mott "has the expertise to explain the

industry context of Apple's agreements with Visa and Mastercard." (Mott Excl. Opp'n 17.)

They argue that "[h]elping to put into context these relationships and drawing conclusions as to

what they mean to competition in the payments industry" is "precisely the proper function of an

industry expert" and "will help a trier of fact better understand complex business and technical

documents that are relevant to the ultimate issues in this case." (*Id.*)

     First, the Court does not exclude paragraphs 119 to 121 as "[m]ere narration." *Tchatat*,

315 F.R.D. at 444. In these paragraphs, Mr. Mott discusses the terms of Apple's agreements

with Visa and Mastercard in order to argue that ██████████████████████████████

████████████████████████████████████████████████ n███████████████

████████████████ 's ██████████████████████████████████████

████████████████████████████████████████████████████

████████ " ████████ . ████ Mr. Mott is not "[a]cting simply as a narrator of the facts" in

these paragraphs, but providing proper expert testimony. *Tourre*, 950 F. Supp. 2d at 676.

Second, Mr. Mott is qualified to testify as an industry expert. Mr. Mott has worked in the payments industry for over thirty years, including working for Mastercard and on Visa and Mastercard products, and "working on projects involving cash, checks, [ACH] transactions and check images, credit cards, debit cards, prepaid cards and accounts, loyalty and reward programs, online and mobile transacting and security, and alternative payments, including mobile and digital wallets." (Mott Rep. ¶¶ 3–18.) *See S.R. Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 132–33 (2d Cir. 2006) (holding that insurance industry expert was qualified based on "over 30 years of experience in the insurance industry"). The Court further disagrees with Defendants' arguments that Mr. Mott's discussion of the agreements and business relationships among issuers, networks, and other entities — agreements and business relationships that hinge on concepts specific to the payments industry, such as tokenization and the difference between staged and pass-through wallets — "does not address technical questions that may be difficult for a juror to comprehend." *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-CV-7242, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002). These agreements and business relationships are the proper subject of expert testimony.

Defendants also claim that in paragraphs 129 to 133, Mr. Mott's "lay interpretation" "of emails and deposition testimony . . . forms the basis for his opinion that ▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬" ▬▬▬▬▬▬▬

▬ ▬▬▬▬▬▬▬▬▬▬ ." ▬ )

The Court agrees that paragraphs 129 to 133 support Mr. Mott's opinion that "since its agreements with Visa and Mastercard, PayPal has been neutralized as a competitive threat to Visa and Mastercard." (Mott Rep. ¶ 134.) However, it disagrees that in these paragraphs Mr. Mott "merely gives his lay interpretation of certain agreements and related documents in the

111

record . . . without purporting to apply any specialized industry knowledge." (Mott Excl. Mem. 12.)  As described above, the agreements between networks, issuers, and PayPal are sufficiently complex and sufficiently related to technical concepts in the payment industry to warrant expert testimony.  The Court therefore declines to exclude these paragraphs as improper narrative testimony.

The Court similarly does not exclude any portions of Mr. Mott's reply report on the basis that they constitute improper narrative testimony.  In paragraph 7, Mr. Mott responds to Mr. Peterson's claims about why A███████████████████████████████████'s ███████████ ████████.  ██████████.  ███  In paragraphs 9 and 10, he summarizes his opinion from his initial report that "Visa and Mastercard have stifled innovation in not only digital wallets but also more generally in digital payments."  (*Id.* ¶¶ 9–10.)  In paragraph 17, Mr. Mott summarizes evidence in his initial report that supports his opinion that "Visa and Mastercard have stifled innovation in not only digital wallets but also more generally in digital payments."  (*Id.* ¶ 9; *see id.* ¶ 17.)  In paragraphs 20 and 22, Mr. Mott provides the basis for his opinion that Visa and Mastercard's security efforts "have been piecemeal and ineffective."  (*Id.* ¶ 19.)  In paragraphs 25 and 26, he provides the basis for his opinion that tokenization "can be performed by a number of different players in the payments ecosystem."  (*Id.* ¶ 24).  In paragraphs 27 and 28, Mr. Mott states and provides evidence for his opinion that Visa and Mastercard "used their proprietary tokenization schemes to perpetuate their network-centric model into digital payments."  (*Id.* ¶ 27.)  In paragraph 39 and 40, Mr. Mott provides the basis for his opinion that the HAW rules have impeded innovation and reduced incentives for merchants and digital wallet operators to enter bilateral partnership agreements.  (*Id.* ¶¶ 35, 39, 40).  In paragraph 41, Mr. Mott provides the basis for his opinion that the HAW rules have "affected Chase Pay and its ability to work

112

directly with merchants." (*Id.* ¶ 41.) Elsewhere in paragraph 41, Mr. Mott opines that Visa and Mastercard have obtained an advantage over other contactless payment forms through the HAW rules and the deployment of NFC-capable POS terminals through the EMV liability shift. (*Id.*) In paragraphs 48 and 54, Mr. Mott summarizes opinions and evidence from his initial report regarding PayPal's staged wallet in order to respond to Mr. Peterson's claim that "the staged-wallet model suffers from 'key limitations.'" (*Id.* ¶ 49.) In paragraph 55, Mr. Mott provides evidence for his claim that "the separation of the funding mechanism from the purchase transaction provides issuers (or merchants or digital-wallet operators) more opportunities to incentivize consumer funding choice prior to the payment transaction." (*Id.* ¶ 55.) In paragraph 56, Mr. Mott provides the basis for his opinion that Mr. Peterson's claim that "network 'fraud protection systems' were adversely affected by the transaction data provided by PayPal" is unfounded. (*Id.* ¶ 56.) Elsewhere in paragraph 56, Mr. Mott contextualizes his opinion that staged wallets like PayPal "can be more secure than" Visa and Mastercard "because they do not share consumer payment information with merchants, who do not need that information." (*Id.*) In paragraph 62, Mr. Mott provides the basis for his opinion that Mr. Peterson's "acceptance mark" criticism of ▉▉▉ is unfounded. (*Id.* ¶ 62.) In paragraphs 63 and 64, Mr. Mott restates and provides background facts about Visa and Mastercard's relationship with PayPal in order to contextualize his opinion that "Visa and Mastercard pressured PayPal to change its business model." (*Id.* ¶ 65.) In paragraph 65, Mr. Mott provides a fact that Mr. Peterson "ignores" in order to claim that Mr. Peterson is wrong to argue that "▉▉▉▉▉▉▉▉▉▉ h ▉▉▉▉▉▉▉▉▉▉. (*Id.*) In paragraphs 66, 69, and 70, he provides the basis for his opinion that ▉▉▉▉▉▉▉▉ h ▉▉▉▉▉▉▉

113



' (*Id.* ¶¶ 65–66, 69–70.) In paragraphs 71, 72, and 77, Mr. Mott provides the basis for

his opinion that the ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. (*Id.* ¶¶ 71–72, 77.) In paragraphs 81, Mr.

Mott opines that Visa and Mastercard's practices are the reason that there "isn't a lot of value" in

digital wallets like Apple Pay. (*Id.* ¶ 81.) In paragraphs 86 and 90, Mr. Mott provides

background facts about ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆'s ▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆' (*Id.* ¶¶ 86, 90.) In paragraphs 88 and 89, Mr. Mott provides evidence to

support and contextualize his opinions about why ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆d. ▆▆▆▆▆▆▆ In paragraph 91, Mr. Mott provides the basis of his opinion that the

creation of a new payment network would be a very difficult task made more difficult by "Visa

and Mastercard's agreements with these companies." (*Id.* ¶ 91.) In paragraph 92, Mr. Mott

opines that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆ In paragraph 94, Mr. Mott summarizes his opinion from his initial report

about the Apple issuer deals. (*Id.* ¶ 94.) Finally, in paragraphs 100 and 101, Mr. Mott provides

the basis for his opinion that Apple Pay could have steered between issuers without undermining

its success. (Id. ¶¶ 100–101.) None of these opinions constitute inadmissible "[m]ere narration,"

*Tchatat*, 315 F.R.D. at 444, or represent Mr. Mott "[a]cting simply as a narrator of the facts,"

*Tourre*, 950 F. Supp. 2d at 676.

### v. Conclusion

The Court grants Defendants' motion to exclude in part the portions of the following

paragraphs described above under "Intent, motives and state of mind": from Mr. Mott's initial

report, paragraphs 38, 39, 63, 81, 82, 93, 94, 105, 106, 109, 110, 111, 113, 114, 116, 118, 119, 120, 122, 123, 125, 126, 127, 133, and 142; and from Mr. Mott's reply report, paragraphs 19, 30, 34, 39, 40, 41, 43, 48, 60, 62, 63, 64, 67, 68, 72, 82, and 94.  Defendants' motion is otherwise denied.

### e.    Motion to exclude the opinions of David P. Stowell

Defendants move to exclude the report and opinions of the Target Plaintiffs' expert David P. Stowell.  (Stowell Mot.; *see* Expert Rep. of David P. Stowell ("Stowell Rep.") ¶ 3, annexed to Carney Decl. as Ex. DDX20, Docket Entry No. 8544-3.)

### i.    Professor Stowell's qualifications and expert report

Professor Stowell is a professor of finance at Northwestern University's Kellogg School of Management.  (Stowell Rep. ¶ 1.)  Previously, he worked in investment banking for twenty years.  (*Id.*)  Professor Stowell has an MBA in Finance from the Columbia University Business School.  (*Id.*)

Professor Stowell's assignment in this matter was to consider Mastercard and Visa's initial public offerings (IPOs) and "determine if the structures imposed on these IPOs were principally designed to preserve the influence of member banks over the businesses of Mastercard and Visa following their IPOs."  (*Id.* ¶ 3.)

After giving an overview of the IPO market, (*id.* ¶¶ 4–15), Professor Stowell considers the Mastercard IPO, (*id.* ¶¶ 16–70).  He opines that the "principal purpose of the Mastercard IPO, and its unusual corporate structure and very strong [anti-takeover provisions (ATPs)], was to mitigate antitrust concerns, while creating corporate mechanisms that allowed member banks to maintain the influence they historically had over Mastercard and its bank-centric business model until that model became entrenched" in the new company.  (*Id.* ¶ 16.)  Professor Stowell

claims that the Mastercard IPO's corporate structure and "unusually strong ATPs" were such that "any threats posed to the continuity of Mastercard's historically bank-centric model by third parties or even by internal management were virtually eliminated at the time of the IPO." (*Id.* ¶ 17.)  Professor Stowell gives an overview of the background of the Mastercard IPO, (*id.* ¶¶ 20–24), and then argues that Mastercard's reorganization and IPO were directed and approved by member banks to mitigate legal and regulatory challenges without changing the bank-centric business model, (*id.* ¶¶ 25–26); the governance structure and ATPs sustained bank influence over Mastercard's business, (*id.* ¶¶ 27–31); the ATPs were designed to prevent a major change in Mastercard's business practices, (*id.* ¶¶ 32–64); the strong ATPs potentially diminished shareholder value, (*id.* ¶¶ 65–68); and post-IPO Mastercard board directors who had been appointed by member banks had more decision-making power and influence than the other directors, (*id.* ¶¶ 69–70).

Next, Professor Stowell discusses the Visa IPO.  (*Id.* ¶¶ 71–113).  He opines that, like the Mastercard IPO, the "principal purpose of the Visa IPO, and its unusual corporate structure and very strong ATPs, was to mitigate antitrust concerns, while creating corporate mechanisms that allowed member banks to maintain the influence they historically had over Visa and its bank-centric business model until that model became entrenched" in the new company.  (*Id.* ¶ 71.)  He claims that "any threats posed to the continuity of Visa's historically bank-centric model by third parties, or even Visa management, were virtually eliminated at the time of the IPO through the ATPs" and that "[i]f no third party can change the business, then the business will be perpetuated even after the IPO."  (*Id.* ¶ 72.)  Professor Stowell first gives an overview of the background of the Visa IPO, (*id.* ¶¶ 75–84), and then argues that Visa's reorganization and IPO were directed and approved by member banks to mitigate legal and regulatory challenges without changing the

116

bank-centric business model, (*id.* ¶ 85); the governance structure and ATPs sustained bank influence over Visa's business, (*id.* ¶¶ 86–93); the ATPs were designed to prevent a major change in Visa's business practices, (*id.* ¶¶ 94–110); the strong ATPs potentially diminished shareholder value, (*id.* ¶¶ 111); and post-IPO Visa board directors who had been appointed by member banks had more decision-making power and influence than the other directors, (*id.* ¶¶ 112–113).

Professor Stowell also submitted a reply report, which responds to criticisms of his initial report. (Reply Rep. of David P. Stowell ("Stowell Reply Rep."), annexed to Carney Decl. as Ex. DDX21, Docket Entry No. 8544-3.)

### ii. "Fit" of Professor Stowell's opinions

Defendants argue that Professor Stowell's opinions should be excluded because they do not make any fact of consequence to the action "more or less probable than it would be without the evidence." (Defs.' Mem. in Supp. of Mot. to Excl. Opinions of David P. Stowell ("Stowell Excl. Mem.") 8–9, Docket Entry No. 8078 (quoting Fed. R. Evid. 401).) They claim that in order to fit the Plaintiffs' theory that the banks possess sufficient control over Mastercard and Visa post-IPO to impose anticompetitive rules and interchange rates, Professor Stowell's opinions "must make it 'more or less probable' that after the IPOs, the banks have been able collusively to exercise control *over the challenged conduct* (i.e., the various network rules) as a result, in whole or in part, of the ATPs that he addresses." (*Id.* at 9.) Defendants claim that Professor Stowell offers no opinion on "whether these particular IPO structures gave the banks any authority to retain, modify or eliminate interchange or the challenged rules," and in fact "repeatedly and expressly *disclaims* the implication that he is offering" any such opinion in his reply report and at his deposition. (*Id.* at 9–10.) In response to the Target Plaintiffs' argument

117

that Professor Stowell will help the jury determine whether Visa and Mastercard withdrew from the alleged conspiracies through their respective IPOs, Defendants argue that "to the extent a jury even considers" withdrawal, Professor Stowell's opinions "do not address (let alone refute) Defendants' evidence demonstrating withdrawal, which shows that Visa and Mastercard each eliminated any bank ownership and any purported bank voting control over the challenged rules." (Reply Mem. in Supp. of Defs.' Mot. to Excl. Opinions of David P. Stowell ("Stowell Excl. Reply") 2–3, Docket Entry No. 8123.)

In response, the Target Plaintiffs argue that Professor Stowell's opinions will help the jury to determine "whether through the IPOs Visa and Mastercard took affirmative steps to exit, or through various ATPs to entrench and strengthen, the existing conspiracies with their member banks." (Target Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Excl. Opinions of David Stowell ("Stowell Excl. Opp'n") 16, Docket Entry No. 8149.) That is, "[t]he relevant issue . . . is not whether the banks were running the day-to-day operations of Mastercard and Visa after the IPOs, but whether Defendants took affirmative steps to withdraw from the existing conspiracies." (*Id.*) The Target Plaintiffs also claim that Professor Stowell "will assist the trier of fact in understanding the evidence," specifically "what an IPO is, how the IPOs affected ownership of Mastercard and Visa, what ATPs are, what impact the ATPs had on Mastercard's and Visa's governance after the IPOs," and "just how unusual the extensive combinations of ATPs that Mastercard and Visa built into their IPOs are" in comparison to other contemporaneous IPOs. (*Id.* at 17–18.)

In his reply report, Professor Stowell states that in his report he did not "address the question of whether the day-to-day operational control of Visa and Mastercard was actually held by the banks." (Stowell Reply Rep. ¶ 21.) Instead,

118

> [t]he Stowell Report principally focused on the likelihood that the
> Visa and Mastercard ATPs were designed to protect the historic
> ability of member banks to influence key strategic decisions
> regarding the business models of Visa and Mastercard. I have
> concluded that the unprecedented ATPs limited the range of
> decisions that independent directors could make, empowering
> member banks to have ongoing control over key strategic decisions
> for a period of time after issuance of the IPOs.

(*Id.*) At his deposition, Professor Stowell testified that he has no opinion on whether "after the IPO, Visa management had the authority to change the levels of Visa's Interchange rates and its pricing," (Videotaped Dep. of David Paul Stowell ("Stowell Dep.") 118:8–13, annexed to Carney Decl. as Ex. DDX30, Docket No. 8544-4); that he has no opinion on whether "post-IPO, Visa management . . . had the authority to adopt, amend, modify, supplement, rescind or repeal Visa operating regulations," (*id.* at 120:4–11); that he agreed that "day-to-day operational control" would include "the authority to change the level of Interchange rates and pricing at Visa and Mastercard," (*id.* at 121:2–9); that he had "not gotten involved" in and could not "express opinions on" rule changes, (*id.* at 230:6–16); that he had "not spoken of" whether the banks could exercise any control over a post-IPO decision to change the honor-all-cards rule, (*id.* at 234:11–21); that he did not "express any opinion" regarding "the operational control of Visa and Mastercard that was held by the bank," (*id.* at 234:20–25); and that he had not "referenced rule making," nor had he "referenced Interchanges," (*id.* at 302:9–18).

Defendants have moved for summary judgment on Plaintiffs' post-IPO conspiracy claims. (Defs.' Mot. for Summ. J., Docket Entry No. 8067; Defs.' Mem. in Supp. of Mot. for Summ. J. on Post-IPO Conspiracy Claims ("Post-IPO Mem."), Docket Entry No. 8089.) For purposes of that motion only, they "do not contest whether the *pre*-IPO structures of Mastercard and Visa" would be sufficient to establish that the networks' then-owner banks "acted collectively regarding Mastercard's or Visa's interchange fees and rules." (Post-IPO Mem. 3.)

Defendants argue that even assuming the banks acted collectively before the IPOs, "[b]y converting Mastercard and Visa into publicly owned and controlled companies," the Visa and Mastercard IPOs "eliminated the 'horizontal' feature of the respective joint ventures that had formed the basis for the asserted pre-IPO conspiracies." (*Id.* at 13.) Defendants argue that "[b]ecause the alleged structural conspiracies necessarily ended when the pre-IPO joint venture structures were dismantled, there was no post-IPO 'conspiracy' from which Defendants could . . . withdraw," but that "the IPOs demonstrate that Defendants 'withdrew' from the asserted pre-IPO conspiracies in any event." (Defs.' Reply Mem. in Supp. of Mot. for Summ. J. on Pls.' Post-IPO Conspiracy Claims ("Post-IPO Reply") 9–10, Docket Entry No. 8094.) Finally, they argue that "evidence does not support" the existence of separate post-IPO conspiracies. (*Id.* at 13.)

In response to Defendants' motion for summary judgment, the Direct Action Plaintiffs argue that "the HAC Rules and 'default' interchange rules were promulgated by the banks that owned Visa and Mastercard" and that "these anticompetitive agreements are presumed to continue until Defendants show they *withdrew* from them." (Direct Action Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. on Pls.' Post-IPO Conspiracy Claims ("Direct Action Post-IPO Opp'n") 13, Docket Entry No. 8193.) They dispute Defendants' characterization of Plaintiffs' claims as "a 'structural conspiracy,'" arguing that "[t]heir cases focus on substance, not form," and that "the *substance* of the HAC Rules and 'default' interchange rules, their anticompetitive effects, and the horizontal agreement to comply with the rules did not change with Visa's and Mastercard's shifts in corporate *form*." (*Id.* at 1–2.) The Direct Action Plaintiffs claim that Defendants "point to *no* evidence that they or the issuing banks took affirmative actions to disavow the purpose or repair the consequences of the horizontal anticompetitive agreements,

before or after the IPOs." (*Id.* at 14.)  Further, the Direct Action Plaintiffs argue that even if the IPOs did end the prior conspiracies, "[t]he evidence supports findings that, *after* the IPOs, Visa, Mastercard, and their issuers have formed hub-and-spoke conspiracies, and Visa and Mastercard have acted as cartel managers for cartels of issuing banks." (*Id.* at 16–17.)

The question posed by this *Daubert* motion is whether evidence that the Visa and Mastercard IPOs generally protected the banks' control over Visa and Mastercard's business models bears on whether the IPOs represent withdrawal from the alleged pre-IPO conspiracies. In general, "[u]pon joining a ... conspiracy, a defendant's membership in the ongoing unlawful scheme continues until he withdraws." *Smith v. United States*, 568 U.S. 106, 107 (2013); *see also United States v. Flaharty*, 295 F.3d 182, 192 (2d Cir. 2002) ("It is well established that where the government has shown that a conspiracy existed and that a given defendant was a member of it, his membership is presumed to continue until the last overt act by any of the coconspirators, unless the defendant proves that the conspiracy was terminated or that he took affirmative steps to withdraw.").  "Passive nonparticipation in the continuing scheme is not enough to sever the meeting of minds that constitutes the conspiracy.  '[T]o avert a continuing criminality' there must be 'affirmative action ... to disavow or defeat the purpose' of the conspiracy." *Smith*, 568 U.S. at 112–13 (alteration in original) (quoting *Hyde v. United States*, 225 U.S. 347, 369 (1912)); *see also United States v. Lebedev*, 932 F.3d 40, 51 (2d Cir. 2019) ("Withdrawal 'requires affirmative action . . . to disavow or defeat the purpose of the conspiracy.'"); *United States v. Leslie*, 658 F.3d 140, 143 (2d Cir. 2011) ("Mere cessation of the conspiratorial activity by the defendant is not sufficient to prove withdrawal."); *United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000) ("[R]esignation from a criminal enterprise, standing alone, does not constitute withdrawal as a matter of law.").  "Unless a conspirator produces

121

affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue

until the last overt act by any of the conspirators." *United States v. Diaz*, 176 F.3d 52, 98 (2d

Cir. 1999) (quoting *United States v. Greenfield*, 44 F.3d 1141, 1150 (2d Cir. 1995)). "To

establish withdrawal, a defendant may show that it has taken '[a]ffirmative acts inconsistent with

the object of the conspiracy and communicated in a manner reasonably calculated to reach co-

conspirators.'" *Osborn v. Visa Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015 (alteration in original)

(quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464 (1978)); *Flaharty*, 295 F.3d at 192

(same); *see also United States v. Eppolito*, 543 F.3d 25, 41 (2d Cir. 2008) ("A person can

withdraw from a conspiracy by taking some affirmative steps to terminate or abandon his

participation in and efforts to promote the conspiracy.").

     While likely not sufficient to show that the IPOs do not represent withdrawal from pre-

IPO conspiracies, Professor Stowell's report is relevant to this question. Defendants argue that

Professor Stowell's opinions "do not address (let alone refute) Defendants' evidence

demonstrating withdrawal," but this is not entirely true. (Stowell Excl. Reply 2–3.) In the reply

memorandum supporting their motion for summary judgment on Plaintiffs' post-IPO conspiracy

claims, Defendants write:

> Here, the banks and networks undertook an "affirmative act
> inconsistent with the object of the conspiracy" by voting to
> implement IPOs . . . . The IPOs — and the divesting of the banks'
> ownership and voting control over the networks — were highly
> publicized and "announced" to the world. Details of each network's
> restructuring and post-IPO ownership and voting structures were
> disclosed in public SEC filings. Contrary to the suggestion of some
> Plaintiffs, the consent by the networks and their pre-IPO members
> to a fundamental restructuring of these business enterprises and
> divestiture of bank ownership control cannot reasonably be
> described as mere "passive nonparticipation" in a "continuing
> scheme."

(Post-IPO Reply 10 (citations omitted).)  Professor Stowell's opinions indicate that the

"fundamental restructuring of these business enterprises and divesture of bank ownership

control" may have been less significant than Defendants argue, and that instead the IPOs

"allowed member banks to maintain the influence they historically had over [the networks] and

[their] bank-centric business model[s]."  (Stowell Rep. ¶¶ 16, 71.)  Defendants are correct that

Professor Stowell's opinions do not show that the banks had the power to implement the

challenged rules and interest rates.  However, Professor Stowell's opinions are nevertheless

relevant because they respond to the argument that, because the banks meaningfully sacrificed

their ownership and voting control through the IPOs, the IPOs represent withdrawal from the

pre-IPO conspiracies.

      Notably, Professor Stowell's report does not address *all* of Defendants' arguments about

withdrawal.  Defendants also argue that the IPOs eliminated the "ownership and board structure"

that are the basis of the alleged pre-IPO conspiracies; that "[t]hrough the IPOs, each bank . . .

terminated its ability to determine each network's rules and disabled itself from participating

with other banks to determine those rules in the future"; that the challenged rules and default

interchange schedules were "repeatedly reassessed and reconsidered by each network" and

"readopted in the self-interest of the post-IPO single-entity network"; and that networks have

taken independent actions even when contrary to the interests of the banks.  (Post-IPO Reply 10–

13.)  Professor Stowell's report does not address these arguments, and to the extent that these

arguments are persuasive, Professor Stowell's opinions may be insufficient to prevent

Defendants from prevailing on summary judgment or at trial.  However, "[t]he dispositive

question [under Rule 702] is whether the testimony will assist the trier of fact . . . not whether the

testimony satisfies the plaintiff's burden on the ultimate issue at trial." *In re Pfizer*, 819 F.3d at 661 (second two alterations in original).  Professor Stowell's opinions meet this standard.[16]

### iii.   Intent, motive, and state of mind

Defendants argue that Professor Stowell's opinions should be excluded because they "consist of speculation about the purposes of the banks and others purportedly involved in adopting structures in the Mastercard and Visa IPOs." (Stowell Excl. Mem. 13.)  Noting that Professor Stowell "reviewed transaction documents, deposition transcripts, and other documents produced during discovery, and compared the Mastercard and Visa IPOs to other contemporaneous U.S. IPOs," Defendants argue that "reviewing that information does not entitle Prof. Stowell to testify about *why* or *for what purposes* certain IPO structures were adopted." (*Id.* at 13–14.)

The Target Plaintiffs argue that Professor Stowell "repeatedly reiterated" at his deposition that he was not offering an opinion "about the parties' purposes or motivation in putting together the IPOs," but instead "was offering an opinion on the unusual nature of the ATPs and the *effects* of the ATPs on Mastercard's and Visa's post-IPO business operations."

---

[16]  Regarding the Target Plaintiffs' argument that Professor Stowell's opinions are relevant because they will help the trier of fact understand "what an IPO is, how the IPOs affected ownership of Mastercard and Visa, what ATPs are, what impact the ATPs had on Mastercard's and Visa's governance after the IPOs, and just how unusual the" Mastercard and Visa IPOs were, the Court agrees that Professor Stowell's opinions are relevant for this purpose — but only because, as described above, the IPOs are relevant to Plaintiffs' case.  (Stowell Excl. Opp'n 17–18.)  If the Court had found in this order that Defendants were correct and that there was no relationship between the IPOs and Plaintiffs' antitrust case, there would be no need for Professor Stowell to educate the jury about these topics.

(Stowell Excl. Opp'n 18.)  They also cite to Defendants' IPO expert Professor Daines,[17] who

wrote a report responding to Professor Stowell's report and who testified that his report was

"about the effects of the corporate governance changes, including the antitakeover opinions."

(Stowell Excl. Opp'n 19.)[18]

Defendants seek to exclude all of Professor Stowell's opinions as "consist[ing] of

speculation about the purposes of the banks and others purportedly involved in adopting

structures in the Mastercard and Visa IPOs."  (Stowell Excl. Mem. 13.)  This remedy is too

drastic.  Although Professor Stowell does improperly opine as to the intentions of the parties

involved in structuring the Mastercard and Visa IPOs, many of his inadmissible opinions also

contain admissible opinions about the structure or effects of the IPOs.  Rather than exclude all of

Professor Stowell's opinions, the Court considers the paragraphs that Defendants specifically

challenge: paragraphs 16, 29, 40, 55, 58, 61, 63, 71, 90, 97, 105, 107, and 109 of Professor

Stowell's initial report, and paragraphs 15, 19, 33, 38, 41, and 65 of his reply report.[19]  (Stowell

---

[17]  Professor Robert Daines is an expert for Defendants who offers opinions on the Visa and Mastercard IPOs, including evaluating Professor Stowell's opinions.  (*See* Expert Rep. of Robert M. Daines ¶11, annexed to Broz Decl. as Ex. 2, Docket Entry No. 8506-1.)

[18]  Both parties cite to Professor Stowell's deposition to support their arguments.  (*See* Stowell Excl. Mem. 14; Stowell Excl. Opp'n 18; Stowell Excl. Reply 5.)  Professor Stowell testified, for example, that "the unprecedented [ATPs] included in the Mastercard and Visa [IPOs] suggest to me that a purpose of those [IPOs] was to maintain the ongoing influence of the member banks over the business models," (Stowell Dep. 204:8–16), but also testified that he does not know "what is in the hearts and minds of people" and that it has "never been [his] mandate" to "determine[e] the principal purpose of companies' former shareholders in structuring an IPO," (*id.* at 269:10–19).
As with the motion to exclude Mr. Mott's opinions, discussed above, the Court focuses not on Professor Stowell's deposition testimony but on the substance of his opinions as expressed in his report.

[19]  Defendants cite to these paragraphs by writing "*See, e.g.*," indicating that they also object to other, unenumerated paragraphs.  The Court does not evaluate every paragraph in

Excl. Mem. 14 n.10; Stowell Rep. 5 n.4.)  Defendants also argue that Professor Stowell's assignment was "to opine on whether the IPOs were '*principally designed* to preserve the influence of member banks,'" and that his "section headings" also help demonstrate "that his opinions concern Defendants' motivations."  (Stowell Excl. Reply 3, 5.)

The Court excludes portions of paragraphs 16, 29, 40, 55, 58, 63, 71, 90, 97, 105, and 109 of Professor Stowell's original report, and paragraphs 19, 38, 41, and 65 of his reply report, for opining about the "intent" or "purpose" behind the IPOs or specific provisions of the IPOs, or "why" the parties took a certain action.  While he may opine that the IPOs or their provisions have certain effects, he may not testify that the parties took actions in order to cause those effects unless he is citing to a source stating that motivation as a fact.  The Court excludes in part paragraphs 61 and 107 of Professor Stowell's original report, and paragraph 33 of Professor Stowell's reply report, for opining about the parties' "desires."  Professor Stowell may not opine about a party's desires unless citing directly to a source stating that the party had that desire.  As discussed above, however, he may opine that the parties' actions had certain effects.

In paragraph 15 of his reply report, Professor Stowell states:

> My focus on the governance structures of Visa and Mastercard was principally limited to the period immediately following the Visa and Mastercard IPOs because the intentions and motivations of the banks as previous owners of Visa and Mastercard are most clearly discernible at that time.  Events or data gathered many years following the IPOs are much less likely to be indicative of the banks' original intentions and motivations.

(Stowell Reply Rep. ¶ 15.)

---

Professor Stowell's reports to determine if it contains improper opinions as to intent, motive, or state of mind. The Court's holdings in this section should make clear what opinions in Professor Stowell's report are and are not proper.  To the extent Defendants believe that Professor Stowell's trial testimony improperly opines as to intent, motive, or state or mind, they may object at that time.

126

The Court excludes this paragraph in its entirety. Further, to the extent the other opinions in Professor Stowell's report are based on "the intentions and motivations" of the banks, those opinions are, as indicated elsewhere in this decision, excluded.

The Court also agrees with Defendants that Professor Stowell's assignment in this case is improper. (*See* Stowell Excl. Reply 5.) As he states in his expert report, Professor Stowell was asked by the Target Plaintiffs:

> to consider the initial public offerings ("IPOs") of Mastercard Incorporated ("Mastercard" or "Company") and Visa Inc. ("Visa" or "Company") and to determine if the structures imposed on these IPOs were principally designed to preserve the influence of member banks over the businesses of Mastercard and Visa following their IPOs.

(Stowell Rep. ¶ 3.) Professor Stowell may not opine as to why the IPOs were "principally designed" the way they were. Because Professor Stowell's report also addresses the closely related question of whether the Mastercard and Visa IPOs *have the effect of* "preserv[ing] the influence of member banks over the businesses of Mastercard and Visa following their IPOs," (*id.*), the Court does not exclude Professor Stowell as a witness altogether. However, it does exclude paragraph 3 of Professor Stowell's report.

Finally, Defendants also challenge Professor Stowell's section headings. (Stowell Excl. Reply 5.) The Court agrees that the following section headings are improper: "[Mastercard and Visa's] Reorganization and IPO Were Directed and Approved by Member Banks and Designed to Mitigate Legal and Regulatory Challenges Without Changing the Historically Bank-Centric Business Model," (Stowell Rep. 12, 42); "[Mastercard and Visa's] Reorganization and IPO Were Designed to Preserve Bank Influence and Avoid Changing Business Practices," (*id.* at 15, 43); "The ATPs in the [Mastercard and Visa] IPO Were Designed to Prevent a Major Change in Mastercard's Business Practices," (*id.* at 17, 45); and "The Mastercard Foundation Was an

Unnecessary Contrivance Designed to Reduce the Possibility of Changes to Mastercard's Bank-Centric Business Model," (*id.* at 23).  For the reasons discussed above in relation to the excluded paragraphs of Professor Stowell's report, the Court excludes the listed section headings.

### iv.   Professor Stowell's methodology

Defendants argue that Professor Stowell "did not apply any reliable methodology" in determining "whether 'the structures imposed on [the Mastercard and Visa] IPOs were principally designed to preserve the influence of member banks over the business of Visa and Mastercard following their IPOs.'"  (Stowell Excl. Mem. 15.)  They argue that Professor Stowell "determined the purposes of the parties to the IPOs by reviewing materials and testimony from the discovery record" and that he conceded at his deposition "that he made credibility evaluations in doing so."  (*Id.*)  Defendants claim that "[s]peculating about a party's purposes or motivations by assessing the credibility of information in the discovery record is not a reliable expert methodology," (*id.* at 16), and that "[t]he fact that [Professor] Stowell's analysis was filtered through his subjective determination of witness' credibility . . . renders his methodology unreliable and inadmissible," (Stowell Excl. Reply 8).  Further, they argue that their expert Professor Daines did not test Professor Stowell's methodology because he did not attempt to "opine on the purposes or motivations behind the ATP structures," (*id.*), and that Professor Stowell's methodology is not analogous to the articles cited by the Target Plaintiffs because "none of the articles survey IPO characteristics to determine the *purpose* of certain provisions in a *particular* IPO," (*id.* at 9).

In response, the Target Plaintiffs argue that Professor Stowell's opinions are reliable "for three straightforward reasons."  (Stowell Excl. Opp'n 12.)  First, they claim that Professor Stowell's opinions are "based on 'sufficient facts or data'" because they are "carefully tied to the

actual ATPs included in Mastercard's and Visa's IPOs, as well as the facts of hundreds of other

IPOs occurring during the same time period," and "are based on 'principles'" set forth in "the

academic articles that are cited in his report." (*Id.*)  Second, the Target Plaintiffs argue that

Professor Stowell's "analytical methodology can be, and in fact was, tested," noting that

Professor Stowell compared the Mastercard and Visa IPOs to other IPOs that occurred in the

United States between 2004 and 2008 and "set forth this methodology in each of the Exhibits

attached to his Report." (*Id.* at 12–13.)  Professor Daines then tested this methodology "by

conducting a similar analysis of IPOs occurring during a much longer time period." (*Id.* at 13.)

Third, the Target Plaintiffs argue that "numerous published peer-reviewed articles have analyzed

the characteristics of IPOs over a period of time, including whether the firms adopted ATPs, and

the types of ATPs that were adopted, and have drawn conclusions from that analysis." (*Id.* at

14.)  They claim that these articles and Professor Daines' citations to these articles show that

Professor Stowell's methodology "has been used by other experts in the area." (*Id.* at 15.)  The

Target Plaintiffs also argue that although Defendants "criticize Professor Stowell for relying on

deposition testimony that supports his opinions while ignoring testimony that does not," "this

argument goes to the weight of his opinion, not its threshold admissibility." (*Id.* at 18.)

      First, as discussed in the previous section, even though it was his original assignment in

this action, Professor Stowell may not opine as to "whether 'the structures imposed on [the

Mastercard and Visa] IPOs were principally designed to preserve the influence of member banks

over the businesses of Visa and Mastercard following their IPOs.'" (Stowell Excl. Mem. 15.)  It

is therefore irrelevant what methodology Professor Stowell may have used to answer this

question.  However, Professor Stowell may opine that the Visa and Mastercard IPOs were

unusual and may opine about the effects of the IPOs.

Second, the Court does not exclude Professor Stowell's opinions on the basis that they improperly consider witness credibility. Defendants claim that Professor Stowell failed to consider evidence that did not support his opinions under the guise that it was unimportant or not credible. (*See* Stowell Excl. Mem. 4 & n.4.) However, much of the evidence that they claim Professor Stowell ignored concerned the purpose of the IPOs, about which, again, Professor Stowell may not testify. At his deposition, for example, Professor Stowell was asked about a Visa witness's testimony that member banks' desire to maintain control was not a factor in the IPOs. (Stowell Dep. at 83:3–85:12.) Professor Stowell said that he had not cited to the testimony in his report because it "did not rise to the level of sufficient importance that [he] felt should be included." (*Id.* at 85:13–20.) He testified that "[g]iven that there are many other opinions that are included in [his] report that say the opposite" of the Visa witness, "the people who are being sued may have less credibility . . . than other parties." (*Id.* at 86:13–19.) He added that "ultimately, one has to make a decision as to what is most relevant and most credible as to what is included in my report and that's the judgment I tried to make." (*Id.* at 86:20–25.) Because Professor Stowell may not testify as to the purpose of the IPOs, it is irrelevant whether he considered Defendants' witnesses' testimony on this topic. The Court therefore does not consider whether Professor Stowell sufficiently considered this evidence. (*See also id.* at 72:1–74:3; 180:7–25; 196:18–204:17.)

Defendants also cite to portions of Professor Stowell's deposition in which he stated that he disagreed with testimony about the effects of the Visa IPO or had not included it in his report. Specifically, Professor Stowell was asked about a ▮▮▮▮▮▮▮ witness' testimony that she was not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████ ) He testified that the quote "did not rise to the level of importance such that [he] felt it needed to be in [his] report, perhaps at the exclusion of other things [he] thought were more important." (*Id.* at 75:20–76:15.)

Professor Stowell was also asked about the ███████████ witness's testimony that she was not aware of ██████████████████████████████████████████████████████████ ████ s █ s █ ████████████████████ r █ ██████ a ██████████████ ████████████████ Professor Stowell replied that this answer was "wrong" because of "what is in the filing documents by Visa." (*Id.* at 78:1–79:25.) Opposing counsel noted that the witness "helped draft the documents that [Professor Stowell had been] referring to." (*Id.* at 80:1–3.) Professor Stowell stated that he had a "dim memory" that the witness was "not the key person in leading that IPO." (*Id.* at 80:9–25.) He said that he was sure the witness was "a very credible person," but that "[i]t couldn't be more clear that that there is the company's own language that demonstrated that she was wrong." (*Id.* at 81:1–22.)

This testimony does not indicate that Professor Stowell made improper credibility determinations. Nor does it indicate that he improperly "chose not to rely on or address testimony . . . that contradicted his opinions . . . because he made a 'value judgment' that the testimony was not sufficiently 'important.'" (Stowell Excl. Mem. 4 n.4.) Professor Stowell is not required to include or agree with witness testimony concerning the objects of his analysis. Rather than showing that Professor Stowell ignored relevant evidence — which by itself does not necessarily warrant exclusion — this testimony shows only that Professor Stowell disagreed with the ███████████ witness about the effects of the IPOs. This is grounds for cross-examination, not exclusion. *See Hollman*, 928 F. Supp. 2d at 670 (noting that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility," and that "[o]nly if the

131

expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded").

In the absence of opinions about the design or purpose of the IPOs, Professor Stowell's report consists of opinions about the histories and structures of the Mastercard and Visa IPOs and the effects of those structures, which he considers unusual. (*See, e.g.*, Stowell Rep. ¶ 27 (describing the Mastercard IPO's "unique governance structure" and "unusually strong ATPs").) His opinions that the Visa and Mastercard IPOs were highly unusual are based on his comparisons to other IPOs from the same time period, which is a reliable methodology for that purpose. (*See* Stowell Excl. Opp'n 12–13). Describing the effects of the provisions in the IPOs does not require a specialized methodology, and Professor Stowell is qualified to provide this testimony. (*See* Stowell Rep. ¶ 1 (describing Professor Stowell's qualifications).) The Court therefore does not exclude Professor Stowell's opinions as lacking reliable methodology.[20]

### v.   Conclusion

The Court grants Defendants' motion to exclude Professor Stowell's opinions as to parts of paragraphs 3, 16, 29, 40, 55, 58, 61, 63, 71, 90, 97, 105, 107, and 109 of Professor Stowell's

---

[20] Defendants cite to *Biotechnology Value Fund, L.P. v. Celera Corp.*, No. 13-CV-3248, 2015 WL 138168 (N.D. Cal. Jan. 9, 2015), in which the Northern District of California excluded portions of Professor Stowell's expert opinion, but that case is not relevant here. (Stowell Excl. Mem. 16 n.11.) In *Biotechnology Value Fund*, the court found that portions of Professor Stowell's report "summarize[d] the facts of the case and provide[d] improper opinions." 2015 WL 138168, at \*3. While most of the report appropriately "discusse[d] industry standards and rebut[ted] plaintiffs' expert reports," some parts "improperly summarize[d] the facts of the case and render[ed] opinions on the ultimate issues to be decided by the jury," such as whether the defendant should "be held accountable." *Id.* at \*3–4. The court noted that these statements went "too far" and "invade[d] the province of the jury," and stated that the experts would "not be permitted to testify and render findings on the issue of whether [the] defendants' actual conduct was in compliance with industry standards." *Id.* at \*4. Defendants do not challenge Professor Stowell's opinion on the basis that it summarizes the facts of the case or improperly opines on ultimate issues, necessarily limiting the relevance of *Biotechnology Value Fund*.

initial report, parts of paragraphs 15, 19, 33, 38, 41, and 65 of his reply report, and certain section headings in his initial report, described above. The Court otherwise denies Defendants' motion.

## III.  Conclusion

For the foregoing reasons, the Court excludes in part paragraphs 53, 99, 102, 103, 114, and 129 of Mr. Karimzadeh's report, and paragraph 95 of his reply report; Professor Carlton's opinions that Mastercard has given discounts to induce merchants not to surcharge since the 2012 settlement and that the 2012 elimination of the surcharging prohibition caused overall merchant fees and net fees to decline; Mr. Mott's opinions as to intent and state of mind, as expressed in paragraphs 38, 39, 63, 81, 82, 93, 94, 105, 106, 109, 110, 111, 113, 114, 116, 118, 119, 120, 122, 123, 125, 126, 127, 133, and 142 of his initial report and paragraphs 19, 30, 34, 39, 40, 41, 43, 48, 60, 62, 63, 64, 67, 68, 72, 82, and 94 of his reply report; and Professor Stowell's opinions as to intent and state of mind, as expressed in all or part of paragraphs 3, 16, 29, 40, 55, 58, 61, 63, 71, 90, 97, 105, 107, and 109 of his initial report and 15, 19, 33, 38, 41, and 65 of his reply report, and certain section headings of his initial report. The Court otherwise denies Defendants' motions to exclude Mr. Karimzadeh's, Professor Carlton's, Mr. Mott's, and Professor Stowell's opinions.

Dated:  October 8, 2022
        Brooklyn, New York

SO ORDERED:

/s/ MKB
_____
MARGO K. BRODIE
United States District Judge