UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

FILED UNDER SEAL

**MEMORANDUM & ORDER**
05-MD-1720 (MKB)

This document refers to: ALL ACTIONS

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.   Background ........................................................................................................... 5

II.  Discussion ............................................................................................................ 5

  a.   Standard of review ............................................................................................ 5

  b.   Motion to exclude portions of the report and opinions of R. Garrison Harvey ................. 8

    i.    Mr. Harvey's background and expert report .............................................................. 8

    ii.   Mr. Harvey's qualifications ................................................................................... 12

      1.   Qualifications to offer alternative benchmarks ...................................................... 13

      2.   Qualifications to point out computational and data errors ....................................... 17

      3.   Qualifications to compare actual and but-for interchange rates ............................... 21

    iii.  Mr. Harvey's alternative benchmarks .................................................................... 22

    iv.   Mr. Harvey's real-world comparisons .................................................................... 23

    v.    Mr. Harvey's comparisons across cases .................................................................. 25

      1.   Relevance ........................................................................................................ 26

      2.   Just and reasonable estimate ............................................................................. 27

      3.   Hearsay .......................................................................................................... 28

      4.   Qualifications .................................................................................................. 31

      5.   Mouthpiece ..................................................................................................... 31

      6.   Expertise ......................................................................................................... 32

    vi.   Conclusion ...................................................................................................... 34

  c.   Motion to exclude report and opinions of Glenn Hubbard ......................................... 34

    i.    Professor Hubbard's background and expert report ................................................. 34

    ii.   Professor Hubbard's qualifications ....................................................................... 39

iii.   Professor Hubbard's opinions about banks in the but-for world.................................. 43

iv.   Professor Hubbard's opinions about Basel III ............................................................. 47

v.   Professor Hubbard's opinions about interchange "balancing" platforms .................. 50

vi.   Professor Hubbard's opinions about commercial cards .............................................. 53

vii.   Conclusion ................................................................................................................... 57

d.   Motion to exclude report and opinions of Barbara E. Kahn ............................................ 57

i.   Professor Kahn's background and expert report ........................................................ 57

ii.   Relevance of Professor Kahn's opinions .................................................................... 61

iii.   Professor Kahn's expertise ......................................................................................... 68

1.   Professor Kahn's economic expertise .................................................................. 70

2.   Professor Kahn's but-for world opinions .............................................................. 72

3.   Professor Kahn's failure to consider natural experiments .................................... 77

4.   Professor Kahn's opinions about digital wallets ................................................... 81

iv.   Empirical basis of Professor Kahn's consumer confusion opinions ........................... 83

v.   Conclusion ................................................................................................................... 87

e.   Motion to exclude report and opinions of David J. Teece .............................................. 88

i.   Dr. Teece's background and expert report ................................................................. 88

ii.   Dr. Teece's opinions about platforms and ecosystems .............................................. 94

iii.   Dr. Teece's but-for world opinions ............................................................................ 99

iv.   Dr. Teece's opinions about Visa's history .............................................................. 107

v.   Dr. Teece's compliance with Rule 26(a)(2) ............................................................ 110

vi.   Conclusion ................................................................................................................ 118

f.   Motion to exclude report and opinions of David P. Kaplan ......................................... 118

i.   Mr. Kaplan's background and expert report ............................................................ 118

ii.   Mr. Kaplan's alleged legal opinions ........................................................................ 119

iii.   Mr. Kaplan's alleged factual narratives .................................................................. 129

iv.   Mr. Kaplan's "lost profits" opinions ....................................................................... 137

v.   Mr. Kaplan but-for world opinions .......................................................................... 143

1.   But-for analysis of merchants .......................................................................... 143

2.   But-for analysis of issuers ............................................................................... 147

3.   Pass-on analysis ............................................................................................... 150

vi.   Conclusion ................................................................................................................ 153

III.   Conclusion ........................................................................................................................ 153

In December of 2020, several parties[1] in this multidistrict litigation filed a combined five

motions for summary judgment and partial summary judgment,[2] and nineteen motions to exclude

---

[1]   The moving Plaintiffs consist of (1) the Equitable Relief Class, which was certified under Federal Rule of Civil Procedure 23(b)(2), *DDMB, Inc. v. Visa, Inc.*, No. 05-MD-1720, 2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021); (2) the Target Plaintiffs, the 7-Eleven Plaintiffs, and The Home Depot (collectively, the "Direct Action Plaintiffs"), which are not members of a class, *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL 4325812, at *3 (E.D.N.Y. Sept. 27, 2017), *order set aside on other grounds*, No. 05-MD-1720, 2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018); and (3) Elgin Ave. Recovery, LLC, which has filed its own separate complaint, (Elgin's Am. Compl. & Jury Demand, Docket Entry No. 8222-1), and has agreed to rely on the 7-Eleven Plaintiffs' experts at trial except in regards to damages, (Letter dated May 26, 2020, Docket Entry No. 7949).
    The Defendants consist of the Visa and Mastercard networks as well as "various issuing and acquiring banks" (the "Bank Defendants"). *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 18 (E.D.N.Y. 2019). "At the beginning of this litigation . . . Visa and Mastercard were effectively owned by their member banks." *Barry's Cut Rate Stores Inc. v. Visa Inc.*, No. 05-MD-1720, 2019 WL 7584728, at *3 (E.D.N.Y. Nov. 20, 2019). In 2006 and 2008, "Mastercard and Visa, respectively, made initial public offerings ('IPOs'), becoming publicly traded individual companies." *Id.* However, Plaintiffs claim that the alleged anticompetitive practices have "continued despite the networks' and the banks' more recent attempt to avoid antitrust liability by restructuring the Visa and [Mastercard] corporate entities." *Id.*; (Equitable Relief Class Action Compl. ("Equitable Relief Class Compl.") ¶ 1, annexed to Szanyi Decl. as SJDX4, Docket Entry No. 8520-1; *see also* Sixth Amended 7-Eleven Compl. ("7-Eleven Compl.") ¶¶ 78–79, annexed to Szanyi Decl. as SJDX1, Docket Entry No. 8520-1 (stating that "the IPOs did not change the essential character of' Visa and Mastercard's "combinations in restraint of trade"); Second Amended Target Compl. ("Target Compl.") ¶¶ 78–79, annexed to Szanyi Decl. as SJDX3, Docket Entry No. 8520-1 (same); First Amended The Home Depot. Compl. ("Home Depot Compl.") ¶¶ 120–134, annexed to Szanyi Decl. as SJDX2, Docket Entry No. 8520-1 (claiming that Visa and Mastercards' "post-IPO structures . . . were designed to perpetuate, and not to disturb, the anticompetitive conduct detailed in this Complaint").)

[2]   (Defs.' Notice of Mot. for Summ. J. ("Def.'s Mot."), Docket Entry No. 8067; Notice of Target Pls.' Mot. for Partial Summ. J. ("Target Pls.' Mot."), Docket Entry No. 8097; Equitable Relief Class Pls.' Notice of Mot. for Partial Summ. J. ("Equitable Relief Class Mot."), Docket Entry No. 8150; Notice of 7-Eleven Pls.' & The Home Depot's Motion for Partial Summ. J. ("7-Eleven & The Home Depot Mot."), Docket Entry No. 8184; Defs.' Notice of Mot. to Excl. Pls.' Expert Opinions on EMV Chargebacks & for Partial Summ. J. ("EMV Mot."), Docket Entry No. 8138.)

expert testimony.[3]  Because of the volume of motions, the Court decides the motions to exclude

in six separate opinions based primarily on the parties who filed the motion.

In this Memorandum and Order, the Court considers the motions to exclude expert

testimony filed by the Direct Action Plaintiffs, seeking to exclude the opinions of Mr. R.

Garrison Harvey on behalf of Visa and the Bank Defendants, Professor Glenn Hubbard on behalf

of Defendants, Professor Barbara E. Kahn on behalf of Defendants, Dr. David J. Teece on behalf

---

[3]  (Defs.' Notice of Mot. to Excl. Opinions of Dr. Reto Kohler ("Kohler Mot."), Docket Entry No. 8101; Defs.' Notice of Mot. to Excl. in Part Opinions of Prof. Robert G. Harris ("Harris Mot."), Docket Entry No. 8104; Defs.' Notice of Mot. to Excl. in Part Section 1 Opinions of Prof. Jerry Hausman ("Hausman Section 1 Mot."), Docket Entry No. 8081; Visa and Bank Defs.' Notice of Mot. to Excl. in Part Section 2 & Debit Opinions of Prof. Jerry Hausman ("Hausman Section 2 Mot."), Docket Entry No. 8084; Defs.' Notice of Mot. to Excl. in Part Opinions of Prof. Joseph E. Stiglitz ("Stiglitz Mot."), Docket Entry No. 8074; Defs.' Notice of Motion to Excl. Opinions of Mansour Karimzadeh ("Karimzadeh Mot."), Docket Entry No. 8077; Visa and Bank Defendants' Notice of Mot. to Excl. Expert Testimony Concerning Visa's Fixed Acquirer Network Fee ("FANF Mot."), Docket Entry No. 8070; Defs.' Notice of Mot. to Excl. Report & Testimony of the 23(b)(2) Pls.' Expert Dennis W. Carlton ("Carlton Mot."), Docket Entry No. 8086; Defs.' Notice of Mot. to Excl. Opinions of Stephen C. Mott ("Mott Mot."), Docket Entry No. 8080; Defs.' Notice of Mot. to Excl. Opinions of David P. Stowell ("Stowell Mot."), Docket Entry No. 8075; Notice of Direct Action Pls.' Mot. to Excl. Portions of Report & Opinions of Def. Expert R. Garrison Harvey ("Harvey Mot."), Docket Entry No. 8090; Notice of Direct Action Pls.' Mot. to Excl. Report & Opinions of Def. Expert Glenn Hubbard ("Hubbard Mot."), Docket Entry No. 8108; Notice of Direct Action Pls.' Mot. to Excl. Report & Opinions of Def. Expert Barbara E. Kahn ("Kahn Mot."), Docket Entry No. 8114; Notice of Direct Action Pls.' Mot. to Excl. Report & Opinions of Def. Expert David J. Teece ("Teece Mot."), Docket Entry No. 8135; Notice of Direct Action Pls.' Mot. to Excl. Portions of Report & Opinions of Def. Expert David P. Kaplan ("Kaplan Mot."), Docket Entry No. 8207; Notice of Mot. to Excl. the Report & Opinions of Def. Expert Andres V. Lerner ("Lerner Mot."), Docket Entry No. 8121; Notice of Target Pls.' Mot. to Excl. Portions of Report & Opinions of Def. Expert Kevin M. Murphy ("Target Murphy Mot."), Docket Entry No. 8129; Notice of The Home Depot & 7-Eleven Pls.' Mot. to Excl. Portions of the Report & Opinions of Def. Expert Kevin M. Murphy ("Home Depot & 7-Eleven Murphy Mot."), Docket Entry No. 8181; Notice of 7-Eleven Pls.' & The Home Depot's Mot. to Excl. Portions of Reports & Opinions of Def. Experts Marc Cleven & Stuart J. Fiske ("Cleven & Fiske Mot."), Docket Entry No. 8200.)

of Visa, and Mr. David P. Kaplan on behalf of Defendants.   For the reasons explained below, the Court grants in part and denies in part the motions to exclude.[4]

## I.   Background

For the relevant factual background, the Court refers the reader to its order addressing the motions by all Defendants to wholly or partially exclude the opinions of Dr. Reto Kohler, Professor Robert G. Harris, and Professor Joseph E. Stiglitz, and the Section 1 opinions of Professor Jerry Hausman.   (Mem. & Order ("First Order to Excl."), Docket Entry No. 8714.)

## II.   Discussion

### a.   Standard of review

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.[5]   "While the proponent of expert testimony has the burden of establishing by a

---

[4]   The Court separately decides (1) the first four motions to exclude filed by all Defendants, (2) the second four motions to exclude filed by all Defendants, (3) the two motions to exclude filed by Visa and the Bank Defendants, (4) the two motions to exclude filed by the Target Plaintiffs, and (5) the two motions to exclude filed by the 7-Eleven Plaintiffs and The Home Depot.

[5]   In June of 2022, the Judicial Conference Committee on Rules of Practice and Procedure voted to approve two amendments to Rule 702.   *See* Colleen Cochran, *The Process, Progression, and Potential Ramifications of the Rule 702 Amendment*, BUSINESS LAW TODAY (Sept. 5, 2022), https://businesslawtoday.org/2022/09/rule-702-amendment-process-progression-potential-ramifications/.   One of the two proposed amendments changes the text of the rule to read: "A witness who is qualified as an expert by knowledge, skill, experience, training or

preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, . . .

the district court is the ultimate gatekeeper." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir.

2020) (alteration in original) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir.

2007)); *see also United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) ("The law assigns

district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of

Rule 702." (citation omitted)), *cert. denied*, 565 U.S. 1088 (2011).

Before permitting a person to testify as an expert under Rule 702, the court must make

the following findings: (1) the witness is qualified to be an expert; (2) the opinion is based upon

reliable data and methodology; and (3) the expert's testimony on a particular issue will "assist

the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005*); see also

United States v. Napout*, 963 F.3d 187–88 (2d Cir. 2020) (explaining that the court is tasked with

"ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task

at hand" (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, (1993))); *United States

v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) (same). In *Daubert v. Merrell Dow Pharmaceuticals,*

---

education may testify in the form of an opinion or otherwise if *the proponent demonstrates to the court that it is more likely than not that. . . .*" Committee on Rules of Practice and Procedure, Agenda Book (June 7, 2022), Tab 7A, https://www.uscourts.gov/sites/default/files/2022-06_standing_committee_agenda_book_final.pdf, at 891. The second proposed amendment changes subsection (d) from "the expert has reliably applied the principles and methods to the facts of the case" to "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." *Id.* at 891–92.

If approved by the Judicial Conference and the United States Supreme Court, and not rejected, modified, or deferred by Congress, the amendments will take effect in December of 2023. Cochran, *supra*. Because the amendments are not in force at the time this decision is published, the Court does not apply the amended version of Rule 702. However, in deciding these motions the Court is mindful of the proposed amendments' purpose of "emphasiz[ing] that the court must focus on the expert's opinion, and must find that the opinion actually proceeds from a reliable application of the methodology" and "explicitly weaving the Rule 104(a) standard into the text of Rule 702." Committee on Rules of Practice and Procedure at 871.

*Inc.*, the Supreme Court set forth a list of factors, in addition to the criteria set forth in Rule 702, that bear on the determination of reliability: "(1) whether a theory or technique has been or can be tested; (2) 'whether the theory or technique has been subjected to peer review and publication;' (3) the technique's 'known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation;' and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 593–94); *see also United States v. Morgan*, 675 F. App'x 53, 55 (2d Cir. 2017) (same); *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) (same).  The *Daubert* inquiry for reliability is a "flexible one" and does not "constitute a definitive checklist or test," and thus, the *Daubert* factors "neither necessarily nor exclusively appl[y] to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 150 (1999) (citation omitted).

The district court is afforded "the same broad latitude when it decides how to determine reliability as it enjoys [with] respect to its ultimate reliability determination." *Id.* at 142.  Expert testimony should be excluded if it is "speculative or conjectural." *Jones*, 965 F.3d at 162 (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (same). When an expert's opinion is based on data or methodologies "that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (citation omitted); *see also Nimely*, 414 F.3d at 396 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between

the data and the opinion proffered." (alteration in original) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))).  Nevertheless, "in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion."  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (*citing Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)); *see also Adams v. Liberty Mar. Corp.*, 407 F. Supp. 3d 196, 202 (E.D.N.Y. 2019) (same).

> **b.   Motion to exclude portions of the report and opinions of R. Garrison Harvey**

The Direct Action Plaintiffs move to exclude portions of the report and opinions of Mr. R. Garrison Harvey (Harvey Mot.), an expert witness for Visa and the Bank Defendants.  (Expert Report of R. Garrison Harvey ("Harvey Rep.") ¶ 2 n.1, annexed as Ex. 1 to Wilson Decl., Docket Entry No. 8493-1.)

> **i.   Mr. Harvey's background and expert report**

Mr. Harvey is a statistician and applied mathematician currently serving as Vice President and Principal Consultant of applied mathematics consulting firm William E. Wecker Associates, Inc. (Harvey Rep. ¶ 1.)  He has previously served as an expert witness in litigation, arbitration, and regulatory proceedings involving evaluation of damages, payment card market analysis and profitability, and statistical analysis of payment card data, among other topics. (Harvey Rep. ¶ 1.)

Mr. Harvey's assignment was to review and assess "the reports and calculations of Drs. Epstein, Harris, Hausman, Kennedy, and Rowe and Mr. Hutchins."[6]  (*Id.* ¶ 2.)  He concludes that

---

[6]  Dr. Roy Epstein is no longer an expert in this litigation. (Mem. of Law in Supp. of Mot. to Excl. in Part Opinions of Prof. Joseph E. Stiglitz 15, Docket Entry No. 8076; Opp'n to Mot. to Excl. in Part Opinions of Prof. Joseph E. Stiglitz 16 n.20, Docket Entry No. 8163.)

these experts' damages estimates "are overstated and unreliable because of [the experts'] errors and omissions." (*Id.* ¶ 5.)  Further, he contends that the experts' but-for world damages "are flawed and inconsistent with observed benchmarks in the actual world."  (*Id.* ¶ 6.)

Mr. Harvey begins his report by giving an overview of Plaintiffs' experts' damages opinions.  (*Id.* ¶¶ 8–61.)  He claims that Plaintiffs' experts' but-for worlds "are similar, but their benchmarks differ significantly, indicating that the reliability of their benchmarks (or corresponding damages estimates) is in question."  (*Id.* ¶ 17.)  He also contends that these inconsistencies "are further demonstrated when one expert's benchmark is applied to another expert's damages estimates."  (*Id.* ¶ 19.)  Mr. Harvey compares the different Plaintiff groups' experts' credit and debit benchmarks and projected damages.  (*Id.* ¶¶ 16–27, 51–55.)

Next, Mr. Harvey claims that Professor Hausman's damages calculations are "unsupported and unreliable" because "the credit interchange rates applicable to [P]laintiffs in the actual world and the credit interchange rates in [Professor] Hausman's hypothesized [but-for world] vary widely, and [] are inconsistent across merchants."  (*Id.* ¶ 28.)  For example, in the real world, the credit interchange rates for ███████████████████████████ and

---

Professor Robert G. Harris, an expert witness for the Target Plaintiffs, wrote a report that included "possible benchmarks for assessing damages."  (Expert Report of Dr. Robert G. Harris ("Harris Rep.") ¶¶ 9, 1022, annexed to Carney Decl. as Ex. DDX3, Docket Entry No. 8544-1.) Professor Hausman, an expert for the 7-Eleven Plaintiffs and The Home Depot, wrote a report that includes damages calculations.  (Expert Report of Professor Jerry Hausman ("Hausman Rep.") ¶¶ 10, 608–689 annexed to Carney Decl. as Ex. DDX5, Docket Entry No. 8544-1.)  Dr. G. William Kennedy used Professor Harris's benchmarks to calculate damages for the Target Plaintiffs.  (*See* Expert Report of G. William Kennedy, Ph.D, CPA/ABV ¶¶ 6 n.2, 9, annexed to Carney Decl. as Ex. DDX10, Docket Entry No. 8544-2.)  Professor Stephen Rowe, an expert for the 7-Eleven Plaintiffs, calculated EMV chargeback and FANF damages.  (Expert Report of Stephen Rowe ¶¶ 1–2, annexed to Carney Decl. as Ex. DDX16, Docket Entry No. 8544-2.)  Mr. Robert Hutchins is a damages expert for The Home Depot.  (Expert Report of Robert Hutchins ¶ 1, annexed to Carney Decl. as DDX7, Docket Entry No. 8544-2.)

are ▮▮▮▮▮▮▮▮ respectively, "than the credit interchange rate for

▮▮▮▮▮▮▮" (*Id.* ¶ 29.)  However, in Professor Hausman's but-for world, the interchange rate

for the same three stores are ▮▮▮▮▮▮▮▮ respectively, than the ▮▮▮▮▮ rate.

(*Id.*)  Mr. Harvey argues that Professor Hausman fails to explain "why the [but-for world] does

not replicate the actual interchange rate pattern."  (*Id.*)  Further, Mr. Harvey claims, Plaintiffs'

experts' but-for rates are "also unreliable because they do not reasonably account for [P]laintiffs'

sales volume in the real world."  (*Id.* ¶ 37.)  He argues that Professor Hausman's division of

merchants into Tier 1 and Tier 2 is "arbitrary and unreliable," noting that "[f]orty-nine (of the

total of 51) Tier 2 merchants have more credit volume than at least one Tier 1 merchant."[7]  (*Id.*

¶¶ 38–48.)  Mr. Harvey then describes discrepancies between actual credit interchange rates and

Drs. Kennedy and Epstein's but-for credit interchange rates, (*id.* ¶¶ 49–50), and between actual

debit interchange rates and Dr. Hausman's and Dr. Kennedy's but-for debit interchange rates.

(*Id.* ¶¶ 56–61.)

     Mr. Harvey then examines Plaintiffs' experts' calculations under different time periods

and types of transactions.  He recalculates Plaintiffs' experts' damages calculations assuming

different but-for world time periods, (*id.* ¶¶ 62–70), and assuming that non-domestic transactions

are excluded from the damages estimates, (*id.* ¶¶ 71–75).  Mr. Harvey next implements the

---

[7] Professor Hausman calculates damages benchmarks for Tier 1 and Tier 2 merchants.
(Hausman Rep. ¶¶ 618–622, 645).  He defines Tier 1, or "category-influential merchants," as
"the merchants that would have had the greatest ability to take advantage of the removal of the
HAC rules" in the but-for world.  (Hausman Rep. ¶ 618.)  Tier 1 merchants "tend to be the
leading merchants in key verticals," but Tier 1 also includes "certain merchants that are not
among the largest merchants in the United States . . . [but] nonetheless have attributes that would
have rendered them well situated in the [but for world] to gain favorable rates from issuers or
networks."  (*Id.*)  He defines Tier 2 merchants as "other large or medium-sized merchants which
do not meet the criteria for Tier 1 merchants, but nevertheless would have experienced lower
acceptance costs" in the but-for world.  (*Id.* ¶ 645.)

alternative benchmarks of Defendants' expert David Kaplan in order to "quantif[y] the effects on [P]laintiffs' experts' claimed damages," including under his alternative time periods.  (*Id.* ¶ 76.) Mr. Harvey then addresses co-brand credit card relationships.  (*Id.* ¶¶ 77–84.)  He claims that Dr. Epstein is "the only [P]laintiffs' expert to recognize and actually implement these offsets," while Professor Harris "accounts for only some of the direct co-brand payments to [P]laintiffs as offsets to damages" and Professor Hausman "completely ignores the direct co-brand payments to [P]laintiffs in his damages calculations."  (*Id.* ¶¶ 80–82.)

Mr. Harvey next addresses point of sale practices.  (*Id.* ¶¶ 85–96.)  He claims that "if one looks at point of sales practices in the real world, it becomes evident that merchants have not actually engaged in the types of acceptance practices that [P]laintiffs' experts envision in a [but-for world] even when they are permitted to do so."  (*Id.* ¶ 87.)  Mr. Harvey argues that this is logical because "surcharging can *lose* money for merchants."  (*Id.* ¶¶ 88–94.)  Further, "even if [P]laintiffs would and could surcharge," Mr. Harvey argues that his analysis shows that the interchange rates in countries that allow surcharge "are not consistent with [P]laintiffs' experts' hypothesized [but-for world] rates."  (*Id.* ¶ 95.)

Mr. Harvey then makes "corrections" to various Plaintiffs' experts' damages estimates. He begins by addressing purported errors "common across [P]laintiffs' experts," (*id.* ¶ 97): failure to include Visa rebates, (*id.* ¶ 98); improper accounting of returns, (*id.* ¶¶ 99–116); and double-counting interchange on some Visa transactions, (*id.* ¶¶ 116).  He then makes specific corrections to Professor Hausman's damages calculations, (*id.* ¶¶ 117–185), Dr. Kennedy's damages calculations, (*id.* ¶¶ 186–225), and Dr. Epstein's damages calculations, (*id.* ¶¶ 226). Mr. Harvey next turns to Visa's Fixed Acquirer Network Fee ("FANF"), addressing purported errors in Professor Rowe's, Professor Harris's, and Dr. Kennedy's FANF estimates.  (*Id.* ¶¶ 227–

11

285.)  He also calculates alternative FANF damages in the event the finder of fact determines that FANF charges related to card-not-present transactions should be excluded from FANF damages; that half of FANF charges related to card-present transactions should be excluded from damages; or both.  (*Id.* ¶¶ 286–290.)  Mr. Harvey addresses alleged network fee errors in the work of Professor Harris, Dr. Kennedy, and Professor Hausman.  (*Id.* ¶¶ 291–297.)

Finally, Mr. Harvey presents "alternative real-world benchmarks" that he claims Plaintiffs' experts should have considered, including actual credit and debit interchange rates around the world, Visa credit interchange rates from the 1980s and 1990s, and the cost of accepting non-Visa and non-Mastercard payment cards.  (*Id.* ¶ 298.)  Mr. Harvey presents an overview of his various "corrections and adjustments" to Plaintiffs' experts' calculations.  (*Id.* ¶ 338.)  He also claims that Dr. Rowe's calculation of EMV fraud liability shift chargeback damages is unreliable because he failed to take certain reimbursements into account.  (*Id.* ¶¶ 339–341.)

### ii.    Mr. Harvey's qualifications

The Direct Action Plaintiffs argue that because Mr. Harvey is not an economist, he is not qualified to critique Plaintiffs' experts' economic opinions or "to offer his own 'alternative' economic benchmarks."  (Mem. of Law in Supp. of Direct Action Pls.' Mot. to Excl. Portions of Report & Opinions of Def. Expert R. Garrison Harvey ("Harvey Excl. Mem.") 10, Docket Entry No. 8092.)  Specifically, they claim, first, that Mr. Harvey is unqualified to offer his alternative but-for world benchmarks because "a proper but-for world benchmark . . . can *only* be determined through economic analysis."  (Reply Mem. of Law in Further Supp. of Direct Action Pls.' Mot. to Excl. Portions of Report & Opinions of Def. Expert R. Garrison Harvey ("Harvey Excl. Reply") 3, Docket Entry No. 8095.)  Second, they argue that many of Mr. Harvey's

purported "computational and data errors" are actually "poorly disguised economic opinions about the but-for world." (*Id.* at 5.) Third, the Direct Action Plaintiffs challenge Mr. Harvey's opinions on the differences between actual interchange rates and the Plaintiffs' economists' but-for-world interchange rates, claiming that Mr. Harvey argues that the difference "*render*[*s*] *the Direct Action Plaintiffs' economic experts' but-for-world rates unreliable*" and that this is "an economic argument that Mr. Harvey is not qualified to render." (*Id.* at 6.)

In response, Defendants argue that Mr. Harvey does not provide economic opinions, noting that he disclaims "any affirmative opinions about the construction of a but-for world or the benchmark interchange rates that would prevail in any but-for world." (Defs.' Mem. in Opp'n to Direct Action Pls.' Mot. to Excl. Portions of Report & Opinions of Def. Expert R. Garrison Harvey ("Harvey Excl. Opp'n") 8, Docket Entry No. 8198.) Rather, Mr. Harvey "relies on his experience analyzing damages models, and his analysis of data in the payment card industry, to identify empirical information that casts doubt on the plausibility of Plaintiffs' experts' opinions about the interchange rates that would prevail in their but-for world" and to "question the reliability of the assumptions underlying Plaintiffs' expert opinions." (*Id.* at 8–9.) Defendants identify cases in which courts allowed "non-economic experts to opine on actual-world information that is relevant to an economic model." (*Id.* at 9–10.)

### 1.   Qualifications to offer alternative benchmarks

The Direct Action Plaintiffs argue that Mr. Harvey "travels well beyond his expertise in math and statistics" in offering his alternative benchmarks. (Harvey Excl. Reply 3.) They claim that if an economist had "sought to introduce such alternatives in a rigorous way," she would have "analyzed whether such examples provide economically reasonable proxies for the but-for world in this case." (*Id.*) The Direct Action Plaintiffs note that none of Defendants' experts

endorse Mr. Harvey's alternative benchmarks and that Mr. Kaplan specifically criticizes

Plaintiffs' experts for "refer[ring] to the fees in other countries with no attempt to take into

consideration relevant differences between the United States and those countries." (Expert

Report of David P. Kaplan ("Kaplan Rep.") ¶ 871, annexed as Ex. 1 to Schindler Decl., Docket

Entry No. 8489-1; Harvey Excl. Reply 3.) The Direct Action Plaintiffs further claim that Mr.

Harvey's presentation of his alternative benchmarks includes inappropriate economic opinions,

such as his claim that "the evidence does not show that the decline [of the average merchant

discount rate for American Express in Australia] *was the result of competitive forces or the

removal of any supposed competitive restraints as [P]laintiffs' experts suggest*." (Harvey Excl.

Reply at 4 (quoting Harvey Rep. ¶¶ 335, 320).) Finally, the Direct Action Plaintiffs argue that

while "a non-economist can criticize an economist's opinion by offering critiques *based on his

own areas of expertise*," "Defendants fail to show how Mr. Harvey's mathematical or statistical

expertise informed his ability to pick economically inapposite proxies" or "how Mr. Harvey's

expertise has anything relevant to say on core economic questions such as the but-for world."

(*Id.*)

      In response, Defendants argue that Mr. Harvey "disclaims any affirmative opinions

about . . . the benchmark interchange rates that would prevail in any but-for world." (Harvey

Excl. Opp'n 8.) They point to the statement in Mr. Harvey's report that he "do[es] not endorse

any particular alternative benchmarks." (*Id.* (citing Harvey Rep. ¶ 298).)

      The Court concludes that Mr. Harvey may present his alternative benchmarks. As a

threshold point, the Court rejects Defendants' claim that Mr. Harvey does not render "any

affirmative opinions about the construction of a but-for world or the benchmark interchange rates

that would prevail in any but-for world." (*Id.* at 8.) Mr. Harvey opines that his alternative

14

benchmarks show that Plaintiffs' experts' but-for interchange rates are unreliable, which necessarily implies that Plaintiffs' but-for world interchange rates *should* be closer to Mr. Harvey's benchmarks — an opinion about the but-for world.  Like Dr. Kohler, however — whose report the Court discusses in its order on the motion to exclude the opinions of Dr. Kohler, Professor Harris, Professor Hausman, and Professor Stiglitz, (*see* First Order to Excl.) — Mr. Harvey may render opinions with implications for the but-for world so long as his opinions are based on his area of expertise and not on economic theory in which he is not qualified.  Mr. Harvey appears to have constructed his alternative benchmarks by identifying situations that are similar to the but-for world in certain ways, and then analyzing data to identify ways those scenarios differ from Plaintiffs' experts' but-for projections.  This does not require the application of economic theory, and appears to be something he is qualified to do: Mr. Harvey testified that his area of expertise is taking an economist's "particular representation or idea" and "testing it against real world data and real world situations . . . and seeing if this is a reliable hypothesis that they have generated by comparing it to, say, the real world, or certain mathematical constructs."  (Videotaped Dep. R. Garrison Harvey ("Harvey Dep.") 42:16–24, Docket Entry No. 8547-2.)  That appears to be exactly what he does in this case.

While Mr. Harvey does not control for all possible variables, the Court concludes that his comparisons are sufficiently similar to the but-for world to be relevant and that any additional variables Plaintiffs may wish to challenge are a basis for cross-examination.  Mr. Harvey also does not explain what range of real-world values would allow him to conclude that a given comparison supported, rather than undermined, Plaintiffs' experts' projections.  The Court concludes that Mr. Harvey's assertion that his results are sufficient to undermine the but-for world is an assumption that may be challenged on cross-examination.

Finally, the Court does not exclude either of the other opinions within Mr. Harvey's benchmark analysis that the Direct Action Plaintiffs challenge as beyond his qualifications. (Harvey Excl. Reply 4.)  First, the Direct Action Plaintiffs point to Mr. Harvey's claim that "the evidence does not show that the decline [of the average merchant discount rate for American Express in Australia] was the result of competitive forces or the removal of any supposed competitive restraints as [P]laintiffs' experts suggest."  (Harvey Rep. ¶ 335.)  Like Mr. Karimzadeh in the sections of his opinions discussing choice screens, however, the Court concludes that Mr. Harvey may refer to areas outside his expertise if he supports these claims with citations and does not proffer them as the primary subject of his expert opinion.  The portion of Mr. Harvey's discussion of Australia that is the subject of his expert testimony is his comparison of American Express interchange rates in Australia to Plaintiffs' experts' but-for interchange rates.  (*See id.* ¶ 336.)  The claim about the reason for the decline of the American Express rate sets up this comparison, but is not the primary subject of his expert testimony and is supported by a citation to an American Express witness's testimony.  (*Id.* ¶ 335 n.547.)  The Court does not exclude this reference, but it notes that Mr. Harvey may not testify that he is an expert on this issue or that this conclusion is the subject of his expertise.

Second, the Direct Action Plaintiffs challenge Mr. Harvey's opinion that Plaintiffs' "ability to withhold or threaten to withhold acceptance of American Express or Discover cards did not drive down acceptance costs in the actual world, as [P]laintiffs' experts posit would happen in the [but-for world ("BFW")]."  (*Id.* ¶ 320.)  This statement summarizes the results of Mr. Harvey's comparison of "the cost to accept American Express cards and Discover cards against the cost to accept Visa credit cards throughout the damages period."  (*Id.* ¶ 308.)  Mr. Harvey's background in statistics and data analysis qualifies him to infer from this data that

American Express and Discover's acceptance costs were not "driven down" during this period, although this conclusion is of course open to challenge on cross-examination.

### 2. Qualifications to point out computational and data errors

The Direct Action Plaintiffs argue that many of Mr. Harvey's identified "computational and data errors" are in fact "poorly disguised economic opinions about the but-for world." (Harvey Excl. Reply 5.)

First, the Direct Action Plaintiffs claim that Mr. Harvey improperly opines "that, in the but-for-world, domestic and non-domestic transactions would have different interchange rates." (Harvey Excl. Reply 5.)  The challenged portion of Mr. Harvey's report criticizes Plaintiffs' experts' assumption that non-domestic and domestic transactions would have the same interchange rate in the but-for world. (Harvey Rep. ¶ 71.)  Mr. Harvey cites to a list of countries in which "average non-domestic Visa credit interchange rates were higher than domestic rates." (*Id.* ¶ 72.)  Plaintiffs' experts "cite interchange rates in regulated countries as a basis for their [but-for world] interchange rates in the U.S.," but Mr. Harvey claims that even in those regulated countries, "interchange on non-domestic Visa transactions exceeds the regulated rates." (*Id.* ¶ 73.)  Similarly, Amazon Pay also charges a higher rate for non-domestic transactions. (*Id.* ¶ 74.) Mr. Harvey provides a table showing "the change in damages when non-domestic transactions . . . are excluded from the damages estimates." (*Id.* ¶ 75.)

The Court concludes that Mr. Harvey is qualified to identify and criticize Plaintiffs' experts' assumption "that non-domestic transactions will have the same BFW interchange rates as U.S. domestic transactions." (*Id.* ¶ 71.)  Again, the Court notes that Mr. Harvey reaches this conclusion not by criticizing Plaintiffs' experts' methodologies or by applying economic theory, but by compiling real-world data, which he is qualified to do. (*See id.* ¶¶ 72, 73, 75.)  The Direct

17

Action Plaintiffs may distinguish Mr. Harvey's comparators from their experts' but-for world on cross-examination.

Next, the Direct Action Plaintiffs claim that Mr. Harvey improperly opines "that, in the but-for world, merchants would not be able to surcharge to drive competition." (Harvey Excl. Reply 5.) In the challenged paragraphs, Mr. Harvey begins by stating that Plaintiffs' experts "argue that the inability to surcharge on an issuer-by-issuer basis . . . is the 'significant' restriction in today's world that is preventing merchants from aggressively surcharging and helping to drive interchange rates to [but-for world] levels." (Harvey Rep. ¶¶ 85–86.) However, "if one looks at point of sales practices in the real world, it becomes evident that merchants have not actually engaged in the types of acceptance practices that [P]laintiffs' experts envision in a [but-for world] even when they are permitted to do so." (*Id.* ¶ 87.) Mr. Harvey points, first, to Visa's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which shows that only ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* ¶ 87 & n.199.) He also claims that merchants' failure to surcharge in the real world "is logical considering that surcharging can *lose* money for merchants." (*Id.* ¶ 88.) Mr. Harvey explains his reasoning with a hypothetical and citations to a consulting group and the Equitable Relief Class Plaintiffs' expert Professor Stiglitz. (*Id.* ¶¶ 88–90.) Dr. Epstein and Professor Hausman claim that merchants do not surcharge due to the "level playing field" provision, which is avoidable only if merchants do not accept the higher-priced competing card — typically American Express. (*Id.* ¶ 91.) Mr. Harvey responds to this claim, arguing that merchants "are not required to accept American Express cards." (*Id.* ¶ 92.) He further argues that some merchants accept Visa or Mastercard but not American Express, and that "[P]laintiffs' experts have not shown that these merchants surcharge in a manner consistent with their hypothesized [but-for world] behavior."

(*Id.* ¶ 92.)  Finally, Mr. Harvey cites to acknowledgments from Plaintiffs and Plaintiffs' experts that merchants may avoid surcharging to avoid scaring away customers, (*id.* ¶ 93); state laws prohibiting surcharging on credit-card transactions, (*id.* ¶ 94); and his own calculations showing the interchange rates in countries that have allowed surcharging, which "are not consistent with [P]laintiffs' experts' hypothesized [but-for world] rates," (*id.* ¶ 95).

The Court concludes that Mr. Harvey is qualified to critique Plaintiffs' experts' opinions by challenging their assumption that merchants who are allowed to surcharge in the real world will do so.  As described above, he is qualified to offer this analysis, which he bases not on claims about the but-for world, but on analysis of real-world data.  Although his discussion of the reasons that a merchant might choose not to surcharge is not strictly data analysis, (*see id.* ¶¶ 88–90), the Court concludes that this discussion is appropriately used to set up Mr. Harvey's real-world comparisons.

Third, the Direct Action Plaintiffs claim that Mr. Harvey improperly opines that "in the but-for-world, merchants would not have been able to drive competition among issuers through selective acceptance."  (Harvey Excl. Reply 5.)  In the challenged paragraph, Mr. Harvey states that according to Plaintiffs' experts, but-for world merchants "would refuse to accept certain types of cards."  (Harvey Rep. ¶ 96.)  However, "[e]vidence in the record suggests this is unlikely to happen in the [but-for world]."  (*Id.*)  He cites to instances of merchant Plaintiffs "conced[ing] that it is unlikely they would refuse to accept cards with higher acceptance costs." (*Id.*)

For the reasons described above, Mr. Harvey is qualified to challenge Plaintiffs' experts' opinions using real-world evidence, in this case testimony from Plaintiffs.

Fourth, the Direct Action Plaintiffs claim that Mr. Harvey improperly opines that "in the but-for world, merchants would not have been refunded interchange on customer returns." (Harvey Excl. Reply 5.)  In the challenged paragraphs, Mr. Harvey states that in October of 2011, coincident with the implementation of the Durbin Amendment, "Visa changed the interchange rate applicable to return transactions on certain debit transactions to zero."  (Harvey Rep. ¶ 109.)  He claims that for this reason, "[w]here there are returns on debit transactions post-Durbin, [P]laintiffs' experts' use of net transactions artificially lowers the [but-for world] interchange and therefore increases damages."  (*Id.* ¶¶ 110–111.)  Mr. Harvey "modifie[s] [P]laintiffs' experts' damages formula" to "correct this error," and calculates "the offsets to [P]laintiffs' experts' debit interchange damages calculations assuming issuers did not rebate the interchange on return transactions in the BFW."  (*Id.* ¶¶ 112–113.)  He then states that the factfinder may determine that in the but-for world, "Visa would have implemented a policy to allow issuers to retain debit interchange on returns throughout the damages period," and calculates "the offsets to [P]laintiffs' experts' debit interchange damages calculations in that scenario as well."  (*Id.* ¶ 114.)

Mr. Harvey is qualified to recalculate damages under the assumption that Visa allowed issuers to retain debit interchange on returns.  The Direct Action Plaintiffs argue that Mr. Harvey may not claim that "in the but-for world, merchants would not have been refunded interchange on customer returns."  (Harvey Excl. Reply 5.)  However, the Court allows Mr. Harvey's statement that the factfinder "may determine that, in [P]laintiffs' experts' BFWs — in which debit interchange rates are lower throughout the entire damages period (including pre-Durbin) than the actual post-Durbin debit interchange rates — Visa would have implemented a policy to allow issuers to retain debit interchange on returns throughout the damages period."  (Harvey

Rep. ¶ 114.)  Mr. Harvey may plausibly suggest that, since Visa allowed issuers to keep

interchange on debit returns after the Durbin Amendment, it may have taken this same step in

response to lower debit interchange in the but-for world.  The Court concludes that this is a

reasonable inference based on real-world data and does not rely on economic analysis Mr.

Harvey is unqualified to offer.

### 3.   Qualifications to compare actual and but-for interchange rates

The Direct Action Plaintiffs claim that Mr. Harvey is not qualified to opine that

differences between real-world interchange rates and the Direct Action Plaintiffs' economists'

benchmarks render the latter unreliable.  (Harvey Excl. Reply 6.)  As an example, they cite to

Mr. Harvey's opinion that "the credit interchange rates applicable to [P]laintiffs in the actual

world and the credit interchange rates in [Professor] Hausman's hypothesized [but-for world]

vary widely, and they are inconsistent across merchants.  [Professor] Hausman provides no

explanation for these variations and inconsistencies, which make his damages calculations

unsupported and unreliable."  (*Id.* at n.3 (quoting Harvey Rep. ¶ 28).)

In response, Defendants argue that "Mr. Harvey's criticisms do not require 'economic

expertise' because they are based on a data analysis, not an economic analysis."  (Harvey Excl.

Opp'n 13.)

The Court concludes that Mr. Harvey may assume that actual and but-for interchange

rates are comparable, such that, for example, the pattern of interchange rates paid by merchants

in the real world should match the pattern of but-for interchange rates.  Defendants may

challenge this claim on cross-examination.

### iii.   Mr. Harvey's alternative benchmarks

The Direct Action Plaintiffs argue that "a reasonable damages benchmark should reflect the fees that merchants likely would have paid in a world without the [honor all cards ("HAC")] rules."[8]  (Harvey Excl. Mem. 12.)  They claim that Mr. Harvey's alternative benchmarks fail this requirement because they "fail to address the *relevant* question" of "what happens in the absence of the HAC Rules and other rules."  (*Id.* at 12.)  Further, "Mr. Harvey offers 'alternative' benchmarks without any supporting economic analysis or rationale or why those benchmarks represent an economically realistic set of but-for world outcomes."  (*Id.* at 13.)  The Direct Action Plaintiffs argue that without "guidance" from an economic expert, "the jury will have no other option but to guess which of Mr. Harvey's smorgasbord of alternative 'benchmarks' might be pertinent."  (Harvey Excl. Reply 8.)

In response, Defendants argue that Mr. Harvey does not offer affirmative economic opinions about the but-for world, but rather "presents examples of alternative benchmarks from the actual world to critique the benchmark interchange fee levels in Plaintiffs' experts' models." (Harvey Excl. Opp'n 11.)  They cite to cases showing that rebuttal experts may critique economic experts "without offering an alternative 'model or theory.'"  (*Id.*)  Further, they argue that Mr. Harvey's benchmarks were not intended to measure what would happen in the absence of the HAC rules, but rather to "help a jury assess whether the interchange rates in Plaintiffs' experts' but-for worlds are plausible."  (*Id.* at 12.)

---

[8]  The HAC rules and related "honor all issuers" (HAI) rules require merchants to accept all Visa or Mastercard credit or debit cards if they accept any of them.  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 228 (2d Cir. 2016); (*See* Sixth Amended 7-Eleven Compl. ("7-Eleven Compl.") ¶ 3, annexed to Szanyi Decl. as SJDX1, Docket Entry No. 8520-1),

The Court agrees with Defendants.  The fact that the benchmarks are not "based on a but-for world without the HAC Rules" is not grounds for exclusion.  (Harvey Excl. Mem. 12.)  There is no requirement that an expert rebutting a but-for world analysis must do so in the form of a but-for world analysis.  *See In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 34 (S.D.N.Y. 2020) (stating that rebuttal expert's "lack of an alternative model does not prevent him . . . from 'tear[ing] down'" other expert's damages model and "is not grounds for excluding his critique of" the other expert).

The Court also disagrees with the Direct Action Plaintiffs' claim that, without "guidance" from an economic expert, "the jury will have no other option but to guess which of Mr. Harvey's smorgasbord of alternative 'benchmarks' might be pertinent."  (Harvey Excl. Reply 8.)  Mr. Harvey does not claim that his benchmarks represent the but-for world; rather, they represent real-world situations that resemble the but-for world in some way.  The jury is equipped to evaluate the pertinence of these comparisons.  On cross-examination, Plaintiffs will have an opportunity to distinguish Mr. Harvey's comparisons from the but-for world; the Court notes that precisely because Mr. Harvey is not an economist, he will not be allowed to make claims about the but-for world in response.

### iv.  Mr. Harvey's real-world comparisons

The Direct Action Plaintiffs challenge Mr. Harvey's opinion that Plaintiffs' benchmarks are unreliable because they fail to replicate interchange rate patterns in the real world.  (Harvey Excl. Mem. 15.)  They claim that Mr. Harvey "ignores that the *purpose* of the but-for world is to model a world *without* the competitive restraints," which is "why but-for interchange rates do not parrot the 'patterns' from the actual world."  (*Id.*)  The Direct Action Plaintiffs claim that Mr. Harvey compares Professor Hausman's benchmark rates to real-world rates without considering

that Professor Hausman's rates are based on a distinction between Tier 1 and Tier 2 merchants. (*Id.* at 15–16.)  To the extent that Mr. Harvey disagrees with Professor Hausman's tiers, the Direct Action Plaintiffs argue that Mr. Harvey "is disagreeing with Professor Hausman's *economic* opinion that, in the but-for world, sales volume would be *only one of several factors* that determine a merchant's competitive interchange rates," which he is not qualified to do. (Harvey Excl. Reply 6–7.)  They claim that Mr. Harvey's opinion "merely compares one set of numbers to another," which is within the ability of a lay person and is therefore not proper expert testimony.  (Harvey Excl. Mem. 16)  Further, because they lack "any economic reasoning or analysis," Mr. Harvey's comparisons "can serve no purpose other than to confuse and mislead the jury."  (*Id.* at 17.)

In response, Defendants argue that Mr. Harvey's report critiques "the failure to provide adequate explanations for the inconsistencies between the actual world and the proposed but-for worlds."  (Harvey Excl. Opp'n 15.)  They claim that Mr. Harvey does not ignore Professor Hausman's tiers, but rather shows that the tiers "arbitrarily lump[] together Plaintiffs without accounting for vast disparities in their relative transaction volume, or changes in their transaction volume over time, in the actual world."  (*Id.*)  Defendants argue that Mr. Harvey's comparisons "require analysis of voluminous and complex transaction data that is beyond the abilities of the average juror."  (*Id.* at 14.)

Mr. Harvey may critique Plaintiffs' experts' opinions by highlighting inconsistencies between the real world and Plaintiffs' experts' but-for worlds.  The Direct Action Plaintiffs may question the relevance of these comparisons on cross-examination, including whether Mr. Harvey's comparisons fail to consider factors relevant to sorting merchants into tiers.  The Court also agrees with Defendants that data analysis is beyond the ken of a layperson and the proper

subject of expert testimony.  *See In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 85 (S.D.N.Y. 2017) (concluding that a lay person could not "us[e] a forensic tool to convert . . . metadata into data readable in an Excel spreadsheet, review[] hundreds of data fields, and perform[] a comparative analysis").

### v.   Mr. Harvey's comparisons across cases

The Direct Action Plaintiffs challenge Mr. Harvey's claim that Plaintiffs experts' damages benchmarks are unreliable because they are different from one another.  (Harvey Excl. Mem. 18.)  First, they claim that this analysis is not relevant.  (*Id.*)  Next, the Direct Action Plaintiffs argue that comparing the different Plaintiff groups' experts "would undermine the precept . . . that once liability and antitrust injury has been established an antitrust plaintiff must provide only sufficient non-speculative evidence to support a 'just and reasonable' estimate of damages." (*Id.*)   The Direct Action Plaintiffs further claim that the comparison would be prejudicial, particularly as it "rests on inadmissible hearsay." (*Id.* at 19.)  They note that although the different cases "were transferred to this Court for coordinated pretrial proceedings," each will be tried separately, such that each Plaintiff group's expert's opinion will be hearsay to the other Plaintiff groups' juries.  (*Id.*)  While an expert witness may incorporate hearsay in his opinions, he may do so only when the hearsay is relevant, only when the expert is reliably applying expertise to that evidence, and only when the probative value of the hearsay outweighs its prejudicial effect.  (Harvey Excl. Reply 9.)  The Direct Action Plaintiffs also argue that allowing Mr. Harvey to use hearsay would be improper in this case because the comparison Mr. Harvey offers is not part of the "reliable methodology" of a mathematician and that Mr. Harvey is not qualified to assume that Professor Hausman's but-for world is comparable to Professor Harris's but-for world.  (*Id.* at 9–10.)  The Direct Action Plaintiffs further argue that Mr.

Harvey's comparisons are not relevant "because Plaintiff's but-for world models are different," which Mr. Harvey does not have the qualifications "to fully analyze and appreciate." (*Id*. at 9.) They claim that in offering this opinion, Mr. Harvey "is acting as nothing more than a prohibited 'mouthpiece' expert: parroting *arguments* Defendants want to make about the opinions of the Plaintiffs' economic experts." (*Id*.) Finally, the Direct Action Plaintiffs argue that Mr. Harvey's comparison of expert witnesses should be excluded as it is "not a matter of expertise." (Harvey Excl. Mem. at 20.)

In response, Defendants argue that the fact that different experts' methodologies produce different results when measuring the same thing indicates that their methods are unreliable. (Harvey Excl. Opp'n 17.) They claim that Mr. Harvey's use of Plaintiffs' experts' opinions is not hearsay because he is not describing their opinions for the truth of the matter asserted; rather, he "opines that [Plaintiffs' experts'] benchmarks are unreliable and untrustworthy." (*Id.*) Further, they point out that "experts are permitted to rely on out-of-court statements in forming their opinions, even if those statements are inadmissible hearsay." (*Id.*) Defendants note that Plaintiffs will be able to "cross-examine Mr. Harvey on all the facts underlying his opinions . . . and Plaintiffs' own expert witnesses will be able to respond in rebuttal." (*Id.* at 18.) Finally, Defendants argue that "[l]ay jurors are not equipped to perform on their own the complex calculations Mr. Harvey conducts," citing to Mr. Harvey's deposition testimony that the calculations in the case were "produced as computer code." (*Id.* at 17.)

## 1. Relevance

Mr. Harvey's comparisons will help the trier of fact evaluate the accuracy of Plaintiffs' experts' damages calculations and are therefore relevant.

"An expert's testimony is relevant if it will 'help the trier of fact to understand the evidence or to determine a fact in issue." *In re Perrigo Co. PLC Sec. Litig.*, No. 19-CV-70, 2021 WL 3773461, at *3 (S.D.N.Y. 2021) (first quoting Fed. R. Evid. 702; then citing *Daubert*, 509 U.S. at 591). Courts have held that "inconsistent results are an 'indicia of unreliability' in an expert's methodologies," including in the context of "multiple methodologies intended to measure the same phenomenon." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 468 (S.D.N.Y. 2018) (quoting *Lippe v. Bairnco Corp.*, 99 F. App'x 274, 279 (2d Cir. 2004)); *see also Apple, Inc. v. Samsung Elecs. Co.*, 12-CV-630, 2014 WL 794328, at *12 (N.D. Cal. Feb. 25, 2014) (holding that "the past methodologies of Apple's experts are highly probative impeachment evidence that a fact-finder will consider in assessing the weight a fact-finder may choose to give the experts in the instant litigation"). Mr. Harvey's comparisons are therefore relevant.

## 2.    Just and reasonable estimate

Mr. Harvey's comparison of different experts' opinions does not violate the precept that plaintiffs must only demonstrate a "just and reasonable" estimate of damages. The Direct Action Plaintiffs cite to *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) to argue otherwise. (Harvey Excl. Mem. 18.) In that case, the Supreme Court held that:

> in the absence of more precise proof, the jury could conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, . . . that defendants' wrongful acts had caused damage to the plaintiffs. . . . The tortious acts . . . precluded ascertainment of the amount of damages more precisely, by comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions. Nevertheless, . . . the jury could return a verdict for the plaintiffs, even though damages could not be measured with the exactness which would otherwise have been possible.

*Bigelow*, 327 U.S. at 264–65.

The rule articulated in *Bigelow* does not preclude antitrust defendants from challenging plaintiffs' experts' opinions on damages.  Rather, it acknowledges the difficulty in comparing real and but-for profits, and makes clear that that difficulty should not preclude plaintiffs' recovery.  Neither Defendants nor Mr. Harvey claim that Plaintiffs should not recover because they cannot prove damages to a sufficiently high standard.  Instead, Mr. Harvey challenges the *accuracy* of the Direct Action Plaintiffs' experts' specific damage calculations by comparing them to the calculations of the other Plaintiff groups' experts.  The jury will consider Mr. Harvey's comparisons along with the Direct Action Plaintiffs' damages calculations in rendering its "just and reasonable estimate of the damage based on relevant data." *Id.* at 264.  The Court concludes that this outcome does not violate *Bigelow.*

### 3.   Hearsay

The Court does not exclude Mr. Harvey's comparisons of Plaintiffs' experts' opinions as inadmissible hearsay.

Under Rule 703, "[a]n expert may base his opinions on facts that are otherwise inadmissible, such as hearsay that does not fall within a recognized exception, if 'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.'" *United States v. Rodriguez*, 651 F. App'x 44, 46 (2d Cir. 2016) (quoting Fed. R. Evid. 703).  However, an expert may only disclose the inadmissible facts or data "if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."  Fed R. Evid. 703.  Further, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (quoting *Malletier v. Dooney & Burke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007)); *see also United*

*States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (stating that an expert must "apply[] his extensive experience and a reliable methodology" to the inadmissible materials or he is simply "repeating hearsay evidence without applying any expertise whatsoever" (quoting *United States v. Dukagjini*, 326 F.3d 45, 58–59 (2d Cir. 2003))).

Assuming without deciding that Plaintiffs' experts' but-for-world interchange rates constitute hearsay, Mr. Harvey's use of them in his report is nevertheless allowable under Rule 703. Any mathematician or statistician comparing a set of figures must rely on those figures in doing so, and the figures must be expressed to the jury for the comparison to be meaningful. Further, Mr. Harvey's analysis is probative; as described above, inconsistent results indicate unreliable methodologies. *See In re LIBOR*, 299 F. Supp. 3d at 468; *Apple, Inc*, 2014 WL 794328, at *12. Nor is that probative effect outweighed by prejudice, given that the Direct Action Plaintiffs may cross-examine Mr. Harvey and rebut his presentation with their own expert witnesses.[9] *See United States v. Cantoni*, No. 18-CR-562, 2019 WL 1441128, at *3 (E.D.N.Y. Apr. 1, 2019) (stating that "the probative value of the location analysis is sufficient to overcome any risk of unfair prejudice, particularly given defense counsel's opportunity to cross-examine the government's expert on the claimed weaknesses in his analysis"). Finally, because Mr. Harvey performs data analysis comparing Professor Hausman's, Mr. Hutchins', and Drs.

---

[9] The Direct Action Plaintiffs argue that cross-examination of Mr. Harvey will "compound" prejudice by "confusing the jury with the opinion of an *absent* expert, who would not himself be subject to cross-examination and whose opinions in a different case never should have been mentioned in the first place." (Harvey Excl. Reply 10.) The Court disagrees. On cross-examination, Mr. Harvey will not present absent experts' methodologies or defend their opinions; as a mathematician, he is not qualified to do so. Rather, the Direct Action Plaintiffs can use cross-examination and rebuttal to present evidence that the discrepancies between Plaintiffs' experts' damages benchmarks are insignificant and that their own experts' methodologies are correct and reliable.

Harris's and Epstein's damages benchmarks, he is more than simply a "conduit" for the inadmissible hearsay.  (*See* Harris Rep. ¶¶ 16–27.)

The Direct Action Plaintiffs cite to *In re Welding Fume Products Liability Litigation*, No. 3-CV-17000, 2010 WL 7699456 (N.D. Ohio June 4, 2010) to support their argument that Mr. Harvey may not testify about the differences in Plaintiffs' economists' methodologies in separate cases.  (Harvey Excl. Mem. 19.)  The court in that case held that "a defendant may cross-examine a plaintiff's expert witness with contradictory statements made by: (1) that plaintiff's own, *case-specific* experts; and (2) any of the plaintiff's *core* experts."  *In re Welding Fume Prods.*, 2010 WL 7699456, at *87.  However, the defendants were not permitted to "cross-examine a particular plaintiff's expert witness with statements made by some *other Welding Fume* plaintiff's *case-specific* witness."  *Id.*  The court noted that its rulings were "informed by whether the statements at issue qualify as an admission against interest by a party or his agent" and that "the fact that a plaintiff in one case retains a case-specific expert provides no basis, without more, for deeming that expert as an agent for any other plaintiff."  *Id.* at *87 & n.332.

As Defendants argue, this comparison is unpersuasive because *Welding Fume Products* concerned *counsel's* introduction of a different plaintiff's expert's opinion.  (Harvey Excl. Opp'n 19.)  Rule 703 does not apply to counsel, therefore the hearsay analysis is not contingent on whether "the statements at issue qualify as admission against interest by a party or his agent."  *In re Welding Fume Prods.*, 2010 WL 7699456, at *87.  Analyzing Mr. Harvey's opinion through the lens of Rule 703, the Court concludes that his comparison of Plaintiff groups' expert witnesses is not inadmissible hearsay.

### 4.   Qualifications

Mr. Harvey is qualified to assume that the Plaintiffs' experts but-for worlds can

appropriately be compared.  The experts are ostensibly measuring the same thing: the effect of

the elimination or modification of the HAC rules on interchange rates.  While the experts "used

different methodologies," (Harvey Excl. Mem. 18), this plainly does not justify wildly

inconsistent results, *see In re LIBOR*, 299 F. Supp. 3d at 468.  To the extent that Plaintiffs claim

their experts' damages projections are within a reasonable range of error or difference of

opinion, they may make this argument on cross-examination and in presentation of their own

experts.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary

evidence, and careful instruction on the burden of proof are the traditional and appropriate means

of attacking shaky but admissible evidence.").

### 5.   Mouthpiece

Mr. Harvey is not a mouthpiece expert.

"A scientist, however well credentialed he may be, is not permitted to be the mouthpiece

of a scientist in a different specialty."  *Malletier*, 525 F. Supp. 2d at 665.  In *Malletier*, a

proposed expert based his "critical conclusion" on a regression analyst conducted by an analyst

who was not an expert in the case.  *Id.* at 664.  The expert himself "was not presented as and was

demonstrably unqualified to be an expert on statistical analysis," and "essentially had nothing to

do with the preparation of the regression analysis."  *Id.*  The court held that while an expert may

rely on the opinions of other experts, he must "in the end be giving his *own* opinion.  He cannot

simply be a conduit for the opinion of an unproduced expert."  *Id.*; *see also Dura Auto. Sys. of*

*Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well

credentialed he may be, is not permitted to be the mouthpiece of a scientist in a separate

specialty."); *Hart v. BHH, LLC*, No. 15-CV-4804, 2018 WL 3471813, at *8 (S.D.N.Y. July 19,

2018) ("[A] proffered expert may not simply pass off as their own, or serve as a vehicle for

presenting, the opinions of others in subjects on which the proffered expert is not personally

qualified." (quoting *In re M/V MSC Flaminia*, No. 12-CV-8892, 2017 WL 3208598, at *22

(S.D.N.Y. July 28, 2017))).

Mr. Harvey does not merely "parrot" Plaintiffs' experts' opinions. *Hart*, 2018 WL

3471813, at *8 (noting that "testifying experts may not parrot studies or act as conduits for

consulting experts"). Rather, he analyzes these opinions by comparing them to the opinions of

Plaintiffs' other experts. Because he applies his mathematical and statistical expertise to

Plaintiffs' experts' benchmarks, Mr. Harvey is not an impermissible mouthpiece for Plaintiffs'

damages experts. *See Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 169 (S.D.N.Y. 2012)

(finding that "[w]here a testifying expert has expertise in the field covered by a consulting expert

and independently verifies the latter's conclusions, there is no danger that the former is acting as

a mere 'mouthpiece or conduit' of the latter").[10]

### 6.   Expertise

Mr. Harvey's comparison of Plaintiffs' experts' damages benchmarks is a matter of

expertise.

"Testimony is properly characterized as 'expert' only if it concerns matters that the

average juror is not capable of understanding on his or her own." *Mejia*, 545 F.3d at 194 (citing

---

[10]   The Direct Action Plaintiffs also seem to claim that Mr. Harvey is a "mouthpiece" not
for the opinions he cites, but for Defendants themselves. (*See* Harvey Excl. Reply 9 (claiming
that Mr. Harvey "parrot[s] *arguments* Defendants want to make about the opinions of the
Plaintiffs' economic experts.").) This is different than the situation discussed in the cases
addressing "mouthpiece" experts. The Court considers this argument to be another form of the
claim that Mr. Harvey's opinion is not a matter of expertise, addressed below.

*United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994)); *see also Amuso*, 21 F.3d at 1263

("A district court may commit manifest error by admitting expert testimony where the evidence

impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the

expert's testimony is not beyond the ken of the average juror."); *Lidle ex rel. Lidle v. Cirrus

Design Corp.*, No. 08-CV-1253, 2010 WL 2674584, at *4 (S.D.N.Y. July 6, 2010) ("[E]xpert

testimony should not merely reiterate arguments based on inferences that can be drawn by

laypersons; those can properly be advanced by the parties in their summations." (quoting *In re

Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 283 (E.D.N.Y. 2007))).  Thus, an expert witness

should testify only to matters of expertise.  *See United States v. Scott*, No. 08-CR-360, 2009 WL

36548, at *7 (S.D.N.Y. Jan. 7, 2009) (concluding that expert's testimony was properly "a matter

of expertise that was beyond the knowledge of the average juror and could not have been

presented other than by expert testimony.").

　　　　Mr. Harvey does not simply claim that some experts' benchmark rates are larger than

others.  Rather, he calculates the percentage difference, for each expert, between the actual

interchange rate and the interchange rate in the expert's but-for world with no HAC rules.

(Harvey Rep. Table 7.)  He then applies the experts' benchmarks to other experts' damages

calculations, showing, for example, that if Dr. Kennedy applied Professor Hausman's benchmark

rate instead of Professor Harris's, the Target Plaintiffs' damages would decline by ███████

███████  (*Id.* ¶¶ 20–21, 25–26; Tables 10–11.)  Mr. Harvey compares the experts'

benchmarks in a but-for world with modified HAC rules.  (*Id.* at Table 8.)  Next, he compares

each expert's benchmark rate in a but-for world with no HAC rules to the same expert's

benchmark rate in a but-for world with modified HAC rules.  (*Id.* at Table 9.)  Mr. Harvey then

compares the experts' but-for-world credit interchange rates for three specific furniture stores.

(*Id.* ¶ 27, Table 12.)  He also compares the experts' debit but-for rates and the difference

between their debit but-for worlds with no HAC rules and modified HAC rules.  (*Id.* ¶¶ 51–55,

Tables 13–16.)  The Court concludes that this analysis is beyond the ability of a layperson.

### vi.   Conclusion

The Court denie**s** Direct Action Plaintiffs' motion to exclude portions of the report and

opinions of R. Garrison Harvey.

### c.   Motion to exclude report and opinions of Glenn Hubbard

The Direct Action Plaintiffs move to exclude the report and opinions of Professor Glenn

Hubbard (Hubbard Mot.), an expert witness for Defendants.  (Rebuttal Expert Report of Glenn

Hubbard ("Hubbard Rep.") ¶ 6, annexed to Wilson Decl. as Ex. 2, Docket Entry No. 8495-1.)

### i.   Professor Hubbard's background and expert report

Professor Hubbard is Dean and Russell L. Carson Professor of Finance and Economics at

the Graduate School of Business of Columbia University.  (Hubbard Rep. ¶ 1.)  He is a research

associate at the National Bureau of Economic Research and has served as a leader, consultant, or

advisor on a variety of governmental and intergovernmental bodies.  (*Id.* ¶ 3.)  Professor

Hubbard has published widely on economics and has appeared as an expert before over a dozen

U.S. courts.  (*Id.* ¶¶ 4–5.)

Professor Hubbard has been asked by Defendants "to evaluate and respond to the

analyses, opinions, and conclusions" of Plaintiffs' experts Dr. Kohler,[11] Professor Harris, and

Professor Hausman.  (*Id.* ¶ 8.)  He concludes that Dr. Kohler's opinions are "unsupported and

---

[11]  Professor Hubbard addresses the report of Maria Blanco, who has since been
substituted by Dr. Reto Kohler.  (Letter from J. Wilson to M. Eisenstein & D. Ioffredo, at 1 (May
22, 2019), annexed to Carney Decl. as Ex. DDX80, Docket Entry No. 8544-7; Expert Report of
Reto Kohler ("Kohler Rep.") ¶ 6, annexed to Carney Decl. as Ex. DDX11, Docket Entry No.
8544-2; Hubbard Rep.)  The Court substitutes "Dr. Kohler" for "Ms. Blanco" in this order.

unreliable," as are Professor Harris's and Professor Hausman's opinions that rely on Dr. Kohler. (*Id.* ¶ 13.)

Professor Hubbard begins by providing an overview of Plaintiffs' reliance on Dr. Kohler and Dr. Kohler's methodology. (*Id.* ¶¶ 18–40.) He states that Professor Harris and Professor Hausman "rely on Dr. Kohler's analyses of and conclusions about average issuer profitability to support their opinions, and particularly to support the viability of their proposed but-for world interchange benchmarks and the existence of supra-competitive profits." (*Id.* ¶ 22.) Professor Hubbard claims that there are "at least two fundamental flaws in [Dr. Kohler's] analysis." (*Id.* ¶ 24.) First, Dr. Kohler's "chosen threshold — whether issuers are profitable on average — is grossly incomplete." (*Id.*) Rather, he should have considered "individual issuers or, at the very least, subsets of comparable issuers." (*Id.*) Further, Dr. Kohler should have considered "not merely *whether* issuers are profitable, but also *how individual issuers would respond* to reduced (and, possibly, negative) profitability under scenarios of reduced interchange." (*Id.*) Second, Professor Hubbard claims that even if Dr. Kohler had addressed the appropriate question, his methodology was improper because his "chosen metric of industry-average profitability ignores critical differences across issuers." (*Id.*) Professor Hubbard claims that neither Dr. Kohler nor any other expert has shown that individual issuers "could endure the significant loss of revenue under the scenarios of reduced interchange proposed by the Plaintiffs' experts." (*Id.* ¶ 26.)

After describing Dr. Kohler's methodology, (*id.* ¶¶ 27–40), Professor Hubbard asserts that Dr. Kohler's "attempts to analyze credit and debit card account profitability under scenarios of reduced interchange fail to account for *any* competitive response by issuers to reduced interchange, and are therefore incomplete, rendering [his] opinions unreliable from an economic perspective." (*Id.* ¶¶ 41–49.) Professor Hubbard points to multiple ways that he claims issuers

would likely respond to reduced interchange, such as reducing their issuance of credit and debit cards or increasing other fees.  (*Id.* ¶ 44.)  He claims that "[b]oth the experience in Australia following the regulation of interchange rates and the experience in the United States following the regulation of debit interchange rates are inconsistent with [Dr. Kohler's] assumption that there would be no competitive response."  (*Id.* ¶ 46.)  Further, he claims that Dr. Kohler also fails to "consider competitive responses *across* business segments."  (*Id.* ¶ 49.)  For example, "reduced profitability in the credit card segment may result in the redistribution of bank capital to other (more profitable) segments."  (*Id.*)

Next, Professor Hubbard claims that by basing his opinions on calculations of average profitability, Dr. Kohler "ignores critical differences across issuers . . . that directly affect each issuer's individual profitability and its response to reduced interchange."  (*Id.* ¶ 50.)  He describes a number of ways that issuers differ from one another.  (*Id.* ¶¶ 51–63.)

Professor Hubbard next claims that Dr. Kohler's failure to analyze the effect of reduced interchange on commercial credit cards "is improper and further invalidates [his] analysis of issuer profitability."  (*Id.* ¶ 64.)  He argues that "commercial credit cards are a large and important source of revenue for issuers and have become an increasingly important part of the payment card issuing industry" and that "interchange is the primary source of income on commercial credit cards" such that "reductions in interchange would be expected to affect revenues from commercial credit cards even more directly than such changes would affect the universe of commercial credit cards."  (*Id.* ¶¶ 65–66.)  Professor Hubbard claims that the commercial credit card data in Dr. Kohler's own backup files illustrates that "reductions in interchange fees under [Dr. Kohler's] reduced interchange scenarios would result in the loss of ███████████████ in interchange revenue."  (*Id.* ¶ 67.)  He critiques Dr. Kohler's explanation

that he excluded commercial credit cards because commercial cards are "part of a broader and more holistic client engagement strategy," "commercial cards are located in a completely separate division of the bank from consumer credit cards," "[c]ommercial cards are a way to deepen the overall client relationship," commercial cards' primary function is "not to act as a line of credit, but rather to facilitate corporate payments," and banks "place a heavier emphasis on the overall profitability of the client relationship" than the standalone profitability of commercial cards, even "sell[ing] some of the cash management product at a discount in order to win client deposits." (Kohler Rep. ¶ 59; Hubbard Rep. ¶ 68.) Professor Hubbard argues that Dr. Kohler has not demonstrated that banks are willing to sell the cash management product at a discount to win client deposits, and that the documents he cites "do not support [his] claim that commercial credit cards are sufficiently important to the overall client relationship that issuers would continue to offer such cards under scenarios of reduced interchange to maintain those client relationships." (Hubbard Rep. ¶ 68.) Nor does he otherwise "demonstrate that the overall client relationship is profitable enough to justify the issuance of commercial credit cards at a loss." (*Id.* ¶ 69.)

Next, Professor Hubbard claims that Dr. Kohler's credit card analysis is "unreliable and inconsistent with the standards of rigorous empirical analysis for additional reasons": (1) Dr. Kohler "constructs inconsistent and inappropriate bank samples that [he] uses as if they are interchangeable throughout [his] credit card analysis" (2) Dr. Kohler's "estimated [cost of equity (COE)] is flawed and inappropriately low""; (3) Dr. Kohler "overstates [returns on equity (ROE)] by erroneously reducing operating expenses in the but-for world"; and (4) Dr. Kohler "overstates EP Spread by erroneously excluding the portion of the Relevant Period with the

lowest ROE (2008 and 2009)."[12]  (*Id.* ¶ 71.)  Professor Hubbard addresses each of these alleged

errors in turn.  (*Id.* ¶¶ 74–101.)

Professor Hubbard next claims that Dr. Kohler's analysis of cardholder lifetime value

("LTV") "is unsuitable for purposes of evaluating credit card profitability" because it "does not

properly account for competitive responses," "selectively relies upon different and inconsistent

data sources," and "us[es] an inappropriate COE from [Dr. Kohler's] credit card analysis to . . .

discount EP to a 2016 valuation."  (*Id.* ¶¶ 103–113.)  In addition, he argues that Dr. Kohler's

LTV analysis "does not properly account for the economic relevance of the underlying *credit*

*risk* associated with revolving account balances" because he "weight[s] the assets of *all* [his]

cardholder categories by the *same* risk weighting of 100 percent."  (*Id.* ¶ 112.)

Professor Hubbard then turns to Dr. Kohler's analysis of debit profitability, which he

claims is "unsuitable from an economic perspective for purposes of determining profitability to

issuers in response to reduced interchange."  (*Id.* ¶ 114.)  Professor Hubbard first claims that Dr.

Kohler's "decision to evaluate debit card profitability *only* as part of the broader DDA

relationship and [his] failure to even consider the effect of reduced interchange on stand-alone

debit card profitability" renders his analysis "irrelevant" for the task of "assessing issuer

behavior in response to reduced interchange."  (*Id.* ¶ 115.)  Next, he argues that Dr. Kohler

"inappropriately combines data from multiple different data sources and for multiple different

and non-overlapping samples, and relies upon a series of unsupported assumptions."  (*Id.* ¶¶

118–121.)  Professor Hubbard also argues that Dr. Kohler "erroneously excludes commercial

debit from [his] debit card-linked DDA analysis, thereby ignoring the effect of billions of dollars

---

[12]  Dr. Kohler's report defines EP (economic profit) spread as a "percentage measure" of
profitability "that shows the [ROE] minus the [COE] per dollar of capital."  (Kohler Rep. ¶ 38.)

in lost interchange revenues under [his] reduced interchange scenarios." (*Id.* ¶¶ 122–123.) Further, he contends that Dr. Kohler "uses efficiency ratios that do not appear to be representative of the largest debit card issuers whose profitability [he] claims to assess," thus "understat[ing] expenses and thereby overstat[ing] EP." (*Id.* ¶¶ 124–126.) Finally, Professor Hubbard claims that Dr. Kohler's "assumptions regarding DDA expenses are internally inconsistent and undermine [Dr. Kohler's] approach to calculating Operating Expenses under reduced interchange scenarios throughout [his] report." (*Id.* ¶ 127.)

### ii.   Professor Hubbard's qualifications

The Direct Action Plaintiffs argue that Professor Hubbard's "experience and knowledge does not encompass bank payment card profitability models, bank credit card portfolio management, lifetime value estimates, and the other issuing bank-specific topics that form the basis for Dr. Kohler's opinion." (Mem. of Law in Supp. of Direct Action Pls.' Mot. to Excl. Rep. & Ops. of Def. Expert Glenn Hubbard ("Hubbard Excl. Mem.") 5, Docket Entry No. 8109.) They note that Professor Hubbard "has never been employed at a bank or performed any consulting work for a retail bank regarding its credit card business, debit card business, or depository account business," "never evaluated the performance of a bank's credit, debit, or depository account portfolios, including by modeling profitability," has not done consulting work "involving any regulations that impact banks' credit and debit card businesses," and has never "had any involvement with banks in setting any aspect of the pricing of their credit card, debit card, or deposit card offerings." (*Id.*) The Direct Action Plaintiffs cite to cases in which courts excluded experts with general academic or professional expertise who lacked specific experience with the issues in questions. (*Id.* at 6.) They argue that Professor Hubbard has "*no* relevant expertise" on the subject of Dr. Kohler's opinion, namely "the profitability of credit and

debit card accounts for banks historically and under scenarios of reduced interchange rates." (Reply Mem. of Law in Supp. of Direct Action Pls.' Mot. to Excl. Rep. & Ops. of Def. Expert Glenn Hubbard ("Hubbard Excl. Reply") 3–4, Docket Entry No. 8112.)

In response, Defendants cite to cases holding that an expert with educational and experiential qualifications in a closely related field will not be excluded solely for lacking expertise in the relevant specialized area. (Defs.' Mem. of Law in Opp'n to Direct Action Pls.' Mot. to Excl. Rep. & Certain Opinions of Professor R. Glenn Hubbard ("Hubbard Excl. Opp'n") 10, Docket Entry No. 8139). They argue that Professor Hubbard "has decades of experience in economics, finance, financial institutions and financial modeling, has worked in academia, government and the private sector, utilizing that expertise, and has previously testified as an economic expert many times." (*Id.* at 11.) Defendants claim that because the primary question that Professor Hubbard addresses in his rebuttal "is an economic question," Professor Hubbard is "eminently qualified" to give the opinions that he does. (*Id.*)

At his deposition, Professor Hubbard testified that he had never "developed a model to look at what would happen to credit card offerings if interchange revenue were reduced." (Videotaped Deposition of R. Glenn Hubbard ("Hubbard Dep.") 21:19–22:1, annexed as Ex. 3 to Wilson Decl., Docket Entry No. 8495-1.) He had never been employed at a bank, done consulting work for a retail bank regarding its credit card business, or done consulting work for a retail bank regarding its depository account business. (*Id.* at 22:10–20.) He stated that he had done consulting work for banks "in analyzing regulation and strategies in response to changes in regulation." (*Id.* at 22:25–23:7.) However, he had not specifically helped banks analyze their response to the Durbin Amendment, the CARD Act, or Regulation E. (*Id.* at 23:8–19.) Professor Hubbard has never been involved in setting prices for credit card or deposit account

40

interchange, interest, or fees.  (*Id.* at 24:16–25:15.)  He has not helped banks benchmark the performance of their credit card portfolios, debit card portfolios, or depository accounts.  (*Id.* at 26:5–16.)  He has not helped a bank create a model evaluating the impact on profitability of any variables.  (*Id.* at 27:7–15.)  Professor Hubbard has not created a strategic financial model for a bank and has taught classes about financial modeling "[o]nly in a very general level in teaching money and banking classes."  (*Id.* at 28:5–19.)

Professor Hubbard is qualified to render the opinions in his report.  As Defendants argue, if an expert "has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."  *In re Zyprexa Prods. Liability Litig.*, 489 F. Supp. 2d at 282; (Hubbard Excl. Opp'n 10).  Professor Hubbard has extensive economic and financial qualifications, (Hubbard Rep. ¶¶ 1–5), which are not diminished by virtue of being predominantly academic rather than acquired from working at a bank.  *See In re LIBOR*, 299 F. Supp. 3d at 466 ("'A formal education in a particular field is sufficient to qualify a witness as an expert' as a general matter, such that a 'lack of extensive practical experience directly on point does not necessarily preclude [the] expert from testifying.'"  (quoting *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, No. 99-CV-1725, 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003))).

Nor does the Court agree with the Direct Action Plaintiffs' assertion that Professor Hubbard "has *no* relevant expertise" in relation to Dr. Kohler's "opinion regarding the profitability of credit and debit accounts for banks historically and under scenarios of reduced interchange rates."  (Hubbard Excl. Reply 3–4.)  Notably, Professor Hubbard's assignment is *not* to give his own opinion regarding the profitability of credit and debit accounts for banks

41

historically and in the but-for world, but rather to "evaluate and respond to the analyses, opinions, and conclusions provided by" Dr. Kohler.  (Hubbard Excl. Mem. ¶ 8.)  His extensive experience "examin[ing] the evolution and behavior of a wide range of firms and industries," "work[ing] on a wide variety of finance matters," and "regularly teach[ing] and apply[ing] the techniques" he uses in his analysis qualify him to identify "conceptual, methodological, and mechanical flaws" in Dr. Kohler's report.  (Hubbard Rep. ¶¶ 4, 5, 128.)

    In *In re LIBOR-Based Financial Instruments Antitrust Litigation*, Professor Hubbard submitted a report opining that the plaintiffs' expert Mr. Craig Beevers' critiques of the defendants' data productions were "misguided."  299 F. Supp. 3d at 473, 516.  The court held that Professor Hubbard was qualified to offer these opinions.  *Id.* at 516.  It noted that he did not opine that the defendant's data productions "were complete and contain[ed] all information necessary to identify trader-based manipulation," but rather that they were "not deficient in the various ways suggested by Mr. Beevers."  *Id.*  Accordingly, Professor Hubbard did "not need an 'understanding of, and experience with, the day-to-day conduct and reporting in dealing rooms of financial services organizations' to offer these opinions"; rather, his "formal training in economics and his extensive experience working with economic and financial data qualify him to do so."  *Id.*  Because Professor Hubbard's opinions were "primarily directed to how Mr. Beevers analyzed the data, rather than what specific data Mr. Beevers analyzed," his "extensive training and experience in the fields of economics and finance render[ed] him qualified to work with spreadsheets and data, and therefore qualifie[d] him to opine that Mr. Beevers made certain errors in analyzing the data produced by" the defendant.  *Id.* at 517.  As in *In re LIBOR*, the Court concludes that Professor Hubbard's "formal training in economics and his extensive

experience working with economic and financial data" qualify him to critique an opposing expert's analysis despite a lack of professional banking experience. *Id.* at 516.

### iii. Professor Hubbard's opinions about banks in the but-for world

The Direct Action Plaintiffs challenge Professor Hubbard's opinions about issuing banks' competitive responses to reduced interchange in the but-for world. They argue that the opinions are "wholly speculative and premised solely on 'studies done by others.'" (Hubbard Excl. Mem. 7.) The Direct Action Plaintiffs claim that Professor Hubbard "did not conduct *any* empirical study or analysis to assess the likelihood of any of the 'competitive responses' he offered," failed to assess "whether the 'studies done by others' he relies on are even reliable," "*did not* undertake to model what would happen to credit card offerings if interchange revenues to issuers were reduced," and "has *no* experience in advising banks as to whether to undertake any of his so-called 'competitive responses.'" (*Id.* at 7–8.) They also argue that Professor Hubbard "admitted he ignored documents that suggested banks would respond to reduced interchange by reducing expenses, rather than adopting his supposed 'competitive responses.'" (*Id.* at 8.) Finally, they claim that Professor Hubbard "*declined* to testify to a reasonable degree of professional certainty that issuers would actually undertake" his proposed competitive responses. (*Id.*)

In response, Defendants cite to cases holding that "[r]ebuttal experts need not conduct their own empirical studies to offer critical assessment of another party's affirmative expert report." (Hubbard Excl. Opp'n 12.) They argue that Professor Hubbard "[a]ppli[ed] basic economic principles to real-world evidence" to "opine[] that card issuers would likely have responded to substantially reduced interchange in one or more ways." (*Id.* at 13.) Similarly, he "reasonably concluded" from data in Dr. Kohler's own report "that a substantial reduction in

commercial card interchange revenue would have adversely affected the economic profitability of credit card issuance." (*Id.* at 14.)

First, it is not necessary that Professor Hubbard perform his own empirical studies. *See Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 385 (S.D.N.Y. Sept. 15, 2014) ("[A]n expert may rely on assistants or the opinions of other experts in formulating their own expert opinions."); *Malletier*, 525 F. Supp. 2d at 664 ("It is true that experts are permitted to rely on opinions of other experts to the extent that they are of the type that would be reasonably relied upon by other experts in the field.") The Direct Action Plaintiffs argue that Professor Hubbard also did not "conduct *any* empirical study or analysis to assess . . . whether the 'studies done by others' he relies on are even reliable." (Hubbard Excl. Mem. 7–8.) While an expert may not uncritically rely on data supplied by a party, *see Forte v. Liquidnet Holdings*, 675 F. App'x 21, 24 (2d Cir. 2017), requiring experts to empirically analyze the studies they rely on would essentially obviate the rule that an expert may rely on the opinions of other experts. The Direct Action Plaintiffs cite to the holding in *Malletier* that an expert may not "simply rehash[] otherwise admissible evidence about which he has no personal knowledge," but *Malletier* is inapposite. (Hubbard Excl. Mem. 9 n.8); *Malletier*, 525 F. Supp. 2d at 678. The *Malletier* court was discussing a situation in which an expert "summariz[ed] the background facts" in order to "construct[] a factual narrative based upon record evidence." *Malletier*, 525 F. Supp. 2d at 677–78 (quoting *Highland Cap. Mgmt., LP v. Schneider*, 379 F. Supp. 2d 461, 468–69 (S.D.N.Y. 2005), *vacated in part and remanded on other grounds*, 485 F.3d 690 (2d Cir. 2007)).

Nor does the Court find Professor Hubbard's opinions inadmissible on the basis that he has not "perform[ed] any analysis to confirm whether the studies performed relevant analyses or could be reconciled with the relevant facts." (Hubbard Excl. Reply 6.) The sources Professor

Hubbard cites to are plainly relevant.  (*See, e.g.*, Hubbard Rep. ¶ 44 n.52 (citing to "a CRA

International paper assessing the effects of the Reserve Bank of Australia [] regulations on

consumers" and a research paper finding that banks offered fewer free accounts after the Durbin

Amendment).)  To the extent that the Direct Action Plaintiffs wish to argue that these sources are

not *perfectly* relevant, this is the proper subject of a battle of the experts and of argument at trial.

*See In re LIBOR*, 299 F. Supp. 3d at 471 ("[A] *Daubert* motion is an improper venue in which to

take sides in a 'battle of the experts' offered by competing parties."); *In re Fosamax*, 645 F.

Supp. 2d at 173 ("If an expert's testimony lies within 'the range where experts might reasonably

differ,' the jury, and not the trial court, should 'decide among the conflicting views of different

experts.'" (quoting *Kumho Tire*, 526 U.S. at 153)).

 Similarly, there is no need for Professor Hubbard, a rebuttal witness, to himself model

credit card offerings under reduced interchange.  *See In re Aluminum*, 336 F.R.D. at 34 (stating

that rebuttal expert's "lack of an alternative model does not prevent him . . . from 'tear[ing]

down'" other expert's damages model and "is not grounds for excluding his critique of" the other

expert).  Nor is it necessary that he have experience advising banks whether to undertake his

proposed competitive responses; as discussed above, Professor Hubbard's academic expertise

qualifies him to render the opinions expressed in his report even without professional banking

experience.  (*See* Hubbard Excl. Reply 8.)

 The Court is also unpersuaded by the Direct Action Plaintiffs' argument that Professor

Hubbard "ignored documents that suggested banks would respond to reduced interchange by

reducing expenses," which they claim "alone merits exclusion."  (Hubbard Excl. Mem. 8.)  The

Direct Action Plaintiffs cite to testimony in which Professor Hubbard was asked about a

consumer credit card issuer benchmark study for ▮▮▮▮ from August of 2011.  (*Id.* at 8;

Hubbard Dep. 80:13-18.)  The study included "a summary slide showing various categories of expenses that in this instance ████ incurred in its credit card business." (Hubbard Dep. 81:15–23.)  Professor Hubbard testified that he had not "evaluate[d] in the context of [his] report the ability of an issuing bank to reduce any of these categories of expense in response to a reduction in interchange revenue." (*Id.* at 81:24–82:5.)  Similarly, Professor Hubbard did not use various other information from the report in "evaluat[ing] the likelihood of" his competitive response scenarios, (*id.* at 87:1–91:3), nor did he use two other Visa benchmark studies for that purpose, (*id.* at 91:4–92:24).  The Direct Action Plaintiffs appear to argue that Professor Hubbard should have used specific information about issuer costs to assess whether issuers would have reduced costs in response to reduced interchange instead of employing his proposed competitive responses. (*See* Hubbard Excl. Mem. 8–9; Hubbard Dep. 80:13–92:24.)

The Direct Action Plaintiffs may cross-examine Professor Hubbard at trial about whether he adequately considered the possibility that issuers would reduce costs instead of employing different responses; however, the Court declines to conclude that Professor Hubbard's failure to use data in three specific reports for that purpose shows that he "cherry-pick[ed] data" or "ignored a large amount of information that calls many aspects of [his analysis] into question." (Hubbard Excl. Mem. 8 (first quoting *E.E.O.C. v. Freeman*, 778 F.3d 463, 469–70 (4th Cir. 2015) (Agee, J., concurring); then quoting *In re Rezulin Prods. Liability Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005)).)  Professor Hubbard also repeatedly testified that using the data in the reports to evaluate the likelihood of his proposed responses would have been inappropriate. (Hubbard Dep. 88:6–8 (stating that he "can't imagine why [he] would" use certain information in evaluating the likelihood of his proposed competitive responses); 88:18–19 (again stating that he was "not sure why [he] would" use the report's "analysis of credit processing costs" for that

purpose); 88:24–89:1 (stating that he was not sure why he would use "account management information" for that purpose); 89:14–15 (stating that he did not use the information "regarding the cost of collections" for that purpose because it was "not a topic for Dr. Kohler"); 89:22–23 (stating that he would not use information "regarding potential expense reductions in cardholder servicing" for that purpose "and for the same reason").)  Whether the data in these three reports is relevant to Professor Hubbard's opinions is a proper subject for cross-examination, but even assuming that it is relevant, the Court does not find it a sufficient basis for exclusion.

Finally, the Court is not troubled by Professor Hubbard's testimony concerning whether issuers would undertake his six projected responses to a reduction in interchange revenue. (Hubbard Dep. 74:4–10.)  Professor Hubbard's report states that "issuers would likely respond to reduced interchange in one or more of the following ways."  (Hubbard Rep. ¶ 44.)  Asked at his deposition whether he was "testifying to a reasonable degree of professional certainty that issuers would undertake any of these six scenarios in response to a reduction in interchange revenue," he testified that "some important margin [would] shift in response to the reduction in interchange, but that as a "rebuttal witness," it was not "[his] role" to determine which of his six competitive responses "or others" would be applied.  (Hubbard Dep. 74:4–17.)  Professor Hubbard clearly disclaimed any opinion as to *which* competitive response issuers would employ, but the Court does not interpret his testimony as disavowing his opinion that issuers would likely employ the strategies he described.  The Direct Action Plaintiffs may cross-examine him further about this statement at trial.

### iv.   Professor Hubbard's opinions about Basel III

Professor Hubbard's report "criticizes the risk-weighting of Dr. Kohler's LTV analysis, suggesting it should have varied according to the behavioral characteristics of the cardholder."

(Hubbard Excl. Mem. 10.)  The Direct Action Plaintiffs argue that Professor Hubbard "apparently did not realize . . . that the U.S. Basel III regulations[13] *require* the precise risk-weighing employed by Dr. Kohler."  (*Id.* at 11.)  They point to Professor Hubbard's testimony at his deposition to argue that Professor Hubbard "did not even understand how Basel III related to an LTV analysis" and that "his only 'opinion' was to assert that the regulation somehow 'got it wrong.'"  (Hubbard Excl. Reply 9.)  They further argue that "[a]part from suggesting that Dr. Kohler ignore binding regulations in conducting his analysis, Professor Hubbard does not make any suggestion about how capital should be calculated."  (*Id.*)

Defendants respond that Basel III "establishes minimum capital adequacy ratios for various categories, or tiers, of bank assets, articulated as a percentage of the bank's risk-weighted assets in each of those tiers."  (Hubbard Excl. Opp'n 15.)  However, they claim that this risk-weighting standard "was not designed to facilitate the creation of an LTV model" to distinguish the value of subsets of cardholders.  (*Id.* at 15–16.)  "Indeed, nothing in Basel III requires that its risk-weighting standards for purposes of *bank solvency* be incorporated into an LTV analysis of *credit cardholder value*."  (*Id.*)  Defendants further argue that "even if Basel III were relevant to Dr. Kohler's LTV analysis," "Dr. Kohler's use of a uniform 100% risk-weighting for credit card assets" was "misplaced" if "the goal of his LTV analysis was to differentiate among various categories of cardholders and to rank their value to credit card issuers."  (*Id.*)

At his deposition, Professor Hubbard was asked if he knew "what the Basel III guidance would suggest be applied to the risk-weighted average."  (Hubbard Dep. 202:19–21.)  He replied

---

[13]  Basel III is "an internationally agreed set of measures developed by the Basel Committee on Banking Supervision."  *Basel III: international regulatory framework for banks*, Bank of International Settlements, https://www.bis.org/bcbs/basel3.htm (last visited Oct. 4, 2022).  The Basel III standards are "minimum requirements which apply to internationally active banks."  *Id.*

that he did not recall.  (*Id.* at 202:22.)  Professor Hubbard explained that his critique of Dr.

Kohler's risk-weighting was that "you have got categories that have very different risk exposure

to an institution."  (*Id.* at 203:1–3.)  He stated that "regulation has all kinds of things that don't

capture risk" and that "[t]he question is whether a bank would" weight risk equally in categories.

(*Id.* at 203:3–7.)  Professor Hubbard stated that he "f[ound] it curious that heavy revolvers are

the same [risk] as other categories."  (*Id.* at 203:7–9.)  Professor Hubbard did not recall "whether

Basel III sets requirements . . . when a bank needs to account for the risk-weighted average of

these assets."  (*Id.* at 203:10–13.)  He stated that it would not "make a difference to [his]

criticism" of Dr. Kohler if so: "It might mean that regulation got it wrong, but no, it wouldn't

make a difference."  (*Id.* at 203:15–19.)  Professor Hubbard was then asked whether his view

was that "if the regulatory requirements imposed on issuing banks are wrong, then Dr. Kohler

shouldn't use those regulatory requirements."  (*Id.* at 203:20–23.)  He replied that he did not

know "what purpose Dr. Kohler is doing.  If he is trying to get something that captures banks'

actual look at strategy, that might be problematic."  (*Id.* at 203:24–204:3.)

The Court does not exclude Professor Hubbard's opinion for failing to comply with Basel

III.  Dr. Kohler uses his LTV model to conclude that "[e]ven with significant reductions in

interchange, banks can maintain credit card profitability on an incremental lifetime value basis

without devaluing the rewards and benefits offered to cardholders."  (Kohler Rep. ¶ 106.)  It is

not clear that Dr. Kohler's model must comply with Basel III risk-weighting requirements to

reach this conclusion, given that his purpose does not appear to be compliance with capital

regulations but an accurate model of various cardholders' profitability to issuers.  (*See id.* ¶¶

106–108.)  At most, whether Dr. Kohler's LTV model should comply with Basel III is a matter

of disagreement between experts, and not properly resolved on a *Daubert* motion.  *See Sullivan*

*v. Saint-Gobain Performance Plastics Corp.*, No. 16-CV-125, 2019 WL 12323322, at *16 (stating that whether a certain methodology "is the appropriate choice in this case is an issue that the court will decide on the merits at a future date"); *In re LIBOR*, 299 F. Supp. 3d at 471 ("[A] *Daubert* motion is an improper venue in which to take sides in a 'battle of the experts' offered by competing parties.").

The Court is also unpersuaded by the Direct Action Plaintiffs' argument that "[a]part from suggesting that Dr. Kohler ignore binding regulations in conducting his analysis, Professor Hubbard does not make any suggestion about how capital should be calculated." (Hubbard Excl. Reply 9.) Professor Hubbard clearly opines that Dr. Kohler should not weight the assets of all cardholder categories by the same risk, but rather "account for credit risk" in his LTV model. (Hubbard Rep. ¶ 112.) As a rebuttal witness, he is not required to make a more specific "suggestion." *See re In re Digital Music*, 321 F.R.D. at 78 ("Rebuttal experts . . . have a 'less demanding task' because 'they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' expert[ ]." (quoting *In re Zyprexa*, 489 F. Supp. at 285)).

### v. Professor Hubbard's opinions about interchange "balancing" platforms

The Direct Action Plaintiffs challenge Professor Hubbard's opinion that "interchange is used to 'balance demand and supply on both sides of the [payment card] platform.'" (Hubbard Excl. Mem. 12.) They argue, first, that Professor Hubbard fails to adequately support this opinion. Instead of "conduct[ing] any analysis *himself*," he "relies on a 2006 academic paper by three experts that are currently, or have previously, worked for Visa and Mastercard█████████ ████████████████████████████████████████████ and "a 2008 letter written by the former Chief Executive Officer of Visa to members of the U.S. Senate." (*Id.*) Nor did Professor Hubbard "review any documents or testimony from the record about whether Visa and

50

Mastercard evaluate supply and demand in setting interchange rates," "ask the individuals at the consulting firm that was assisting him" to evaluate these documents, or "consider, much less review, the documentary evidence and sworn testimony in this case about how Visa and Mastercard actually set interchange rates." (*Id.* at 13.)  The Direct Action Plaintiffs argue that not only is Professor Hubbard's opinion unreliable, it also "fails to satisfy the *Daubert* 'fit' and relevance requirements" because it "ignores the facts adduced during the discovery process." (*Id.*)  Second, the Direct Action Plaintiffs claim that at his deposition, Professor Hubbard "back-tracked, testifying that he is '*not* offering [the] affirmative opinion' that Visa and Mastercard actually use interchange to balance demand and supply on both sides of the platform." (*Id.* at 14.)

In response, Defendants argue that Professor Hubbard never offered an opinion that Visa and Mastercard use interchange to balance the two sides of the market.  (Hubbard Excl. Opp'n 17.)  Rather, his "sole reference to the balancing of supply and demand in the two-sided transaction market is in a parenthetical concerning his observation that Dr. Kohler failed to account for other possible competitive responses by issuers to plaintiffs' posited reduction in interchange revenue." (*Id.*)  They argue that none of Professor Hubbard's opinions "depend on whether Visa and Mastercard balance supply and demand on both the merchant and cardholder sides of the network," but that regardless, under *Amex*, "as a matter of law, that is precisely the nature of pricing in the two-sided payment card transaction market." (*Id.*)

In paragraph 42 of Professor Hubbard's report, he states:

> Specifically, [Dr. Kohler's] analyses fail to incorporate any response by issuers (or any other platform participants) to a reduction in interchange—the analyses instead assume that issuers will continue to provide the same level of services to all segments of the industry while being compensated at a substantially reduced level (and similarly assume that all other platform participants will not respond

> to changes in the levels of a mechanism (interchange) that Visa and
> Mastercard use to balance demand and supply on both sides of the
> platform).

(Hubbard Rep. ¶ 42.)  At his deposition, Professor Hubbard was asked whether he was "offering

in this case the opinion that Visa and Mastercard use interchange to balance demand and supply

on both sides of the platform."  (Hubbard Dep. 108:16–19.)  He replied: "I am not offering that

affirmative opinion."  (*Id.* at 108:20–21.)  He also testified that such a premise was not

"necessary for any of the opinions that [he does] offer in the case."  (*Id.* at 108:22–25.)

Because Professor Hubbard claims not to opine that Visa and Mastercard use interchange

to balance supply and demand, and because paragraph 42 creates the misleading opinion that he

does offer this opinion, the Court excludes the following parenthetical phrase: "(and similarly

assume that all other platform participants will not respond to changes in the level of a

mechanism (interchange) that Visa and Mastercard use to balance demand and supply on both

sides of the platform)."  (Hubbard Rep. ¶ 42.)  *See Devito v. Smithkline Beecham Corp.*, No. 02-

CV-745, 2004 WL 3691343, at *5 (concluding, where expert "expressly disavowed" opinions

attributed to him, that "if [the expert] has not formed the opinions which [the] plaintiff is

ascribing to him, necessarily he has no foundation, scientific or otherwise, for same").

Defendants argue that "as a matter of law" it is the case that Visa and Mastercard balance supply

and demand on the merchant and cardholder sides of the network.  (Hubbard Excl. Opp'n 17.)

While *Amex* holds that credit card networks "must find the balance of pricing that encourages the

greatest number of matches between cardholders and merchants," it does not hold that Visa and

Mastercard *do* appropriately balance the cardholder and merchant sides of their platform or that

they use interchange to do so.  *Ohio v. American Express Co.*, 138 S.Ct. 2274, 2286 (2018)

("*Amex*").  Interpreting *Amex* this way amounts to a holding that credit card networks cannot use

anticompetitive strategies to raise interchange fees.  Rather, whether Visa and Mastercard use

52

interchange to balance supply and demand is a disputed issue in this litigation.  (*See* Equitable Relief Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. Under *Amex* 11, Docket Entry No. 8168 (stating that "[t]he defendants offer the explanation that the [competitive] restraints' purpose and effect is to 'balance' the prices paid by cardholders and merchants" but that "Plaintiffs offer an entirely different explanation").)  Because Professor Hubbard is clear that he does not opine that Visa and Mastercard use interchange to balance the two sides of the market, (Hubbard Dep. 108:16–21), the Court excludes the misleading parenthetical in paragraph 42.

### vi.   Professor Hubbard's opinions about commercial cards

The Direct Action Plaintiffs argue that Professor Hubbard "opines on the general profitability of commercial cards without *any* regard to how they are placed within the bank's organization and accounted for."  (Hubbard Excl. Mem. 14.)  They also argue that Professor Hubbard "did *no* analysis to evaluate, and does not in fact dispute, Dr. Kohler's findings [] 'that issuing banks issue commercial cards as part of strategies to develop corporate cash management relationships with large and small business.'"  (*Id.* at 15.)  Nor does he offer an opinion "about whether commercial cards would be offered in the but-for worlds presented by the Direct Action Plaintiffs' experts."  (*Id.*)  The Direct Action Plaintiffs further argue that Professor Hubbard "entirely ignores how a reduction in interchange would impact 'banking relationships with commercial clients,'" and that as such, his "opinions on commercial card profitability would be misleading and unhelpful to the jury."  (*Id.*)  Finally, they claim that Professor Hubbard "admitted that he lacked experience and an understanding of commercial card accounts" and "ignores relevant facts about how commercial cards work . . . unlike Dr. Kohler (who accounted for banks' separate treatment of commercial cards from consumer cards)."  (Hubbard Excl. Reply 7.)

53

In response, Defendants argue that "Professor Hubbard need not have conducted his own analysis of the effect that a substantial reduction in commercial credit card interchange revenue would have had on the profitability of credit card issuance" to conclude that "a substantial reduction in commercial card interchange revenue would likely have adversely affected the economic profitability of credit card issuance."  (Hubbard Excl. Opp'n 14.)  They note that the Direct Action Plaintiffs' "other experts include commercial credit cards in their 'but for' world analyses," even though Dr. Kohler excludes commercial cards from his profitability analyses. (*Id.* at 14 n.30.)

Professor Hubbard is not required to analyze how commercial cards "are placed within the bank's organization and accounted for," whether "issuing banks issue commercial cards as part of strategies to develop cash management relationships with large and small businesses," "whether commercial cards would be offered in the but-for worlds presented by the Direct Action Plaintiffs," or "how a reduction in interchange would impact 'banking relationships with commercial clients'" in order to critique Dr. Kohler's opinions.  (Hubbard Excl. Mem. 14–15.) *See Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-CV-681, 2015 WL 5459662, at *12 (S.D.N.Y. Sept. 16, 2015) ("There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party."); *Henkel v. Wagner*, No. 12-CV-4098, 2016 WL 1271062, at *12 (S.D.N.Y. Mar. 29, 2016) (stating that rebuttal expert "does not need a 'model or theory' to identify purported flaws in [the opposing expert's] testimony" but rather "needs only her expertise and the 'method' identified at the beginning of the report — namely, reviewing the documents in this case, along with [the opposing expert's] report, and arriving at an opinion").

54

The Direct Action Plaintiffs also argue that Professor Hubbard "admitted that he lacked experience and an understanding of commercial card accounts," citing to testimony from Professor Hubbard's deposition in which he testified, in response to a report prepared for Mastercard by a consulting firm, that he had not known about certain specific "aspects of commercial card products when [he was] preparing [his] report."  (Hubbard Excl. Reply 7; Videotaped Deposition of R. Glenn Hubbard ("Hubbard Dep. 2") 161:13–162:18, annexed as Ex. 10 to Wilson Decl., Docket Entry No. 8496-1.)  He also testified that none of these aspects would have made a difference in his report if he had known about them.  (*Id.* at 162:19–23.)  This does not constitute an admission that Professor Hubbard is not qualified to render opinions on commercial credit cards.  At most they show that Professor Hubbard is unfamiliar with certain specific aspects of commercial cards, which the Direct Action Plaintiffs may cross-examine him about at trial.

Finally, the Direct Action Plaintiffs argue that Professor Hubbard "ignores relevant facts about how commercial cards work (*e.g.*, where they fit into a bank's organization and how they are accounted for in terms of evaluating profitability), unlike Dr. Kohler (who accounted for banks' separate treatment of commercial cards from consumer cards)."  (Hubbard Excl. Reply 7.)  The Direct Action Plaintiffs support this claim with citations to portions of Professor Hubbard's deposition in which he testified that he did not "ask anyone why" Visa "didn't include commercial credit cards" in a benchmark study for ███████ (Hubbard Dep. 82:10–14), had no opinion regarding whether "issuing banks issue commercial cards as part of strategies to develop corporate cash management relationships with large and small businesses," (*id.* at 235:21–236:5), and had not "looked at what percentage of commercial card products come from other aspects of the issuing bank's relationship with the cardholder," (Hubbard Dep. 2 at 166:13–20).

To the extent the Direct Action Plaintiffs argue that Professor Hubbard's commercial cards opinions should be excluded because he does not agree with Dr. Kohler about whether to treat them separately from consumer cards, this is not a proper grounds for exclusion under *Daubert*.  *See In re LIBOR*, 299 F. Supp. 3d at 471 ("[A] *Daubert* motion is an improper venue in which to take sides in a 'battle of the experts' offered by competing parties."); *Daubert*, 509 U.S. at 595 (stating that the focus of the *Daubert* inquiry "must be solely on principles and methodology, not on the conclusions that [experts] generate").  Nor does the Court exclude Professor Hubbard's opinions on the basis that he "ignore[d] relevant facts about how commercial cards work."  (Hubbard Excl. Reply 7.)  The "facts" highlighted by the Direct Action Plaintiffs relate to where commercial cards are placed in a bank's organization and the role commercial cards play in banks' relationship with businesses.  As stated above, however, Professor Hubbard is not required to develop an opinion on every aspect of commercial credit cards in order to critique Dr. Kohler's opinions, including how commercial cards "are placed within the bank's organization and accounted for" or whether "issuing banks issue commercial cards as part of strategies to develop cash management relationships with large and small businesses."  (Hubbard Excl. Mem. 14–15.)  Notably, Professor Hubbard does not specifically dispute Dr. Kohler's opinion that "[c]ommercial cards are accounted for in the commercial or corporate banking segment and are part of a broader and more holistic client engagement strategy."  (Kohler Rep. ¶ 59.)  Rather, he critiques Dr. Kohler's claim that "banks will 'sell some of the cash management product at a discount in order to win client discounts," arguing that the "two documents from Visa and Mastercard" that Dr. Kohler cites in support "do not support [his] claim."  (Hubbard Rep. ¶ 68.)  Professor Hubbard may criticize a single assertion in Dr. Kohler's report without developing opinions about related matters.

### vii.   Conclusion

The Court grants the Direct Action Plaintiffs' motion to exclude the report and opinions of Professor Hubbard as to the phrase "(and similarly assume that all other platform participants will not respond to changes in the levels of a mechanism (interchange) that Visa and Mastercard use to balance demand and supply on both sides of the platform)" in paragraph 42 of Professor Hubbard's report and otherwise denies the motion.

### d.   Motion to exclude report and opinions of Barbara E. Kahn

The Direct Action Plaintiffs move to exclude the report and opinions of Professor Barbara E. Kahn (Kahn Mot.), an expert witness for Defendants.  (Expert Report of Barbara E. Kahn ("Kahn Rep.") ¶ 6, annexed to Wilson Decl. as Ex. 1, Docket Entry No. 8497-1.)

### i.   Professor Kahn's background and expert report

Professor Kahn is the Patty and Jay H. Baker Professor of Marketing and former Director of the Jay H. Baker Retailing Center at the Wharton School at the University of Pennsylvania. (Kahn Rep. ¶ 1.)  She also holds a faculty position at the Perelman School of Medicine and is a member of the graduate faculty group of the Department of Psychology at the University of Pennsylvania.  (*Id.*)  Professor Kahn has taught, published, and consulted extensively on consumer behavior and decision making.  (*Id.* ¶ 3.)  She has held leadership roles at multiple consumer research and marketing science organizations and editorial roles on multiple consumer research and marketing journals.  (*Id.* ¶ 4.)

Professor Kahn submitted an expert report in this matter in December of 2009, "review[ing] the characterizations of the Network Rules."  (*Id.* ¶ 7.)  Her assignment in her current report is "the same as it was in 2009, but taking into account the new allegations and developments."  (*Id.* ¶ 8.)  She opines that "[t]he absence of the Network Rules would undermine

the ability of Visa and Mastercard to deliver consistently on their brand promises of universal acceptance and convenient transactions." (*Id.* ¶ 18.) Further, the removal of the Network Rules would "create frustration and confusion for consumers." (*Id.* ¶ 20.)

Professor Kahn begins her report with an overview of competition in "today's highly competitive retail environment." (*Id.* ¶¶ 22–26.) She introduces the "Kahn Retailing Success Matrix," a two-by-two matrix with columns representing "'retail proposition' (*i.e.*, consumer value through product benefits and consumer experience)" and rows representing "'superior competitive advantage.'" (*Id.* ¶ 24.) The resulting matrix has four quadrants: the brand quadrant, the experiential quadrant, the low price quadrant, and the frictionless quadrant. (*Id.* ¶¶ 24–25.) Professor Kahn states that Visa and Mastercard "help retailers deliver superior consumer value in two quadrants: (1) the brand quadrant, by providing value to their end-users through the Visa brand and Mastercard brand promises, and (2) the frictionless quadrant, by helping to provide a convenient and hassle-free transaction at the [point of sale ("POS")]." (*Id.* ¶ 26.)

Next, Professor Kahn discusses the importance of brands and firms' strategies for protecting their brands. (*Id.* ¶¶ 27–57.) She explains that brands influence consumer choice, (*id.* ¶¶ 29–32); that brands are valuable assets, (*id.* ¶¶ 33–36); that brands like Visa and Mastercard follow branded house strategies, in which "a single brand name . . . is used for product offerings in multiple product markets," (*id.* ¶¶ 37–39); that firms must control their marketing to deliver the brand promise, (*id.* ¶¶ 40–48); and that firms follow a variety of strategies to protect their brands, (*id.* ¶¶ 49–57.)

Professor Kahn then discusses Visa's and Mastercard's brands specifically. (*Id.* ¶¶ 58–77.) She states that both networks "built and strategically positioned their brands around core

promises of universal acceptance and convenient transactions." (*Id.* ¶ 58.)  She describes the historical development of Visa's and Mastercard's brands, which she states were positioned "from their very inception on the concepts of universal acceptance and convenience." (*Id.* ¶¶ 59–69.)  In addition to their advertising, both brands have reinforced these concepts through "different marketing activities" like "sponsorships, public relations, and other initiatives that reinforced the respective brand's positioning." (*Id.* ¶¶ 70–77.)

Professor Kahn describes the benefits that Visa and Mastercard provide to retailers and consumers in the brand quadrant of the Kahn Matrix.  (*Id.* ¶¶ 78–85.)  She states that "Visa's and Mastercard's consistent delivery on their brand promises benefits retailers through association and co-branding." (*Id.* ¶ 78.)  Further, their delivery on their brand promises also benefits consumers "because consumers can trust that wherever they use their Visa or Mastercard cards, their purchase experience will be easy and convenient thanks to, among other things, a universally accepted means of payment." (*Id.* ¶ 80.)  Next, Professor Kahn describes Visa and Mastercard's benefits to retailers in the frictionless quadrant of the Kahn Matrix.  (*Id.* ¶¶ 86–96.)  Visa and Mastercard "help retailers provide frictionless shopping experiences to their consumers, including through the enablement of technologies such as mobile POS and self-checkout." (*Id.* ¶ 86.)  Professor Kahn states that "[m]obile ordering, self-checkout, and cashless strategies are examples of payment processes and technologies that are facilitated by Visa's and Mastercard's delivery on their brand promises and further contribute to a frictionless shopping experience. (*Id.* ¶ 92.)  Professor Kahn also describes the benefits of the Visa and Mastercard brands to banks, explaining that "being associated with the Visa brand or the Mastercard brand can help enhance a bank's credibility and image." (*Id.* ¶¶ 97.)

Next, Professor Kahn claims that Visa and Mastercard's rules provide protection to their respective brands, beginning with the HAC rules. (*Id.* ¶¶ 98–147.) She says that the HAC rules protect the Visa and Mastercard brands "by ensuring positive POS experiences that are consistent with these brands' respective positioning on universal acceptance and convenient transactions." (*Id.* ¶ 101.) Eliminating the HAC rules "would strip the Visa and Mastercard brands of the very premises on which they were built." (*Id.* ¶ 103.) The no-surcharge rules "further help ensure cardholders' expectations of the brand promises of universal acceptance and convenience are not violated at the POS." (*Id.* ¶ 116.) Frustration from being surcharged "can translate to negative consumer sentiment toward the network brand" and "negatively affects payment card usage and creates friction at the POS." (*Id.* ¶¶ 117–118.) Professor Kahn next addresses "[t]he Visa and Mastercard rules that Plaintiffs refer to as 'Anti-Discrimination Rules,' which specifically relate to discounting and other forms of POS steering." (*Id.* ¶ 128.) She claims that these rules "help prevent Visa or Mastercard cardholders from experiencing disadvantages or limitations at the POS relative to consumers using other payment forms, particularly other payment cards." (*Id.* ¶ 128.) Next, Professor Kahn notes that Visa and Mastercard formerly had No Minimum Purchase Rules, "which prohibited retailers from limiting a consumer's use of a Visa or Mastercard card to a minimum or maximum transaction amount." (*Id.* ¶ 142.) She claims that these rules "protected the Visa and Mastercard brands by delivering on the promises of universal acceptance and convenient transactions through providing a convenient POS transaction regardless of the transaction amount." (*Id.*) Although "legislation passed in 2010 requires payment-card networks . . . to allow retailers to impose minimum purchase amounts of up to $10 on credit card transactions," Visa and Mastercard "have still taken steps, to the extent permitted under the legislation, to mitigate the POS friction that flows

60

from these minimum purchase amounts." (*Id.* ¶ 143.)  Finally, Professor Kahn addresses the No Competing Marks Rules, which "prohibit Visa and Mastercard cards from bearing the mark, or network linkage . . . of a competing general purpose payment card network." (*Id.* ¶ 145.)  She claims that these rules "ensure that Visa's and Mastercard's competitive brand positioning in the marketplace is not compromised." (*Id.* ¶ 147.)

Professor Kahn then responds to Plaintiffs' experts' branding-related opinions. (*Id.* ¶¶ 148–179.)  She claims that although Plaintiffs and their experts characterize the Network Rules "as lacking any legitimate, competitive business reasons," these arguments "do not consider the role brands play in consumer behavior." (*Id.* ¶ 148.)  Professor Kahn addresses Plaintiffs' experts' opinions about how consumer expectations would be different in the but-for world. (*Id.* ¶¶ 150–156.)  Finally, Professor Kahn responds to Plaintiffs' experts' opinions about the effects of network rule changes and business practices on brand value. (*Id.* ¶¶ 163–179.)

### ii.   Relevance of Professor Kahn's opinions

The Direct Action Plaintiffs argue that Professor Kahn's opinions "about marketing and brand management are irrelevant and should be excluded." (Mem. of Law in Supp. of Direct Action Pls.' Mot. to Excl. Rep. & Opinions of Def. Expert Barbara E. Kahn ("Kahn Excl. Mem.") 8, Docket Entry No. 8116.)  They claim that the purpose of the antitrust laws is to protect competition, not competitors, and that therefore "[i]f businesses or their brands suffer because of competition, then that is nothing less than what the antitrust laws require." (*Id.*)  Because Professor Kahn's "purported justifications for allegedly anticompetitive restraints" do not show that the restraints "enhance *competition*, not brand loyalty or marketing consistency," they are not relevant. (*Id.* at 9.)  Further, Professor Kahn "lacks the expertise to offer an *economic* opinion as to whether the restraints in this case 'enhance[] competition' or not," and

indeed offers no such opinion.  (Reply Mem. of Law in Further Supp. of Direct Action Pls.' Mot. to Excl. Rep. & Opinions of Def. Expert Barbara E. Kahn ("Kahn Excl. Reply") 5, Docket Entry No. 8119.) The Direct Action Plaintiffs note that Professor Kahn's opinion that changes to the HAC rules will harm the Visa and Mastercard brands is supported by "*no* empirical analysis." (Kahn Excl. Mem. at 10.)

In response, Defendants argue, first, that the Supreme Court "has recognized that payment card networks . . . compete using the same brand promises that Professor Kahn addresses in her opinions."  (Defs.' Mem. in Opp'n to Direct Action Pls.' Mot. to Excl. Rep. & Opinions of Def. Expert Barbara E. Kahn ("Kahn Excl. Opp'n") 7, Docket Entry No. 8199.) They claim that Professor Kahn's "explanation of how the challenged rules help protect the Visa brand and Mastercard brand, and how Visa and Mastercard compete through those brands, will assist a factfinder in resolving that ultimate question of whether the challenged rules, 'on balance,' enhance competition."  (*Id.* at 9.)  Second, Defendants argue that Professor Kahn's opinions are separately relevant because "they rebut Plaintiffs' assertions that the justifications Visa and Mastercard witnesses have identified for the challenged rules — including brand protection — are illegitimate or a 'pretext.'"  (*Id.* at 10.)

The Court agrees with Defendants that Professor Kahn's opinion is relevant to show that the challenged rules are procompetitive.  Professor Kahn's opinion articulates a potentially valid procompetitive justification for the challenged rules: protecting the brands that Visa and Mastercard use to compete.  This is illustrated by *Amex*, (*see id.* at 7), in which the Supreme indicated that the restraints in that case promoted competition:

> These agreements actually stem negative externalities in the credit-card market and promote interbrand competition.  When merchants steer cardholders away from Amex at the point of sale, it undermines the cardholder's expectation of "welcome acceptance"—the

> promise of a frictionless transaction.  A lack of welcome acceptance at one merchant makes a cardholder less likely to use Amex at all other merchants.  This externality endangers the viability of the entire Amex network.  And it undermines the investments that Amex has made to encourage increased cardholder spending, which discourages investments in rewards and ultimately harms both cardholders and merchants.  Perhaps most importantly, antisteering provisions do not prevent Visa, MasterCard, or Discover from competing against Amex by offering lower merchant fees or promoting their broader merchant acceptance.

*Amex*, 138 S. Ct. at 2289–90 (citation omitted).  Professor Kahn opines that like Amex's antisteering rules, Visa and Mastercard's challenged rules are necessary to protect the "welcome acceptance" that makes the networks viable.  While this argument may or may not be successful on summary judgment or at trial, it is sufficiently relevant for admission.

The Direct Action Plaintiffs attempt to distinguish *Amex*, arguing, first, that the *Amex* Court "did not decide whether American Express's restraints were procompetitive" and held only that "the government had failed to demonstrate that the . . . restraints at issue were anticompetitive."  (Kahn Excl. Reply 3 n.2.)  Plaintiffs are correct that, because the *Amex* Court determined the government had failed to establish anticompetitive effects, it did not reach the second step of the rule of reason analysis, under which "the burden shifts to the defendant to offer evidence of any procompetitive effects of the restraint at issue."  *N. Am. Soccer League, LLC v. U.S. Soccer Fed., Inc.*, 296 F. Supp. 3d 442, 469 (E.D.N.Y. 2017); *see Amex*, 138 S. Ct. at 2285 (stating that "the plaintiffs' evidence is insufficient to carry their burden").  As the quote above shows, however, the *Amex* Court clearly stated that the restraints "promote[d] interbrand competition," leaving the door open to such a procompetitive finding at the second stage in future cases.  *Id.* at 2289.  Even assuming this statement is mere dicta, it usefully illustrates the relevance of Professor Kahn's marketing and brand management opinions.

63

Next, the Direct Action Plaintiffs argue that *Amex* is distinguishable because it concerned American Express's vertical restraints and that "horizontal restraints . . . are analyzed differently under the antitrust laws."  (Kahn Excl. Reply 1.)  Whether this case involves vertical or horizontal restraints, however, is in dispute.  (*Compare* Kahn Excl. Reply 1 (describing "the HAC Rules and other rules at issue here" as "*horizontal* restraints involving virtually every bank that issues payment cards in the United States") *with* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. Under *Ohio v. American Express* ("Amex Mem.") 16, Docket Entry No. 8071) (stating that "the network rules challenged here by downstream merchants are imposed at different levels of distribution and thus are vertical restraints").)  Further, while *Amex* notes that "[a] horizontal agreement between competitors is markedly different from a vertical agreement that incidentally affects one particular method of competition," it does not hold that the agreements that "promote interbrand competition" in the context of vertical restraints cannot serve a similar function in the context of horizontal restraints.[14]  *Amex*, 138 S. Ct. at 2289–90 & n.10.  As stated above, even assuming that *Amex* is not controlling on this point, Professor Kahn's opinions still point to a procompetitive justification for the challenged restraints.  Plaintiffs may argue at trial or on summary judgment that these procompetitive justifications do not apply here or in cases involving horizontal restraints generally, but the Court declines to exclude Professor Kahn's opinions on that basis at the current stage of the litigation.

---

[14]  Further, even if this case does involve horizontal rather than vertical restraints, procompetitive justifications may still be relevant.  *See* William H. Rooney, Timothy G. Fleming, Michelle A. Polizzano, *Tracing the Evolving Scope of the Rule of Reason and the Per Se Rule*, 2021 Colum. Bus. L. Rev. 21–30 (2021) (stating that in evaluating horizontal restraints, the Supreme Court "has maintained a consistent focus on the context of the restraint and whether that context offered the prospect of a legitimate business or consumer benefit").  The Court does not decide at this time whether the restraints in question are horizontal or, if so, how they should be evaluated.

The Direct Action Plaintiffs cite two primary cases to support their argument that brand protection cannot justify horizontal restraints among competitors, (*see* Kahn Excl. Reply 3 (citing *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972); *United States v. Sealy*, 388 U.S. 350 (1967))), but these cases are distinguishable, (*see* Kahn Excl. Opp'n 8 n.4).   *Topco Associates, Inc.* concerned a suit brought by the United States government against Topco, a "cooperative association of approximately [twenty-five] small and medium-sized regional supermarket chains." 405 U.S. at 598.   The government alleged the existence of a "continuing agreement . . . among the co-conspirator member firms acting through Topco . . . that each co-conspirator or member firm will sell Topco-controlled brands only within the marketing territory allocated to it." *Id.* at 601.   The district court held that the practices' anticompetitive effect on the sale of Topco private label brands was outweighed by the procompetitive effects on Topco members' ability to compete with other chains. *Id.* at 606.   In reversing the district court's decision, the Supreme Court held that the district court had erred by "fail[ing] to make any determination as to whether there were per se horizontal territorial restraints in th[e] case and simply applied a rule of reason in reaching its conclusions that the restraints were not illegal." *Id.* at 608.   It found that the restraint was a horizontal territorial limitation and, as such, a "per se violation" of section 1 of the Sherman Act.   *Id.*   The Court noted that it had "consistently rejected the notion that naked restraints of trade are to be tolerated because they are well intended or because they are allegedly developed to increase competition" and that it was "irrelevant" whether it would reach the same conclusion under the rule of reason.   *Id.* at 609. Thus, because the *Topco* Court found the restraints at issue illegal per se, it rejected *all* procompetitive justifications.   This holding does not constitute a rejection of brand-based

65

procompetitive justifications specifically, and it does not mean that courts will reject brand-based justifications in a case in which the restraints are not per se illegal.

In *United States v. Sealy, Inc.*, the United States government sued Sealy, a company "engaged in the business of licensing manufacturers of mattresses and bending products to make and sell such products under the Sealy name and trademark." 388 U.S. 350, 351 (1967).  The government charged that Sealy had "conspir[ed] with its licensees to fix the prices at which the retail customers of the licensees might resell bedding products bearing the Sealy name, and to allocate mutually exclusive territories among such manufacturer-licensees." *Id.*  The Supreme Court found that the "anticompetitive nature and effect" of Sealy's price-fixing activities were "so apparent and so serious that the court will not pause to assess them in light of the rule of reason." *Id.* at 355.  It noted the defendants' argument that "a number of small grocers might allocate territory among themselves on an exclusive basis as incident to the use of a common name and common advertisements, and that this sort of venture should be welcomed in the interests of competition." *Id.* at 357.  However, the Supreme Court declined to even consider this hypothetical situation, finding it "quite different" from the case at hand.  *Id.*  Thus, like the *Topco* Court, the *Sealy* Court refused to consider an argument that brand protection could be a procompetitive justification.  Neither *Topco* nor *Sealy* stands for the proposition that brand protection may *never* constitute a procompetitive justification.

Similarly unpersuasive is the Direct Action Plaintiffs' argument that Professor Kahn's opinion cannot support a procompetitive rationale for the challenged network rules because she "lacks the expertise to offer an *economic* opinion" and "testified that she had formed *no* such opinion."  (Kahn Excl. Reply 5.)  While the issue of expertise is discussed in more detail below, the Court finds that it is not necessary that Professor Kahn reach the economic conclusion that

the challenged rules are procompetitive for her opinion to be relevant on that issue. *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d 1126, 1146–47 (N.D. Cal. 2014) (stating that "a reasonable fact-finder could conclude" from public opinion researcher's survey results "that the NCAA's ban on student-athlete compensation serves a procompetitive purpose").[15]   Even if Professor Kahn's opinion is not sufficient to establish the existence of a procompetitive justification, the "dispositive question [under Rule 702] is whether the testimony will assist the trier of fact . . . not whether the testimony satisfies the plaintiff's burden on the ultimate issue at trial." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 661 (2d Cir. 2016) (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 135 (D.C. Cir. 1996)).  Professor Kahn opines that "[i]n today's highly competitive retail environment," "[o]ne of the ways retailers can differentiate themselves is through the brands that they carry and support," (Kahn Rep. ¶ 22); that the Visa and Mastercard brands provide benefits to retailers, consumers, and banks, (*id.* ¶¶ 78–97); and that the challenged network rules "help protect the core promises of universal

---

[15]   The Direct Action Plaintiffs argue that Defendants misread *NCAA*, claiming that the case actually "underscores the impropriety of Professor Kahn's testimony" because in *NCAA* the defendant's "*economist* relied on the survey results of its public opinion researcher." (*Id.*) *NCAA* states that the defendant relied on the expert reports of both an economist and a public opinion researcher to support its claim that amateurism was a procompetitive justification of the challenged restraint.  *NCAA*, 37 F. Supp. 3d at 1146.  The *NCAA* court specifically found that despite shortcomings in the public opinion researcher's report, "a reasonable fact-finder could conclude *from his survey results* that the [defendant's] ban on student-athlete compensation serves a procompetitive purpose." *Id.* at 1147 (emphasis added).  While it appears that the economist did describe the public opinion researcher's survey results in his report, the Court cited to the public opinion researcher's own report in describing his results and did not indicate that it only relied on his survey questions because they had been mentioned by the economist. *Id.*; Expert Rebuttal Report of Daniel L. Rubinfeld Regarding Merits, *In re NCAA Student Athlete Name & Likeness Litigation*, Case No. 09-CV-1967 (N.D. Cal. Nov. 5, 2013), ECF No. 925-15 at ¶¶ 19, 173–178.  Regardless, neither the economist nor the public opinion researcher made an *economic* argument that the challenged restraint was procompetitive because consumers prefer the amateur nature of college sports; rather, both relied solely on consumer surveys. *NCAA*, 37 F. Supp. 3d at 1147.

acceptance and convenience that their brands are fundamentally positioned on," (*id.* ¶¶ 98–147). The Court concludes that Professor Kahn's opinion will assist the trier of fact in determining whether the challenged rules are procompetitive because they protect the brands that Visa and Mastercard use to compete.  *See In re Perrigo Co.*, 2021 WL 3773461, at \*3 ("An expert's testimony is relevant if it will 'help the trier of fact to understand the evidence or to determine a fact in issue.").

### iii.  Professor Kahn's expertise

The Direct Action Plaintiffs next argue that Professor Kahn's opinions should be excluded because, "to the extent she purports to offer what appear to be economic opinions, she lacks sufficient expertise to render those opinions and failed to conduct the analysis required to support opinions concerning a legitimate procompetitive justification."  (Kahn Excl. Mem. 11.) They claim that Professor Kahn "overreach[es] beyond her marketing expertise" when she "tries to connect her general opinions about brand marketing to the relevant economic factors that will guide the resolution of this case."  (*Id.*)  Further, because Professor Kahn "has not done anything meaningful to investigate the economic issues in the case," she is "in no position to opine about what would happen, even from a marketing perspective, in a hypothetical world in which HAC Rules did not exist."  (*Id.* at 12.)  The Direct Action Plaintiffs point as an example to Professor Kahn's "failure to analyze any 'natural experiments' that show how participants in the payment card industry actually responded to changes to the HAC Rules or to other network rules."  (*Id.*) They acknowledge that Professor Kahn considers the effects of Visa and Mastercard allowing surcharging in Australia and in connection with a proposed class action settlement, but argue that these instances of "limited surcharging" were "not 'natural experiments' at all."  (Kahn Excl. Reply 7.)  They also challenge Professor Kahn's opinion that the application of the HAC rules to

digital payments helps prevent negative consumer experiences at the point of sale, arguing that Professor Kahn "lacks the relevant expertise to offer useful opinions on the economic questions raised by the HAC Rules as they pertain to digital wallets." (*Id.* at 16.) Further, they argue that Professor Kahn's argument about digital payments is undermined by "[t]he advent of digital wallets" and the fact that Visa and Mastercard allow Apple to "selectively accept only *some* Visa and Mastercard cards and not others," which they claim "further refutes Professor Kahn's fundamental premise that even 'a single violation of a branded experience can violate consumer trust.'" (*Id.* at 16–17.)

In response, Defendants argue, first, that "[a]n expert does not need to be an economist to opine about the potential effects of rule changes in a hypothetical but-for world." (Kahn Excl. Opp'n 11.) They argue that "[e]conomic expertise is not necessary to render" Professor Kahn's opinions about "the brand-protection justifications for the challenged rules and how the Visa brand Mastercard brand could be harmed without those protections." (*Id.* at 12.) Next, Defendants claim that Professor Kahn does in fact analyze "several 'natural experiments' in the form of real-world changes to network rules to support her opinions." (*Id.* at 13.) They argue that the Direct Action Plaintiffs' claim that Professor Kahn did not analyze specific natural experiments "boils down to a complaint that Professor Kahn's report does not discuss all of the real-world rule changes or other events they say are relevant," which "is, if anything, a matter for cross-examination." (*Id.* at 13–14.) Defendants further argue that Professor Kahn's opinions about digital wallets "do not require being 'an expert in digital wallets or the associated technology,'" noting that "courts do not require experts to have a 'degree or training narrowly matching the point of dispute in the lawsuit.'" (*Id.* at 15.)

### 1.   Professor Kahn's economic expertise

The Court does not exclude Professor Kahn's opinions as lacking economic expertise. The Direct Action Plaintiffs specifically cite to paragraphs 14, 15, 22, 39 to 41, and 44 of Professor Kahn's report, claiming that she "overreach[es] beyond her marketing expertise" by "tr[ying] to connect her general opinions about brand marketing to the relevant economic factors that will guide the resolution of this case." (Kahn Excl. Mem. 11.)  Paragraphs 14 and 15 are summaries of Professor Kahn's opinions about brands in general and Visa and Mastercard's brands in particular; she opines that a strong brand is an important asset to a firm, that firms invest in building and promoting their brands, that Visa and Mastercard have built and strategically positioned their brands around the core brand promises of universal acceptance and convenient transactions, and that the consistent delivery of these promises have been "instrumental in helping Visa and Mastercard earn consumers' recognition, and cardholders' trust and loyalty." (Kahn Rep. ¶¶ 14–15.)  She is eminently qualified to render these opinions. In paragraph 22 she opines that "[s]trong brands have consistently provided marketers and retailers with a sustainable competitive advantage and a superior way to compete"; that retailers "can differentiate themselves . . . through the brands that they carry and support," including Visa and Mastercard; that Visa and Mastercard have differentiated themselves "through their strong brand positioning and loyalty"; and that Visa and Mastercard help retailers offer strategic advantages through their strong brand names and promises of a superior consumer experience through universal acceptance and convenient transactions. (*Id.* ¶ 22.)  This too is well within Professor Kahn's extensive qualifications in marketing and consumer decisions.  She opines in Paragraphs 39 to 41 that "brand protection is paramount" under a "branded house strategy" because of the risk of brand dilution, brand confusion, and consumers generalizing negative

70

experiences with the brand in one product category to the brand more generally; that brands must ensure consistent consumer interactions to successfully leverage the equity of their brands, and that they generally develop quality control practices or rules to achieve this; that brands must also ensure consistent advertising, distribution, product, and pricing strategies; and that Plaintiffs have recognized the importance of this consistency, "including with respect to payment acceptance practices." (*Id.* ¶¶ 39–41.) These opinions do not run the risk of reaching beyond Professor Kahn's marketing and consumer decision-making expertise. Finally, Professor Kahn opines in paragraph 44 that all messages delivered by the brand "should be consistent with the 'brand promise,'" which "encompasses the intended functional and emotional benefits . . . that the brand is expected to deliver." (*Id.* ¶ 44.) None of the paragraphs cited by the Direct Action Plaintiffs consist of improper economic opinions, or indeed any opinions that are not clearly rooted in marketing and consumer decision-making.

The Direct Action Plaintiffs also cite to Professor Kahn's opinion that if the logos of competing payment networks were displayed on the same cards as the Visa and Mastercard brands, competing brands would be allowed to "strengthen their relative position by free-riding off of the strength and benefits of the Visa or Mastercard brand." (*Id.* ¶ 146.) They argue that Professor Kahn is "unequipped to offer any economic opinion that the HAC Rules promote competition by protecting 'free riding.'" (Kahn Excl. Mem. 11 n.12.) This is a misreading of Professor Kahn's report; Professor Kahn uses "free-riding" to express a danger to Visa and Mastercard's *brands*, not an argument about the more general economic phenomenon of free-riding. Similarly unpersuasive is the Direct Action Plaintiffs' criticism of Professor Kahn's opinion that "smaller issuers can 'compete for cardholders' business' by issuing Visa and Mastercard branded credit cards." (*Id.* at 12 n.13.) The Direct Action Plaintiffs argue that

Professor Kahn is "in no position" to offer this argument because she "did not evaluate the rationale for the HAC Rules, or other network rules, from the perspective of issuing banks" and "made no effort to conduct an economic evaluation of the 'but-for world.'" (*Id.* at 12 & n.13.) The challenged paragraph explains that Visa and Mastercard offer branding benefits to card issuing banks because "being associated with the Visa brand or the Mastercard brand can help enhance a bank's credibility and image," and that the Visa and Mastercard brands allow smaller banks in particular to "compete for cardholders' business with much larger banks because the payment cards they issue will still be accepted everywhere Visa and Mastercard cards are accepted." (Kahn Rep. ¶ 97.) This opinion is squarely focused on the uses and benefits of *branding*, not issuer competition more generally.

### 2. Professor Kahn's but-for world opinions

The Court also rejects the Direct Action Plaintiffs' argument that Professor Kahn is unqualified to opine "as to what Visa and Mastercard would have to do in the absence of HAC Rules." (Kahn Excl. Mem. 11.) In the final section of her report, Professor Kahn responds to certain of Plaintiffs' experts' claims about the but-for world. (Kahn Rep. ¶¶ 148–179.) First, she addresses Plaintiffs' experts' opinion that "if different consumer expectations in [the but-for world] . . . had been established, that would not create confusion at the POS or meaningfully injure Visa's or Mastercard's businesses." (*Id.* ¶ 149.) She disagrees, claiming that if the Visa and Mastercard brands in the but-for world were "not positioned around the promises of universal acceptance and convenient transactions," then the brands would be "far weaker and less successful," while if the brands were positioned around the same promises but did not deliver, "consumers . . . would likely respond negatively." (*Id.* ¶¶ 151–152.) Professor Kahn supports her claims with statements about branding and marketing more generally, citing to

sources including her own book and other "[m]arketing literature." (*Id.*)  Because this analysis is entirely based on marketing rather than economics more generally, Professor Kahn is fully qualified to offer it.

Next, Professor Kahn responds to Plaintiffs' experts' opinion that in the but-for world, "merchants, card issuers, Visa, and Mastercard would message and prepare consumers" for changes to the network rules; "that consumers would adapt, and develop new expectations"; that consumer confusion at the point of sale "could be addressed through effective POS signage and messaging"; and that the result "would be no impairment to Visa or Mastercard and their respective commercial success." (*Id.* ¶¶ 153–154.)  Professor Kahn argues that Plaintiffs' experts "do not consider the branding implications of their assumptions about consumer adaptation," citing to her own book about branding to argue that disruption of consumer expectations "would undermine each brand's association with the pillars of their positioning in the marketplace." (*Id.* ¶¶ 153, 155.)  She cites to "branding literature suggest[ing] that lack of delivery on the brand's promise would be likely to decrease affinity for and loyalty to the brand, and may decrease consumers' purchase, usage, and recommendation of the brand to others." (*Id.* ¶ 156.)  Professor Kahn goes on to "highlight important questions" about the suggested signage at the point of sale, challenges Plaintiffs' experts' opinions that consumers would not experience any confusion or dissatisfaction after their first experience with the new signage, notes that consumers can still experience dissatisfaction even after they are no longer surprised by the new payment experience, and cites to evidence that preventing negative experiences is "particularly important for brands related to financial services." (*Id.* ¶¶ 157–161.)  The Court finds that all of this but-for world analysis is squarely within Professor Kahn's domain.

Finally, Professor Kahn responds to Plaintiffs' experts' specific opinions regarding the effect of network rule changes on brand value.  She first addresses Professor Harris's opinion that "Visa's and Mastercard's profitability and stock price performance" after certain network rule changes "are proof that removal of the Network Rules would not harm the brands."  (*Id.* ¶ 163.)  Professor Kahn argues that Professor Harris's analysis fails to "isolate the value of the brand from other aspects of the business" and "overlooks or does not consider consumers' reactions to these changes to the Network Rules due to regulation."  (*Id.* ¶¶ 164, 166.)  Further, because these regulatory changes "do not remotely approach a blanket removal of the [n]etwork [r]ules that Plaintiffs propose," Professor Harris's observations "cannot be used to make extrapolations to what would happen to the Visa brand and the Mastercard brand . . . in the but-for world."  (*Id.* ¶ 165.)  As discussed above, this but-for world critique does not exceed Professor Kahn's marketing and consumer decision-making bailiwick.

Next, Professor Kahn considers "examples of purported exceptions to the Network Rules due to Visa's or Mastercard's own actions . . . that [Plaintiffs' experts] say have not materialized in harm to Visa or Mastercard."  (*Id.* ¶ 167.)  She begins by noting that none of these purported exceptions "resembles a blanket removal of the Network Rules"; that some of the purported exceptions "never meaningfully materialized in the marketplace"; and that the exceptions that did materialize "did so in an idiosyncratic context where one would not expect them to undermine Visa's and Mastercard's respective brand positioning."  (*Id.* ¶ 168.)  She then addresses Professor Harris's opinion that "Visa's purported exceptions to its Honor-All-Cards Rules and No-Surcharge Rules for ChaseNet undermine Visa's justification for these rules."  (*Id.* ¶ 169.)  Professor Kahn claims that Professor Harris "did not consider the implication that exclusive Chase Visa card acceptance would be unlikely to have violated consumers'

expectations because consumers had previously not expected general Visa card acceptance at these retailers." (*Id.* ¶ 170.) Further, ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

Next, Professor Kahn addresses Professor Harris's opinion that "Visa's and Mastercard's allowance of convenience fees charged to card payments in certain markets or industries . . . undermines the brand protection claims for the Visa and Mastercard" network rules. (*Id.* ¶ 172.) She notes that the markets or industries that charge convenience fees "are all markets or industries where card payments were historically not accepted." (*Id.* ¶ 173.) Thus, "[b]ecause consumers do not expect payment cards to be an available method of payment in this context . . . then they will not feel the same violation of trust" when confronted with the additional fee. (*Id.*)

Next, Professor Kahn addresses Professor Hausman's and Professor Harris's citation of "payment cards that are intentionally restricted to specific types of transactions" as "another example of a purported exception to Visa's and Mastercard's Network Rules with no materialized harm." (*Id.* ¶ 174.) Professor Kahn states that restricted use cards "do not undermine the brand promise of convenient transactions because they can be used with substantially less friction than other payment alternatives." (*Id.* ¶ 175.) Further, because "the issuer rather than the retailer restricts the locations and types of transactions that can be performed with" a restricted use card, "there is no expectation that these cards would be accepted elsewhere." (*Id.* ¶ 176.)

Finally, Professor Kahn addresses a series of claims by Professor Harris, beginning with his assertion that "Visa and Mastercard did not prevent issuers from engaging in, or punish

issuers in response to, deceptive and abusive practices that would result in negative consumer experiences with the Visa and Mastercard brands," and that this lack of action by Visa and Mastercard "demonstrates that no brand harm occurs." (*Id.* ¶ 177.) She argues that consumers are unlikely to associate these practices with Visa's and Mastercard's brand promises because, first, practices like Wells Fargo's practice of opening new payment card accounts without consumer consent have no bearing on Visa and Mastercard's core brand promises of universal acceptance and convenient transactions, and, second, coverage of the Wells Fargo example typically mentioned Visa and Mastercard rarely if at all. (*Id.* ¶ 178.) Next, Professor Harris claims that Visa and Mastercard allow comparative advertising among issuers, including disparaging competing rewards cards. (*Id.* ¶ 179.) Professor Kahn argues that the Visa and Mastercard brands "relate primarily to the purchase payment transaction," while benefits like rewards "do not directly impact the Visa or Mastercard brand promises about the payment experience." (*Id.*) Finally, Professor Harris opines that the fact that some issuers have received permission to move the Visa and Mastercard logos to the back of certain cards "undermines brand-protection justification for rules governing the placement of the Visa and Mastercard logos." (*Id.*) Professor Kahn argues that placement of a brand logo is less important than violations of the HAC and no-surcharge rules and that Professor Harris "does not acknowledge that the practice of putting the Visa logo on the back of the card was part of a pilot program that is no longer in practice." (*Id.*)

While all the opinions described above relate in some way to the but-for world, all are also grounded in marketing and consumer decision-making in general and branding in particular. To the extent that Professor Kahn is not specifically an expert in branding as applied to payment cards, she is nevertheless qualified as the caselaw is clear that experts may be qualified based on

their general expertise even when they lack more specific expertise in the industry in question. *See Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04-CV-7369, 2006 WL 2128785, at *6 (S.D.N.Y. July 28, 2006) ("It is not important that [the expert] does not have specific training in the field of optometry or experience related to the eye care profession because his opinions involve financial rather than industry specific analysis.").  The Direct Action Plaintiffs do not argue, however, that Professor Kahn merely lacks payment card experience; rather, they claim that because she is not an economist and has not "investigate[d] the economic issues in the case," she is "in no position to opine about what would happen, *even from a marketing perspective*," in the but-for world.  (Kahn Excl. Mem. 12 (emphasis added).) The Court disagrees.  *See Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 178 (N.D. Cal. 2015) (allowing bioethicist's opinion "regarding the various ethical concerns associated with donor compensation" to "support a conclusion that physicians' ethical judgments influence compensation levels in ways that may not be responsive to market forces" which in turn "is relevant to understanding whether [the economic expert's] statistical models can accurately predict the value of donor compensation").[16]

### 3.  Professor Kahn's failure to consider natural experiments

The Court also does not exclude Professor Kahn's opinion due to her failure to consider certain "natural experiments."  The Direct Action Plaintiffs point specifically to the fact that Professor Kahn "did not analyze the impact of the changes to Visa and Mastercard arising from

---

[16]  The Direct Action Plaintiffs argue that Defendants' citation to *Kamakahi* is "misplaced" because the bioethicist's opinions were relevant to understanding the accuracy of statistical models, the court stated that the motion to strike "present[ed] a close question," and the bioethicist's testimony was only admissible "for the *very limited purpose*" for which the defendants sought to admit it.  (Kahn Excl. Reply 6 n.7.)  None of these facts invalidate *Kamakahi* as an example of a court admitting a non-economist's opinion as relevant to economic projections.

the *Visa Check* settlement," which "presented the same risk to the Visa and Mastercard brands as supposedly exists in this case" and "refutes [Professor Kahn's] claim that Visa and Mastercard could not (without damage) adjust their brand messaging to account for competition." (Kahn Excl. Mem. 12–14.)

While it is true that courts have rejected expert testimony where the expert has "ignored a large amount of information that calls many aspects of [the expert's] theory into question," *In re Rezulin*, 369 F. Supp. 2d at 425, courts in other circumstances have found that an expert's "failure to discuss" contradictory evidence "is not so glaring as to render his opinion unreliable or inadmissible," *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 466 (S.D.N.Y. 2016). In *Rezulin*, the plaintiffs' experts opined that Rezulin (the brand name of a drug called troglitazone) was "capable of causing liver injury 'silently,' that is without markedly elevating liver enzymes, and that such injury is a consequence of a form of liver cell death, known as apoptosis." *In re Rezulin*, 369 F. Supp. 2d at 402, 408. They opined that this apoptosis could be caused through injury to mitochondria. *Id.* at 410. The court noted that the plaintiffs' experts did "not mention that the one study that looked for Rezulin-induced apoptosis in humans failed to find it"; that although one study found that Rezulin induced apoptosis in rat cells, another study failed to induce apoptosis in monkey cells; that troglitazone had been found to induce apoptosis in cancer cells while having no effect on healthy cells; that researchers who found that troglitazone affected human mitochondria did not find evidence of apoptosis at relevant concentrations; that another study failed to find evidence of mitochondria-mediated apoptosis; and that a study that found that troglitazone affected the mitochondria in the liver cells of one diabetic patient did not see the same result in cells from a different diabetic patient. *Id.* at 425–26. It concluded that the scientists had "discussed only the evidence that they believed would advance the plaintiffs' position," *id.* at 426,

and after discussing other problems with the experts' opinions, ultimately excluded the testimony about silent liver injury, *id.* at 438.

In *Mirena*, on the other hand, the defendants proffered an expert to opine about the accuracy of the label on the challenged product Mirena. *In re Mirena*, 169 F. Supp. 3d at 461. He concluded that the label was adequate, that the essential risk information regarding uterine perforation had always been present, and that "the FDA in 2000 would not have accepted a warning that there were reports of migration after insertion, because the FDA, before it approved the Mirena label, struck language to that effect." *Id.* at 461–62. The plaintiffs argued that the expert should not be allowed to opine about the FDA's willingness to accept different perforation warnings because "he failed to consider or analyze the label for Progestasert, another progestin-releasing IUD on the market before Mirena, to which the FDA referred in recommending warnings for Mirena." *Id.* at 465. The court concluded that the expert's failure to analyze the Progestasert label went "to the weight, not the admissibility, of his testimony." *Id.* It stated that "[w]hile the fact that the FDA had approved the Progestasert warning is fair game for cross-examination of [the expert], and seems to undermine his conclusion that the FDA would not have permitted such a warning for Mirena . . . , in these circumstances his failure to discuss it in his report is not so glaring as to render his opinion unreliable or inadmissible." *Id.* at 466.

The circumstances before the Court are more similar to *Mirena* than *Rezulin.* While experts may not cherry-pick studies in order to misrepresent the field in question, they need not address every relevant counterexample. *See Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 440 (E.D.N.Y. 2013) (finding that the materials the defendants cited to did not "conclusively contradict [the expert's] report such that his failure to discuss these articles could render his report

fundamentally flawed").  The Direct Action Plaintiffs may cross-examine Professor Kahn about

the effects of the post-*Visa Check* change in network rules on the Visa and Mastercard brands.

The Direct Action Plaintiffs also point to the natural experiment created by the Durbin

Amendment's requirement that Visa and Mastercard "modify their rules to allow merchants to

decline Visa and Mastercard credit-card transactions under $10."  (Kahn Excl. Mem. 14–15)

Despite this rule change, Professor Kahn acknowledged at her 2019 deposition ███████████████

███████████████████████████████████████████████ (Videotaped Deposition of

Barbara Kahn ("Kahn Dep.") 52:1–53:6, annexed to Wilson Decl. as Ex. 2, Docket Entry No.

8497-1), which the Direct Action Plaintiffs argue undermines the claim in Professor Kahn's 2009

report[17] that "[i]f Visa and Mastercard each are accepted for some transactions but not others, this

could lead to consumer confusion about the brands and their respective brand promises," (Kahn

Excl. Mem. 14–15.)  Professor Kahn comments on the rule change in her 2019 report, claiming

that "Visa and Mastercard have [] taken steps, to the extent permitted under the litigation, to

mitigate the POS friction that flows from these minimum purchase amounts."  (Kahn Rep. ¶ 143.)

The Direct Action Plaintiffs may cross-examine Professor Kahn about the effect of the

Durbin Amendment minimum-transaction rule change, but the fact that Professor Kahn reaches a

different conclusion on this issue than the Direct Action Plaintiffs does not represent an "inability

to analyze the economic issues implicated by her opinions."  (Kahn Excl. Mem. 12.)  *See*

*Amorgianos*, 303 F.3d at 266 (stating that in conducting the *Daubert* inquiry, "the district court

must focus on the principles and methodology employed by the expert, without regard to . . . the

district court's belief as to the correctness of [the expert's] conclusions").  The Direct Action

---

[17] As noted above, Professor Kahn previously submitted an expert report in this matter in December of 2009.  (Kahn Rep. ¶ 7.)

Plaintiffs argue that rather than supporting Professor Kahn's theories about brand protection, Visa and Mastercard's mitigation efforts "demonstrate[] the *feasibility* of brand protection efforts that do *not* involve anticompetitive restraints." (Kahn Excl. Mem. 15.) Again, this is an argument the Direct Action Plaintiffs may make to counter Professor Kahn's opinions. As Professor Kahn notes in her report, "regulatory changes and modifications to the Network Rules . . . do not remotely approach a blanket removal of the Network Rules that Plaintiffs propose." (Kahn Rep. ¶ 165; *see also* ¶ 168.) The fact that Visa and Mastercard were able to mitigate the effect of the minimum-transaction rule change does not necessarily negate Professor Kahn's opinion that less-than-universal acceptance would harm the Visa and Mastercard brands — at least not to the extent necessary to warrant exclusion. *See Amorgianos*, 303 F.3d at 267 ("The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions.").

#### 4.   Professor Kahn's opinions about digital wallets

The Court does not exclude Professor Kahn's opinions about digital wallets. In the relevant paragraphs of Professor Kahn's report, she opines that "Visa's and Mastercard's interpretations and applications of their Honor-All-Cards Rules to digital payments sensibly relate to each network's attempts at protecting the consistent delivery of the core promises of their respective brands to consumers." (Kahn Rep. ¶ 111.) Professor Kahn claims that "[i]f a Visa- or Mastercard-accepting retailer that accepts digital payments . . . refuses to accept Visa or Mastercard payment credentials in a specific mobile wallet," it would create "inconvenience, uncertainty, and increased burden for the cardholder." (*Id.* ¶ 112.) Similarly, "if a retailer accepts certain Visa (Mastercard) payment credentials in a mobile wallet (*e.g.*, Apple Pay) but refuses to accept other Visa (Mastercard) credentials in that same mobile wallet, such behavior

would directly undercut Visa's (Mastercard's) promise of universal acceptance." (*Id.* ¶ 113.) These negative experiences "would also be inconsistent with Visa's and Mastercard's marketing communications and promotional activity regarding different payment form factors." (*Id.* at 114.)

The Direct Action Plaintiffs argue that "[t]he advent of digital wallets" undermines the premise of this opinion. (Kahn Excl. Mem. 16.) The HAC rules "apply to firms that Visa and Mastercard define as *merchants*," but because some digital wallets, like Apple Pay, "are not defined as merchants," "cards issued by thousands of Visa and Mastercard issuing banks do not work on Apple Pay." (*Id.*)

Apple Pay does not necessarily contradict Professor Kahn's opinions: Professor Kahn's report describes the inconvenience that would occur if a *retailer* refused to accept Visa or Mastercard credentials in a digital wallet, but the Direct Action Plaintiffs describe a situation in which *Apple Pay* accepts some Visa or Mastercard cards and not others.[18]  It remains an open question whether Apple Pay's failure to accept all Visa and Mastercard cards undermines Professor Kahn's opinions about digital wallets — a question the Court leaves to cross-examination.  Regardless, Apple Pay does not prove that Professor Kahn's opinions about digital wallets are inaccurate or show that her characterization of digital wallets is "so unrealistic and contradictory as to suggest bad faith." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 306

---

[18]  This distinction is similar to Professor Kahn's claim that restricted use cards "do not undermine the brand promise of universal acceptance" because these cards "are not selectively *accepted*" but "selectively *authorized*," that is, "the issuer rather than the retailer restricts the locations and types of transactions that can be performed with a card." (Kahn Rep. ¶ 176.) Professor Kahn contrasts this situation to one in which "the consumers have expectations that the Network card will be accepted . . . and where the merchant, counter to consumer expectations, determines the Network card will not be accepted at the POS." (*Id.* ¶ 176 n.421.)

(S.D.N.Y. 2015).  Nor does the Court agree with the Direct Action Plaintiffs that Professor Kahn

"lacks the relevant expertise to offer useful opinions on the economic questions raised by the

HAC Rules as they pertain to digital wallets."  (Kahn Excl. Mem. 16.)  Professor Kahn's

opinions about digital wallets are, like her other opinions, limited to the marketing and branding

implications that are the subject of her expertise.

### iv.   Empirical basis of Professor Kahn's consumer confusion opinions

The Direct Action Plaintiffs argue that "[c]onsumers' understanding of a brand is an

empirical question," which is evaluated using "recognized techniques."  (*Id.* at 18.)  They claim

that Professor Kahn does not use empirical analysis to support her opinion that elimination or

modification of the network rules would cause consumer confusion.  (*Id.* at 18.)  Instead, she

cites "the self-serving, hearsay deposition testimony of a handful of Visa and Mastercard

witnesses," which the Direct Action Plaintiffs argue is "an improper effort to use an expert to

transmit hearsay to the jury."  (*Id.* at 19.)  Professor Kahn also relies on survey data, but never

"analyz[ed] the reliability or credibility of the survey data"; rather, she "relied on summaries of

the surveys because they were 'consistent' with some other unidentified data she purported to

have relied upon."  (*Id.* at 19–20.)  Further, the Direct Action Plaintiffs argue that the surveys fail

to support Professor Kahn's opinions because the purpose of the surveys was "to poll 'affluent'

consumers to understand which *predetermined* attributes or characteristics the respondent

believed were associated with one of four payment card networks."  (*Id.* at 20–21.)  They claim

that neither the surveys nor any of the other sources Professor Kahn relied on "addressed the

relevant question: whether selective acceptance would harm the Visa and Mastercard brands."

(Kahn Excl. Reply 8.)

In response, Defendants claim that Professor Kahn "found that the [empirical] data were consistent across sources and also consistent with Professor Kahn's own hypothesis of how Visa and Mastercard are perceived based on her knowledge of their marketing and brand positioning." (Kahn Excl. Opp'n 16.)  They argue that it was not necessary for Professor Kahn to perform her own empirical analysis "because empirical data on consumer perceptions of Visa and Mastercard already existed."  (*Id.* at 17.)  Professor Kahn "properly relies on survey data" provided for Visa and Mastercard between 2002 and 2012, which are "consistent with data from another market research firm" and with "Professor Kahn's understanding of how Visa and Mastercard are perceived."  (*Id.* at 18.)  Defendants claim that Professor Kahn knew the wording of the survey questions and accurately described the survey data in her report.  (*Id.* at 18–19.)  Finally, they claim that Professor Kahn properly relied on the testimony of Visa and Mastercard witnesses and did not "merely parrot [their] testimony" but instead cited it as "one piece of 'corroborative' evidence."  (*Id.* at 19.)

The Court does not exclude Professor Kahn's consumer confusion opinions for lack of empirical support.  First, Professor Kahn's opinions about the but-for world are adequately supported.  The Direct Action Plaintiffs are correct that Professor Kahn does not cite to studies showing how consumers' perception of the Visa and Mastercard brands would change in reaction to elimination or modification of the network rules.  (*See* Kahn Excl. Reply 8.)  However, the sources Professor Kahn cites are sufficient to support her claims.  With regard to the HAC rules, for example, she cites to survey data to show that "consumers understand the brands' core positionings and do expect each brand to deliver on universal acceptance and convenience."  (Kahn Rep. ¶ 102.)  She then cites to "academic marketing and branding literature" about what generally happens when consumers' brand expectations are violated, as

well as Visa and Mastercard representatives' "corroborative" testimony about their "concerns and fears" should the HAC Rules be eliminated.  (*Id.* ¶¶ 102–105.)  Professor Kahn then cites to a book, news articles, and a study documenting "negative consumer response[s] stemming from frustrations at the POS." (*Id.* ¶ 106.)  Next, she cites to testimony from the Plaintiffs that changes to the HAC rules would cause "negative consumer reactions against the retailers themselves," (*id.* ¶ 107), and points to the existence of "similar rules" imposed by other payment networks, (*id.* ¶ 109).

These sources are sufficient to support Professor Kahn's opinions about the impact on the Visa and Mastercard brands of modifying or eliminating the HAC rules.  Professor Kahn's opinion would presumably be more persuasive — and stronger on cross-examination — if she cited to survey data showing that proposed elimination or modification of the network rules caused consumers to view the Mastercard and Visa brands more negatively.  However, sources showing consumers' current impressions of the Visa and Mastercard brands combined with academic literature about the consumer response when brand promises are violated are sufficient to support Professor Kahn's opinions about the Visa and Mastercard brands in the but-for world.  This conclusion is buttressed by Professor Kahn's extensive qualifications in marketing and consumer decision-making.  (*See* Curriculum Vitae, Appendix A to Kahn Rep.); *In re Fosamax*, 645 F. Supp. 2d at 179 ("[T]he more qualified the expert, the more likely that expert is using reliable methods in a reliable manner." (alteration in original) (quoting *Malletier*, 525 F. Supp. 2d at 616)).  The Direct Action Plaintiffs "may cross-examine [Professor Kahn] concerning the evidence or lack of evidence upon which [her] opinion is based."  *Strauss*, 925 F. Supp. 2d at 440.

Second, Professor Kahn is not an improper "conduit" for hearsay testimony.  Although she cites to Visa and Mastercard witnesses' testimony about the confusion they believe would result in the absence of the network rules, she does not simply repeat this evidence "without applying any expertise whatsoever." *Mejia*, 545 F.3d at 197 (quoting *Dukagjini*, 326 F.3d at 58–59).  Rather, Professor Kahn cites to "corroborative" evidence from Visa and Mastercard witnesses to support her analysis informed by the survey data, academic literature, and marketing expertise described above.  (Kahn Rep. ¶ 104.)  The Court does not exclude Professor Kahn's citations to Visa and Mastercard witnesses' testimony.  *See* Fed. R. Evid. 703 (stating that "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted").  Notably, Professor Kahn's report also cites to testimony from Plaintiffs.  (Kahn Rep. ¶ 107.)

Third, the Court does not consider the surveys Professor Kahn relied on or her use of those surveys to be problematic.  The Direct Action Plaintiffs argue that Professor Kahn "did not know how the data for the . . .surveys were obtained," "did not evaluate the . . . surveys for potential biases," and "did not review the data underlying the . . . surveys to determine whether the appropriate conclusions were being drawn."  (Kahn Excl. Mem. 20.)  They also note that "rather than analyzing the . . . surveys' data herself, Professor Kahn relied upon a consulting firm . . . to summarize the . . . surveys in a chart."  (*Id.* at 20 n.27.)  Professor Kahn testified, however, that she "saw the exact wording of the questions for the data that [she] saw recorded," (Kahn Dep. 50:2–8), and that she believed the data was trustworthy because it was "consistent with lots of information that [she] had seen," (*id.* at 55:1–9).  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (Kahn Excl. Mem. 19; Kahn Excl. Opp'n 17 n.8.)  The Direct Action Plaintiffs point to no specific errors or

biases in the survey data.  The Court concludes that they may cross-examine Professor Kahn about the reliability of the surveys at trial, but that the surveys are not so "unrealistic and contradictory" as to preclude admissibility.  *See Washington*, 105 F. Supp. 3d at 306.

Finally, the Direct Action Plaintiffs cite to case law to argue that Professor Kahn's "uncritical reliance on survey data . . . renders her opinion unreliable," but the cases they cite to concern experts who uncritically relied on sources supplied to them by the party retaining them. (Kahn Excl. Mem. 20); *Forte*, 675 F. App'x at 23–24 (affirming district court's decision to exclude expert's report in part because expert "simply input the numbers he was given by [the plaintiff] and used them to calculate pay discrepancies"); *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 69 (S.D.N.Y. 2018) (affirming district court's decision to exclude expert's studies of pairs of defendant's employees where the defendant's counsel "hand-picked the pairs [the expert] discussed in his report" and the expert relied on interviews with the employees' managers).  Professor Kahn's reliance on relevant survey data prepared in a non-litigation context is not comparable to situations in which experts merely recited facts provided by a party or by counsel.  *See Washington*, 105 F. Supp. 3d at 306 ("Unless the information or assumptions that plaintiff's expert [] relied on were 'so unrealistic and contradictory as to suggest bad faith,' inaccuracies in the underlying . . . facts do not generally render an expert's testimony inadmissible." (quoting *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010))).

### v.  Conclusion

The Court denies Direct Action Plaintiffs' motion to exclude the report and opinions of Professor Kahn.

### e.   Motion to exclude report and opinions of David J. Teece

The Direct Action Plaintiffs move to exclude the report and opinions of Dr. David J. Teece (Teece Mot.), an expert witness for Visa.  (Rebuttal Report of David J. Teece, Ph.D. ("Teece Rep.") ¶ 6, annexed to Wilson Decl. as Ex. 1, Docket Entry No. 8503-1.)

### i.   Dr. Teece's background and expert report

Dr. Teece is the Thomas Tusher Professor of Global Business in the Haas School of Business at the University of California, Berkeley, and Chairman and Principal Executive Officer of consulting firm Berkeley Research Group.  (Teece Rep. ¶ 1.)  He has researched and written extensively on topics including business ecosystems, network effects, and multisided market and platforms; published and consulted on topics including public policy and antitrust; and testified as an expert witness in matters including antitrust issues.  (*Id.* ¶¶ 2–4; *see also* Curriculum Vitae, Attachment 1 to Teece Rep.; Expert Testimony of David J. Teece—Last Four Years, Attachment 2 to Teece Rep.)

Dr. Teece's assignment in this case was "to assess the economic and analytical context for the recommended injunctive relief and additional remedies proposed by the experts for the Equitable Relief Plaintiffs . . . and any injunctive relief and additional remedies that other Plaintiffs may propose."  (Teece Rep. ¶ 6.)  He was also asked by Visa "to provide a separate critique of the analytical frameworks proposed by Plaintiffs' experts" and in particular to "comment on the importance of platforms, standards, systems, and ecosystems . . . as well as the adequacy of Plaintiffs' experts' discussion of these issues."  (*Id.* ¶ 7.)  Dr. Teece states that although his report focuses on Professors Stiglitz and Carlton's expert reports, his conclusions "are equally applicable to other cases and the reports submitted by other experts (e.g., Hausman, Harris, and Epstein), to the extent those experts call into question the same aspects of the Visa

payment system that Professors Stiglitz and Carlton question." (*Id.* ¶ 8.) Dr. Teece concludes that Professors Stiglitz and Carlton "pay no attention to Visa's organizational architecture and the role of mechanisms" like the default interchange fee and the HAC rule; "do not analyze whether changing these long-standing mechanisms will undermine the integrity and value of the Visa network (and brand)"; "do not examine the role of the Visa network in enabling and facilitating commerce"; and generally "fail to pay heed to basic principles that ought to guide the analysis of complex business and organizational arrangements." (*Id.* ¶ 16.)

Dr. Teece begins his report by explaining the units of his analysis: platforms and ecosystems. (*Id.* ¶¶ 17–31.) He defines a platform as "an economic institution that (1) brings together diverse sets of economic actors by reducing the costs of transacting for these economic actors; and (2) which coordinates the participation in and usage of the platform by these economic actors by providing appropriate incentives for such participation and usage." (*Id.* ¶ 18.) Many platforms also play a role in "creating new markets and new ways of doing business, and in supporting and hosting businesses that leverage platforms," which in turn is "the *business ecosystem* that emerges around the platform." (*Id.* ¶ 20.) A business ecosystem is "a group of interdependent organizations collectively providing goods and services to their customers." (*Id.*) A platform-based ecosystem features "[s]hared standards and interfaces" that "permit the members of the ecosystem to innovate independently while competing collectively against other firms and/or ecosystems." (*Id.*) Many platforms "play an inherent standardization role in business ecosystems," and these standards "enable interoperability between different elements of the ecosystem." (*Id.* ¶ 24.) As an example, Dr. Teece points to the major payment card platforms' development of "common standards for 'card dimensions, the location for the signature panel, the format for embossed characters, and a consistent account numbering

system." (*Id.*)  Dr. Teece states that standardization "stimulat[es] the development of ecosystems" and that an ecosystem anchored by a platform "benefit[s] from having, at [its] center, organizations that provide rules and key inputs and intellectual property to the benefit of the ecosystem as a whole."  (*Id.* ¶¶ 25–26.)  He defines "enabling technologies" as "those technologies or innovations . . . that are capable of ongoing technical improvement and which enable complementary innovations in application sectors."  (*Id.* ¶ 27.)  Dr. Teece claims that management literature "identifies the risk to the entire ecosystem when a keystone organization — such as a central platform that sets standards — is harmed."  (*Id.* ¶ 28.)  He cites to examples of "platforms (and hence ecosystems) that do not take off or which suffer or even unravel because of their failure to provide the right incentives to a broad enough set of participants."  (*Id.* ¶ 29–30.)

Next, Dr. Teece discusses Visa's history as a platform and ecosystem for electronic payments.  (*Id.* ¶¶ 32–65.)  He claims that Visa "fits the economic paradigm of a platform at the center of a business ecosystem" and that the rule changes advocated by Professors Carlton and Stiglitz "run the risk of eventually fragmenting . . . the Visa network, with an associated detrimental impact on the broader ecosystem (e.g., in e-commerce and payments) that Visa enables."  (*Id.* ¶ 32.)  Dr. Teece argues that Visa "provides a base technology and distribution system to which other companies can add their own innovations, increasing the value for the system as a whole," such as facilitating the emergence of digital commerce and developing new standards for digital wallets.  (*Id.* ¶ 34.)  The Visa platform also "has an important function in providing standardization in payments infrastructure."  (*Id.* ¶ 35.)  Dr. Teece describes early developments in the general-purpose payment card market.  (*Id.* ¶¶ 36–39.)  He then describes Visa's role as an organizational innovator.  (*Id.* ¶¶ 40–55.)  Dr. Teece claims that Visa and

Mastercard contributed the "key organizational innovation" of creating "an 'open' system in which cardholders could use their cards at any merchant that participated in the system, regardless of whether the cardholder's bank was also the merchant's bank." (*Id.* ¶ 41.) Visa "codified" this innovation in the HAC rule, and created interchange as a "settlement system between" the different banks acting for the merchant and consumer. (*Id.*) Visa also "recognized the value of creating a visible brand for its network." (*Id.* ¶ 42.) Dr. Teece describes the success of Visa as a platform, claiming that Visa's "open platform has offered participating banks the benefit of a common set of rules and technologies, including the backbone of a vast electronic payments network developed over several decades." (*Id.* ¶¶ 50–55.) He argues that "the Visa platform facilitated the development of national payment-card products, which might otherwise have taken far longer to develop," (*id.* ¶ 51), and that Visa "has been recognized as a major organizational innovator," (*id.* ¶ 54). Next, Dr. Teece discusses "[t]he value that Visa brings to the payments industry" through "the benefits that merchants and consumers receive from cards" and the "development of numerous complementary innovations made possible by its platform." (*Id.* ¶ 56.) Dr. Teece begins with the "significant economic benefits" that general-purpose payment cards provide "to merchants and consumers alike." (*Id.* ¶¶ 57–58.) He then claims that the "advent and proliferation" of payment-card systems "arguably laid the groundwork for e-commerce platforms and, more generally, digital retail" by providing "a standardized and reliable way in which retailers could transact with customers." (*Id.* ¶ 59.) Finally, Dr. Teece argues that "Visa . . . actively work[s] with ecosystem participants to combat fraud," which has led to the development of technology including digital tokenization and mobile wallets. (*Id.* ¶¶ 60–65.)

In the next section of his report, Dr. Teece argues that "altering foundational aspects of the [Visa] system such as Honor All Cards and default interchange," as proposed by Plaintiffs' experts, "[t]hreaten[s] to [f]ragment the [p]latform." (*Id.* ¶¶ 66–82.) He claims that Visa is "not a typical provider of commoditized goods," but rather "a platform at the center of a payments ecosystem that manages in a coherent way the interdependencies of its multiple users." (*Id.* ¶ 66.) "To facilitate interactions between" thousands of issuing and acquiring banks, "it was necessary for Visa to develop and maintain rules through which the participants in the system would abide." (*Id.*) Dr. Teece argues that Plaintiffs' experts' opinions that the rules should be modified or eliminated "do not fully account for, or at times even stop to consider, the importance of these rules to the Visa system or whether, as a result of altering foundational aspects of the system such as Honor All Cards and default interchange, the rest of the Visa platform would have continued to operate as normal." (*Id.* ¶ 67.)

Dr. Teece specifically critiques the work of Professor Stiglitz, who "believes that the economically desirable outcome involves merchant fees set to reflect competition between issuing banks for merchant acceptance." (*Id.* ¶ 68.) However, Dr. Teece argues, "coordination in one dimension can intensify competition in other dimensions," and Visa's "open model" enables thousands of financial institutions "to engage in competition that would not have existed otherwise." (*Id.* ¶ 69.) Dr. Teece claims that without the HAC rules or default interchange, the Visa network likely could not "have delivered the same benefits," pointing to "the empirical evidence indicating the success of the open platform model" and "the historical difficulties faced by Visa's forerunner when it first began licensing multiple banks without a default interchange rate." (*Id.* ¶ 70–71.) Dr. Teece also argues that "modern economic literature on two-sided platforms provides no support at all to the view that if merchant fees were to be established

through individualized interactions among issuing banks, merchants[,] and acquiring banks, that the level of fee would be more efficient (or generally lower for that matter)." (*Id.* ¶ 71.) He criticizes Professor Stiglitz's statement that it is a "substantial burden" to require antitrust plaintiffs to prove "the consequence of [a] higher price in one market on prices elsewhere" and to show that "there are not beneficial effects anywhere," arguing that this statement is "not applicable to a tight business ecosystem where the very design of the platform and its likely success depends on micro-level interdependencies." (*Id.* ¶ 72–73.) Professor Stiglitz also claims that Visa's rules have caused a decline in total transaction output, but Dr. Teece argues that it is "imperative to consider the role (direct or indirect) of Visa's rules in fostering or enabling new modes of commerce or payment, which perhaps could *increase* the total volume and value of transactions in the economy." (*Id.*) He further argues that Professor Stiglitz "does not analyze" whether selective deals between retailers and banks "would have an impact on the incentives of issuing banks to continue participating in the Visa network," whether "such selective acceptance would have an impact on consumers' confidence in their ability to use Visa cards," whether "a less attractive Visa network . . . would be as powerful an enabler of complementary activity as it has historically been," or whether "developers of new payment options . . . would find alternative platforms that could provide them with the same benefits of ubiquity that Visa currently achieves." (*Id.* ¶ 75.) Professor Stiglitz also claims that "the interchange fee structure is defunct," based in part on the fact that "consumers today can obtain 'many credit cards with no annual fees.'" (*Id.* ¶ 77.) Dr. Teece argues that "the availability of payment cards that have no annual fees today is a function of the network rules that are in place today," such that "[i]mposing changes to those rules are likely to impact the networks' ability to attract cardholders." (*Id.*) Finally, he notes that the HAC rules and the default interchange fee "are

interwoven" and that this "consideration remains important today, regardless of the existence of the type of 'chicken and egg' problems around cardholder and merchant acceptance that Professor Stiglitz dismisses." (*Id.* ¶ 78.)

Next, Dr. Teece addresses the opinions of Professor Carlton, who "does not propose to regulate default interchange rates but to instead promote merchant steering (i.e., surcharging)." (*Id.* ¶ 79.) Dr. Teece claims that this view "is at odds with regulatory developments in the European Union." (*Id.*) He claims that Professor Carlton's "discussion of surcharging does not address participation incentives or the potential for issuers to bypass or defect to payment-card networks that offer protection against surcharging." (*Id.* ¶ 80.) Dr. Teece further contends that Plaintiffs' experts do not "adequately consider whether a combination of surcharging at the point-of-sale, selective acceptance of cards, exclusives involving merchants accepting only one bank's Visa cards, etc. would deter *card usage* by creating uncertainty about card acceptance in general and imposing costs on the consumer" and "whether this reduction in usage would negatively impact the overall volume and level of commerce." (*Id.* ¶ 81.)

Dr. Teece concludes that Plaintiffs' experts "clearly ignore the risk that [eliminating default interchange rates and the HAC rules] will simply dissolve the glue that supports the coherence and congruence of the Visa platform and its associated ecosystem." (*Id.* ¶ 83.) He argues that Professors Stiglitz and Carlton "do not consider the *relationship between Visa's revenues or profits and the social value that its network creates*." (*Id.* ¶ 86.)

### ii. Dr. Teece's opinions about platforms and ecosystems

The Direct Action Plaintiffs argue that Dr. Teece's "broad commentary on 'platforms, standards, systems, and ecosystems' is irrelevant" to the central question for the jury: "whether the HAC Rules restrain or promote competition." (Mem. of Law in Supp. of Direct Action Pls.'

94

Mot. to Excl. Rep. & Opinions of Def. Expert David J. Teece ("Teece Excl. Mem.") 6, Docket

Entry No. 8136.)  They claim that Professor Teece's "general commentary" about standards and

practices focuses on examples like OpenTable and Facebook but mentions payment card

platforms only in the context of "common standards for 'card dimensions, the location for the

signature panel, the format for embossed characters, and a consistent account numbering

system'"—none of which are at issue in this litigation.  (*Id.* at 7 (quoting Teece Rep. ¶ 24).)  The

Direct Action Plaintiffs point to Dr. Teece's concession at his deposition that "none of the

challenged rules in this litigation are the sorts of 'standards' he was referring to in this section of

his report."  (*Id.*)  Nor do any of Defendants' other experts rely on Dr. Teece's opinions about

ecosystems and standards to make more specific arguments about the challenged rules.  (*Id.* at 7–

8.)

        In response, the Visa Defendants argue, first, that *Amex* "confirms that [Dr. Teece's]

opinions are relevant to the central economic questions here."  (Visa Defs.' Mem. in Opp'n to

Direct Action Pls.' Mot. to Excl. Rep. & Opinions of Def. Expert David J. Teece ("Teece Excl.

Opp'n") 6, Docket Entry No. 8202.)  The Visa Defendants note that the *Amex* Court analyzed

American Express's anti-steering provisions under a "'two-sided platform' framework" and

stated that the challenged provisions "actually stem negative externalities in the credit-card

market and promote interbrand competition."  (*Id.* at 7.)  The Visa Defendants argue that Dr.

Teece's opinions about platforms "provide similar context to evaluate the competitive effects of

the challenged Visa rules."  (*Id.*)  Second, the Visa Defendants argue that Professor Teece's

testimony "need not be limited to a critique of Plaintiffs' experts to be relevant and admissible"

and that his "affirmative testimony about platforms will help the factfinder understand the

industry and the procompetitive effects of the challenged rules under the *Amex* framework."  (*Id.*

at 8.)  Third, the Visa Defendants argue that Dr. Teece's "discussion of platforms also serves to support his critique of Plaintiffs' experts' opinions on the subject."  (*Id.* at 9.)  They claim that Dr. Teece explains why Professor Harris and Professor Hausman, as well as the Equitable Relief Class Plaintiffs' experts, "do not adequately consider the role of the Visa and Mastercard platforms or the competitive dynamics in the industry."  (*Id.*)  Finally, the Visa Defendants defend Dr. Teece's use of examples like OpenTable, arguing that "[t]here is nothing unusual or improper about an expert providing examples or analogies to help a factfinder consider complicated concepts."  (*Id.* at 10.)

At his deposition, Dr. Teece was asked whether he considered the HAC rule to be a standard.  (Videotaped Deposition of David Teece, Ph.D. ("Teece Dep.") 151:8-9, annexed to Wilson Decl. as Ex. 2, Docket Entry No. 8503-2; *see also* Teece Dep., annexed to Carney Decl. as DDX120, Docket Entry No. 8547-3.)  He replied: "I wouldn't consider it to be a standard as such.  It's one of those — it's a rule.  And it does lead to certain standardized expectations by consumers, but it — but it's perhaps best thought of as a rule or a guardrail and not — not a standard as such."  (*Id.* at 151:10–15.)  Asked whether default interchange was a standard, he replied "[y]es, in a way," but that it "wasn't what [he] necessarily had in mind when [he] talked about standards."  (*Id.* at 151:16–20.)  Dr. Teece was then asked whether "any of the rules that are at issue in this litigation [are] considered standards to you."  (*Id.* at 151:21–22.)  He replied: "No, I don't consider those standards as such.  They do lead to a certain amount of standardization.  They do facilitate a common network, which, in turn, you know, facilitates and enables standardization."  (*Id.* at 151:23–152:2.)  Opposing counsel asked, "But you're not saying that they're standards within the—."  (*Id.* at 152:3–4.)  Dr. Teece replied, "Correct."  (*Id.* at 152:5.)  He was next asked whether Visa is a standard-setting organization.  (*Id.* at 152:6–7.)

He replied no: "What I'm claiming is that the existence of a keystone entity like Visa facilitates standardization, whether it's done directly or indirectly, for various other standard-setting bodies." (*Id.* at 152:8–12.)  Asked the same question again, he replied, "It facilitates standardization.  Whether you call it a standard-setting body or not is a different matter." (*Id.* at 152:22–24.)

The Court does not exclude Dr. Teece's general opinions about platforms and ecosystems.[19]  These opinions are not "irrelevant" as the Direct Action Plaintiffs argue.  (Teece Excl. Mem. 6.)  Rather, the paragraphs challenged by the Direct Action Plaintiffs form the basis for Dr. Teece's position that Visa is "a platform at the center of a business ecosystem" and that the changes proposed by Plaintiffs' experts "run the risk of essentially fragmenting . . . the Visa network, with an associated detrimental impact on the broader ecosystem . . . that Visa enables." (Teece Rep. ¶ 32.)  The Direct Action Plaintiffs argue that this is irrelevant to "the central question" of "whether the HAC Rules restrain or promote competition." (Teece Excl. Mem. 6.)  However, Dr. Teece's opinion that the HAC rules and other "foundational aspects of the system" may be necessary for the Visa platform to "operate as normal" and to enable its larger commerce ecosystem, (Teece Rep. ¶¶ 32, 67), bear on the question of "whether the HAC Rules . . . promote competition," (Teece Excl. Mem. 6).  As the Visa Defendants note, (Teece Excl. Opp'n 7), the *Amex* Court considered similar factors in concluding that Amex's antisteering provisions "actually . . . promote interbrand competition," *Amex*, 138 S. Ct. at 2289.  The *Amex* Court noted that merchants steering cardholders away from Amex "undermines the cardholder's expectation

_____

[19]  The Direct Action Plaintiffs' argument appears to challenge section III of Dr. Teece's report, which "highlight[s] some of the key concepts" in the economics and management literature concerning platforms and ecosystems.  (*See* Teece Rep. ¶¶ 17–31.)

of 'welcome acceptance,'" which "makes a cardholder less likely to use Amex at all other merchants," "endangers the viability of the entire Amex network," and "undermines the investments that Amex has made to encourage increased cardholder spending."[20]  *Id.*  These considerations are similar to Dr. Teece's opinions that the challenged rules may be necessary for the Visa system to operate, (Teece Rep. ¶¶ 66–67), and that the Visa system has "created substantial efficiencies" and "provided its financial institution members with a common standardized platform . . . from which they could compete with cardholder business," (Teece Rep. ¶ 50).  The Direct Action Plaintiffs argue that this section does not "support any purported procompetitive justifications for the challenged rules" because none of Defendants' other experts "rely upon — or even reference — *any* of Dr. Teece's opinions in attempting to justify the HAC Rules or other network rules for *any* reason."  (Teece Excl. Mem. 7–8.)  However, there is no reason that the section cannot validly support Dr. Teece's own opinion about the procompetitive implications of the network rules.  (*See* Teece Rep. ¶ 50.)

Nor is it problematic that Dr. Teece did not describe the rules challenged in this litigation as "standards."  (Teece Excl. Mem. 7.)  Dr. Teece opines that these rules are "foundational aspects of the [Visa] system" that may be necessary for the system to "operate as normal." (Teece Rep. ¶ 67.)  It is not necessary that they also be "common standards" in the sense defined by Dr. Teece.  (*See id.* ¶ 24.)  Rather, it is sufficient for the relevance of Dr. Teece's opinion that the rules may be necessary for the success of the Visa platform, which in turn provides benefits like standardization to the larger business ecosystem.  (*See id.*)

---

[20]  As described above in relation to the motion to exclude Professor Kahn's report and opinions, even assuming that this portion of *Amex* is dicta, it nevertheless usefully illustrates how Defendants' experts' opinions may support procompetitive justifications of the challenged rules.

Finally, the Court is not concerned by Dr. Teece's use of examples like OpenTable, nor is it concerned that the challenged section of Dr. Teece's report discusses concepts like platforms and ecosystems in general, rather than specific, terms.  The Direct Action Plaintiffs argue that Dr. Teece "has not studied the facts *at all*, and does not explain why his 'analogies' are apt, or 'fit' the facts here."  (Reply Mem. in Supp. of Direct Action Pls.' Mot. to Excl. Rep. & Opinions of Dr. Teece ("Teece Excl. Reply") 8, Docket Entry No. 8141.)  In the context of a section providing background information on business platforms and ecosystems, however, (*see* Teece Rep. ¶¶ 17–31), it is not problematic to discuss concepts generally before applying them to the facts at issue.  *See Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 03-CV-1851, 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008) ("When . . . the alleged confusion in the report in chief turns on a subtle scientific distinction that neither side's experts have previously discussed, it is not only permissible but also obligatory for the rebuttal expert report to provide technical background information adequate to illustrate the point."); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers*, 313 F. Supp. 2d 213, 237 (S.D.N.Y. 2004) ("It is well settled that an expert is free to offer testimony to provide a background for the case.").  Dr. Teece's analogies are similarly appropriate.  By pointing to familiar companies and explaining their business models in the terms of the new frameworks he is presenting, Dr. Teece helps readers understand the potentially unfamiliar concepts of "platform" and "ecosystem."  (*See* Teece Rep. ¶¶ 19, 22, 23.)

### iii.   Dr. Teece's but-for world opinions

The Direct Action Plaintiffs argue that Dr. Teece's "speculative assertions about what would happen" in the but-for world are wholly unreliable because he failed to undertake even the most basic study of the facts or data."  (Teece Excl. Mem. 8.)  They note that "out of *hundreds* of depositions that were taken in this case," Dr. Teece cites to only two, both of Visa witnesses.

(*Id.* at 9.)  Dr. Teece also testified that he did not review any merchant testimony because the "level at which [he] was dealing with these issues" was "not in the weeds."  (*Id.*)  Next, the Direct Action Plaintiffs argue that although Dr. Teece claims that the changes advocated by Plaintiffs' experts run the risk of "fragmenting" the Visa network, he also "testified that he had performed no work to quantify the risk or likelihood of 'fragmentation,' a concept that lacks any accepted, objective meaning in economics."  (*Id.* at 9.)  They contend that Dr. Teece also asserted in his report "that it was 'unlikely' Visa could continue to offer the same services" in the absence of the HAC rules and default interchange, but admitted at his deposition that he had not done "any type of study" of what would happen in the but-for world without these rules.  (*Id.* at 9–10.)  Dr. Teece further testified that modern economic literature "provides no support at all" to the view that merchant fees would be lower or more efficient if they were set through individual transactions between issuers, merchants, and acquirers, but admitted that he "hadn't had a chance to study" whether interchange fees would increase or decrease in the absence of the HAC rules and default interchange, that it "could go either way," and that it was possible that interchange fees would actually decrease.  (*Id.* at 11.)  The Direct Action Plaintiffs also point to Dr. Teece's testimony that the HAC rules and default interchange "remain[] important today" to "maintain and enhance the appeal of the network," despite testifying that he had not analyzed many aspects of the payment card industry between 2004 and the present.  (*Id.*)  Finally, the Direct Action Plaintiffs respond to the Visa Defendants' argument that Dr. Teece's report is appropriate for a rebuttal witness, pointing to caselaw holding that "[t]he standard for evaluating a rebuttal expert is 'the same as for any expert witness."  (Teece Excl. Reply 4.)

In response, the Visa Defendants argue that Dr. Teece does not "opine on what the but-for world would look like" if the challenged rules were changed, but rather "critique[s]"

Plaintiffs' experts for "failing to 'engage with the systemic consequences of changing [Visa's] rules,'" which is "proper rebuttal testimony." (Teece Excl. Opp'n 16.) They claim that Dr. Teece does "*not* offer[] an opinion regarding what the but-for world would look like if these mistakes were corrected." (*Id.* at 16–17.) Further, they argue that Dr. Teece's opinion that modern economic literature "provides no support at all" to the view that merchant fees would be lower or more efficient if they were established through individualized interactions "exemplifies" Dr. Teece's critique "that Plaintiffs' experts fail to engage with a body of economic literature that does not support their opinions." (*Id.* at 17 n.12.) The Visa Defendants also defend Dr. Teece's opinion that the Honor All Cards and default interchange rules "maintain and enhance the appeal of the network to its participants," arguing that "he did not need to analyze data regarding interchange fees, merchant costs, acceptance volume, or issuer profits today to support that observation." (*Id.* at 18.) The Visa Defendants note that rebuttal experts need not "produce models or methods of their own," and argue that "[n]ot all economic analyses require empirical data, let alone data from the record of a given case." (*Id.* at 19–20.)

The Court is not persuaded that Dr. Teece "is *not* offering an opinion regarding what the but-for world would look like." (Teece Excl. Opp'n 16.) While Dr. Teece's report primarily critiques Plaintiffs' experts' opinions, and does not offer specific projections regarding, for instance, interchange fees in the but-for world, (*see* Teece Excl. Opp'n 16–17), in several places his critiques clearly state or imply an affirmative opinion about the but-for world. (*See, e.g.*, Teece Rep. ¶¶ 70 (stating that it "seems unlikely" that a version of the Visa network without the HAC rules or default interchange "could continue" to deliver the same benefits "going forward"); 76 (stating that in Professor Stiglitz's but-for world, "the benefits to participating in the Visa network significantly diminish relative to going it alone"); 77 (stating that imposing

changes to the network rules is "likely to impact the networks' ability to attract cardholders");

*see also* Teece Dep. 51:11–16 (Dr. Teece testifying that the "whole thrust" of his report "is that

absent these restraints, one would have a dramatically diminished payments system that would

be highly fragmented and would have, in fact, less output").)

Nevertheless, the Court does not exclude Dr. Teece's opinions about the but-for world on

the basis that he "failed to undertake even the most basic study of the facts or data."  (Teece

Excl. Mem. 8.)  While Dr. Teece's opinions would likely be stronger if he had reviewed the

testimony cited by the Direct Action Plaintiffs, (*id.* at 8–9), his failure to do so does not warrant

exclusion.  In *United States v. Napout*, the Second Circuit affirmed a district court's decision not

to exclude an expert's testimony where the expert had not reviewed "any empirical data"

relevant to the facts of the case.  963 F.3d at 188.  The Court noted that unless they are "so

unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges

comparison," contentions that an expert's assumptions are unfounded "go to the weight, not the

admissibility, of the testimony."  *Id.* at 188 (quoting *Restivo v. Hessemann*, 846 F.3d 547, 577

(2d Cir. 2017)).  Similarly, here, Dr. Teece's lack of familiarity with the underlying facts goes to

the weight not the admissibility of his testimony.[21]  While Dr. Teece's critiques of the but-for

world are not based on empirical data in the record, they are based on his theoretical

understanding of how platforms and ecosystems work, and the Court concludes that this is

---

[21]  The Direct Action Plaintiffs critique the Visa Defendants' citation to *Napout*, noting that in that case, the financial information in question "was not available" and the expert "did not have access to it."  (Teece Excl. Reply 5 n.4.)  The Second Circuit's analysis of the issue, however, focused not on the expert's lack of access to the data, but on the fact that most criticisms of the assumptions an expert relies on "go to the weight, not the admissibility, of the testimony."  *Napout*, 963 F.3d at 188.  Other courts have held similarly.  *See U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122 (S.D.N.Y. 2015) ("As a rule, the factual basis of an expert's opinion goes to the credibility of the testimony, not the admissibility."); *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 670 (E.D.N.Y. 2013) (same).

acceptable.  *See United States v. Ray*, No. 20-CR-110, 2022 WL 101911, at *7 (S.D.N.Y. Jan.

11, 2022) (noting that "[p]eer review and acceptance by the scientific community are neither

necessary, nor always sufficient, conditions for the admissibility of expert testimony" and that

"expert testimony need not be based on statistical analysis in order to be probative" (quoting

*United States v. Joseph*, 542 F.3d 13, 21 (2d Cir. 2008))).

As to the specific portions of Dr. Teece's report challenged by the Direct Action

Plaintiffs, the Court does not exclude Dr. Teece's opinion that the changes advocated by

Plaintiffs' experts risks "fragmenting" the Visa network.  (Teece Excl. Mem. 9.)  The Direct

Action Plaintiffs argue that "fragmentation" "lacks any accepted, objective meaning in

economics," (*id.*), but Dr. Teece defines the term for his purposes in the report itself:

"fragmenting (i.e., reducing the reach, seamlessness and ubiquity of) the Visa network," (Teece

Rep. ¶ 32).  The meaning of this analysis is particularly clear in the context of Dr. Teece's report,

which discusses how the Visa platform "has offered participating banks the benefits of a

common set of rules and technologies," (Teece Rep.¶ 50), and claims that eliminating the

challenged rules could diminish the value of the Visa network, (*see, e.g.*, *id.* ¶ 84).

Nor does the Court exclude Dr. Teece's opinion that "[i]t seems unlikely" that a network

without the honor all cards rules or default interchange could have "delivered the same benefits"

or "could continue to do so going forward."  (Teece Rep. ¶ 70.)  The Court is skeptical of the

Visa Defendants' argument that this is "not a hypothesis about what the 'but-for world' would

look like."  (Teece Excl. Opp'n 17.)  Although the beginning of the paragraph critiques Professor

Stiglitz's opinion that Visa's "rules and pricing policies reflected the assertion of market power

from the start," Dr. Teece clearly goes beyond mere critique to offer his own opinion that Visa

could not have delivered the same benefits without the challenged rules.  (Teece Rep. ¶ 70.)

However, the Court does not exclude this statement.  Dr. Teece supports his claim by citing to an article from an economics journal and a case by the Eleventh Circuit, (Teece Rep. ¶ 70 n.82), and goes on to point to "the empirical evidence indicating the success of the open platform model" and "the historical difficulties of Visa's forerunner," discussed earlier in his report, (*id.* ¶ 71.) To the extent that the Direct Action Plaintiffs find these sources weak or insufficient, they can challenge his testimony on cross-examination.  *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, No. 11-CV-0564, 2019 WL 1515231, at *9 (E.D.N.Y. Feb. 21, 2019) (describing alleged "falsities and inconsistencies" in expert's report as "perfect to elicit on cross-examination to attack [the expert's] credibility in front of the jury").

The Court also declines to exclude Dr. Teece's opinion that "modern economic literature on two-sided platforms provides no support at all to the view that if merchant fees were to be established through individualized interactions among issuing banks, merchants and acquiring banks, that the level of fee would be more efficient (or generally lower for that matter)."  (Teece Rep. ¶ 71.)  As the Visa Defendants argue, Dr. Teece claims that "Plaintiffs' experts fail to engage with a body of economic literature that does not support their opinions," (Teece Excl. Opp'n 17 n.12), specifically that they fail to engage with "the Baxter or tourist test interchange fee model" as well as other works in "[t]he extensive but complex and evolving literature on two-sided platforms,"  (Teece Rep. ¶ 71 nn.84, 85.)  As discussed above, while Dr. Teece does offer an opinion about the but-for world, this is a relevant opinion grounded in the relevant academic literature.  The Direct Action Plaintiffs point to Dr. Teece's testimony that he had not "had a chance to study" the effect of removing default interchange and honor all cards on interchange fees, (Teece Dep. 155:11-2, Teece Excl. Mem. 11), but it is not necessary that an expert study a subject himself rather than relying on academic sources.  *See Pacific Life Ins. Co.*

*v. Bank of N.Y. Mellon*, 571 F. Supp. 3d 106, 115, (S.D.N.Y. 2021) (noting that "an expert may rely on . . . the opinions of other experts in formulating their own expert opinions").  To the extent the Direct Action Plaintiffs believe Dr. Teece's testimony indicates that he lacks *any* knowledge about the relationship between the challenged rules and interchange fees, they may cross-examine him based on that testimony, and may challenge the articles on which Dr. Teece relies.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Hogan v. Novartis Pharm. Corp.*, No. 06-CV-260, 2011 WL 1533467, at *7 (E.D.N.Y. Apr. 24, 2011) (stating that the reliability of an article on which an expert relied "goes to weight, not admissibility").

Nor does the Court exclude Dr. Teece's testimony that the HAC rules and default interchange were instituted "to maintain and enhance the appeal of the network to its participants" and that this consideration "remains important today."  (Teece Rep. ¶ 78.)  The Direct Action Plaintiffs argue that Dr. Teece "did essentially no analysis of the payment card industry during the relevant period," (Teece Excl. Mem. 11), but this conclusion, like much of Dr. Teece's analysis, is based on his understanding of the Visa system and the possible "systemic consequences of changing the rules," including the sensitivity of participation in platforms "to the incentives and rules governing that participation," (Teece Rep. ¶¶ 76, 77).  Although this may be a weak basis for an expert opinion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S.  at 596.  Because they are grounded in Dr. Teece's understanding of Visa as a platform enabling a larger ecosystem, and because they are supported with citations to the academic literature and real-life examples, (*see,*

105

*e.g.*, Teece Rep. ¶ 77, citing to articles about the effects of reducing interchange fees in Europe and the U.K.), Dr. Teece's opinions are not *ipse dixit*.  (*See* Teece Excl. Mem. 12.)

The cases cited by the Direct Action Plaintiffs are distinguishable.  (*See* Teece Excl. Mem. 12 (citing to *Multimedia Patent Tr. v. Apple Inc.*, No. 10-CV-2618, 2012 WL 5873711 (S.D. Cal. Nov. 20, 2012); *Burton v. Am. Cyanamid*, No. 07-CV-0303, 2018 WL 3954858, at *9 (E.D. Wis. Aug. 16, 2018).)  In *Multimedia Patent Trust v. Apple Inc.*, Dr. Teece relied on "industry surveys" and "industry royalty rates." 2012 WL 5873711, at *9.  The court held that the "generic industry data" was not "tethered to the relevant facts and circumstances of the present case." *Id.*  As the Visa Defendants note, however, (Teece Excl. Opp'n 20), in *Multimedia Patent Trust* Dr. Teece was calculating a reasonable royalty, which "must be tied to the relevant facts and circumstances of the particular case at issue" and "should not be based on 'an arbitrary, general rule, unrelated to the facts of this case.'" *Id.* (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).  The court therefore excluded Dr. Teece's testimony only "to the extent it relie[d] on or [was] based on generic industry data as part of [his] damages analysis." *Id.*  The heightened standard applicable to calculating royalties is not relevant here.

In *Burton v. American Cyanamid*, Dr. Teece opined that it was "unlikely that Sherwin-Williams' white lead in oil or its paints with [white lead carbonate] pigments were used on [the] plaintiffs' residences," which was supported by "two sub-opinions": "Geographic markets for retail paint in Milwaukee were likely small," and "Most white lead in oil and white lead paint sold in Milwaukee was likely made by other manufacturers." 2018 WL 3954858, at *9.  The court found that his reasoning relied "on a number of assumptions for which Dr. Teece offers little rationale," including that "cost and difficulty of transportation is the dispositive factor in

determining the geographic market for paint in the early 20th Century" and that "the cost and difficulty that consumers in 2015 were willing to incur to travel to a supermarket or discount store is analogous to the cost or difficulty that consumers in the first half of the 20th century were willing to incur in order to purchase paint."  *Id.* at *10.  In *Burton*, Dr. Teece's opinion was based on empirical assumptions for which he did "not articulate . . . a reason."  *Id.*  Dr. Teece's opinions about the but-for world are based on his understanding of the Visa platform and platforms in general.  While the bases for his opinions are theoretical rather than based on data, and therefore may be easier to undermine on cross-examination, the Court does not find that they are "assumptions for which Dr. Teece offers little rationale."  *Id.*

### iv.   Dr. Teece's opinions about Visa's history

The Direct Action Plaintiffs argue that Dr. Teece's opinions about Visa's history are "nothing more than Visa's preferred historical narratives disguised as expert testimony."  (Teece Excl. Mem. 13.)  They claim that Dr. Teece simply "parrots information . . . from Visa's promotional materials and other, third-party sources," which "requires no special knowledge or expertise and does not employ any sophisticated methodology."  (*Id.*)  The Direct Action Plaintiffs also argue that Dr. Teece's history consists of "hearsay that is otherwise inadmissible," citing to caselaw holding that an expert may not "repeat[] hearsay evidence without applying any expertise whatsoever."  (*Id.* at 14 (quoting *United States v. Mejira*, 545 F.3d 179, 197 (2d Cir. 2008)).)

In response, the Visa Defendants argue, first, that Dr. Teece's review of Visa's history "is helpful to understand how [Dr. Teece] reaches his affirmative opinions about Visa's role as a platform and rebuts Plaintiffs' experts' opinions"; "follows the custom and practice of other economists conducting similar analyses"; and "fits comfortably within [Dr. Teece's] expertise in

economics, business models, industrial organization, and innovation." (Teece Excl. Opp'n 11.) The Visa Defendants claim that Dr. Teece explains how Visa "adopted certain centralized operating procedures and rules" to "achieve the delicate balance between the interests of issuing banks, acquiring banks, cardholders and merchants," and that the factfinder "will benefit from this historical context to consider whether the rules continue to serve these purposes today." (*Id.* at 12.) They also note that Plaintiffs' economic experts "provide historical information to support their opinions." (*Id.* at 13.) Second, the Visa Defendants argue that although Dr. Teece may rely on hearsay — which expert witnesses are entitled to do — he does not merely "parrot[] information," but rather "analyzes the history of Visa's organizational structure as an open platform to opine . . . on how Visa successfully manages the incentives of participants through its 'long-standing rules and interchange fee structures.'" (*Id.*) They also argue that Dr. Teece's sources are not biased, noting that one of the sources Plaintiffs identifies as biased is "favorably cited . . . in *Amex*," and claiming that Dr. Teece does not "rel[y] 'primarily' on any of these sources" regardless. (*Id.* at 15.)

The Court agrees with the Visa Defendants. Dr. Teece does not simply "recite" Visa's history, but describes how that history, in his opinion, "demonstrate[s] that [Visa] fits the economic paradigm of a platform at the center of a business ecosystem." (Teece Rep. ¶ 32.) Dr. Teece explains the "closed"-system Diners Club and American Express cards, (*id.* ¶¶ 36–39), and claims that the innovation of Visa's "open" system required the implementation of rules including the HAC rules, (*id.* ¶¶ 40–42). He also explains how Visa implemented "certain centralized operating procedures and rules" to avoid "complete collapse," including a default interchange fee. (*Id.* ¶¶ 43–49.) Dr. Teece also discusses the benefits of the Visa platform, including "offer[ing] participating banks the benefits of a common set of rules and technologies,"

"facilitat[ing] the development of national payment-card products," and serving as "a major organizational innovator." (*Id.* ¶¶ 50–55.)  Next, he describes the "value that Visa brings to the payments industry," (*id.* ¶ 56), including providing value to consumers and merchants, (*id.* ¶¶ 57–58); facilitating the growth of e-commerce, (*id.* ¶¶ 59); and facilitating the development of digital tokenization and mobile wallets, (*id.* ¶¶ 60–65.)  His discussion in this section claims that Visa provides "a standard and reliable way in which retailers could transact with customers," (*id.* ¶ 59), and "standards and a foundation for ecosystem participants to develop in ways that might not otherwise have been possible," (*id.* ¶ 65).  This discussion both furthers Dr. Teece's analysis of Visa as a platform enabling a larger economic ecosystem and is necessary background for his later opinion that Plaintiffs' experts "do not fully account for . . . the importance of [the challenged] rules to the Visa system." (*Id.* ¶ 67.)  While it is true that "[s]imply rehashing evidence about which an expert has no personal knowledge is impermissible under Rule 702," Dr. Teece is not merely "rehashing" evidence but rather developing his opinions about the value of the Visa network and the importance of the rules to that network. *Ridge Clearing & Outsourcing Sols., Inc. v. Khashoggi*, No. 07-CV-6611, 2011 WL 3586468, at *2 (S.D.N.Y. Aug. 12, 2011).

Because Dr. Teece does not simply "parrot" the sources he cites to, he also does not run afoul of the prohibition against "repeating hearsay evidence without applying any expertise whatsoever." *Mejira*, 545 F.3d at 197.  Nor does the Court exclude Dr. Teece's opinion on the basis that it is based on biased sources.  As the Visa Defendants argue, one of the sources the Direct Action Plaintiffs criticize as biased is cited favorably in *Amex*, 138 S. Ct. at 2289, and though financially supported in part by Visa states that it does not "necessarily reflect the views of Visa." (Teece Excl. Opp'n 15 & n.8.)  While this does not exclude the possibility that the

book is biased, it also weighs against exclusion on this basis.  The Direct Action Plaintiffs also

criticize another of Dr. Teece's sources on the basis that it was "written by the founder and

former CEO of Visa, Dee Hock."  (Teece Excl. Mem. 3.)  As the Visa Defendants note, however,

Professor Hausman, an expert for the 7-Eleven Plaintiffs and The Home Depot, also cites to one

of Mr. Hock's books.[22]  Nor is the Court persuaded that Dr. Teece's sources are sufficiently

biased to warrant exclusion because they include "Visa promotional materials" or "one

deposition of one Visa witness, out of the *hundreds* of depositions taken in this case."  (Teece

Excl. Mem. 3–4.)  While it is certainly possible that Dr. Teece's sources instill some bias, the

Court concludes that "[c]ross-examination is sufficient to address the issue of bias," *Linde v.*

*Arab Bank, PLC*, 922 F. Supp. 2d 316, 324 (E.D.N.Y. 2013).

### v.  Dr. Teece's compliance with Rule 26(a)(2)

The Direct Action Plaintiffs argue that although Dr. Teece's report "references or cites to

Professors Stiglitz and Carlton extensively," it "provides barely a hint of the substance of his

opinions as to Professor Harris and Professor Hausman."  (Teece Excl. Mem. 15.)  They claim

that this violates Federal Rule of Civil Procedure 26(a), which requires that expert reports

include "a complete statement of all opinions the witness will express and the basis and reasons

---

[22]  The Visa Defendants appear to argue that Professor Hausman cited the exact same book as Dr. Teece, which is not the case.  (*See* Teece Excl. Opp'n 15.)  The Direct Action Plaintiffs criticize Dr. Teece's use of "a 1995 book written by the founder and former CEO of Visa, Dee Hock," (Teece Excl. Mem. 3), which Dr. Teece's report reflects is titled "The Chaordic Organization: Out of Control and Into Order," (Teece Rep. n.45).  Contrary to the Visa Defendants' claim, (Teece Excl. Opp'n 15), Professor Hausman does not appear to cite to this book.  Rather, he cites to Mr. Hock's 2005 book "One From Many: VISA and the Rise of Chaordic Organization."  (*See* Reply Expert Report of Prof. Jerry Hausman ¶ 32 n.59 ("Hausman Reply Rep."), annexed to Carney Decl. as Ex. DDX6, Docket Entry No. 8544-1.)  Regardless, the fact that both Plaintiffs' and Defendants' experts cite to books by "the founder and former CEO of Visa" undermines Plaintiffs' claim that any book by this author is necessarily biased in favor of Defendants.

for them" and the "facts or data considered by the witness in forming them."  Fed. R. Civ. P. 26(a)(2)(B)(i), (ii); (*see* Teece Excl. Mem. 14.)  The Direct Action Plaintiffs argue that Dr. Teece "had plenty of time to review and consider" Professor Harris's and Professor Hausman's reports, and note that he testified that he "simply did not read those reports in their entirety at any time." (Teece Excl. Mem. 16.)  Applying the Rule 37(c) factors, they argue that "[t]here is no plausible explanation for Dr. Teece's failure to comply with Rule 26(a)(2)," that "the Direct Action Plaintiffs would be prejudiced if they were required to meet Dr. Teece's undisclosed opinions during the course of summary judgment briefing or at trial," and that granting a continuance would not be "an appropriate response." (*Id.* at 17.)  The Direct Action Plaintiffs further claim that Dr. Teece's "vague statement" that the conclusions in his report are "equally applicable" to Professor Harris's and Professor Hausman's reports to the extent they "call into question the same aspects of the Visa payment system that Professors Stiglitz and Carlton question . . . or engage in the same types of simplistic and erroneous analyses of competitive effects" is insufficient to comply with Rule 26. (Teece Excl. Reply 6.)  They argue that it is irrelevant that Professor Harris and Professor Hausman addressed Dr. Teece's report in their rebuttal reports because their rebuttals "were limited to citing things Dr. Teece 'ignored' or 'failed to consider,' because Dr. Teece provided no clear opinions on those issues." (*Id.* at 7.)  They further argue that it does not matter that Dr. Teece testified about his disagreements with Professor Harris and Professor Hausman, because parties may not "cure deficient expert reports by supplementing them with later deposition testimony." (*Id.* (quoting *Baker v. Anschutz Expl. Corp.*, 68 F. Supp. 3d 368, 382 (W.D.N.Y. 2014).)

In response, the Visa Defendants argue that Dr. Teece's report fully complies with Rule 26.  (Teece Excl. Opp'n 21.)  They claim that Dr. Teece's "opinions and conclusions were

111

concrete and complete enough for Plaintiffs' experts to attempt to rebut them substantively," noting that both Professor Harris and Professor Hausman "devoted significant attention to [Dr. Teece's] opinions in their rebuttal reports."  (*Id.* at 22–23.)  Plaintiffs also questioned Dr. Teece "at length about his specific critiques of [Professor] Harris's and Prof. Hausman's analyses" at his deposition.  (*Id.* at 23.)

Federal Rule of Civil Procedure 26(a)(2)(B)(i) and (ii) provide that a party using an expert witness must provide a written report containing "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them."  Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  The court may also impose "other appropriate sanctions" in addition or instead.  "The purpose of an expert report is to eliminate 'unfair surprise to the opposing party.'"  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 471, 482 (S.D.N.Y. 2009) (quoting *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995)).  To meet the Rule 26(a)(2)(B) standard, "the report must disclose the underlying conclusions on which the expert's opinion is based and 'how' and 'why' the expert reached those conclusions."  *Great White Bear, LLC v. Mervyns, LLC*, No. 06-CV-13358, 2008 WL 2220662, at *2 (S.D.N.Y. May 27, 2008) (citing *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998)).  Rule 26(a)(2)(B) "does not limit an expert's testimony simply to reading his report" but rather "contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report."  *Id.* (quoting *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006)).  However, the expert report may not

be "sketchy and vague." *Great White Bear*, 2008 WL 2220662, at *2.  An expert report is deficient if it "fails to include any of the *underlying conclusions* on which the expert's ultimate opinions are based" or if it does not "set forth 'a complete statement' of the 'basis and reasons' for [the] expert['s] opinions." *Giladi v. Strauch*, No. 94-CV-3976, 2007 WL 415365, at *7 (S.D.N.Y. Feb. 6, 2007) (alterations in original) (quoting *St. Paul Fire & Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd.*, No. 91-CV-748, 1996 WL 19028, at *11–12 (S.D.N.Y. Jan. 17, 1996)).  "Preclusion is appropriate where an expert's report is 'so inadequate that it is impossible for [the other party] to ascertain . . . the specifics to which [the expert] will testify or any of the bases from which [he or she] derived their conclusions." *Id.* (alterations in original) (quoting *251 CPW Hous. Ltd. v. Paragon Cable Manhattan*, No. 93-CV-944, 1995 WL 70675, at *4 (S.D.N.Y. Feb. 21, 1995)).

At his deposition, Dr. Teece testified that he "took a quick look" at Professor Harris's initial report and that he "spent several hours on it," but was not able to "digest the entirety of what [Professor Harris] said." (*Id.* at 187:13–188:1.)  He also reviewed Professor Harris's reply report "in part," namely the parts in which Professor Harris "address[ed] issues pertinent to [Dr. Teece's] issues." (*Id.* at 188:2–7.)  Similarly, he "did not review" all of Professor Hausman's report, but "reviewed enough to get an understanding of the extent to which he was or was not thinking in systems terms versus reductionist terms." (*Id.* at 189:3–16.)  Dr. Teece testified that in reviewing the reports, his focus was "not necessarily specific sections or particular details," but rather "the overall framework that is employed and the failure to recognize complex interdependencies and the reason for having guardrails to essentially generate positive outcomes for consumers and stronger competition against other networks." (*Id.* at 190:5–17.)

Dr. Teece testified that he "didn't see" Professor Harris "do anything to look at knock-on effects and systems effects." (*Id.* at 193:2–7.) He said that Professor Harris did not "do an analysis of the kind that [Dr. Teece] believe[s] is required when you're looking at a multisided market and you have a complex system that is exposed to externalities where the actions of individual parties aren't necessarily going to be consistent with the benefit of the whole." (*Id.* at 194:2–7.) He also testified that Professor Harris's analysis lacked "a robust analysis of the workings of the but-for world." (*Id.* at 194:25–195:9.) He acknowledged that it was "possible" that he failed to read the sections of Professor Harris's report dealing with Dr. Teece's specific criticisms of Professors Stiglitz and Carlton, but found this "unlikely." (*Id.* at 197:2–18.) Dr. Teece testified that the "posted price mechanism" put forward by Professor Harris was the kind of "uncomfortable checkout experience . . . for cardholders" that "could actually harm merchants as well." (*Id.* at 86:9–14.) He later elaborated on why he believed the mechanism could harm merchants, noting that there are "systems effects that the merchant is not going to think about" when adopting such a mechanism. (*Id.* at 173:24–178:9.) Dr. Teece also testified that when Professor Hausman "engages in analysis, for instance, his effort to talk about auctions . . . as a way in which supposedly a more competitive outcome will arise," he "does so in the same reductionist fashion that the other [P]laintiffs' experts engage in where they're not paying attention to the interdependencies in the second and third order knock-on effects that might occur." (*Id.* at 228:19–229:7.) He testified that Professor Hausman, like Professors Stiglitz and Carlton, "pay[s] no attention to Visa's organizational architecture and the role of mechanisms such as the default interchange fee and the 'honor all cards' rule in that organizational . . . architecture," and "do[es] not analyze whether changing these longstanding mechanisms will undermine the integrity and value of the Visa network (and brand)." (*Id.* at 230:24–232:11.)

Dr. Teece's opinions about Professor Harris's and Professor Hausman's opinions do not violate Rule 26(a)(2)(B). Dr. Teece does not "provide[] barely a hint of the substance of his opinions as to Professor Harris and Professor Hausman, or the basis for whatever his opinions may be." (Teece Excl. Mem. 15.) It is plain from Dr. Teece's report — as well as his deposition testimony — that he intends to criticize all of Plaintiffs' experts for failing to adequately consider "the importance of [the challenged] rules to the Visa system or whether, as a result of altering foundational aspects of the system such as Honor All Cards and default interchange, the rest of the Visa platform would have continued to operate as normal." (Teece Rep. ¶ 67.) Dr. Teece opines in his report, for instance, that "Plaintiffs' experts" do not "adequately consider whether a combination of surcharging at the point-of-sale, selective acceptance of cards, exclusives involving merchants accepting only one bank's Visa cards, etc. would deter *card usage* . . . and whether this reduction in usage would negatively impact the overall volume and level of commerce." (Teece Rep. ¶ 81.) Dr. Teece may provide this opinion at trial, and to a limited extent may "supplement, elaborate, [and] explain" it by, for instance, applying it to Professor Harris's posited "posted price mechanism." *Great White Bear*, 2008 WL 2220662, at *2; (*see* Teece Dep. 86:9-14, 173:24-178:9.) The Direct Action Plaintiffs argue that where Dr. Teece criticizes "all 'Plaintiffs' experts,' without specifying any other expert by name, or citing to any portions of Professor Harris or Professor Hausman's reports" he "does not comply with Rule 26(a)(2) and . . . leaves the Direct Action Plaintiffs to guess about what Dr. Teece might say." (Teece Excl. Mem. 16.) The Court disagrees that the Direct Action Plaintiffs will have to "guess" about the content of Dr. Teece's testimony simply because Dr. Teece refers to "all experts" instead of naming or citing to Professor Harris or Professor Hausman.

The cases the Direct Action Plaintiffs cite to are distinguishable.  (*See* Teece Excl. Mem. 17 (citing *Advanced Analytics, Inc. v. Citigroup Cap. Mkts., Inc.*, 301 F.R.D. 31 (S.D.N.Y. 2014); *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262 (6th Cir. 2010); *Lyons v. Leatt Corp.*, 322 F.R.D. 327 (N.D. Ind. 2017); *United States v. Marder*, 318 F.R.D. 186 (S.D. Fla. 2016).)  In *Advanced Analytics*, the plaintiff provided an updated report for one of its experts that was "unquestionably 'designed to fill a significant and logical gap' in [the expert's] past reports."  301 F.R.D. at 39–40.  Because the new report was not served until "more than a year" after initial disclosures were due and was "based on materials [the] [p]laintiff had in its possession *for years*," the court concluded that the plaintiff had violated Rule 26(a)(2)(B).  *Id.* The factors that were relevant in *Advanced Analytics* — most notably, that the new report was not served until a year after the relevant deadline — are not at issue here.

In *R.C. Olmstead, Inc.*, the plaintiff retained an expert witness who "filed a two-page expert report and attached nearly two-hundred pages of exhibits."  606 F.3d at 267.  The district court granted the defendant's motion to bar the testimony under Rule 26(a)(2)(B), noting that the report "vaguely list[ed] a sampling of 'similarities'" between two types of software at issue, but "never explain[ed] why the alleged similarities indicate actual copying of [the] [p]laintiff's software rather than that the softwares simply perform similar functions."  *Id.* The Sixth Circuit concluded that the district court had not abused its discretion, finding that while the report opined that the defendant's software "was developed by copying" the plaintiff's software, it "failed to discuss the basis of his conclusion."  *Id.* at 270–71.  *R.C. Olmstead* concerned a report's failure to discuss the basis of the expert's conclusion, while the issue in this case is whether Dr. Teece's report expresses any opinions about Professor Harris's or Professor Hausman's opinions.  (*See* Teece Excl. Mem. 15.)

116

In *Lyons*, the court concluded that the plaintiff's expert report "fail[ed] to set forth the reasons for his opinions and the facts or data he considered in forming his opinions." 322 F.R.D. at 334. Although the expert had conducted "a biomechanical 'surrogate study'" and taken 270 photographs of the study and the accident scene, there was no reference in the report "to the study, the measurements [generated by the study], an analysis of the measurements, the photographs, or how the study supports his opinions." *Id.* The court found that because the report "omitted the fact of the study, the data, the photos, and any analysis thereof," the defendants' experts "did not have the benefit of the basis of [the expert's] opinion in forming their own opinions" and the defendant was "'ambushed' with this information at [the expert's] deposition." *Id.* at 335. Even at his deposition, the expert "did not identify any specific measurements, calculations, or analysis." *Id.* The Direct Action Plaintiffs do not allege a comparable omission from Dr. Teece's opinions, nor have the Direct Action Plaintiffs been "ambushed."

In *Marder*, the court struck the defendant's experts' reports and testimony. 318 F.R.D. at 191. On reconsideration, the defendants argued that although expert disclosure for one of the experts was incomplete, "there was clearly no prejudice" to the government. *Id.* The court stated that the defendants were "overlook[ing] the effects of the dilatory discovery efforts," and that reopening discovery to accommodate the defendants' "untimely and incomplete expert reports" would both "reward" the defendants "for their indolence" and "prejudice the [g]overnment's preparation for trial." *Id.* Because expert disclosure was incomplete, the defendants' expert witnesses' opinions would "necessarily be a surprise to the [g]overnment," which had been "deprived of the opportunity to determine whether rebuttal experts [were] necessary" and "deprived of the opportunity to investigate" the defendants' qualifications and the

117

bases for their opinions. *Id.* at 192.  Neither untimeliness nor "failure to submit the required

information about the experts' backgrounds and compensation" are  at issue here, and as stated

above, the Court disagrees that Dr. Teece's report "is so general and lacking in detail it neither

provides a meaningful basis for determining the substance of the expert's opinion, nor . . . a fair

basis for expert discovery." *Id.*

The Court notes that if Dr. Teece provides an opinion to the factfinder for which no basis

can be found in his report, such that Plaintiffs are unfairly surprised, they may object to such

testimony. *See Foster v. Cotton States Mut. Ins. Co.*, No. 12-CV-150, 2014 WL 12625103, at *1

(M.D. Fla. Jan. 7, 2014) (denying motion to exclude under Rule 26(a)(2)(B) as "premature" and

stating that "[s]hould [the p]laintiff's expert witnesses stray beyond their reports at trial, [the

d]efendant can object to such testimony").  Dr. Teece's report alone, however, is not "so general

and lacking in detail" to warrant exclusion.  *Marder*, 318 F.R.D. at 192.

### vi.  Conclusion

The Court denies Direct Action Plaintiffs' motion to exclude Dr. Teece's report and

opinions.

### f.  Motion to exclude report and opinions of David P. Kaplan

The Direct Action Plaintiffs move to exclude portions of the report and opinions of David

P. Kaplan (Kaplan Mot.), an expert witness for Defendants.  (Expert Rep. of David P. Kaplan

dated June 10, 2019 ("Kaplan Rep.") ¶ 7, annexed to Shinder Decl. as Ex. 1, Docket Entry No.

8489-1.)

### i.  Mr. Kaplan's background and expert report

Mr. Kaplan is an Executive Director and Vice Chairman of the Berkeley Research Group,

an economic and financial consulting firm.  (*Id.* at ¶ 1.)  Previously he has been a university

professor and guest lecturer; the executive of a public company; and an economic consultant to multiple governmental bodies.  (*Id.* ¶ 3–5.)  He has testified as an expert economist in federal and state court and before Congress.  (*Id.* ¶ 2.)

Mr. Kaplan's assignment in this case was "to consider the claims for individual plaintiff damages" advanced in Professor Hausman's report; Professor Harris's report; Dr. Kennedy's report; Dr. Epstein's report; Mr. Hutchins' report; and Dr. Rowe's report.  (*Id.* ¶ 7.)  He concludes that these experts' damages calculations "are unreliable for many reasons" and that "particular aspects of [the experts'] analyses amount to speculation."  (*Id.* ¶ 54.)  After critiquing many aspects of Plaintiffs' experts' damage models, (*id.* ¶¶ 203–1168), Mr. Kaplan makes "certain necessary corrections and improvements to [P]laintiffs' experts' damages models to correct key flaws."  (*Id.* ¶¶ 1169–1216.)

### ii.   Mr. Kaplan's alleged legal opinions

The Direct Action Plaintiffs claim that Mr. Kaplan "repeatedly cites and quotes from legal treatises and court cases to offer opinions about the appropriate standard for proving antitrust damages and causation."  (Mem. of Law in Supp. of Direct Action Pls.' Mot. to Excl. Portions of Rep. & Opinions of Def. Expert David P. Kaplan ("Kaplan Excl. Mem.") 9, Docket Entry No. 8209.)  They argue that, first, this "usurp[s] the role of the Court in instructing the jury on the applicable law."  (*Id.*)  Second, they argue that Mr. Kaplan's legal opinions are "misleading" because he "urges the jury to require a level of precision in proving antitrust damages that is at odds with the law."  (*Id.* at 10.)  In particular, the Direct Action Plaintiffs point to Mr. Kaplan's statement that "a model to estimate but-for prices 'should capture <u>all</u> of the essential economic relationships and factors that are likely to influence prices.'"  (*Id.*)  They argue that "[n]othing in the law requires antitrust plaintiffs to prove damages with the precision

Mr. Kaplan demands." (*Id.*)  The Direct Action Plaintiffs further argue that the Kaplan

Declaration, prepared by Mr. Kaplan in response to the Direct Action Plaintiffs' motion, (Decl.

of David P. Kaplan in Resp. to Pls.' Mot. ("Kaplan Decl."), annexed to Szanyi Decl. as Ex.

DDX137, Docket Entry No. 8547-7), is "riddled with legal arguments," (Reply Mem. of Law in

Further Supp. of Direct Action Pls.' Mot. to Excl. Portions of Rep. & Opinions of Def. Expert

David P. Kaplan ("Kaplan Excl. Reply") 3, Docket Entry No. 8233.)

 In response, Defendants argue that the Direct Action Plaintiffs' arguments "track those

made by plaintiffs in" *In re Aluminum Warehousing*, 336 F.R.D. 5, "and should be rejected for

the same reasons." (Defs.' Mem. in Opp'n to Direct Action Pls.' Mot. to Excl. Portions of Rep.

& Opinions of Def. Expert David P. Kaplan ("Kaplan Brief") 16, Docket Entry No. 8212.)  They

claim that "[n]othing prohibits an expert economist from citing legal treatises or court opinions"

and that "Plaintiffs' own experts cite to similar materials, and even to legal standards articulated

in legal opinions." (*Id.*)  Defendants further argue that "many of the so-called 'legal sources' to

which Plaintiffs object" are in fact "articles written by economists to describe antitrust economic

analysis" and are cited for that purpose. (*Id.*)  They also defend Mr. Kaplan's statement that a

but-for pricing model should capture all essential economic relationships and factors, arguing

that "courts routinely hold that . . . a model that ignores *essential* economic factors is speculative

and insufficient to show damages." (*Id.* at 17.)

 "As a general rule an expert's testimony on issues of law is inadmissible."  *United States*

*v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *United States v. Prevezon Holdings, Ltd.*, 251

F. Supp. 3d 684, 699 (S.D.N.Y. 2017) (quoting *Bilzerian*, 926 F.2d at 1294); *see also United*

*States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988) (stating that Federal Rule of Evidence 704 "was

not intended to allow experts to offer opinions embodying legal conclusions").  "[A]lthough an

expert may opine on an issue of fact within the jury's provence, he may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian*, 926 F.2d at 1294; *see also Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993) (stating that testimony "is not objectionable merely 'because it embraces an ultimate issue to be decided by the trier of fact,'" but that courts should guard against "the admission of opinions which would merely tell the jury what result to reach" (first quoting Fed. R. Evid. 704; and then quoting Fed. R. Evid. 704 (Advisory Committee Notes))).  In addition, "[e]xpert testimony may not usurp the province of the judge to instruct on the law." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) (first citing *Bilzerian*, 926 F.2d at 1294; and then citing to *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510–11 (2d Cir. 1977)); *see also A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1207 (9th Cir. 2016) (stating that "instructing the jury as to the applicable law is the distinct and exclusive province of the court" (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)).

The Direct Action Plaintiffs point to several paragraphs in Mr. Kaplan's report that they claim contain legal opinions.[23]  In claiming that Mr. Kaplan "summarizes legal treatises or offers legal arguments styled as opinions," they cite to paragraphs 41, 45, 124, 131, 182, 204, 324 to 328, 858, and 862 of Mr. Kaplan's report (Kaplan Excl. Mem. 6 n.5.)  In claiming that Mr. Kaplan "offers opinions about the appropriate standard for proving antitrust damages and causation, relying on *legal* sources," they cite to paragraph 204 and footnote 196; paragraphs 324

---

[23]  Here and elsewhere, the Direct Action Plaintiffs cite to specific paragraphs of Mr. Kaplan's report while implying that the report also contains additional unenumerated examples of improper expert testimony.  (*See* Kaplan Excl. Mem. 5 n.4, 6 nn.5 & 7, 11 n.15 (beginning "*See, e.g.*").)  The Court declines to scour Mr. Kaplan's 663-page report to find other examples the Direct Action Plaintiffs may consider improper and considers only the paragraphs specifically cited.

to 328 and footnotes 615 to 632; paragraph 412 and footnote 827; paragraph 603 and footnote 1368; paragraphs 869 to 870 and footnotes 2009 to 2017; paragraph 1018 and footnotes 2397 to 2398; and paragraph 1179 and footnote 2781.  (*Id.* at n.7.)

First, the Court does not exclude any of Mr. Kaplan's opinions related to "mootness." The Direct Action Plaintiffs cite to paragraphs 41, 45, 182, 858, and 862, apparently because each refers to some portion of Plaintiffs' experts' damages calculations as "moot."  (Kaplan Excl. Mem. 6 n.5.)  Mootness is not an exclusively legal concept, and nowhere in his report does Mr. Kaplan use "mootness" in the narrowly legal sense, that is, to describe a suit where "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).  The fact that an expert describes some fact as "moot" in the ordinary sense is not a ground to exclude his opinions.

Second, the Court does not exclude any of Mr. Kaplan's opinions related to "causal connections."  In paragraph 124, Mr. Kaplan states that the government's intervention in the debit market "broke the causal connection between the conduct at issue and debit interchange fees attributable to only the conduct of Visa and Mastercard with respect to debit fees covered by Durbin, and calculating damages purportedly attributable only to the conduct of Visa and Mastercard in such a market setting is wrong."  (Kaplan Rep. ¶ 124.)  Similarly, in paragraph 131, Mr. Kaplan states the Durbin Amendment "br[oke] the causal connection between conduct related only to Visa and Mastercard and that related to the government intervention," but that Professor Harris and Professor Hausman ignored this distinction in performing their debit interchange calculations.  (*Id.* at ¶ 131.)  Mr. Kaplan is arguing that Professor Harris and Professor Hausman's damages estimates are incorrect because they incorporate not only fees set

by Visa and Mastercard, but also fees set by the government.  This is not improper, and it does not constitute a legal conclusion.

The Court does exclude some, but not all, of the paragraphs that the Direct Action Plaintiffs claim "offer[] opinions about the appropriate standard for proving antitrust damages and causation, relying on *legal* sources."  (Kaplan Mem. 6.)  Paragraph 204 of Mr. Kaplan's report reads as follows:

> In my opinion, it is critically important from an economic perspective for any reliable damage model to be explicitly connected to the precise allegations at issue.  A book published by the ABA highlighted that a "sound economic model should also reflect a plausible relationship between liability and the calculated overcharge."  Plaintiffs' damage models fail this test.

(Kaplan Rep. ¶ 204.)  The Court agrees with the Direct Action Plaintiffs that this is improper. Although it does not state a legal conclusion, paragraph 204 tells the factfinder how to evaluate proof of damages — a fundamentally legal concept — thus "encroach[ing] upon the court's duty to instruct on the law."  *Bilzerian*, 926 F.2d at 1294.  As a rebuttal expert, Mr. Kaplan may critique Plaintiffs' experts' models from an economic perspective, but he may not instruct the jury on what is "critically important" in a damages model.  (Kaplan Rep. ¶ 204.) This is because the standard that is applicable to the plaintiffs' proof of damages in an antitrust case is a legal, not an economic, standard.  *See U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988) (noting that courts allow "antitrust plaintiffs considerable latitude in proving the amount of damages"); *see also Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48–49 (S.D.N.Y. 2016) (noting that "the line between permissibly identifying evidence that was overlooked by [the] plaintiffs' experts and impermissibly suggesting to the [c]ourt that such evidence is important may be thin" but ultimately striking "those portions of [the expert's] testimony that purport to analyze the relevance of [the] plaintiffs' evidence").

123

Defendants are correct that courts have excluded experts' testimony as unreliable for failing to consider alternative causes, (Kaplan Excl. Opp'n 17), *see, e.g.*, *R.F.M.A.S., Inc* 748 F. Supp. 2d 244, 270 (S.D.N.Y. 2010), but the question is not whether Mr. Kaplan's opinions are justified but whether they "invade the court's province by testifying on issues of law," *In re: Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (collecting cases). Notably, the Court does not exclude the surrounding paragraphs, which set forth Mr. Kaplan's argument that Plaintiffs' experts fail to consider idiosyncratic factors affecting the liability of individual Plaintiffs. Mr. Kaplan may argue that Plaintiffs' experts' damages models do not effectively correspond to Plaintiffs' theories of liability, but he may not turn this opinion into an instruction for evaluating damages models. *See U.S. Info. Sys., Inc.*, 313 F. Supp. 2d at 240–41 (holding that although expert could not "state that the defendants did or did not engage in anticompetitive conduct," he could "point to factors that would tend to show anticompetitive conduct in a market," "indicate whether he believed those factors existed here, and what the economic significance of those factors would be," and "explain how certain conduct could affect a market through the use of hypothetical statements"); *Union Carbide Corp. v. Montell N.V.*, 28 F. Supp. 2d 833, 843 (S.D.N.Y. 1998) (holding that experts could not testify that given conduct "was either 'anti-competitive' or 'unlawful,'" but could "opine that the licensing market was 'not competitive' and to explain how they reach that conclusion").

The Court finds *In re Aluminum Warehousing Antitrust Litigation* to be distinguishable. (*See* Kaplan Excl. Opp'n 16.) In that case, the plaintiffs argued that Mr. Kaplan "attempt[ed] to provide legal opinion in the guise of expert opinion." *In re Aluminum*, 336 F.R.D. at 30. The court held otherwise, finding that Mr. Kaplan's "empirical analysis led him to reach the economic, not legal, conclusions" that "fact-intensive inquiries would be needed to determine

whether each proposed class member meets the factual criteria for class membership" and that "potential class members from differing loci in the aluminum distribution chain face differing economic incentives." *Id.* at 32. The court found that Mr. Kaplan "reache[d] factual conclusions . . . on mixed questions of law and fact that bear on issues relevant to this motion" and that "[h]is [was] quintessential class certification rebuttal expert testimony." *Id. In re Aluminum* addressed whether Mr. Kaplan reached improper legal conclusions, not whether he improperly provided the jury with legal standards, and concluded that he did not.

The Court also excludes paragraphs 324 to 328. These paragraphs describe the economic literature relevant to Mr. Kaplan's claim that Plaintiffs' experts' damages models "do not properly consider changes in demand and supply . . . during the damage period." (Kaplan Rep. ¶ 320.) The paragraphs state that "[r]elevant economic literature discusses the critical need to properly investigate relevant market factors when generating estimates of damages," citing to "a chapter of a recently published book, Antitrust For Lawyers," by "an economist with . . . an economic consulting firm." (*Id.* ¶ 324.) The author of the book states that "the 'model should capture <u>all</u> of the essential economic relationships and factors that are likely to influence prices," and that if the economic model "<u>omits important explanatory factors</u>" it may "produc[e] biased results." (*Id.* ¶¶ 324–25.) Next, Mr. Kaplan cites to "[a] chapter in 'Proving Antitrust Damages, Legal and Economic Issues,' published by the [American Bar Association (ABA)]," which "concludes that any 'overcharge is typically calculated as the difference between the price actually charged and the but-for price, <u>after controlling for all factors</u> that may affect supply and demand of the relevant products.'" (*Id.* ¶ 325.) The source chapter also "discusses certain language from prior cases" holding that economic models must attempt to account for all possible causes of an alleged price increase. (*Id.*) "Another book, entitled 'Econometrics, Legal,

Practical, and Technical Issues,'" also describes the possibility of "other major influences" affecting "price or other important variables one needs to take into account to estimate damages." (*Id.* ¶ 327.) An article "by van Dijk and Verboven, published by the ABA in 2008," concluded that the failure to control for other factors affecting prices "may result in an inference of significant damages," and "[a]nother economic article" similarly "noted that any attempt to estimate overcharges must account for factors other than the conduct at issue that might affect prices." (*Id.* ¶ 328 (emphasis in original).) Finally, "the Litigation Services Handbook represented that '[c]ourts similarly refuse to find causation when an expert neglects to consider other factors that could have caused, or at least contributed to, the plaintiff's damages.'" (*Id*

Because whether damages have been estimated with sufficient accuracy is a fundamentally legal concept, Mr. Kaplan may not instruct the jury as to what is "critical" with regard to damages estimations. (*Id.* ¶ 324.) Although the Court does not exclude Mr. Kaplan's actual arguments that Plaintiffs' experts' models fail to control for other economic factors, (*see id.* ¶¶ 320–323, 329–411), Mr. Kaplan may not instruct the jury that this is an essential component of evaluating proof of damages. In particular, Mr. Kaplan may not instruct the jury on situations in which "[c]ourts . . . refuse to find causation." (*Id.* ¶ 328.)

The Court also excludes paragraph 412 of Mr. Kaplan's report. That paragraph reads:

> Economic literature indicates that a damage model is not capable of reliably estimating overcharges if it omits important economic variables. A chapter in Antitrust Economics for Lawyers, for example, written by an economic consultant at CRA, concluded that if an economic damage model is incomplete and "omits important explanatory factors" it may be "unable to explain price movements or it may incorrectly attribute the effects" of the relevant omitted variable to the anticompetitive conduct, "producing biased results."

(*Id.* ¶ 412.) For the reasons described above, Mr. Kaplan may not opine about how the factfinder should evaluate Plaintiffs' proof of damages or what makes a damages model "reliable."

Paragraph 603 of Mr. Kaplan's report states:

> When estimating antitrust damages, a generally accepted method is to compare relevant data, including prices or fees, before the conduct at issue was deemed anticompetitive to relevant prices or fees after the conduct was deemed anticompetitive.  For example, a chapter in the book Antitrust Economics For Lawyers discussed above authored by an economist . . . notes that the "most conceptually straightforward method for estimating the overcharge" is "through a before-during-after model" where one analyzes data, including pricing data, both "before and after" the conduct at issue is deemed anticompetitive to prices during the relevant damages period.

(*Id.* ¶ 603.)  The Court does not exclude this paragraph.  Mr. Kaplan does not tell the jury how to evaluate Plaintiffs' proof of damages, but rather describes "a generally accepted method" of estimating antitrust damages before arguing that Plaintiffs' experts do not accurately apply this method.  (*Id.* ¶¶ 604–17.)  Although Mr. Kaplan does cite to Antitrust Economics For Lawyers, which the Direct Action Plaintiffs argue is a "*legal* source," (Kaplan Excl. Mem. 6 & n.7), as Defendants argue, "[n]othing prohibits an expert economist from citing legal treatises or court opinions," (Kaplan Excl. Opp'n 16).  The issue with the paragraphs described above is not that Mr. Kaplan cites legal sources but that he uses them to articulate a legal standard.  Because he does not do so here, the Court declines to exclude paragraph 603.

In paragraphs 869 and 870, Mr. Kaplan cites to many of the sources he cites above to argue that "[w]hen using a benchmark such as a credit or debit interchange fee applicable in a different country, it is incumbent on the researcher to ensure that the benchmark is comparable to the fees that might be established in the but-for world under consideration."  (Kaplan Rep. ¶ 869.)  Antitrust For Lawyers states that "it is challenging to find an alternative market (or product) that is a good analog to that allegedly affected by the conspiracy but which is a truly competitive comparison," (*id.*); the ABA book "Econometrics, Legal, Practical, and Technical Issues" points out "that the utility of a benchmark market is dependent on 'accounting for other

economic factors that might have differed between the two markets'"; the ABA book "Proving Antitrust Damages, Legal and Economic Issues" concludes that "<u>it is important to ensure that the approach controls for any difference between the benchmark used and the relevant market</u>"; an article by Brander and Ross "reached similar conclusions"; and the article by van Dijk and Verboven noted the necessity of "control[ling] for determinates of price that have changed over time or differ across markets," (*id.* at ¶ 870 (emphasis in original)).

The Court does not exclude these paragraphs, in which Mr. Kaplan cites to sources explaining that a benchmark analysis must "ensure that the benchmark is comparable to the fees that might be established in the but-for world under consideration." (*Id.* ¶ 869.) Mr. Kaplan does not represent to the jury that this step is critical to the admissibility or acceptability of proof of antitrust damages. Rather, paragraphs 869 and 870 are limited to an economic critique of benchmark analyses.

In paragraph 1018, Mr. Kaplan describes "economic literature" claiming that "examining the possible relationship between changes in costs and prices should focus on just that, costs and prices," citing to the van Dijk and Verboven article and an ABA publication titled "Indirect Purchaser Litigation Handbook." (*Id.* ¶ 1018.) The Court also does not exclude this paragraph. Mr. Kaplan makes no claims about how damages projections should be evaluated, but rather makes an economic claim about studies "examining the possible relationship between changes in costs and prices." (*Id.*)

Finally, in paragraph 1179, Mr. Kaplan states that his alternative damage calculations "adopt the proper method of calculating damages by netting any benefits experienced by a plaintiff against any positive damages." (*Id.* ¶ 1179.) In footnote 2781, he explains that "[v]arious literature discusses this issue of net damages," citing to the ABA publication Proving

128

Antitrust Damages and the Litigation Services Handbook.  (*Id.* at n. 2781.)  The Court does not

exclude this paragraph or this footnote.  Mr. Kaplan is not making a claim about how damages

projections should be evaluated, but rather citing to sources that support his damages method.

Accordingly, the Court excludes paragraphs 204, 324 to 328, and 412 of Mr. Kaplan's

expert report.

### iii.   Mr. Kaplan's alleged factual narratives

The Direct Action Plaintiffs argue that Mr. Kaplan "spends much of his lengthy report

offering an advocate's narrative about Defendants' case," claiming that he narrates evidence

regarding "merchant testimony on the benefits of credit cards," "merchant testimony on pass-

on," "Chase's ChaseNet strategy," "Discover's competitive strategies and Visa's and

Mastercard's responses to it," and "American Express's strategy, and Visa's and Mastercard's

responses to it, among others."  (Kaplan Excl. Mem. 11.)  They further argue that Mr. Kaplan's

narratives "lack [] expert methodology," citing in particular to his comparison of the Direct

Action Plaintiffs' benchmark rates with merchants' real-world negotiations with networks.  (*Id.*

at 11–12.)  The Direct Action Plaintiffs claim that Mr. Kaplan's narratives "are riddled with

credibility assessments and mischaracterizations of the record that will mislead the jury,"

including "impl[ying] that he does not believe merchants when they say their fees are excessive."

(*Id.* at 12.)  Finally, the Direct Action Plaintiffs argue that Mr. Kaplan's narratives "often pertain

to liability issues even as he admits he has not analyzed liability, thereby rendering them

unreliable."  (*Id.* at 13.)

In response, Defendants argue that "Mr. Kaplan is permitted to 'lay a foundation that

necessarily requires restating facts in evidence.'"  (Kaplan Excl. Opp'n 11 (quoting *Scott*, 315

F.R.D. at 46).)  They argue that it is not true that Mr. Kaplan's report lacks "expert

methodology," claiming that "[i]dentifying contrary real-world evidence is an appropriate expert methodology" and that "Mr. Kaplan, at length and in detail, explains why the relative negotiating leverage between merchants and certain networks in the real world would have been comparable to the relative leverage in negotiations between merchants and large issuers in a but-for world." (*Id.* at 12–13.)  Defendant also claim that Mr. Kaplan does not improperly assess witness credibility, arguing that "Plaintiffs' own economic experts introduce the concept of whether issuers would find 'credible' merchants' threats to discontinue acceptance of the cards of specific issuers" and that Mr. Kaplan "takes Plaintiffs' testimony at face value."  (*Id.* at 13–14.)  Finally, Defendants argue that Mr. Kaplan's summaries do not pertain to liability issues.  (*Id.* at 15.)

The Court does not exclude Mr. Kaplan's opinions as improper factual narratives.  The Direct Action Plaintiffs cite to paragraphs 163 to 164, 272 to 278, 285 to 295, 299 to 304, 373 to 382, 399, 424 to 457, 513 to 523, 531 to 536, 543 to 546, 548 to 573, 574 to 592, 595 to 598, 645 to 651, 746 to 752, 767 to 770, 827, 957 to 971, 972 to 975, and 976 to 1044.  (Kaplan Excl. Mem. 5 n.4, 11 n.15.)   While it is true that "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence," Mr. Kaplan is not "solely . . . constructing a factual narrative," but rather using the evidence in the record to critique Plaintiffs' experts' opinions. *Highland Cap. Mgmt.*, 379 F. Supp. 2d at 469; *see also Scott*, 315 F.R.D. at 47 (concluding that the defendant's expert could permissibly "use[] record evidence . . . to attack the probative value of plaintiffs' experts' opinion").   In paragraphs 163 to 164 and 272 to 278, Mr. Kaplan uses record evidence to argue that Plaintiffs will not refuse to accept certain cards, which undermines Plaintiffs' experts' damage models, (*see* Kaplan Rep. ¶¶ 163–64, 272–78); in paragraphs 285 to 295, he uses record evidence to argue that Plaintiffs will not surcharge, (*see id.* ¶¶ 285–295); and in paragraphs 299 to 304, he uses record evidence to

argue that Plaintiffs will not discount at the point of sale, (*see id.* ¶¶ 299–304). In paragraphs 957 to 975, Mr. Kaplan "discuss[es] additional evidence related to the issue of possible surcharging and discounting" to argue that "such activity would be relatively limited"; that "even if merchants did choose to surcharge," consumers would just switch to American Express"; and that "discounting may have been an ineffective means of influencing customer behavior." (*Id.* ¶¶ 957–975.) In paragraphs 373 to 382, Mr. Kaplan describes Mastercard and Visa's response to competition from American Express and Discover in the late 1990s through the mid-2000s, (*see id.* ¶¶ 373–382), in order to argue that Plaintiffs' experts' claims about higher rewards cards do "not properly consider that these cards were introduced or reintroduced . . . because of new competitive 'supply' provided by American Express and Discover and the demand by consumers for higher reward cards," (*id.* ¶ 384.) He then re-summarizes this opinion at 399. (*Id.* ¶ 399.) In paragraphs 424 to 457, Mr. Kaplan uses record evidence about the benefits of payment cards to merchants to argue that Plaintiffs' experts fail "to properly measure and incorporate the benefits enjoyed by merchants when accepting payment cards from Visa and Mastercard." (*See id.* ¶¶ 424–457). In paragraphs 513 to 523, Mr. Kaplan uses record evidence to argue that Plaintiffs "had opportunities to access lower interchange fees in the actual world but chose not to," which "is inconsistent with the claims of [P]laintiffs' experts." (*See id.* ¶¶ 513–523.) In paragraphs 531 to 536, Mr. Kaplan uses record evidence about American Express to argue that "the credit merchant fees set by American Express . . . are generally <u>higher</u> than the but-for credit interchange benchmarks advanced by [P]laintiffs' experts." (*See id.* at ¶¶ 526, 531–536.) In paragraphs 543 to 546, he does the same with record evidence about Discover to argue that the "credit merchant fees negotiated between Discover and merchants appear <u>generally similar</u> to the default credit interchange fees set by Visa and Mastercard." (*See id.* ¶¶ 543–546.) In paragraphs

548 to 573, he describes Chase's experience with ChaseNet to argue that the resulting negotiated

fee levels are "well in excess of what [Plaintiffs' experts] predict would develop when issuing

banks negotiate with merchants directly in the but-for worlds they advance" and that Plaintiffs'

experts fail to explain "how Chase would have been able to gain any meaningful competitive

advantage with merchants over other issuing banks . . . even in the absence of the HAC Rules."

(*See id.* ¶¶ 548–573.)  In paragraphs 574 to 592, Mr. Kaplan uses record evidence to critique

Plaintiffs' experts' claims about issuing banks and their interpretation of internal Mastercard

documents.  (*See id.* ¶¶ 574–592.)  In paragraphs 595 to 598, Mr. Kaplan uses record evidence to

argue that "[a] number of [P]laintiffs chose to accept tender types with significantly higher fees

than those associated with the default interchange fees set by Visa and Mastercard," thereby

undermining Plaintiffs' experts' but-for projections.  (*See id.* ¶¶ 524, 595–598.)  In paragraphs

645 to 651, Mr. Kaplan cites to record evidence about co-brand cards to argue that "the

possibility of lower interchange fees does not necessarily guarantee the success of such cards,"

undermining Plaintiffs' experts' use of co-brand cards "in support of their opinions related to

but-for credit interchange benchmarks."  (*Id.* ¶¶ 630, 644–651.)  In paragraphs 746 to 752, Mr.

Kaplan uses record evidence about the FANF to set up his critique of Plaintiffs' experts' FANF

damage calculations.  (*See id.* ¶¶ 746–753.)  In paragraphs 767 to 770, Mr. Kaplan describes

Visa and Mastercard's explanations of why network fees increased in order to counter Plaintiffs'

experts' explanations.  (*See id.* ¶¶ 762–771.)  In paragraph 827, Mr. Kaplan "investigate[s] what

various [P]laintiffs [told] the public about their business performance," citing to "statements

made by various [P]laintiffs that are also public companies to their shareholders in 2011."  (*Id.* ¶

827.)  He uses these statements to challenge "the claims advanced by [P]laintiffs' experts and

various [P]laintiffs."  (*Id.* ¶ 828.)  Finally, in paragraphs 976 to 1044, Mr. Kaplan uses a variety

of record evidence relating to the Durbin Amendment, other payment cost savings and prices, 2018 federal tax law, and critiques of Professor Hausman's and Professor Harris's arguments to argue that lower interchange fees would not be passed through to consumers.  (*Id.* ¶¶ 976–1044.) All of this is acceptable expert testimony.

The Court also disagrees with the Direct Action Plaintiffs' claim about Mr. Kaplan's "lack of expert methodology."  (Kaplan Excl. Mem. 11.)  The Direct Action Plaintiffs refer to "many examples," but only cite examples of Mr. Kaplan comparing real-world rates to but-for benchmark rates, (*id.* at 11–12 & n.17, 8 & n.11), and argue that "such comparisons do not draw upon any expert skill," (*id.* at 12.)  First, as Defendants note, Mr. Kaplan's comparisons are in many places more complex than the Direct Action Plaintiffs acknowledge, (Kaplan Excl. Opp'n 13); for example, his comparison in paragraphs 115 and 116 incorporates an analysis of different issuing banks and networks' relative credit card volume, (*see* Kaplan Rep. ¶¶ 115–16.)  Second, even where the comparisons themselves are relatively basic, (*see, e.g.*, *id.* at ¶ 450 (comparing the cost to ███ of accepting credit cards to Plaintiffs' experts' benchmarks)), they are embedded in Mr. Kaplan's larger analysis of Plaintiffs' experts' damages estimates.  The fact that a lengthy and sophisticated analysis contains some relatively simple steps does not mean that the analysis is no longer the proper subject of expert testimony.

The Direct Action Plaintiffs also argue that these comparisons are "unhelpful to the jury" because "it is unsurprising that the victims of a cartel paid higher prices in the real world than they would have if the cartel had not existed."  (Kaplan Excl. Mem. 12.)  However, Mr. Kaplan does not blindly compare real-world prices to benchmark prices, but provides comparisons that are at least arguably relevant to assessing Plaintiffs' benchmarks.  In paragraph 221, for example, he compares ████████████████████████████████████ to Plaintiffs'

experts' but-for debit interchange fee, which is also intended to represent the result of negotiations.  (Kaplan Rep. ¶ 221; *see also id.* ¶ 213.)  The Direct Action Plaintiffs may seek to distinguish the real and but-for negotiations, but "[t]o the extent that Plaintiffs wish to dispute the interpretation of this evidence, a *Daubert* motion is an inappropriate stage in the litigation to do so."  *In re Digital Music*, 321 F.R.D. at 79.

The Court similarly declines to find that Mr. Kaplan's report is "riddled with credibility assessments."  (Kaplan Excl. Mem. 12.)  It is true that "'expert opinions that constitute evaluations of witness credibility' are precluded under Fed. R. Evid. 702, even when 'rooted in scientific or technical expertise.'"  *United States v. Noze*, 255 F. Supp. 3d 352, 353 (D. Conn. 2017) (quoting *Nimely*, 414 F.3d at 398).  This does not mean, however, that an expert must assume that everything said by all other witnesses in the case is accurate.  Rather, it means that "the Federal Rules of Evidence do not allow one party to call an expert to opine about the tendencies or incentives of the other party's fact witnesses to lie or not to lie."  *Id.* at 353–54.  Mr. Kaplan does not do this.  Rather, in the paragraphs cited by the Direct Action Plaintiffs, (*see* Kaplan Excl. Mem. 6 n.6, 12;Kaplan Excl. Reply 4–5), Mr. Kaplan points to evidence that interchange fees did not hamper Plaintiffs' business performance, despite Plaintiffs' testimony, (*see* Kaplan Rep. ¶¶ 145–148, 817–826); points to evidence that merchants in the but-for world would not engage in selective acceptance, (*id.* ¶¶ 168, 269, 272–278, 558, 941–945; Videotaped Dep. of David Kaplan ("Kaplan Dep.") 24:7–25, annexed to Carney Decl. as DDX117, Docket Entry No. 8547-3); points to evidence that merchants in the but-for world would not engage in surcharging or discounting, (Kaplan Excl. Mem. at ¶¶ 270, 282–303); and testifies that, regarding selective acceptance, "there are some tepid representations by some of the [P]laintiffs where 'we might try this' or 'we may do this' or 'we'll consider that,'" (Kaplan Dep. 63:17–

134

64:5).  Mr. Kaplan uses "tepid" to characterize *what the Plaintiffs said* — i.e., that they would possibly, but not definitely, engage in selective acceptance — rather than to characterize their demeanor or otherwise imply that they are lying.  While the Direct Action Plaintiffs may disagree with this interpretation of the evidence, it is nevertheless admissible.  Mr. Kaplan's citation to evidence that contradicts Plaintiffs' testimony is also admissible; a holding to the contrary — that these statements are inadmissible because they imply "that [Mr. Kaplan] does not believe merchants when they say their fees are excessive" — would prevent experts from disagreeing with fact witnesses altogether, a bizarre result.  (Kaplan Excl. Mem. 12.)

In addition, although some of Mr. Kaplan's opinions use the term "credible," he is not claiming that Plaintiffs' witnesses are not credible.  Rather, he is arguing that a credible threat is a prerequisite to the bargaining scenarios envisioned by Plaintiffs' experts, but that merchants in the but-for world will not be able to credibly threaten to use selective acceptance, surcharging, or discounting.  (*See, e.g.*, Kaplan Rep. ¶ 168; *see also* Harris Rep. ¶ 72; Videotaped Dep. Of Jerry Hausman ("Hausman Dep.") 131:5–25, 201:21–24, 213:25–214:1, annexed to Carney Decl. as Ex. DDX25, Docket No. 8544-4 (noting importance of "credible threat").)[24]

Finally, the Court does not exclude Mr. Kaplan's report on the basis that it "often pertain[s] to liability issues" even though Mr. Kaplan "has not analyzed liability."  (Kaplan Excl.

---

[24]  The Direct Action Plaintiffs also argue that Mr. Kaplan mischaracterizes the record when he claims that Plaintiffs are "unlikely to drop any particular cards" bu ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (Kaplan Excl. Mem. 12; Kaplan Rep. ¶ 951.)  The Direct Action Plaintiffs' criticism applies to some but not all of the sources Mr. Kaplan cites in the paragraph in question.  One of the sources refers to "not accept[ing] payment cards" in general, but another refers to "differentiat[ing] between different cards issued by different banks at the point-of-purchase."  (Kaplan Rep. ¶ 951.)  To the extent that some of these sources do not fully support Mr. Kaplan's claim, this goes to weight, not admissibility.  "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible."  *Amorgianos*, 303 F.3d at 267.

135

Mem. 13.)  As Mr. Kaplan testified, he did not opine about liability in that he did not opine about "whether the conduct at issue in this matter was consistent with the competitive outcome or an anticompetitive outcome."  (Kaplan Dep. 65:10–66:15.)  However, he did opine about both "the reliability, or lack thereof, of [P]laintiffs' damage . . . models" and "how . . . the but-for world would develop in the absence of the [challenged] conduct."  (*Id.* at 65:25–66:6.)  The Direct Action Plaintiffs, (Kaplan Excl. Mem. 13 & n.20, Kaplan Excl. Reply 4), challenge paragraphs that relate to how rewards can generate higher sales for merchants, (Kaplan Rep. ¶¶ 314–317); rewards as a mechanism by which issuers compete for customers, (*id.* ¶¶ 345–348); rewards increases as a competitive response to American Express and Discover, (*id.* ¶¶ 373–382, 399); ChaseNet, (*id.* ¶¶ 548–573); merchants' ability to drop Visa or Mastercard cards, (*id.* ¶¶ 513–517); issuer differentiation, (*id.* ¶¶ 574–589); the competitive effects of Visa's routing strategy post-Durbin, (*id.* ¶¶ 678–689); and Plaintiffs' business performances, (*id.* ¶ 827).  Each of these discussions is relevant to damages in that they pertain to the assumptions underlying Plaintiffs' experts' but-for world.  For example, Mr. Kaplan discusses ChaseNet in order to argue that it represents "a pattern of conduct that is inconsistent with the but-for worlds advanced by [P]laintiffs' experts."  (*Id.* ¶ 551.)  His discussion is structured to respond to Plaintiffs' experts' claims regarding ChaseNet's negotiated fee levels.  (*See id.* ¶¶ 557, 565, 567.)  As Visa Defendants argue, just because these same facts are also relevant to liability issues does not make them irrelevant to Mr. Kaplan's but-for world analysis.  (Kaplan Excl. Opp'n 15.)

Accordingly, the Court does not exclude any portions of Mr. Kaplan's report on the basis that it is an improper factual narrative, lacks methodology, assesses witness credibility, or is addressed to liability.

### iv. Mr. Kaplan's "lost profits" opinions

The Direct Action Plaintiffs argue that Mr. Kaplan's testimony "would confuse the jury by impermissibly applying inapposite lost profits concepts." (Kaplan Excl. Mem. 14.) They claim that the Direct Action Plaintiffs' damages have properly been "calculated based on the traditional overcharge theories of damages," and that Mr. Kaplan's report improperly applies lost profits concepts to this analysis. (*Id.* at 13–14.) The Direct Action Plaintiffs further argue that Mr. Kaplan improperly considers "the benefits the Direct Action Plaintiffs supposedly received from accepting Visa and Mastercard payment cards in evaluating damages," which they claim is contrary to the Supreme Court holding in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968). (*Id.* at 14.) Finally, they claim that "Mr. Kaplan also contends that the jury should consider the Direct Action Plaintiffs' profit margins in evaluating their damages claims," which "would further confuse the jury" because "[t]he fact that the Direct Action Plaintiffs' businesses have not declined as a result of the supracompetitive interchange and network fees is legally irrelevant." (*Id.* at 14–16.)

In response, Defendants argue that Mr. Kaplan invokes lost sales and benefit to merchants in order to critique Plaintiffs' experts' predictions about the outcomes of negotiations between issuers and merchants in the but-for world. (Kaplan Excl. Opp'n 18–19.) They also note that Mr. Kaplan specifically states that he does not propose offsets for lost profits, but rather "limit[s] [his] opinions to the issue of how the possibility of lost sales likely would affect the outcome of negotiations between merchants and issuing banks in [P]laintiffs' but-for worlds." (*Id.* at 20 (alterations in original).) Regarding Mr. Kaplan's statement in his report that "antitrust damages represent the difference in the financial position of the plaintiff in" the actual and but-for worlds, Defendants claim that this statement "introduced Mr. Kaplan's discussion of

a methodological error some of Plaintiffs' experts made" by failing to properly net "negative" overcharges against "positive" overcharges.  (*Id.* at 19–20.)

The Court excludes only minimal portions of Mr. Kaplan's "lost profits" opinions.  The Direct Action Plaintiffs cite to paragraph 66 and footnote 88, paragraphs 82 to 84, 145 to 148, 199 to 202, 340, 402, 413, 474 to 477, 817 to 843, 951, 1174, 1179 and footnote 2781, and exhibits 134 to 141.  (Kaplan Excl. Mem. 6–7 n.8, 14 n.22, 15 n.26.)  In paragraph 66, Mr. Kaplan states that he "discuss[es] the issue of lost sales for two reasons": first, the possibility of lost sales would reduce merchants' negotiating leverage in the but-for world, and second, Plaintiffs' experts' damage calculations do not take into account lost sales in the but-for world.  (Kaplan Rep. ¶ 66.)  In footnote 88, Mr. Kaplan adds:

> From an economic perspective, such lost sales and profits should be "offset" against the damages calculated by [P]laintiffs' experts. If it were deemed legally impermissible to actually apply any such offset, I would limit my opinion to the role any such possible lost sales would have on the ability of merchants to successfully negotiate lower relevant fees when negotiating with issuing banks in the but-for world.

(*Id.* at n.88.)  Mr. Kaplan is correct that such offsets are "legally impermissible."  *See In re Electronic Books Antitrust Litig.*, No. 11-MD-2293, 2014 WL 1282293, at *17 (S.D.N.Y. 2014) ("[A]n antitrust defendant may not alter this well-settled measurement of damages by speculatively raising potential offsets."); *id.* at *20 (noting that the defendant "may not avoid liability for overcharging a customer by speculating that that customer may have been better off paying the overcharge than being unable to purchase the good at all").  Indeed, Defendants do not defend a "lost profits" analysis.  (Kaplan Excl. Opp'n 18–20.)  However, this paragraph and footnote also explain an admissible and relevant rationale for discussing lost sales — merchant negotiating leverage in the but-for world.  The Court excludes the last sentence of paragraph 66, stating that lost sales "have not been taken into account in the damage calculations advanced by

plaintiffs' experts," as well as footnote 88, stating that "lost sales and profits should be 'offset' against the damages calculated by [P]laintiffs' experts." (Kaplan Rep. ¶ 66 & n.88.) The Court does not exclude paragraphs 82 to 84, 340, 413, 474 to 477, and 951, which discuss the benefits and costs to merchants of accepting payment cards, or paragraphs 145 to 148, 199 to 202, 817 to 843, and exhibits 134 to 141, which discuss Plaintiffs' business performance and fee levels relative to Plaintiffs' profits, because all are relevant to the dynamics of but-for world negotiations. However, the Court notes that, in keeping with excluded paragraph 88, Mr. Kaplan must "limit [his] opinion to the role any such possible lost sales would have on the ability of merchants to successfully negotiate lower relevant fees when negotiating with issuing banks in the but-for world." (Kaplan Rep. n. 88.) Any statement in these paragraphs to the contrary is excluded.

Mr. Kaplan states in paragraph 1174 of his report that:

> Properly calculated antitrust damages represent the difference in the financial position of the plaintiff in a world where the conduct at issue took place, or the actual world, and one where it did not, or the but-for world. When advancing any such analysis, any difference in the financial position of the plaintiff between the actual world and the but-for world <u>must be considered in its entirety based on sound economic reasoning.</u> Most importantly, if a plaintiff benefited in some way in the actual world and that benefit would not exist in the but-for world, any such benefit <u>must be netted</u> against any claimed damage suffered by a plaintiff when comparing the two worlds. For example, if the interchange fee applicable to a plaintiff's transactions in the actual world is lower than that plaintiff experienced in the but-for world, any such benefit <u>must be netted</u> against any calculated overcharge. By calculating damages using this method, one is calculating the <u>actual net damages</u> suffered by the plaintiff and not allowing the plaintiffs to inappropriately exclude undercharges.

(*Id.* ¶ 1174.) Mr. Kaplan goes on to claim that Mr. Hutchins employs this methodology by "net[ting] 'negative damages'" against positive damages in situations "where the actual interchange fee applicable to The Home Depot was lower than the but-for interchange fee." (*Id.*

139

¶ 1175.)  However, Professor Hausman does not net negative damages "if for a given plaintiff and year, the result of his calculation is a negative number," which Mr. Kaplan describes as a "mistake:" Mr. Kaplan contends that "[d]amages should reflect the difference in the economic circumstances for any given plaintiff comparing the relevant fees in the actual world to those in the but-for world <u>in their entirety</u>, including netting any possible overcharges with savings (or here negative damages) the plaintiff experienced in the actual world that it would not have experienced in the but-for world."  (*Id.* ¶¶ 1176–1178.)  In paragraph 1179, Mr. Kaplan states that in his alternative damage calculations, he "adopt[s] the proper method of calculating damages by netting any benefits experienced by a plaintiff against any positive damages."  (*Id.* ¶ 1179.)  In footnote 2781, he adds:

> Various literature discusses this issue of net damages.  For example, the ABA publication Proving Antitrust Damages represents that "antitrust damages can be quantified by comparing the plaintiff's actual profit (in a lost profit case), purchase prices (in an overcharge case), or the like, against what the plaintiffs would have enjoyed absent the illegal conduct."  (ABA Overcharges, at p. 89.)  The Litigation Services Handbook represents that when calculating damages, "losses are measured as the difference between the earnings the plaintiff would have received if the harmful event had not occurred, and the earnings [the] plaintiff has received or will receive, given the harmful event" and that the proper analysis "considers the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position."  (Litigation Services Handbook, at pp. 5.2 and 5.4.)

(*Id.* at n.2781.)

The Court does not exclude most of this language.  As Defendants note, (Kaplan Excl. Opp'n 20), the Direct Action Plaintiffs do not move to exclude Mr. Kaplan's critique about "negative damages" itself.  Rather, their concern is that Mr. Kaplan "impermissibly appl[ies] inapposite lost profit concepts."  (Kaplan Excl. Mem. 14.)  However, the challenged paragraphs do not argue that Plaintiffs' damages should be computed in terms of their lost profits, but rather

140

that the overcharge calculation should subtract "negative damages" in all situations "where the actual interchange fee applicable to [a Plaintiff] was lower than the but-for interchange fee." (*Id.* ¶ 1175.) This is not an argument about whether the Court should apply an overcharge or lost profits theory, but about *how* the overcharge theory should be applied. For purposes of this motion, the Court does not decide whether Mr. Kaplan is correct on this issue or whether Professor Hausman is correct that "it does not make economic sense for a plaintiff to be expected to make a payment in a given year to a defendant who has violated the antitrust laws." (Hausman Reply Rep. ¶ 880.) Rather, the Court declines to exclude Mr. Kaplan's opinions as advancing a "lost profits" theory where it does not do so. The exception is the second sentence of footnote 2781, which quotes the Litigation Services Handbook as stating that "losses are measured as the difference between the *earnings* the plaintiff would have received if the harmful event had not occurred, and the *earnings* [the] plaintiff has received or will receive, given the harmful event." (Kaplan Rep. n.2781 (emphasis added).) Because this does appear to articulate a lost profits damages theory — without also acknowledging an overcharge theory, as in the footnote's previous quotation from Proving Antitrust Damages — the Court excludes this sentence. *See Drug Mart Pharmacy v. Am. Home Prods.*, 296 F. Supp. 2d 423, 429 (E.D.N.Y. 2003) (applying overcharge theory to antitrust case).[25]

---

[25] The Court also notes that at least some of the language in Mr. Kaplan's report would seem to be excessively broad. From a legal perspective it is not always the case, as Mr. Kaplan claims, that "if a plaintiff benefited in some way in the actual world and that benefit would not exist in the but-for world, any such benefit must be netted against any claimed damage suffered by a plaintiff when comparing the two worlds." (Kaplan Rep. ¶ 1174.) *See In re Electronic Books Antitrust Litig.*, No. 11-MD-2293, 2014 WL 1282293, at *17 (S.D.N.Y. 2014) (noting that "an antitrust defendant may not alter this well-settled measurement of damages by speculatively raising potential offsets" and concluding that "the jury's task in assessing damages will be confined to multiplying the relative overcharge by the actual purchase prices of [the defendant's products] during the class period"). However, because Mr. Kaplan uses this language not to

The Court does not exclude Section VII of Mr. Kaplan's report, which the Direct Action Plaintiffs claim improperly "assum[es] that lost sales need to be offset but admit[s] that might not be legally permissible"; Section IX, which they claim improperly "refer[s] to lost profits due to the benefits of accepting cards as an 'omitted variable'"; or Section XXIII, which they claim improperly "discuss[es] merchant performance." (Kaplan Excl. Mem. 6 n.8.) Section IX discusses the "omitted . . . economic factor" of "benefits to merchants provided by the use of credit and debit cards," which is relevant to merchants' bargaining positions in the but-for world, (Kaplan Rep. ¶ 413), and Section XXIII discusses merchant performance, which is relevant for the same reason, (*see id.* at ¶¶ 817–818). The Court excludes part of paragraph 268, contained in Section VII, in which Mr. Kaplan states that he discusses the issue of lost sales for two reasons: first, because it is relevant to merchants' bargaining position in the but-for world, and second, because it is Mr. Kaplan's opinion that "such lost sales and profits should be 'offset' against any claimed damages in order to accurately measure any harm to a given plaintiff caused by the conduct at issue." (*Id.* at ¶ 268.) As in footnote 88, Mr. Kaplan adds that "such an offset might not be deemed allowable for legal reasons," in which case he "limit[s] [his] opinions to the issue of how the possibility of lost sales likely would affect the outcome of negotiations . . . in [P]laintiffs' but-for worlds." (*Id.*) The Court excludes the portion of paragraph 268 in which Mr. Kaplan opines that the "lost sales and profits should be 'offset' against any claimed damages," but does not otherwise exclude Section VII.

---

argue that all speculative potential offsets are legitimate but rather to make an argument for how overcharge damages should be calculated, the Court does not exclude this language. Rather, Direct Action Plaintiffs can cross-examine him and the Court will instruct the jury on calculating damages.

Accordingly, the Court excludes the second sentence of footnote 2781 as improperly describing a "lost profits" damages theory.

### v.   Mr. Kaplan's but-for world opinions

The Direct Action Plaintiffs argue that Mr. Kaplan "*assumed* that the but-for world would be the 'same or very similar' to the actual world" and based his subsequent analysis on this assumption.  (Kaplan Excl. Mem. 16.)  They contest three specific elements of Mr. Kaplan's but-for world analysis: his analysis of merchants, his analysis of issuers, and his analysis of merchant pass-on.  (Kaplan Excl. Mem. 17–24.)[26]

In response, Defendants argue that "Mr. Kaplan did not assume anything," but rather "sets forth extensive evidence and economic principles that undermine *Plaintiffs' experts' assumptions*."  (Kaplan Excl. Opp'n 21.)

### 1.   But-for analysis of merchants

The Direct Action Plaintiffs argue that Mr. Kaplan improperly compares the Direct Action Plaintiffs' but-for benchmarks with results of real-world interchange negotiations, "in which the HAC Rules require merchants to negotiate only with networks in an 'all or nothing' proposition."  (Kaplan Excl. Mem. 17.)  They claim that this approach "runs counter to bedrock antitrust principles that the but-for world must assume the *removal* of the restraint at issue."  (*Id.* at 18.)  The Direct Action Plaintiffs argue that although caselaw shows "expert[s] using actual-world data . . . as a *starting* data point to control or otherwise adjust their models," there are no

---

[26]   The Direct Action Plaintiffs also argue that Mr. Kaplan's "lack of a coherent economic methodology, bargaining analysis, or analytical rigor in his but-for-world analysis was apparent at his deposition," where he allegedly confused the Nash bargaining solution with Nash equilibrium.  (Kaplan Excl. Mem. 17 n.31.)  As Defendants point out, Plaintiffs do not actually argue that this alleged error informed Mr. Kaplan's analysis.  (Kaplan Excl. Opp'n 25.)  The Court therefore does not to consider whether Mr. Kaplan did or did not err in his comments  at his deposition.

cases showing "that a damages expert may use outcomes tainted by the anticompetitive conduct as a standalone critique of a plaintiff's damages." (Kaplan Excl. Reply 7.)  Similarly, they acknowledge that their own experts use real-world data, but argue that they do so only in their liability analyses, "not as standalone bases for benchmarking damages." (*Id.* at 8.)  The Direct Action Plaintiffs argue that merchants' unwillingness to stop accepting some networks' cards in the real world is not a reasonable proxy for their willingness to engage in selective acceptance in the but-for world because that analysis "depends on whether the HAC Rules gave Visa and Mastercard market power." (*Id.* at 8–9.)  They further point to Mr. Kaplan's testimony that he did not analyze liability issues and argue that "[a]n expert cannot offer *any* reliable analysis on an issue that he admittedly has not studied." (Kaplan Excl. Mem. at 19.)  The Direct Action Plaintiffs claim that Mr. Kaplan's opinions about merchants in the but-for world rely on opinions about liability, including whether the HAC rules gave Visa and Mastercard market power over merchants and whether the HAC rules barred issuer competition for merchant acceptance. (*Id.* at 18–19.)  Finally, the Direct Action Plaintiffs claim that Mr. Kaplan's arguments about American Express's agreements with merchants rely on "whether Defendants' HAC Rules and their anticompetitive effects drove up American Express rates, another liability question." (Kaplan Excl. Reply 9.)

In response, Defendants argue that "[e]xamining parties' real-world behavior from a period during which purportedly anticompetitive conduct occurred is an acceptable method by which an expert witness may reach conclusions about how those parties would behave in the but-for world." (Kaplan Excl. Opp'n 23.)  They claim that Plaintiffs' failure to "engage in the various selective options available to them in the real world" — for example, declining to accept American Express cards — "is reliable economic evidence that they would be unlikely to have

engaged in selective acceptance in the but-for world." (*Id.* at 24.)  They also note that Plaintiffs'

own experts "consider[] real-world interchange fee negotiations with networks by merchants

such as Costco, Amazon, and Walmart to support *their* predictions about the but-for world." (*Id.*

at 24–25.)  Defendants further argue that Mr. Kaplan does not offer liability opinions about

whether the HAC rules gave Visa and Mastercard market power over merchants or whether the

HAC rules bar issuer competition for merchant acceptance. (*Id.* at 26–28.)  Rather, Mr. Kaplan

opines that issuers in the but-for world would have leverage comparable to the leverage of

issuers in the real world and that issuer competition in certain real-world contexts is evidence of

how issuer-merchant negotiations would unfold in the but-for world. (*Id.*)  Defendants argue that

these are "independent damages opinions" that are "separate from any liability issues." (*Id.* at

28.)

      The Court does not exclude Mr. Kaplan's but-for analysis of merchants.  First, while it is

true that "[t]he proper measure of damages in a suit concerning a price-fixing conspiracy is 'the

difference between the prices actually paid and the prices that would have been paid absent the

conspiracy,'" *In re Electronic Books*, 2014 WL 1282293, at *16 (quoting *New York v.*

*Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077 (2d Cir. 1988)), this does not mean that experts

may not use real-world situations and data to inform their damages opinions.  The Direct Action

Plaintiffs advance a theory under which use of real-world data "taint[s]" an expert's damages

proxies such that the expert's damages opinions are inadmissible unless the data are used "only

as a *starting* data point." (*See* Kaplan Excl. Reply 7–8.)  However, they cite to no cases in

support of this principle.  The Direct Action Plaintiffs may argue at trial that Mr. Kaplan's

comparisons are unpersuasive, including because Mr. Kaplan's but-for world is "*still tainted* by

the anticompetitive restraints *to the same extent* as the actual world." (*Id.* at 8.)  Given the

"[d]eference to experts" that is "particularly appropriate when expert testimony concerns soft sciences like economics," *Hughes v. The Ester C Co.*, 317 F.R.D. 333, 341 (E.D.N.Y. 2016), Mr. Kaplan is allowed to opine that, for example, the result of real-world negotiations between merchants and networks is indicative of possible results between these groups in the but-for world.

Second, the Court does not exclude Mr. Kaplan's but-for opinions about merchants on the basis that they contain "veiled liability opinions." (Kaplan Excl. Mem. 18.) The Direct Action Plaintiffs argue that Mr. Kaplan's conclusions rest on the liability opinions that "the HAC Rules did not give Visa and Mastercard substantial market power over merchants," that "the HAC Rules did not bar issuer competition for merchant acceptance," (*id.*), and that the HAC rules did not "dr[i]ve up American Express rates," (Kaplan Excl. Reply 9.) As noted above, Mr. Kaplan did not opine about "whether the conduct at issue in this matter was consistent with the competitive outcome or an anticompetitive outcome," but did opine about both "the reliability, or lack thereof, of [P]laintiffs' damage . . . models" and "how . . . the but-for world would develop in the absence of the [challenged] conduct." (Kaplan Dep. at 65:10–66:6.) It is difficult to understand how any expert could opine on damages without assuming that the but-for world would be similar or different from the real world in certain ways. For example, if Mr. Kaplan had assumed that the HAC rules *do* give Visa and Mastercard substantial market power over merchants such that real-world interchange fees are not comparable to but-for fees, this too would be a "liability opinion" according to the Direct Action Plaintiffs. The Court does not exclude Mr. Kaplan's opinions on the basis that they rely on improper "liability opinions," although the Direct Action Plaintiffs may critique his assumptions about the effects of the HAC rules on cross-examination.

146

## 2.   But-for analysis of issuers

The Direct Action Plaintiffs argue that Mr. Kaplan "simply rejects the hypothesis that issuers would have competed for merchant acceptance in the but-for world to differentiate their products and gain new cardholders" without "engag[ing] in bargaining or economic analysis of issuers' competitive incentives."  (Kaplan Excl. Mem. 19–20.)  They critique Mr. Kaplan's claim that payment cards would maintain widespread acceptance in the but-for world "in response to consumer demand," arguing that "the same demand" would also "have exerted pressure on issuers and networks to compete for acceptance."  (*Id.* at 20.)  They argue that "any reliable methodology purporting to analyze negotiations in the but-for world must examine both merchants' *and issuers'* risks and incentives," but that Mr. Kaplan "simply began with the conclusion that issuers would not have faced any competitive pressure to negotiate with merchants in the but-for world," (Kaplan Excl. Reply 10), and "speculative[ly]" asserted "that issuers would not take merchants' selective acceptance strategies seriously," (Kaplan Excl. Mem. 20).  The Direct Action Plaintiffs further argue that Mr. Kaplan's opinion is contradicted by Defendants' other liability expert Professor Murphy, who "acknowledges that [] competition for acceptance through bilateral negotiations *would have* put pressure on interchange rates."  (*Id.* at 21.)

In response, Defendants argue that Mr. Kaplan's opinion that issuers would not compete for merchant acceptance is based on his "analysis of the benefits of payment card acceptance to merchants," which leads him to conclude "that those benefits would likely cause issuers to doubt that merchants would follow through on the threats of selective acceptance that Plaintiffs' experts envision in the but-for world."  (Kaplan Excl. Opp'n 22.)  Defendants further argue that Mr. Kaplan's and Professor Murphy's opinions are not inconsistent because both experts

147

"conclude that interchange fees in the but-for world are unlikely to fall to the levels theorized by Plaintiffs' experts." (*Id.* at 4.)  They claim that "to the extent Plaintiffs perceive there to be any tension between Mr. Kaplan's and Prof. Murphy's opinions, that would go to weight, not admissibility."[27] (*Id.* at 30.)

The Court agrees with Defendants.  Mr. Kaplan opines that issuers in the but-for world would not be motivated to reduce interchange rates because merchants could not credibly threaten to engage in selective acceptance, which the Direct Action Plaintiffs characterize as a "baseless presumption[]" and "*ipse dixit*."  (Kaplan Excl. Mem. 19–20.)  This opinion, however, is based on the very analysis of the benefits of payment cards to merchants that the Direct Action Plaintiffs challenge as improper narrative testimony, (*id.* at 11), and "legally inappropriate," (*id.* at 14–15).  The Direct Action Plaintiffs may claim in their legal argument and on cross-examination that this conclusion is incorrect or that it fails to consider all the incentives faced by issuers, but the Court does not find it so "speculative" as to warrant exclusion.  (*Id.* at 20.)  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Nor is the Court concerned about contradictions between Mr. Kaplan's and Professor Murphy's opinions.  The Direct Action Plaintiffs point to Professor Murphy's opinions that issuers "might find it unilaterally profitable in the short term to negotiate exclusive acceptance

---

[27]  The parties also disagree about Mr. Kaplan's references to "pass-on," with the Direct Action Plaintiffs arguing that pass-on is a "contested liability question" that Mr. Kaplan nevertheless expounds on even though his "narration of his view of the evidence is not a proper subject of expert testimony," (Kaplan Excl. Mem. 22), and Defendants claiming that Mr. Kaplan "discussed the notion of pass-on by merchants *only to critique Plaintiffs' economic experts' efforts to introduce that concept*," (Kaplan Excl. Opp'n 28).  The Court addresses these arguments in the next section.

relationships with some merchants" and that in the absence of the HAC rules a large merchant could demand "very favorable interchange" from issuers.[28]  (Kaplan Excl. Mem. 21.)  In response, Defendants point to Professor Murphy's testimony that he "ha[s]n't seen any evidence that [interchange] would substantially go one way or the other," noting that this is "consistent with Mr. Kaplan's damages opinion."  (Kaplan Excl. Opp'n 30 (alterations in original).)  Even assuming that Professor Murphy and Mr. Kaplan do disagree about whether issuers would feel pressure to bargain with merchants in the but-for world, the Court does not exclude Mr. Kaplan's opinion on this basis.  While courts have expressed skepticism about whether "fundamental disagreements between a party's <u>own</u> experts can be considered a mere 'battle of the experts,'" *In re LIBOR*, 299 F. Supp. 3d at 481, the Court does not consider a disagreement about whether issuers and merchants may negotiate for lower interchange in the short term to be so "fundamental" as to warrant exclusion.[29]  Further, the Direct Action Plaintiffs argue that they "did not point to Defendants' liability experts to show disagreement with Mr. Kaplan," but rather to highlight those experts' "recognition that issuers also would have felt pressure to bargain in the but-for world, and that any reliable methodology purporting to analyze negotiations in the but-for world must examine both merchants' *and issuers'* risks and incentives."  (Kaplan Excl. Reply 10.)  While this argument would be persuasive if the Court fully agreed with Professor

---

[28]  The Direct Action Plaintiffs also cite to Professor Kenneth G. Elzinga's opinion that issuers could gain a "private advantage" through bilateral negotiations with merchants.  (Kaplan Excl. Reply 9–10 n.16.)  Professor Elzinga is an expert for Defendants.  (Expert Rep. of Kenneth G. Elzinga 2, annexed to Szanyi Decl. as Ex. SJDX 388, Docket Entry No. 8526-12.)

[29]  Notably, the court in *In re LIBOR* did not exclude the plaintiffs' challenged expert's opinions solely because they contradicted the opinions of the plaintiffs' other experts.  *See In re LIBOR*, 299 F. Supp. 3d 430, 476–89 (S.D.N.Y. 2018) (stating that the expert's opinions were not only inconsistent with the plaintiffs' other expert's opinions but also "internally inconsistent" and inconsistent with the "plaintiffs' own allegations").

Murphy's or Professor Elzinga's opinions about issuer incentives, the Court concludes that Mr. Kaplan provides sufficient evidence and analysis to support his opinion. (*See* Kaplan Rep. ¶¶ 162–68.) The Court leaves the ultimate credibility and correctness of the experts' opinions to the factfinder. *See Washington*, 105 F. Supp. 3d at 326 (noting that "it is the function of the factfinder, utilizing the 'conventional devices' of cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof,' to determine which is the more trustworthy and credible" (quoting *In re Zyprexa*, 489 F. Supp. 2d at 285)).

### 3. Pass-on analysis

The Direct Action Plaintiffs argue that Mr. Kaplan's opinions about "pass-on" are both "wholly speculative" and "irrelevant *as a matter of law* to his damages opinions" because "'pass-on' cannot be invoked as a defense to overcharge damages" under *Hanover Shoe*. (Kaplan Excl. Mem. 23.) They claim that Mr. Kaplan opines "that issuers would not have been willing to reduce interchange rates in a but-for world, unless they were comfortable that such reductions *would have been* passed on to customers," which "relates to a contested liability question, *i.e.* whether the anticompetitive conduct reduced output." (*Id.* at 21–22.) Further, they claim that Mr. Kaplan "points to *no evidence* that issuers faced with losing critical acceptance would ever consider pass-on, or merchant profitability, when deciding whether to bargain," and that his relevant opinion is "raw speculation." (Kaplan Excl. Reply 6.) The Direct Action Plaintiffs argue that Mr. Kaplan "devotes 36 pages of his report to narrating his personal view of the evidence" on this subject, even though "Mr. Kaplan's narration of his view of the evidence is not a proper subject of expert testimony." (Kaplan Excl. Mem. 22.) They also argue that it is not the case that Mr. Kaplan's discussion of pass-on is a proper rebuttal of Plaintiffs' experts' opinions

because "Professor Hausman and Professor Harris analyzed pass-on *solely as part of their liability analyses on output* and not as part of their damages analyses." (Kaplan Excl. Reply 6.)

      In response, Defendants argue that Mr. Kaplan "discussed the notion of pass-on by merchants *only to critique Plaintiffs' economic experts' efforts to introduce that concept* to support *their* conclusions regarding but-for world prices and transaction volume." (Kaplan Excl. Opp'n 28.) Defendants claim that Plaintiffs' experts' theories rely on the idea that lower interchange would be passed through from merchants to consumers, and that without this pass-on, "issuers would have no self-interested reason to . . . adopt a new business model that relied on providing lower costs to merchants." (*Id.*) Defendants argue that Mr. Kaplan's conclusion that "'it is much more likely that merchants would keep the savings' rather than pass them on to consumers" is "an appropriate and admissible rebuttal opinion concerning Plaintiffs' experts' proffered but-for worlds." (*Id.* at 29.)

      In the paragraphs cited by the Direct Action Plaintiffs, (Kaplan Excl. Mem. 5 n.4, 11 n.15), Mr. Kaplan states that Plaintiffs' experts "advance two arguments" in response to the claim that issuing banks would be reluctant to reduce interchange and thus risk reducing use of payment cards, (Kaplan Rep. ¶ 976). The second of these arguments is that "in response to reductions in interchange fees, merchants would reduce prices to consumers and that, as a result, use of payment cards would not be adversely affected in the but-for world." (*Id.* ¶ 977.) Mr. Kaplan argues that "[a]vailable evidence does not support [this] conclusion," but rather "supports the conclusion that it is much more likely that merchants would keep the savings to improve their profits or spend the funds for some other purpose that did not directly result in lower prices to consumers." (*Id.*) He claims that "issuing banks likely would be very reluctant" to deviate from the status quo and that Professor Stiglitz concluded that "one would expect a shift in economic

benefits to merchants at the expense of cardholders" in the but-for world. (*Id.* ¶¶ 978–979.) He then discusses evidence about merchant pass-on from the post-Durbin Amendment market, (*id.* ¶¶ 980–987); evidence from other cost savings and prices, (*id.* ¶¶ 988–993); evidence from the 2018 federal tax law, (*id.* ¶¶ 994–996); evidence from the use of co-brand cards, (*id.* ¶¶ 997–998); and evidence from outside the United States, (*id.* ¶ 999). Finally, he critiques the "three empirical analyses" that Professor Hausman "contends support the conclusion that lower interchange fees would be passed on to consumers," (*id.* ¶¶ 1000–1030), and the evidence that Professor Harris claims "indicate[s] that merchants pass a substantial share of interchange fee costs on to their customers," (*id.* ¶¶ 1031–1044).

The Court does not exclude these paragraphs. First, Mr. Kaplan reviews evidence about merchant pass-on in order to argue that reductions in interchange fees would not spur consumer demand, and therefore that issuers would be reluctant to lower interchange fees. (*Id.* ¶ 976–977.) He is thus not merely "narrating his personal view of the evidence" but using it to render an opinion. (Kaplan Excl. Mem. 22.) Second, while pass-on does "relate[] to a contested liability question," it is also relevant to Mr. Kaplan's damages opinion because it bears on issuers' incentives in the but-for world. (*Id.*) Third, the Court does not find Mr. Kaplan's opinion to be "raw speculation" that "points to *no evidence* that issuers faced with losing critical acceptance would ever consider pass-on, or merchant profitability, when deciding whether to bargain." (Kaplan Excl. Reply 6.) While the Direct Action Plaintiffs certainly may challenge this lack of evidence on cross-examination, the Court concludes that it is reasonable to assume that issuers would be apprised of merchant incentives and behavior. *See MacQuestern Gen. Contracting, Inc. v. HCE, Inc.*, 99-CV-8598, 2002 WL 31388716, at *2 (S.D.N.Y. Oct. 22, 2002) (noting that

claims "that the assumptions relied on by an expert are unfounded is generally an argument that goes to the weight rather than the admissibility of the evidence").

Finally, the Court does not exclude these paragraphs as contrary to *Hanover Shoe*.  In that case, the Supreme Court affirmed the Court of Appeals' rejection of the antitrust defendant's "passing-on" defense that "the illegal overcharge during the damage period was reflected in the price charged" by the plaintiff to its customers.  *Hanover Shoe*, 392 U.S. at 487–88.  As Defendants point out, "Mr. Kaplan is arguing that merchants would *not* pass on changes in interchange costs to consumers, which is the opposite of a pass-on defense."  (Kaplan Excl. Opp'n 29.)  Further, the Court disagrees with the Direct Action Plaintiffs' characterization of Mr. Kaplan's opinion as "contend[ing] that because . . . merchants will absorb price increases or savings, they are not entitled to damages."  (Kaplan Excl. Mem. 24.)  Leaving aside that it is not clear why merchants would not be entitled to damages to compensate losses they did *not* pass on, Mr. Kaplan's opinion — taken in context — is clearly about issuers' incentives to reduce interchange in the but-for world, which is a proper subject of his opinion.

Accordingly, the Court does not exclude Mr. Kaplan's pass-on opinions.

### vi.   Conclusion

The Court grants in part Direct Action Plaintiffs' motion to exclude portions of the report and opinions of Mr. Kaplan as to paragraphs 204, 324 to 328, 412, footnote 88, the second sentence of footnote 2781, and portions of paragraphs 66 and 268, and otherwise denies the motion.

## III.   Conclusion

For the foregoing reasons, the Court denies the Direct Action Plaintiffs' motions to exclude the report and opinions of Mr. Harvey, Professor Kahn, and Dr. Teece.  The Court grants

the Direct Action Plaintiffs' motion to exclude part of paragraph 42 of Professor Hubbard's

report and paragraphs 204, 324 to 328, 412, footnote 88, the second sentence of footnote 2781,

and portions of paragraphs 66 and 268 of Mr. Kaplan's report.  The Direct Action Plaintiffs'

motions to exclude are otherwise denied.

Dated:  October 9, 2022
        Brooklyn, New York

                          SO ORDERED:


                          _____/s/ MKB_____
                          MARGO K. BRODIE
                          United States District Judge